# EXHIBIT A

IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

STEVEN IVANKOVICH,   CASE NO.: _____

    Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP, an
Illinois limited liability partnership, and
JOSEPH SEINITZ, an individual.

    Defendants.
_____/

## COMPLAINT

Steven Ivankovich ("***Steven***") sues Schiller, DuCanto & Fleck, LLP ("***Schiller Firm***") and Joseph Seinitz ("***Seinitz***"), and alleges as follows:

### Jurisdiction, Venue and the Parties

1. This is an action for damages in excess of $750,000, exclusive of interest, costs, and attorney's fees.

2. Steven is a resident of Miami-Dade County, Florida.

3. The Schiller Firm is a law firm based in Chicago, Illinois, specializing in family law.

4. Upon information and belief, Seinitz is a resident of Fort Pierce, Florida. Seinitz was formerly employed by certain of Steven's family members, or their affiliated entities.

1

## The Marital Dissolution Proceeding

5. Around October 29, 2021, Jeanette Ivankovich ("***Jeanette***") hired the Schiller Firm to represent her in a divorce action against Steven pending in the Circuit Court of Cook County, Domestic Relations Division ("***Cook County Court***"), Case No. 2021-D0009220 ("***Divorce Proceeding***").

6. Steven and Jeanette have two children who live with Jeanette in Chicago.

7. Steven's parents have provided and continue to provide extensive financial support for the children, including private school tuition, extracurricular activities, clothing, housing, food, and private club membership dues.

8. Notwithstanding the extensive financial support provided by Steven's parents, on May 4, 2024, pursuant to 750 ILCS 5/713(a), the Cook County Court issued a Body Attachment Order ("***BAO***") as to Steven for not appearing in court pursuant to a court order and for personally not paying child support in the amount of $672,559.41.[1]

9. On September 13, 2024, pursuant to 750 ILCS 5/713(a), the Cook County Court entered a second BAO as to Steven holding him in "*indirect civil contempt*" for not paying an interim attorney's fee award entered against him in favor of the Schiller Firm for $425,000 ("***Schiller Fee Award***").

## The Schiller Firm Seeks Over $2.5 Million in Fees From Steven

10. The Schiller Firm claims to be owed attorney's fees and costs that far exceed the Schiller Fee Award.

---

[1] This BOA has since expired.

11. According to an affidavit of Tanya Jo Stanish, Esq. ("***Stanish***"), a Senior Partner at the Schiller Firm who leads Jeanette's representation, the Schiller Firm has been paid $16,672.00 since inception of the Divorce Proceeding, and as of September 29, 2025, the Schiller Firm was owed **$2,529,936.73** ("***Outstanding Fees***") in fees and costs related to Jeanette's representation.

12. While Jeanette is its client, the Schiller Firm has always looked to Steven or his parents to pay its Outstanding Fees.

13. The amount of Outstanding Fees has attracted the attention and focus of the Schiller Firm's senior management, and, upon information and belief, has caused the Schiller Firm financial distress.

14. Upon information and belief, the Schiller Firm has grown increasingly desperate, despondent, and frustrated with Steven for not having paid the Schiller Fee Award, as well as for refusing to pay its Outstanding Fees.

### Stanish and the Schiller Boast to be "Fierce" Attorneys

15. The Schiller Firm promotes, advertises, and boasts to the public in its YouTube channel that Stanish is a "fierce" attorney.

16. The Mirriam Webster dictionary provides the following four sets of formal definitions to the term "fierce": (1) (a) "violently hostile or aggressive in temperament" and (b) "given to fighting or killing"; (2) (a) "marked by unrestrained zeal or vehemence" and (b) "extremely vexatious, disappointing, or intense"; (3) "furiously active or determined"; and (4) "wild or menacing in appearance."[2]

---

[2] *See* https://www.merriam-webster.com/dictionary/fierce#:~:text=2-,a,extremely%20vexatious%2C%20disappointing%2C%20or%20intense

17. Stanish and the Schiller Firm sought to be fierce – as that term is defined in the Mirriam Webster dictionary – towards Steven to collect the Outstanding Fees it desperately wanted paid.

### The Islamorada House, Seinitz, and the Security Camera

18. Seinitz, while employed by Steven's family, installed at least one Soliom brand security camera ("*Security Camera*") within the front entrance of a house located in Islamorada, Monroe County, Florida ("*Islamorada House*") that Steven on occasion occupied. The Security Camera had the capability to view multiple portions of the property, including the front driveway, the front door, and a portion of the backyard of the Islamorada House.

19. The Security Camera was programmed to transmit data, including video recordings, to Soliom's cloud storage, which could be accessed through an Access Key ID

20. Through at least April 28, 2025, the account associated with the Security Camera, the unique device identifier, the SIM card integrated circuit card identifier, and the Access Key ID were registered to and controlled and monitored by Seinitz.

21. After his termination, Seinitz was requested to (a) delete his remote access to live feed of the Security Camera; (b) no longer use any access or control over, with, or connected to the Security Camera; and (c) turn over all relevant information, access, and control over, with, or connected to the Security Camera, such as the Access Key ID.

### Steven Arrives at the Islamorada House, is Surreptitiously and Wrongfully Surveilled, and then Wrongfully Arrested

22. On April 28, 2025, Steven arrived at the Islamorada House.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

23. Unbeknownst to Steven and his family, as Seinitz's former employer, the Islamorada House was being wrongfully and surreptitiously surveilled through the Security Camera. Upon information and belief, including because he installed the Security Camera and no one else had access to the Security Camera, Seinitz did so, possibly in concert with others.

24. The Schiller Firm was notified, upon information and belief by Seinitz, that Steven was at the Islamorada House and directed its first-year associate attorney Kevin Cremoux, Esq. ("***Kevin***"), to contact the Monroe County Sheriff's Office ("***MCSO***") to request that MCSO execute on two outstanding "warrants" for Steven and to take Steven into custody.

25. On April 28, 2025, the day Steven arrived at the Islamorada House, Kevin made numerous telephone calls to MCSO to facilitate Steven's arrest by MCSO, including providing Steven's full name and date of birth, the address of the Islamorada House, and the assurance that there were valid "civil warrants" for Steven's arrest.

26. MCSO's records reflect that the MCSO dispatcher understood Kevin was "CALLING FROM CHICAGO PD."

27. Upon diligent investigation, Kevin did not disclose to the MCSO dispatcher that he was an attorney in private practice with the Schiller Firm – a **monetary** creditor of Steven's – who was unaffiliated with any law enforcement, let alone the Chicago Police Department.

28. To encourage and entice MCSO to take Steven into custody, Kevin warned MCSO that Steven was armed and would resist by attempting to flee.

29. The Schiller Firm's factual representations (transmitted by Kevin to law enforcement) were false and baseless.

30. Ostensibly, the purpose of taking Steven into custody and imprisoning him was to facilitate his extradition to Illinois. But this was a façade.

31. The Schiller Firm was motivated by its interest as a civil creditor of Steven, i.e., the Outstanding Fees.

32. Pursuant to 750 ILCS 22/801, the Illinois governor may demand extradition where an individual has been charged ***criminally*** for failure to pay support obligations.

33. The "warrants" referenced by Kevin were the BAOs entered in the Divorce Proceeding, neither of which found Steven in criminal contempt nor charged Steven with any crime.

34. Indeed, at or around this time, Kevin – who lamented being subjected to "*a lot of pressure*" from his bosses at the Schiller Firm – regularly emailed the Cook County Sheriff's Office (in Illinois) and the Summit County Sheriff's Office (in Colorado) to have the BAOs (1) labeled in national criminal databases Leads[3] and NCIC[4] as "nationwide extraditable"; and (2) viewable by sheriff offices outside Illinois.

35. Upon information and belief, the Schiller Firm's goal was to manipulate and mislead MCSO into believing Steven was armed and dangerous so that MCSO would act quickly and aggressively to apprehend and take Steven into custody, or worse.

36. The Schiller Firm knew or should have known there was no lawful basis for the MCSO to execute on these warrants or otherwise imprison Steven. The Schiller Firm knew or should have known that if taken into custody, Steven was not subject to and did not meet the criteria

---

[3] https://leadsonline.com/
[4] National Crime Information Center.

for extradition to Illinois because he had not been charged with a crime or held in criminal contempt.

37. The Schiller Firm knew or should have known that the only reason for MCSO to apprehend and imprison Steven was to facilitate his extradition to Illinois. If extradition was not possible, then the Schiller Firm knew that there was no legitimate basis to apprehend and imprison Steven.

38. Nevertheless, the Schiller Firm went to great lengths to cause Steven to be imprisoned in Monroe County.

39. The Schiller Firm was motivated by its own financial interests to apply pressure on Steven or his parents to collect the Outstanding Fees.

40. On April 28, 2025, the same day Steven arrived at the Islamorada House, at approximately 3:15 PM, based on the Schiller Firm's wrongful and false representations, two MCSO officers entered the property at the Islamorada House and arrested Steven (who was armed only with a cigar).

41. Video footage from the Security Camera recorded the MCSO officers as they entered and walked about the property.

42. The footage reflects that the Security Camera was remotely accessed and controlled to track the officers. Upon information and belief, Seinitz did so, viewing the scene unfold through the Security Camera he had installed, manipulating the camera remotely to improve his view as the officers moved about the property.

43. One officer went through a neighbor's property to enter the back of the Islamorada House. The officer demanded Steven come down a staircase from the back porch. Alarmed, Steven

7

asked the officer to explain the reason for entering the property unannounced. Rather than do so, the officer came up the stairs and placed Steven in handcuffs as the second officer pointed a taser gun at Steven and shouted "*Do not resist!*"

44. Steven complied. He did not resist. The officers detained Steven in handcuffs on the porch for approximately 25 minutes waiting for the MCSO dispatcher to "confirm the warrant."

45. While detained, the officers informed Steven that MCSO was called by "Cook County" and had an "extraditable warrant" for Steven's arrest.

46. Then, while barefoot in shorts and a t-shirt, Steven was placed cuffed in the backseat of a MCSO cruiser and taken into custody.

47. At no point during his detainment or arrest did Steven resist or attempt to flee the scene. At no time did Steven attempt to use the cigar as a weapon.

48. Steven was confined and imprisoned at the Monroe County Detention Facility in Plantation Key and later moved to the detention facility in Key West.

49. Upon information and belief, the Schiller Firm represented to counsel for MCSO that Illinois would extradite Steven.

50. At all relevant times, the Schiller Firm knew there was no basis to imprison Steven in Monroe County because the Schiller Firm knew full well there was no legal basis to extradite Steven to the State of Illinois.

51. The Schiller Firm's goal was to deprive Steven of his freedom, violate his most basic civil rights, interfere with the enjoyment of his life, and cause him distress, all towards the goal of either (1) punishing Steven for not having paid the Outstanding Fees the Schiller Firm

desperately sought; or (2) causing Steven (or his elderly parents), while he was incarcerated, to cause the Outstanding Fees to be paid.

52. The Schiller Firm has great animosity towards Steven, including for not paying the Schiller Fee Award, and the Outstanding Fees, and its professionals relished in Steven not knowing if or when he would finally be released from his wrongful imprisonment.

### The Next 35 Days

53. While Steven was in custody, Schiller Firm attorneys, including Kevin, Stanish, and general counsel Bridget Maul, regularly communicated with MCSO's general counsel to ensure Steven *remained* in custody.

54. On May 29, 2025, a month after Steven's arrest, Steven's counsel filed a renewed *Petition For Writ Of Habeas Corpus to Immediately Release the Defendant and Alternatively an Order to Show Cause on an Expedited Basis Against the Monroe County Sheriff's Office*, which was heard on May 30, 2025, by Monroe County Circuit Court Judge Mark Wilson.

55. The Schiller Firm attended the May 30th hearing.

56. After the May 30th hearing, the Schiller Firm filed an emergency motion in Cook County Court seeking an order directing the Governor of Illinois to issue the interstate extradition warrant, conceding no Governor's warrant was in process. The Schiller Firm's goal was to increase Steven's period of imprisonment even though it knew or should have known that no warrant would be issued.

57. Circuit Judge Wilson continued the May 30th hearing to June 4th and ordered that at the continued hearing the Monroe County State Attorney's Office ("*MCSAO*") and MCSO must

9

identify specific contacts it had with Illinois law enforcement and/or the Cook County State Attorney to reflect that Illinois indeed was pursuing extradition.

58. On Monday, June 2, 2025, MCSO and MCSAO confirmed that Cook County in fact would not pursue a Governor's warrant to extradite Steven.

59. Rather than proceed with a futile June 4th hearing, MCSAO acknowledged that Steven was required to be released immediately because the truth was that Illinois was not seeking to extradite him. *See* **Exhibit 1**.

60. The text of Judge Wilson's Order states as follows:

> **AGREED ORDER FOR EMERGENCY RELEASE**
>
> **THIS CAUSE** having come before the Court on May 31, 2025 on Petitioner's "Petition for Writ of Habeas Corpus to Immediately Release the Defendant and Alternatively an Order to Show Cause on an Expedited Basis Against the Monroe County Sheriff's Office," with the Court having read the file and heard argument of counsel, it is hereby
> **ORDERED AND ADJUDGED** that:
> 1. Upon representation from the Monroe County State Attorney's Office on June 2, 2025, Cook County, Illinois has confirmed that they will not extradite Steven Ivankovich; and
> 2. The Court GRANTS Petitioner's motion for immediate release and directs the Monroe County Sheriff's Office to release Petitioner, Steven Ivankovich immediately.
> **DONE AND ORDERED** in Chambers at the Monroe County Courthouse, Key West, Florida, on Monday, June 2, 2025.

61. Steven was imprisoned for approximately 35 days before being liberated on June 2, 2025.

### Steven's Intent to Take Discovery and Amend the Complaint as Appropriate

62. Steven's privacy was invaded and he spent 35 days involuntarily confined in jail in South Florida and intends to learn the full extent of all participants involved.

63. On August 19, 2025, Schiller Firm Senior Partner Stanish was deposed in connection with the firm's (failed) effort to prevent four entities affiliated with the Ivankovich family from confirming a Chapter 11 bankruptcy plan of reorganization. The Schiller Firm opposed the plan even though it provided for Steven's parents to create and fund a support trust with $316,392 for their grandchildren, the children of Steven and Jeanette (this amount to be exclusive of support payments for Jeanette). However, the plan preserved the right to challenge the Schiller Firm's fees. At her deposition, Stanish testified (emphasis added):

> Q: **Did you communicate or speak with Mr. Seinitz about detaining or incarcerating Mr. Ivankovich** from anywhere prior to his detention or incarceration?
>
> (objection by Stanish's counsel)
>
> A: **I'm going to claim work product privilege** as well.
>
> \*\*\*
>
> Q: Well, **did you ever communicate with him prior to Mr. Ivankovich's detention** in Monroe County?
> A: Again, I'm not – **I'm going to refuse to answer that.**
> Q: And my question to you in that regard is did you speak to Mr. Seinetz (sic) about detaining or incarcerating [Steven] prior to [Steven's] detention or incarceration in May of 2025?
> A: Same response. I've never spoken with Mr. Seinetz (sic) in connection with the bankruptcy proceeding, and **as it relates to the divorce proceeding, I'm claiming attorney-client work product.**

64. Plainly, the Schiller Firm secured Seinitz's cooperation to cause Steven to be wrongfully detained and incarcerated. Upon information and belief, that cooperation included having Seinitz serve as an informant for the Schiller Firm as to when Steven was at the Islamorada House and related information.

65. Steven intends to take discovery in connection with, among other things: (1) Seinitz's access and control over the Security Camera; (2) Seinitz's relationship, communications, and concert of action with the Schiller Firm; (3) the details of Schiller Firm's written and oral

11

communications with Seinitz; (4) how the Schiller Firm knew that Steven was at the Islamorada House on the very day he got there, and successfully convinced law enforcement to arrive at that very moment; (5) the extent of the financial pressure and motivation of the Schiller Firm given the Outstanding Fees; (6) the details of just how much "*pressure*" Kevin felt the Schiller Firm subjected him to cause Steven's wrongful incarceration; and (7) anyone who had any role or any connection with the Schiller Firm (including its attorneys and outside consultants) and / or Seinitz related to these matters. Such discovery may lead to additional counts.

66. Steven reserves the right to amend this Complaint as appropriate.

## COUNT I – FALSE IMPRISONMENT
### (The Schiller Firm)

67. Plaintiff realleges paragraphs 1–66 as if fully set forth herein.

68. Due to the Schiller Firm's actions and misrepresentations to MCSO, Steven was unlawfully detained, against his will, and deprived of his liberty for 35 days.

69. The Schiller Firm was the direct cause of Steven's arrest and imprisonment, despite the Firm knowing that Steven was not subject to extradition because he had not been charged let alone convicted of a crime, nor found in criminal contempt.

70. The Schiller Firm did so knowingly and intentionally, and such actions were unreasonable and unwarranted. The Schiller Firm committed this wrongdoing to extract payment of the Outstanding Fees from Steven and/or his elderly parents.

71. As a result of the Schiller Firm's actions, Steven has suffered damages.

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory damages and costs of this action, and such further relief as the Court deems just and proper. Steven reserves the right to seek punitive damages in accordance with applicable law.

### COUNT II – MALICIOUS PROSECUTION
### (The Schiller Firm)

72. Plaintiff realleges paragraphs 1– 66 as if fully set forth herein.

73. Due to the Schiller Firm's actions and misrepresentations to MCSO, Steven was unlawfully detained, against his will, and deprived of his liberty for 35 days, and a criminal proceeding was commenced against him in Monroe County.

74. The Schiller Firm caused the initiation of Steven's incarceration and participated throughout by manipulating and attempting to mislead the MCSO and the Monroe County Court.

75. The proceeding was terminated in Steven's favor when Judge Wilson ordered Steven's immediate release (with the agreement of the MCSAO) finding that Illinois would not extradite Steven.

76. The Schiller Firm lacked probable cause to initiate Steven's arrest and the criminal proceeding.

77. The Schiller Firm knew or should have known that there was no basis to arrest Steven and have him incarcerated in Monroe County.

78. The Schiller Firm acted with malice and for an improper purpose, including to intimidate, retaliate against, or otherwise harm Steven in order to try to extract payment of the Outstanding Fees from Steven and/or his parents.

79. As a result, Steven has suffered damages.

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory damages and costs of this action, and any other relief the Court deems appropriate. Steven reserves the right to seek punitive damages in accordance with applicable law.

### COUNT III – ABUSE OF PROCESS
### (The Schiller Firm)

80. Steven realleges paragraphs 1–66 as if fully set forth herein.

81. The Schiller Firm made use of legal process, including but not limited to invoking law enforcement and initiating detention procedures, for an ulterior purpose not intended by law.

82. The Schiller Firm knew or should have known that Illinois would not extradite Steven from the State of Florida.

83. The Schiller Firm knew or should have known there was no justifiable basis for MCSO to arrest Steven in the first place because he was not subject to extradition.

84. Nevertheless, not only did Schiller Firm cause Steven's arrest, it used the MCSO and the courts to keep Steven incarcerated.

85. The Schiller Firm used legal process in a manner not proper in the regular conduct of proceedings, including knowingly misrepresenting the legal basis for arrest, knowingly inducing a baseless arrest, causing the arrest to pressure or coerce Steven and his elderly parents, and attempting to extend Steven's baseless incarceration.

86. The Schiller Firm's conduct constituted a willful and intentional misuse of legal process to achieve improper ends, such to retaliate against, intimidate, and otherwise harm Steven in order to extract payment of the Outstanding Fees from Steven and/or his elderly parents.

87. As a result, Steven suffered damages.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory damages and costs of suit, and all further relief deemed proper by the Court. Steven reserves the right to seek punitive damages in accordance with applicable law.

### COUNT IV – INTRUSION UPON SECLUSION
### (Seinitz)

88.  Steven realleges paragraphs 1–66 as if fully set forth herein.

89.  At all relevant times, including on April 28, 2025, Seinitz had access and control of the Security Camera without Steven's consent.

90.  Steven maintained a reasonable expectation of privacy in the curtilage of Islamorada House.

91.  Seinitz intentionally intruded, through electronic means, into Steven's private quarters by accessing, controlling, viewing, and monitoring the Islamorada House and Steven at the Islamorada House without Steven's consent.

92.  Seinitz's intrusion is highly offensive to a reasonable person, as it invaded areas and activities that Steven reasonably expected to remain private.

93.  As a direct and proximate result of Seinitz's intrusion, Steven has suffered damages.

WHEREFORE, Steven demands judgment against Seinitz for compensatory damages and costs of suit, and all further relief deemed proper by the Court. Steven reserves the right to seek punitive damages in accordance with applicable law.

## DEMAND FOR JURY TRIAL

Steven demands a trial by jury on all issues so triable.

Dated: October 21, 2025.

                                                  Respectfully submitted,

                                                  */s/Michael S. Budwick*
                                                  Michael S. Budwick, Esquire
                                                  Florida Bar No. 938777
                                                  mbudwick@melandbudwick.com
                                                  MELAND BUDWICK, P.A.
                                                  3200 Southeast Financial Center
                                                  200 South Biscayne Boulevard
                                                  Miami, Florida 33131
                                                  Telephone: (305) 358-6363
                                                  Telecopy: (305) 358-1221

                                                  *Attorneys for Plaintiff*

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT, IN AND FOR MONROE COUNTY, FLORIDA
## LOWER KEYS FELONY DIVISION

**STEVEN IVANKOVICH**　　　　　Case Nos. 2025-CF-498-A-K
　　　　　　　　　　　　　　　　　　　2025-CF-499-A-K
v.

**SHERIFF RICK RAMSEY**
**Sheriff Monroe County Florida**
_____/

## AGREED ORDER FOR EMERGENCY RELEASE

**THIS CAUSE** having come before the Court on May 31, 2025 on Petitioner's "Petition for Writ of Habeas Corpus to Immediately Release the Defendant and Alternatively an Order to Show Cause on an Expedited Basis Against the Monroe County Sheriff's Office," with the Court having read the file and heard argument of counsel, it is hereby

**ORDERED AND ADJUDGED** that:

1. Upon representation from the Monroe County State Attorney's Office on June 2, 2025, Cook County, Illinois has confirmed that they will not extradite Steven Ivankovich; and

2. The Court GRANTS Petitioner's motion for immediate release and directs the Monroe County Sheriff's Office to release Petitioner, Steven Ivankovich immediately.

**DONE AND ORDERED** in Chambers at the Monroe County Courthouse, Key West, Florida, on Monday, June 2, 2025.

_[signature]_
Judge Mark Wilson, Acting Circuit Judge
44-2025-CF-000499-000AKW 06/02/2025 05:13:06 PM

**EXHIBIT 1**

| | |
|---|---|
| Cara Higgins<br>cara227@aol.com | Cara Higgins<br>cara@carahigginslaw.com<br>amy@carahigginslaw.com<br>christine@carahigginslaw.com |
| Kara Freeman<br>kara@carahigginslaw.com | State Attorney's Office<br>sao@keyssao.org |
| Carter Reeves<br>creeves@keyssao.org | Catherine Frederick<br>cfrederick@monroe-clerk.com |
| Monroe County Detention Center<br>ddeihl@keysso.net<br>mlindback@keysso.net<br>jailrecords@keysso.net<br>amiller@keysso.net<br>jlinares@keysso.net | Riza Hall<br>rtabag@monroe-clerk.com |
| Elaine Hollowood<br>ehollowood@monroe-clerk.com | |

**EXHIBIT 1**