# Composite Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

STEVEN IVANKOVICH, )
)
Plaintiff, )
)
vs. ) No. 1:25-cv-25402-KMW
)
SCHILLER, DUCANTO & FLECK, )
LLP, and JOSEPH SEINITZ, )
)
Defendants. )

VOLUME I - Pages 1 through 173

The discovery deposition of JAMES A. DOPPKE, JR., taken under oath on Wednesday, May 20, 2026, at 70 West Madison Street, Suite 2060, Chicago, Illinois, pursuant to the Rules of the Supreme Court of Illinois and the Code of Civil Procedure, before Katie K. Elliott, Certified Shorthand Reporter No. 084-004537, commencing at 10:20 a.m., pursuant to notice.

APPEARANCES:

BRODSKY FOTIU-WOJTOWICZ, PLLC, by
MR. JOSHUA TRUPPMAN
(44 West Flagler Street, Suite 2200
Miami, Florida 33130
305.503.5054
joshua@bfwlegal.com)
appeared on behalf of the plaintiff;

APPEARANCES: (Cont'd)

KONICEK & DILLON, PC, by
MR. RAMSES JALALPOUR
(21 West State Street
Geneva, Illinois 60134
630.262.9655
rj@konicekdillonlaw.com)
appeared on behalf of the defendants.

ALSO PRESENT:

Ms. Kathleen Opal, Dussias Wittenberg & Koenigsberger, Counsel for Ivankovich in different case (observing).

* * * * * * *

I N D E X


| Witness: | Page |
|---|---|
| JAMES A. DOPPKE, JR. | |
| Examination by: | |
| Mr. Jalalpour............... | 4 |




E X H I B I T S


| No. | Description | Marked/Referenced |
|---|---|---|
| 1 | Expert Report of Deponent............. | 8 |
| 2 | Supplemental Expert Report............ | 43 |
| 5 | Plaintiff's Objections and Responses to SDF's First Set of Interrogatories.. | 50 |
| 7 | Email - Bates 2548.................... | 56 |
| 9 | Text Message Chain - Ivankovich and Hand.................................. | 67 |
| 13 | Monroe County Sheriff's Office - Call History............................... | 105 |
| 17 | Order - Ivankovich v. Ivankovich - 12/20/2024............................ | 128 |
| 18 | Hearing Transcript - Ivankovich v. Ivankovich - 11/6/2024................ | 120 |
| 19 | Excerpt Hearing Transcript - Ivankovich v. Ivankovich - 12/20/2024.. | 129 |
| 20 | Various Emails Between Colin Luce, Cathy Ryan, Kevin Cremoux, Chris Kimble - 4/28/2025.................... | 161 |
| 21 | Various Emails Between Kevin Cremoux, Colin Luce and others - First Page 4/28/25................................ | 142 |
| 23 | Email From Colin Luce to Chris Kimble - 4/24/2025.......................... | 169 |
| 24 | Various Rules of Professional Conduct.. | 172 |


(Exhibits attached/scanned.)

C E R T I F I E D Q U E S T I O N S

PAGE/LINE

58/7
60/18
\- - -



(Witness sworn.)

MR. JALALPOUR: First, can we get everybody's names on the record? I'll start off.

Ramses Jalalpour here on behalf of the defendants in this matter, Schiller DuCanto & Fleck and Joseph Seinitz.

THE WITNESS: The witness, Jim Doppke of Robinson Stewart Montgomery & Doppke, LLC.

MR. TRUPPMAN: Joshua Truppman from Brodsky Fotiu-Wojtowicz, on behalf of the plaintiff.

MS. OPAL: Katie Opal from Dussias Wittenberg Koenigsberger. I am Steven Ivankovich's counsel in the divorce case, and I am just here in my capacity as an observer today.

JAMES A. DOPPKE, JR.

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. JALALPOUR:

**Q. Mr. Doppke, can you please state and spell your name for the record.**

A. Name is James, J-a-m-e-s; A; Doppke, D, as in David, o-p-p-k-e, Jr.

**Q. Mr. Doppke, how much time did you**



**prepare -- how much time did you spend preparing for today's deposition?**

A. I spent about 45 minutes last night preparing.

**Q. And in those 45 minutes, what were you doing?**

A. I was reviewing the opinions, the written opinions I prepared, the original and supplemental.

**Q. Okay. Did you review any other documents?**

A. I reviewed documents that were forwarded to me by counsel actually from the Meland Budwick firm from recent production from the Cook County Sheriff's Office. They were additional emails that were produced.

Other than that, no other documents.

**Q. Okay. So do you recall what the Bates numbers were or how they were Bates labeled?**

A. I'm afraid I don't. They were -- the name of the witness they relate to is Luce, L-u-c-e. He's a Cook County sheriff's officer.

**Q. Okay. And did you review all those -- all those documents that were sent over?**

A. I reviewed about nine PDF files that contained probably somewhere between nine and 20 emails, given that there are chains of emails.

**Q. Okay. And in that 40 minute -- 45 minutes of deposition preparation, did you meet or speak with anybody?**

A. Not in those 45 minutes, no.

I did also meet with counsel Mr. Truppman, counsel Will Rosenzweig from Meland Budwick, Ms. Opal, Mr. Wittenberg, and another -- Tiffany Winchester also from the Meland Budwick firm. That was on Monday.

**Q. So that was a meeting you had on Monday?**

A. Yes.

**Q. And how long was that meeting?**

A. Approximately an hour.

**Q. And was that in preparation for the deposition or not necessarily?**

A. It -- we discussed the fact that the deposition was coming up. It was not really a prep session.

**Q. Okay. So in other words, you would have had that meeting regardless of the deposition.**

A. I believe so.



**Q. Okay. How many times have you been retained as an expert witness in a case?**

A. My CV would reflect the correct number, but I believe it's somewhere between four and six. I can't exactly fix on it right off the top of my head.

**Q. And in those four to six cases, were you retained to opine on ethical issues?**

A. Yes.

**Q. Okay. And for the four to six cases, were you -- can you specify whether you were retained by a plaintiff or defendant?**

A. I know it was defense in one case. Another was I was retained by someone who actually was seeking -- seeking support for legal malpractice claims against the law firm, but they wound up being the defendant in a case that the law firm filed for fees. So really sort of a plaintiff but technically a defendant.

The others I can think of were defense.

**Q. Okay. So then is it fair to say you were -- you've only been retained once prior to this engagement to opine about that an attorney did**



**violate ethical rules?**

A. I believe that's correct.

**Q. And what case was that?**

A. I'm trying to remember.

Do you have a copy of my CV, or were you going to use that -- mark that as an exhibit?

**Q. Yes. Okay.**

**So let's go ahead and share that. This will be Exhibit No. 1.**

(Deposition Exhibit No. 1, Witness Doppke, was marked for identification 05/20/2026.)

BY MR. JALALPOUR:

**Q. And for the record, Exhibit No. 1 is your original expert report, correct?**

A. That's correct.

The expert engagement in which I was retained on behalf of a plaintiff was the matter listed on page 5 of my CV as Brusic, et al., versus Brusic-Simms, et al. Brusic is B-r-u-s-i-c.

**Q. And who was the attorney you provided an opinion about?**

A. I'm sorry. I don't remember his name off the top of my head.



**Q. In that case, did you opine that that attorney committed ethical violations?**

A. I did.

**Q. What was -- do you know what the conclusion of that case was?**

A. It was settled.

**Q. You've got three other cases listed here under Expert Engagements in your curriculum vitae. Do you see that?**

A. I do.

**Q. Apart from the cases listed here, are there any other cases in which you've been retained as an expert?**

A. No. There was -- the reason I thought it was more than four was because there was another case in which I had been retained as a consultant by a law firm and wound up testifying at a deposition. But I was not really an expert in that case.

**Q. The other three cases here listed, all three you testified in favor of the attorney that was being sued; is that correct?**

A. It's true as to the Lincoln Park 2550 Homeowners' Association case, and it's true in regard to Jilani versus Cann.

The 8th Juror versus Kovac case, that's the one where I was an expert for Mr. Kovac who was a client of a law firm, which then assigned its interest in fees to a company or an entity called 8th Juror, Limited, which sued Mr. Kovac. So I was opining about the conduct of the attorney who had billed Mr. Kovac for fees and then assigned them to 8th Juror, Limited.

**Q. And in that case, you opined that that attorney committed ethical violations?**

A. Well, I opined concerning that attorney's billing practices. I don't recall if I concluded that they violated or if I was asked to conclude that they violated the Rules of Professional Conduct, but I was opining concerning his billing practices.

**Q. And what was the result of the 8th Juror case?**

A. That was resolved on other grounds unrelated to the other matters opined on.

**Q. And what was the resolution in the Lincoln Park case?**

A. I don't know. That has -- I was deposed in that matter. I believe last I had heard it was



proceeding to a mediation, and that was sometime ago. And I don't know -- I haven't been asked to do anything else about it since. I don't know what the result was.

**Q. Have you -- in any of these cases listed in your CV, were you engaged by the Wittenberg law firm?**

A. No.

**Q. Have you ever had any cases involving Mr. Wittenberg or his law firm before --**

A. No.

**Q. -- this case?**

**In this case, who were you retained by?**

A. I was retained by the Meland Budwick firm in Florida.

**Q. And you've disclosed certain opinions, correct?**

A. Yes.

**Q. When you were retained, what was your understanding as to which proceeding your opinion would be used in?**

A. The proceeding captioned Ivankovich versus Schiller DuCanto & Fleck and Seinitz, the



case pending in the Southern District of Florida, Miami Division.

**Q. And you understand that there is a pending divorce case between Steven Ivankovich and his wife, Jeanette Ivankovich, correct?**

A. I do.

**Q. Was it your understanding when you signed your expert report that your report would also be used in a divorce proceeding?**

A. No.

**Q. Are you aware that it has been used in a divorce proceeding?**

A. Yes.

**Q. And when were you made aware of that?**

A. Shortly after I submitted it to an attorney at Meland Budwick.

**Q. And did you approve of that?**

A. Yes.

**Q. Have you ever spoken to Steven Ivankovich?**

A. No.

**Q. In preparing your expert report or your supplemental report, did you speak with anybody from the Wittenberg firm?**



A. Not in preparing the original report. But in preparing the supplemental report, I did.

**Q. And with respect to the supplemental report, did your opinions in your supplemental report rely on any information provided by the Wittenberg firm?**

A. Yes.

**Q. And what information was that?**

A. It should be spelled out in the supplemental report itself, but just I had discussions with Mr. Wittenberg and Ms. Opal concerning the information that was available to them concerning the matter. Mr. O'Hara's report was the principal basis for the supplemental, though that came to me through the Meland Budwick firm.

**Q. Okay.**

A. I don't recall if I was given additional documentation by the Wittenberg firm in relation to the supplemental report. I don't think so. But I did have discussions with them about it.

**Q. And so what specific information did the Wittenberg firm provide to you that you relied upon in signing your supplemental report?**

A. Just their observations about the

O'Hara -- Mr. O'Hara's conclusions and which I had discussed with them, but I formulated my own opinions based on those discussions, based on my review of Mr. O'Hara's report, and my own knowledge of the materials I had previously reviewed.

**Q. And what opinions did they provide that helped you incorporate into your opinion?**

A. Well, it was just a -- it was a discussion of their understanding of the -- the matters that Mr. O'Hara had discussed pertaining to, for example, Mr. Seinitz's conduct in obtaining what I'll call surveillance images of Mr. Ivankovich, their observations of Ms. Stanish's conduct in court in the divorce matter, things of that nature.

**Q. And what -- let's start with the Joseph Seinitz aspect.**

**And is it okay if we call him Seinitz for the rest of today's deposition?**

A. Yes.

**Q. Okay. What did the Wittenberg firm provide to you in terms of information about Seinitz?**

A. One thing they provided me was a copy of a pleading. So this was a document that I relied on



in the supplement. I'm recalling this now.

A document that -- it was a pleading that Ms. Stanish had filed in the divorce case that had to do with service or a jurisdictional issue, and that it concerned the conduct of Mr. Seinitz in preparing an affidavit relating to service.

The pleading called into question Mr. Seinitz's veracity in that affidavit and in general, and attempted to expose him as a person of poor character who wrote racist posts and posted them on Facebook.

I don't know the truth of those allegations, but that's what the -- that's what the pleadings said.

**Q. Is that relevant at all to your opinions in this case?**

A. It didn't alter my opinions.

**Q. Is it -- that's not my question.**

**Is that information regarding Seinitz relevant at all to your opinions in this case?**

A. It was relevant to my understanding of what the Schiller firm knew or understood themselves about Seinitz.

**Q. Okay. You stated earlier these -- the**



**documents you reviewed touched on Seinitz's veracity.**

**You used the word "veracity."**

**Do you recall that?**

A. Yes.

**Q. Is there another way to phrase that is information about his credibility?**

A. The pleading that Ms. Stanish filed suggested that Seinitz -- Seinitz's affidavit relating to service, whatever it said, should not be believed.

**Q. And did that affect your opinion as to Mr. Seinitz's credibility as to matters outside of that affidavit?**

A. It affected my understanding of the Schiller firm's knowledge and positions they had taken about his credibility. That is, it indicated to me that they thought that he was someone who was not worthy of trust.

**Q. Okay.**

A. If I can interject, I did think there was a prep -- a dep prep session that I omitted to mention that was about a week before this deposition. And I apologize, I thought of the



first -- the meeting we had on Monday first, but then there was a meeting that I had, again with the same attorneys present that I discussed before.

**Q. And that meeting a week ago, you describe as a deposition preparation meeting?**

A. Yes.

**Q. And how long did that last?**

A. Again about an hour.

**Q. And who -- I know you referenced it was the same group, but could you for the record say who was in attendance?**

A. This time it was Ms. Opal, Mr. Wittenberg, Mr. Truppman, Mr. Rosenzweig from the Meland Budwick firm, and I believe that's it. And myself.

**Q. Okay. And by that time, you were aware that your expert report had been used in the divorce proceeding, correct?**

A. Yes.

**Q. Have you sent or received any emails from the Wittenberg firm?**

A. I believe so. I know there were emails concerning the scheduling of the meeting on Monday, and I believe the other emails that I have exchanged

with the Wittenberg firm principally concern matters like that, scheduling and logistics of meetings.
Other than that, I don't believe that I've had extended or substantive discussions with them over email.
**Q. Who assisted you in drafting your original expert report, if anybody?**
A. No one assisted me. I did it myself.
**Q. Okay. And did anybody assist you in drafting the supplemental report?**
A. No.
**Q. Okay. Turning back to Exhibit No. 1, which is your expert report, correct?**
A. That is. Yes, it is.
**Q. Okay. And if you turn to page 11, that's your electronic signature there, correct?**
A. It is.
**Q. And you placed that on the document, correct?**
A. I did.
**Q. And you did your best to ensure that everything in your expert report was truthful and accurate to the best of your knowledge before signing off on the report, correct?**



A. To the best of my knowledge, yes.
But I did allow for the fact that this matter is in discovery, and I could be alerted to other facts or changes in facts as the matter proceeds.
**Q. Okay. And in this case, you're making some pretty serious allegations of misconduct against two attorneys in Illinois, correct?**
A. I -- in the report, I identify areas in which I believe in my opinion their conduct is inconsistent with the Rules of Professional Conduct.
**Q. Okay. Would you consider those serious allegations?**
A. I think that -- I mean, I take legal ethics matters seriously in all aspects of my practice. So in that sense, yes.
**Q. And so you had even more incentive to ensure that everything in your report was truthful and accurate to the best of your knowledge considering the content of what's in your report, correct?**
A. I -- I ensured that what I was writing was correct to the best of my ability.
**Q. Okay.**



A. And I did take that seriously, yes.
**Q. You didn't just opine as to attorneys' so-called misconduct just because you were being paid to say that, correct?**
MR. TRUPPMAN: Objection to the form.
You can answer.
THE WITNESS: That's correct.
BY MR. JALALPOUR:
**Q. And for the record, you're being paid $450 an hour --**
A. That's correct.
**Q. -- with respect to your services in this case, correct?**
A. That's correct.
**Q. You assert in your report that Kevin Cremoux violated Rule 8.4(c) of the Illinois Rules of Professional Conduct, correct?**
A. I disagree that I said that.
**Q. Okay. And by the way, for purposes of today's deposition, when I refer to Kevin Cremoux, I'll refer to him as Cremoux; is that fair?**
A. Yes.
**Q. So your testimony is that you have not -- you have not asserted an opinion that Kevin**



**Cremoux violated Rule 8.4(c); is that correct?**
A. My assertion is that what I said was to the extent that -- and I'm quoting from page 7 here: To the extent that Cremoux knowingly allowed a misimpression to be created in his communications with the Monroe County Sheriff's Office concerning his role, that conduct would have been inconsistent with Rules 4.1, 4.3, and 8.4(c).
**Q. Okay. Have you reasonably inferred from your evaluation of all the documents and evidence that Cremoux violated Rule 8.4(c)?**
A. The question is -- I'm sorry.
**Q. I'll repeat it.**
**Have you reasonably inferred from your evaluation of all the evidence that you reviewed that Mr. Cremoux violated Rule 8.4(c)?**
A. The materials that I have reviewed indicate that Cremoux did not identify himself to the Monroe County Sheriff's Office in the sense of saying who he worked for or his purpose in contacting them.
To the extent that that gave the Monroe County Sheriff's Office a misunderstanding of what his role was, I think that would be

inconsistent with Rule 8.4(c).
But again, I don't know exactly what the evidence -- given that this matter is still in discovery, I don't know exactly what the evidence is going to show concerning what the Monroe County Sheriff's Department's understanding was or how they reached that understanding.
Therefore, my conclusion is that if he knowingly allowed a misimpression to be created, that would violate Rule 8.4(c).
**Q. And that answer is fine, but it didn't directly answer my question. It's a simple yes or no.**
**Have you reasonably inferred from your evaluation of the evidence that you've reviewed that Mr. Cremoux violated Rule 8.4(c)?**
MR. TRUPPMAN: Form, asked and answered.
THE WITNESS: Knowing what I know at present, I can't conclude specifically that he violated Rule 8.4(c).
What I'm saying is he created conditions in which a misimpression could have been created, and there is evidence that the Monroe County Sheriff's Office had a misimpression.



The question is what Mr. Cremoux's understanding was about that.
BY MR. JALALPOUR:
**Q. Okay. So the answer is no, at this time you have not reasonably inferred that Mr. Cremoux violated Rule 8.4(c); is that correct?**
MR. TRUPPMAN: Form.
You can answer.
THE WITNESS: That's correct.
BY MR. JALALPOUR:
**Q. Okay. In your report, do you assert that Tanya Stanish violated Rule 8.4(c) -- or let me take that back. Strike that question.**
**Is it your opinion in this case that Tanya Stanish violated 8.4(c)?**
A. My opinion is that --
**Q. And --**
A. -- her --
**Q. -- I don't want you just reading --**
A. I'm not.
**Q. -- off your report.**
A. I'm not.
**Q. So if we can close it for now, but is it your -- is it your opinion that Tanya Stanish**



**violated Rule 8.4(c) based upon your review of the evidence?**
MR. TRUPPMAN: And I'll object to the form, and the witness is entitled to look at his report if he needs to to answer your question. You can't remove the exhibit from him, but ...
MR. JALALPOUR: Okay.
MR. TRUPPMAN: You can answer. And if you need to reference the document, you're free to.
THE WITNESS: My opinion is that her conduct was inconsistent with Rule 8.4(c) given -- and the conduct I'm specifically referring to is conduct in telling Judge Scannicchio that she would turn over materials to Mr. Ivankovich's attorneys in the interest of transparency in connection with the NCIC matter, and that that conduct was inconsistent with Rule 8.4(c) because she did not do so.
BY MR. JALALPOUR:
**Q. Okay. So you have reasonably inferred based upon your review of the evidence that Ms. Stanish violated Rule 8.4(c), correct?**
A. That's fair to say.
**Q. Let's turn -- for the record, I provided the witness a packet of certain Rules of**



**Professional Conduct, and that's the document right there to your left.**
**If you could turn to Rule 8.3.**
MR. TRUPPMAN: Are you marking this as an exhibit or --
MR. JALALPOUR: No.
BY MR. JALALPOUR:
**Q. Mr. Doppke, are you at Rule 8.3?**
A. Yes, I am.
**Q. And you're familiar with Rule 8.3, correct?**
A. Yes.
**Q. Can you read for the record 8.3(a)?**
A. Rule 8.3(a) states: A lawyer who knows that another lawyer has committed a violation of Rule 8.4(b) or Rule 8.4(c) shall inform the appropriate professional authority.
**Q. And an obligation -- an attorney's obligation under Rule 8.3(a) is considered a Himmel obligation, correct?**
A. That's how it's often referred to, yes.
**Q. And so have you reported Ms. Stanish to the ARDC for violation of Rule 8.4(c)?**
A. No.

**Q. Okay. But you just said for the record that you have reasonably inferred that she has violated Rule 8.4(c), but you have not reported her to the ARDC, correct?**

A. I have reviewed this matter in my capacity not as someone with direct knowledge of her conduct, but as someone who is asked to opine based on materials that I have read.

**Q. Okay. But Rule 8.3 states that, once a lawyer becomes aware that another lawyer has violated Rule 8.4(c), that attorney, quote, shall inform the appropriate professional authority, correct?**

A. No, that's not what it says. It says a lawyer who knows that another lawyer has committed a violation of Rule 8.4(b) or Rule 8.4(c) shall inform the appropriate professional authority.

**Q. Okay. So is it your testimony you don't know if she did violate Rule 8.4(c)?**

A. Knowledge is a specific standard and has a specific meaning in connection with that rule.

**Q. And what is the standard for that rule?**

A. Actual knowledge.

**Q. And what is the standard?**



A. Which is knowledge that can be derived from circumstances based on the lawyer's observations of another lawyer's conduct. I do not believe that the -- that an absolute duty exists in circumstances where an expert witness reviews matters pertaining to ongoing litigation.

**Q. Actual knowledge may be inferred from circumstances, correct?**

A. Yes.

**Q. And you've testified already here today that you've reasonably inferred from the documents that you've reviewed that Ms. Stanish violated Rule 8.4(c), correct?**

A. My -- my review of the documents indicates that her conduct was inconsistent with the rule. And I use that phrasing deliberately and specifically to say inconsistent with the rule.

**Q. But that that's how you just phrased it now, but previously you testified that you've reasonably inferred that she has violated Rule 8.4(c). You testified to that earlier.**

**Are you retracting that testimony?**

A. Only the Supreme Court can determine whether she's violated a rule. My testimony is that



her test -- her conduct was inconsistent with the rule. That's what my opinion says.

**Q. Let's make sure there's a clear record here.**

**Is it your opinion that -- strike that.**

**Have you reasonably inferred from your review of the evidence that Ms. Stanish violated Rule 8.4(c)?**

A. I can't establish a violation in and of myself.

I can say that I believe that her conduct was inconsistent with the rule.

**Q. And when you say "inconsistent," is that a violation, or is that something short of a violation?**

A. It's -- in my view, her conduct does not comport with the terms of the rule.

**Q. Okay. So inconsistent under your phrasing is a simile for violation, fair?**

A. You're interpreting it that way.

I don't say the word "violation" because I am not a party who is responsible for determining whether a violation has occurred in a



sense that it's the Supreme Court that determines that.

**Q. Well, it's the Supreme Court determines it, but if an attorney has knowledge of it, that attorney has an obligation to report it, correct?**

MR. TRUPPMAN: Form.

THE WITNESS: An attorney -- if an attorney has knowledge that another lawyer violated the rule, then yes.

BY MR. JALALPOUR:

**Q. Okay. And that rule applies to you, correct?**

MR. TRUPPMAN: Form.

BY MR. JALALPOUR:

**Q. Rule 8.3, correct?**

A. Well, the rule applies to any lawyer in Illinois.

**Q. And that includes you, correct?**

A. That includes me.

**Q. And just because you're testifying here as an expert doesn't except you from your obligations under Rule 8.3(a), correct?**

A. I -- that's -- my testifying here would not except me from the obligations of Rule 8.3.

**Q. Okay. So if you learned through your services in this case as an expert that an attorney violated Rule 8.4(c) and you had actual knowledge of that, you'd have a duty to report that to the ARDC, correct?**

MR. TRUPPMAN: Form.

THE WITNESS: I don't view the knowledge that I have come to as the kind of knowledge that gives rise to a reporting duty.

BY MR. JALALPOUR:

**Q. That's not my question, sir.**

**If you as an expert in this case came to an understanding and had actual -- or strike that.**

**If you as an expert in this case had actual knowledge of another attorney violating Rule 8.4(c), you would have an obligation under 8.3(a) to report that attorney to the ARDC, correct?**

MR. TRUPPMAN: Objection to the form.

THE WITNESS: If I had actual knowledge arising from any context, yes.

BY MR. JALALPOUR:

**Q. Okay. And your testimony here today, just so we're clear, are you don't have actual**



**knowledge that Ms. Stanish violated Rule 8.4(c)?**

A. As I said before, my opinion is based on the information that I know now.

There is other information that could come to light that could affect a determination of whether Ms. Stanish's conduct was inconsistent with the rule.

**Q. But I'm not asking you about future developments. I'm asking right here right now.**

**Based on what you know, do you have actual knowledge that Ms. Stanish violated Rule 8.4(c): Yes or no?**

A. My -- my opinion is what it is, and it says that I believe that her conduct was inconsistent with the rule.

I do not believe that what I know right now rises to the level of requiring me to report something to the ARDC.

**Q. Okay. Have you reasonably inferred -- strike that.**

**You've already testified that you've reasonably inferred that Ms. Stanish violated Rule 8.4(c), correct?**

A. I -- my testimony is that based on my



understanding right now I believe her conduct to be inconsistent with the rule. That's my testimony.

**Q. Okay. Well, I get that that's part of your testimony, but I want you to answer my actual question. And I believe you already have, and I want to make sure that you're standing by it.**

**Based upon your review and evaluation of the evidence, sitting here today, have you reasonably inferred that Ms. Stanish violated Rule 8.4(c): Yes or no?**

A. I can't determine that there was a violation.

**Q. Okay. Would you say you violated Rule 8.3(a) by not reporting Ms. Stanish to the ARDC for violation of Rule 8.4(c)?**

A. No, I would not.

MR. TRUPPMAN: Objection to form.

BY MR. JALALPOUR:

**Q. Aside from Rule 8.4(b) or 8.4(c), have you reasonably inferred from your evaluation of the evidence that Cremoux violated any other Rules of Professional Conduct?**

A. I believe my report in reference to Cremoux indicated that his conduct may also be



inconsistent with Rules 4.1 and Rule 4.3.

**Q. Okay. But listen to my question though. My question is more narrow than that.**

**Have you reasonably inferred from your review of the evidence that Mr. Cremoux violated the Rules of Professional Conduct besides 8.4(b) and 8.4(c)?**

A. For the same reasons as I referred to in my answer about his conduct and Rule 8.4(c), no.

**Q. Okay. Same question with respect to Ms. Stanish.**

**Aside from Rules 8.4(b) and 8.4(c), have you reasonably inferred from your review of the evidence that Ms. Stanish violated any of the ethical rules?**

A. Again, my report does not refer to violations of the rules. My report refers to conduct that my -- to my review and my understanding is inconsistent with the rules.

**Q. Okay. But I'm not asking about your report. I'm asking about your opinion in this case, and --**

A. My report is my opinion in this case.

**Q. Well, but I'm not referring to your**

**report here. I'm asking you a specific question, and you're not answering -- you're answering a different question. And I might ask that different question later on and you can answer it that way, but my question is more specific.**

**Have you reasonably inferred from your evaluation of the evidence that Ms. Stanish violated the Rules of Professional Conduct aside from Rule 8.4(b) and (c)?**

A. Phrased that way, the answer is no.

**Q. You've asserted in your report that Mr. Cremoux may have violated or may have engaged in acts inconsistent with Rule 4.1 through his conversation with the dispatcher for Monroe County.**

**Do you recall that?**

A. Yes.

**Q. Okay. Does Rule 4.1 apply to your conduct in this case?**

A. I don't believe so.

**Q. And why is that?**

A. Because I am not representing a client in this case.

**Q. Okay. Do any of the ethical obligations of the Rules of Professional Conduct apply to you in**



**this matter such that you cannot knowingly make false statements of fact?**

A. I --

MR. TRUPPMAN: I'll object to the form.

BY MR. JALALPOUR:

**Q. Did you understand the question?**

A. I do, I think.

As an Illinois attorney, I am not permitted to make false statements of fact. That is an obligation that is included under the obligations imposed by Rule 8.4(c), if nothing else.

**Q. Okay. Turning back to your report, which is Exhibit 1, I'd point your attention to page 2, paragraph 3.**

**Do you see that?**

A. Yes.

**Q. Paragraph 3 starts with the following statement from you, quote: I have reviewed and relied upon the following documents in forming my opinions.**

**Do you see that?**

A. Yes.

**Q. And then it lists out a number of different documents and materials, correct?**



A. Yes.

**Q. Subparagraph L, can you read that for the record, please?**

A. Oh, recordings of telephone calls between Kevin Cremoux and the Cook County Sheriff's Office.

**Q. Okay. And now, as far as I know, there have been no recorded telephone calls between Mr. Cremoux and the Cook County Sheriff's Office that have been produced in this case.**

**But you state here that you reviewed such recordings, correct?**

A. It says that. That's an error.

**Q. Okay. You didn't review recordings of telephone calls between Kevin Cremoux and the Cook County Sheriff's Office, correct?**

A. No, it should read emails.

**Q. Okay. So that's a misstatement of fact there, correct?**

A. It is not an intentional misstatement of fact.

**Q. Okay. But you agree that misstatements of fact can sometimes be unintentional, and there's not a violation of the ethical rules under those**



**circumstances, correct?**

A. That is not what I said.

**Q. Well --**

A. And I do not agree with that.

**Q. You -- your testimony is that an unintentional misstatement of fact is a -- can be a violation of the ethical rules?**

A. That's not my testimony either.

**Q. Okay. Do you agree that an unintentional misstatement of fact is not a violation of the ethical rules?**

MR. TRUPPMAN: Form.

THE WITNESS: The Illinois Supreme Court has opined or said in published opinions that there's essentially no way to define what violates Rule 8.4(c). And given that they have held that, I am not going to step in and say there's one way to violate Rule 8.4(c).

What they have said is that the conduct that violates Rule 8.4(c) can be characterized as, quote, anything calculated to deceive. This is a case called In Re Cutright, C-u-t-r-i-g-h-t. And that is what -- that is conduct that violates or is inconsistent with

Rule 8.4(c).
My erroneous transcription of the words "recordings of telephone calls" in subparagraph 3L was not calculated to deceive. It was a simple error.
BY MR. JALALPOUR:
**Q. Okay. And because it was a simple error that was not intended to deceive, your testimony is that you didn't violate Rule 8.4(c) by making that error, correct?**
A. I did not violate Rule 8.4(c) in any respect.
**Q. Okay. By the way, turn your attention to subparagraph C or excuse me subparagraph F on page 2. Do you see that?**
A. Yes.
**Q. Okay. Read that for the record.**
A. Subparagraph F reads: Email correspondence from the Cook County Sheriff's Office to Kevin Cremoux.
**Q. So you had already listed the emails between Kevin Cremoux and the Cook County Sheriff's Office under paragraph 3, correct?**
A. That is correct.



**Q. And then in subparagraph L, your testimony today is that you meant to restate that, but you made an error in describing emails as recordings of telephone calls?**
A. It was a simple error. I don't know what I can tell you.
**Q. Okay. And in this case, you're asserting that Mr. Cremoux may have made a misstatement of fact through omission, correct?**
A. That's fair to say.
**Q. But your actual misstatement of affirmative fact here, that doesn't rise to the level of ethical violation, correct?**
MR. TRUPPMAN: Form.
THE WITNESS: It absolutely does not.
BY MR. JALALPOUR:
**Q. Okay. I want to now dive into the details of your opinion in this case, and we'll start off first with your opinions as they relate to Mr. Seinitz.**
**And in paragraph 6, I guess page 4, paragraph 6, towards the top of the page, the first full sentence states, quote: The amended complaint alleges that both the still image and the video were**



**created by a security camera located on the property, and that Seinitz had access to images taken or recorded by that camera even after his employment with plaintiff was terminated, without plaintiff's knowledge or authorization.**
**Do you see that?**
A. Yes.
**Q. Did you assume that to be true when forming your opinions that he had been terminated?**
A. That was information that I received from Mr. Ivankovich's attorneys.
**Q. And you assumed that to be true in formulating your opinions, correct?**
A. Yes.
**Q. Okay. Did you undertake any investigation of your own to assess whether that assumption was accurate or not?**
A. No.
**Q. And you agree that if you're going to assert that attorneys may have violated ethical rules, you should undertake a reasonable investigation of the facts before forming that opinion, correct?**
A. My review as an expert, as I said in the



opinion, is based on the information that was available to me, that was made available to me at the time.
**Q. And you would have expected that all the attorneys that you've been dealing with on this case would have provided you all the necessary and relevant information to arrive at your opinions, correct?**
A. Understanding that the matter is in an early stage of development of evidentiary facts, yes.
**Q. Okay. But whatever was available at the time that would have been relevant and necessary for you to formulate your opinion, you would have expected that that information would have been conveyed to you, correct?**
A. Yes.
**Q. Okay. Going back to that language in paragraph 6 on page 4, the phrase, quote, after his employment with plaintiff was terminated.**
**Do you see that?**
A. Yes.
**Q. Who was Mr. Seinitz employed by?**
A. Either Mr. Ivankovich or an entity owned

or controlled by Mr. Ivankovich or Mr. Ivankovich's family.

**Q. Okay.**

A. Is my understanding.

**Q. Well, which one of those three? Those are three separate possibilities you just listed out, correct?**

A. Yes.

**Q. And which one of those three was -- did you understand to be true when you wrote here, quote, after his employment with plaintiff was terminated?**

A. I under --

MR. TRUPPMAN: Objection to the form. It omits the first clause of the paragraph.

THE WITNESS: I understood it to mean either that Mr. Seinitz was employed by Mr. Ivankovich personally or by an entity controlled by Mr. Ivankovich.

BY MR. JALALPOUR:

**Q. Okay. And do you understand sitting here today that that's not actually what Mr. Ivankovich is stating throughout various litigation?**



A. No.

**Q. Okay. You understand he's taken the position that he doesn't employ anybody, and that in fact he's unemployed.**

**Did you understand that before you arrived at your opinions in this case?**

MR. TRUPPMAN: Objection to the form.

THE WITNESS: No.

BY MR. JALALPOUR:

**Q. Would that affect potentially your opinions in this case knowing that this statement here about being employed with Steven Ivankovich is untrue?**

A. No.

(Deposition Exhibit No. 2, Witness Doppke, was marked for identification 05/20/2026.)

BY MR. JALALPOUR:

**Q. Mr. Doppke, you've been handed what's been marked as Exhibit 2, which is your supplemental report, correct?**

A. Correct.

**Q. And turning to the last page of your supplemental report, that's your electronic**



**signature, correct?**

A. It is.

**Q. And just like with the original report, you to the best of your ability ensured that everything in your supplemental report was accurate and truthful to the best of your knowledge before signing the report, correct?**

A. Correct.

**Q. On page 3, paragraph 6 of your report towards the middle, you write the following, quote: I am not of the opinion that Steven's status with relation to the property somehow constituted or indicated his consent to surveillance of the property, or of Steven's person or personal property, by Seinitz using equipment Steven authorized Seinitz to use for his benefit and not to his detriment.**

**Do you see that?**

A. I see that.

**Q. And when you wrote here, quote, authorize -- Steven authorized Seinitz to use for his benefit and not to his detriment, you're referring, when you say "his," you're talking about Steven, correct?**



A. That's correct.

**Q. What basis -- actually, strike that.**

**When you refer to the word "equipment" here, that's the security camera at the Islamorada house, correct?**

A. Yes.

**Q. And what basis did you have to state that Steven authorized Seinitz to use the camera for Steven's benefit and not to Steven's detriment?**

MR. TRUPPMAN: Objection to the form.

THE WITNESS: I base that on my review of all of the evidence that was made available to me concerning the existence of the security camera, the use to which Seinitz put that camera, and my understanding of the relationship between Steven Ivankovich and Seinitz.

BY MR. JALALPOUR:

**Q. Who owned that camera? Do you know?**

A. My understanding when I prepared this report, and my continued understanding as of today, is that either Steven Ivankovich owned it personally or an entity associated with him owned it.

**Q. Okay. And who owned -- or strike that.**

**Who owned or leased the property at**

**issue in this case?**
A. I don't know.
**Q. Do you even know what the purpose of that property was?**
A. I -- my understanding is that it's a residence, but other than that, I don't know.
**Q. And whose residence is it?**
A. I don't know.
**Q. And what do you base your testimony that it's a residence?**
A. That's the -- based on all the information that I reviewed indicated that it was. I didn't have any information that indicated that it wasn't. The suggestion of the -- that I understood of the -- sorry, strike that.
What I understood of the communications between Ms. Stanish and Seinitz was that Seinitz was reporting to her that Ivankovich, Steven Ivankovich was staying at that Florida property and could be located there.
**Q. And you testified to this earlier, but I'd like to see if you've got more specifics.**
**What evidence did you review to conclude that Steven authorized Seinitz to use the**



**security camera for Steven's benefit?**
A. Again, the evidence that I was presented with indicated that the Florida property was a property with which -- that either Steven Ivankovich owned or that he was associated with or resided at sometimes or could reside at and was residing at at the time of the relevant events.
There was a security camera located on the premises that Mr. Seinitz had access to. My conclusion from that was it was a security camera that was used by Seinitz in his -- in his capacity as someone employed to provide security related services to Mr. Ivankovich, and that the security camera was a tool used in providing those services.
**Q. And do you know if Steven Ivankovich was paying -- well, strike that.**
**You've already testified you don't know who employed -- or strike that.**
**You've testified that you're of the opinion that Steven Ivankovich employed Joe Seinitz, correct?**
A. That's my understanding.
I am not expressing an opinion concerning their employment relationship or the



legal nature of it. That is simply my understanding that I base my opinion on, in part.
**Q. Wouldn't the legal nature of any relationship or non-relationship between Steven and Seinitz have a potential impact on the proper use of the security camera?**
A. Not the precise nature of the relationship.
My understanding was Seinitz was a person who provided security related services to Ivankovich at Ivankovich's direction and for Ivankovich's benefit. And whether he was an independent contractor doing that, whether he was a salaried employee doing that, whether he was employed by Mr. Ivankovich personally or by an entity doesn't affect my opinion.
**Q. And prior to Mr. Seinitz no longer working for whomever he was working for with respect to the Ivankovichs, you agree that under your understanding he had authorized access to that security camera, correct?**
A. That's my understanding.
MR. TRUPPMAN: Form.



BY MR. JALALPOUR:
**Q. Now, returning back to Exhibit 1, top of page 4, again the phrase, after his employment with plaintiff was terminated.**
**Do you see that?**
A. Yes.
**Q. And you stated that you base that off of the amended complaint, correct?**
A. That's one of the sources, yes.
**Q. Okay. You understand that the amended complaint was not verified; is that correct?**
A. I'll take your representation to that effect. I don't recall.
**Q. Okay. And in -- assuming that was true, that he was terminated, you're in part relying on the credibility of Steven Ivankovich, correct?**
A. I don't know the extent to which I am. I suppose that he must have made a statement to that effect at some point, but I have not reviewed a statement from him to that effect.
The only thing I have reviewed that could be considered to be that is the amended complaint itself, but that is also not a direct statement from Mr. Ivankovich.

**Q. Okay. But it was made on his behalf by his attorneys, correct?**
A. I presume so.
(Deposition Exhibit No. 5, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Okay. Mr. Doppke, you've been handed Exhibit No. 5, which contains Steven Ivankovich's answers to Schiller DuCanto's first set of interrogatories. Do you see that?**
A. I see that.
**Q. Have you seen this document before today?**
A. I don't believe so.
**Q. Okay. And if you turn to the second to last page, do you see the verification page there?**
A. I see it.
**Q. And the verification contains what purports to be Steven Ivankovich's signature, correct?**
A. I see an electronic signature that appears to read Steven Ivankovich.
**Q. And it says above his signature, quote, I declare under penalty of perjury under the laws of**



**the United States of America that the foregoing is true and correct. Do you see that?**
A. I do see that.
**Q. If you turn to page 4, interrogatory No. 4, and let me know when you're there.**
A. I see that.
**Q. And the interrogatory states, quote: State the date on which Seinitz was terminated, as alleged in paragraph 21 of the complaint.**
**You see that?**
A. Yes.
**Q. And the response says, quote: Defendant Joseph Seinitz was terminated on or about March 25, 2025, as officially documented in a termination email on April 2, 2025.**
**Do you see that?**
A. I do.
**Q. So whereas the amended complaint you stated that was submitted by his attorneys, this interrogatory was actually signed -- these interrogatory answers were actually signed off by Mr. Ivankovich directly, correct?**
A. I don't know that to be true, but I presume so.



**Q. Okay. And in that interrogatory answer, he states that an official termination email was sent on April 2, 2025, correct?**
A. That's what it says.
**Q. Okay. Now, by the way, in this case, you understand that while Mr. Ivankovich asserts that Joe Seinitz had been terminated sometime in late March or early April 2025, Seinitz disputes that, correct?**
A. I don't know -- sorry, strike that.
I do not recall having reviewed any information that contains Mr. Seinitz's statement concerning whether and when he was terminated.
What I have reviewed is information that informs me that Ms. Stanish and/or the Schiller firm have stated that Seinitz told them that he was not terminated, that he was still working for the Ivankovich family, or Steven Ivankovich in whatever capacity it was, in late March 2025. That's what I've reviewed.
But it does not contain a statement directly from Seinitz himself concerning the matter.
**Q. Okay. Well, I'll represent to you that in this case he is taking that position that he was**



**not terminated as alleged by Mr. Ivankovich; is that fair?**
A. I'll accept your representation.
**Q. Okay. And so we have Mr. Seinitz on one hand claiming he wasn't terminated, and then we have Steven Ivankovich on the other hand claiming that he was terminated.**
**Do you have an -- do you now have an understanding of that?**
MR. TRUPPMAN: Form, time frame.
THE WITNESS: I accept what you're telling me; that there's a dispute about that.
BY MR. JALALPOUR:
**Q. Okay. So and that disputed issue can come down to who's more credible than the other; is that fair?**
MR. TRUPPMAN: Form, time frame.
You can answer.
THE WITNESS: Many factual issues can come down to that, but I assume that that will be something that evidence will be presented about at some point.
BY MR. JALALPOUR:
**Q. Okay. But you've assumed in coming to**

**your conclusions in this case that Steven is telling the truth, that Seinitz was terminated in or around late March 2025, correct?**
MR. TRUPPMAN: Form.
THE WITNESS: Well, when I -- when I created my original opinion, I didn't know that there was any kind of dispute about the termination, so I had nothing else to assume. When --
BY MR. JALALPOUR:
**Q. Do you --**
MR. TRUPPMAN: Let him finish his answer.
BY MR. JALALPOUR:
**Q. Do you think that you should have been informed that there was a dispute about that particular issue before finalizing your opinion?**
MR. TRUPPMAN: Did you finish your prior answer or would you --
THE WITNESS: I did not.
MR. TRUPPMAN: Okay. Please finish your prior answer, and then he can ask you the next question.
THE WITNESS: My prior answer was going to continue that by the time of my supplemental opinion I believe I was aware of Ms. Stanish's position concerning what she had been told by Seinitz



concerning the termination, and it still didn't affect my opinion one way or another.
BY MR. JALALPOUR:
**Q. Well, you've stated in one of your reports that it was reasonable based upon the information available to Stanish that Mr. Seinitz was no longer employed at the time he began communicating with the Schiller firm.**
**Do you recall?**
A. Yes.
**Q. Well, if it turns out that he was actually still employed, you'd withdraw that opinion, correct?**
A. No.
**Q. Okay. So your testimony here is that Ms. Stanish, when being told that Joe Seinitz was still employed by the Ivankovichs, should have concluded otherwise, even if he was actually telling the truth. That's your testimony today.**
MR. TRUPPMAN: Form.
THE WITNESS: My testimony is that she could have, because in view of the other materials I referred to, she believed Seinitz to be a liar.



BY MR. JALALPOUR:
**Q. Okay. But well, we're going to get to it in the future, but let's tackle it right now.**
**Your report states that it was reasonable for Ms. Stanish to conclude that Seinitz was no longer employed, correct?**
A. Based on what I reviewed at the time and based on what I know as of now.
**Q. Okay. Is it your testimony also that it was unreasonable for her to conclude that he was still employed?**
A. No.
**Q. Okay.**
(Deposition Exhibit No. 7, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 7 which consists of a purported email from Steven Ivankovich to Joe Seinitz and Olafur Hand, O-l-a-f-u-r, Hand, on April 2, 2025, at 8:36 a.m.**
**Do you see that?**
A. I see that that's what this document says.



**Q. And the subject of this purported email is, quote, Termination of Services.**
**Do you see that?**
A. That's what it says.
**Q. Have you seen this document before today's -- strike that.**
**Have you seen this document before?**
A. No.
**Q. And in this purported email, Steven supposedly writes, quote, Effective immediately, your consulting services agreement is terminated for cause. Cease all work, contact with staff and do not access to property and equipment. Please return vehicles you are using or purchased for your use as company vehicles. Govern yourself accordingly, Steven Ivankovich.**
**Do you see that?**
A. You've read it correctly.
**Q. And this would appear consistent with Mr. Ivankovich's interrogatory answer in Exhibit 5 where he stated that there was an official termination email sent on April 2, 2025, correct?**
MR. TRUPPMAN: Form, outside the scope of his testimony.

Page 58

THE WITNESS: In the interrogatory, he states that the termination was confirmed by an April 2, 2025, email. This appears to be April 2, 2025, email, so the two answers would be consistent in that respect.

BY MR. JALALPOUR:

**Q. If someone doctors a document and passes it off as a real document in litigation, would that indicate to you that that person is more likely to be credible or less likely to be credible?**

MR. TRUPPMAN: Object to the form, outside the scope.

I'm going to instruct you not to answer.

MR. JALALPOUR: Based on what?

MR. TRUPPMAN: It's outside the scope of his expert opinions. You can't just ask him random questions about random things that are not in his expert opinion or expert report. It's unrelated to any of the opinions he's proffered. It's a complete hypothetical.

MR. JALALPOUR: That's not a proper basis to instruct him not to answer.

MR. TRUPPMAN: I'm not -- I see where you're

Page 59

going with this line of questioning, and it's inappropriate. If you want to file a proper motion with the Court that addresses these issues, you can, but this is not what was noticed, not what was part of the expert deposition at all.

We can go off the record and talk about it if you want, but ...

MR. JALALPOUR: His report states multiple times that Joe Seinitz was terminated. The issue of the termination is therefore relevant.

MR. TRUPPMAN: That's not correct. He says according to the alleged complaint, he was terminated in the cause, and you've asked him about that and that's fair game.

What you cannot do is ask him about other documents and his opinion on whether or not they're authentic and whether or not that would affect his testimony.

MR. JALALPOUR: I have not asked him if this is authentic or not, and he's not going to opine on it.

MR. TRUPPMAN: Not yet.

MR. JALALPOUR: Okay. Well, you can't predict where I -- I mean, so you're trying to predict where

Page 60

I'm going. That's where --

MR. TRUPPMAN: No.

MR. JALALPOUR: That's why you're stopping my questioning?

MR. TRUPPMAN: No. Your current question is improper, and I'm instructing him not to answer, and I've explained why on the record.

MR. JALALPOUR: Okay. Let's certify that.

MR. TRUPPMAN: You can move on with your line of questioning.

BY MR. JALALPOUR:

**Q. Are you aware that Mr. Ivankovich has, quote-unquote, withdrawn Exhibit 7 from this case?**

MR. TRUPPMAN: You can answer that.

THE WITNESS: I'm not aware of anything about Exhibit 7 at all.

BY MR. JALALPOUR:

**Q. Okay. If it turns out that this is a doctored email, would you have thought -- would you have wanted that information prior to giving your opinion in this case?**

MR. TRUPPMAN: Objection to the form. I'm going to instruct him not to answer.

Page 61

BY MR. JALALPOUR:

**Q. Are you going to follow that instruction?**

A. Yes, I am.

MR. JALALPOUR: Can you certify that?

BY MR. JALALPOUR:

**Q. Were you informed at all prior to issuing your opinions in this case that there's evidence that Steven doctored a document purporting to prove the termination of Joseph Seinitz?**

MR. TRUPPMAN: You can answer that one.

THE WITNESS: I have no information about that one way or another.

BY MR. JALALPOUR:

**Q. Do you believe that information would at all be relevant to your opinions in this case?**

MR. TRUPPMAN: You can answer that too.

THE WITNESS: I just don't know. It's too -- it's too speculative for me to answer. There are factual contentions that go into the allegation that someone doctored a document. I don't know any facts about that that are present in this case. It's impossible for me to speculate what those facts would be or how they might affect my opinion.

Page 62

BY MR. JALALPOUR:
**Q. Okay. Let me ask it a different way.**
**If the Court in this case were to conclude that Steven Ivankovich doctored this email, would that have any impact on your opinions in this case?**
MR. TRUPPMAN: I'll object to the form, but you can answer if you're able to.
THE WITNESS: I honestly can't answer that. I just don't know. There are so many ways in which a finding could be made, so many ways in which the Court could determine the import of the finding that could affect the way that I think about it.
I just can't answer that question.
BY MR. JALALPOUR:
**Q. But nonetheless, you're sticking by the assumption from the amended complaint that Joe Seinitz was terminated prior to the events in question.**
**You're still sticking by that assumption, correct?**
MR. TRUPPMAN: Form, time frame.
THE WITNESS: I have no evidence upon which I can base a different conclusion at this point. And

Page 63

I stick by the fact that that's what I reviewed in my opinion, and that's the conclusion that I came to.
BY MR. JALALPOUR:
**Q. Okay. So but if you were provided other documentation, you could -- you might no longer make that assumption, correct?**
A. Well, as I said at the beginning of my opinion, the fact that additional facts could be developed in this matter could affect my opinion, yes.
**Q. You agree that would be unfair if you were provided only a certain subset of materials and not other materials that might contradict your opinion in this case.**
**Do you agree that that would be unfair?**
A. No.
**Q. Okay. So you would be okay rendering an opinion knowing that the materials being provided to you from Steven's attorney were picked just so that they would support the opinions that you have in this case?**
MR. TRUPPMAN: Form.

Page 64

BY MR. JALALPOUR:
**Q. You'd be okay with that.**
MR. TRUPPMAN: I object to the form of your question.
THE WITNESS: First of all, that's not what I said.
What I am saying is I was given what I was given, and I believe that what I was given was a -- constituted the available evidence that I needed in order to reach conclusions in this matter. Not the conclusions that I reached but in order to reach conclusions.
And I am not prepared to say that anything that the attorneys did in forwarding me that information was fair or unfair.
BY MR. JALALPOUR:
**Q. Okay. But how do you know you had the correct -- strike that.**
**How do you know you had all the information necessary to come to your conclusions when you weren't aware of certain other evidence in this case?**
A. As I said, I've prepared it under the knowledge that this matter was early in discovery

Page 65

and that additional information could come to light.
**Q. Okay. But setting aside what information might come to light later on, I'm talking about the information that was available to Steven's attorneys at the time of your engagement.**
**Do you understand that?**
A. Yes.
**Q. Okay. You had to assume that they were providing you all the evidence that would be necessary for you to come to a truthful and accurate opinion in this case, correct?**
A. I did and I still do.
**Q. Okay. And you weren't -- you weren't told anything about a potentially doctored email as part of the materials that were sent to you, correct?**
MR. TRUPPMAN: Form, but you can answer.
THE WITNESS: I was not. I was not told about that.
BY MR. JALALPOUR:
**Q. Okay. And sitting here today, your testimony is you don't feel like they should have provided you that; is that fair?**
A. My testimony is that the fact that I was not made aware of that doesn't change my opinion in

any way.
**Q. Okay. But answer my question.**
**You're okay with Steven's attorneys not providing you any information relating to this purported termination email.**
**Is that your testimony today?**
A. I'm not -- my testimony is that I take no issue with the fact that the -- that that email was not discussed with me.
**Q. Okay. Even if it turns out that it's a fake doctored email. That's your testimony, correct?**
MR. TRUPPMAN: Form.
THE WITNESS: I have no -- I have no way of knowing whether that will happen or what the import of that will be, and therefore my concern is whether it would have affected my opinion in some way, and my conclusion right now is no.
BY MR. JALALPOUR:
**Q. What if there's substantial evidence showing it is a doctored email? Would that affect your answer?**
MR. TRUPPMAN: Form. I'm giving you a lot of latitude.
You can answer.



THE WITNESS: It could, just as the development of any other substantial evidence could affect my opinion.
BY MR. JALALPOUR:
**Q. Do you know who Olafur Hand is?**
A. I have no idea.
**Q. So then I assume you didn't review his deposition transcript from this case, correct?**
A. I did not.
(Deposition Exhibit No. 9, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 9, which consists of a text message thread between Steven Ivankovich and Olafur Hand.**
**I want to turn your attention to the ninth page here, which is Bates numbered Hand 45. Let me know when you're there.**
A. I'm at that page.
**Q. Towards the bottom of Hand 45, there's a text message from Steven Ivankovich to Olafur Hand dated April 24, 2025. Do you see that?**
A. Yes.



**Q. Okay. And the dates structure that way because Olafur Hand was from Iceland, but that's from -- that text message is April 4, 2025, from Steven to Olafur Hand where Steven writes, quote: Has Joe abandoned his post again?**
**Do you see that?**
A. I see those words.
**Q. And then that day, Olafur Hand responds, He is in FP, which I'll represent to you is a reference to Fort Pierce, and seems he is willing to assist, at least that is what he told me.**
**Do you see that?**
A. I see those words too.
**Q. And then later that day, Steven sends another text message, and he writes, quote: Let's get the keys and tell Joe his services won't be required anymore or let's change the locks.**
**Do you see that?**
A. I see that's what the document says.
**Q. Okay. In your opinion, is this inconsistent with the term -- the supposed termination email on April 2, 2025?**
MR. TRUPPMAN: Form, outside the scope.



BY MR. JALALPOUR:
**Q. Let me rephrase.**
**In your opinion, are these text messages from April 24, 2025, inconsistent with the purported termination email on April 2, 2025?**
MR. TRUPPMAN: Form.
THE WITNESS: First of all, I have no knowledge of the genuineness of this exhibit, but even presuming that it contains what it purports to contain, my answer would be that the substance of these text messages could be inconsistent with the other email that you showed me but are not necessarily inconsistent with the email that you showed me.
And I don't know how to determine right now whether they are or are not.
BY MR. JALALPOUR:
**Q. Turning back to Exhibit No. 1, you agree that Mr. Seinitz did have actual access to the security camera in late April 2025 such that he was able to obtain images and video from the camera, correct?**
MR. TRUPPMAN: You said did or did not?

Page 70

BY MR. JALALPOUR:
**Q. Did have actual. Not authorized, not consensual, but my question is specifically that he obviously had actual access at that time, correct?**
A. I -- I assume that based on the information I reviewed, yes.
**Q. Okay. The fact that he had access to the security camera at that time, would that in your opinion make it more probable or less probable that he was authorized to access the security camera at that time?**
MR. TRUPPMAN: Form, outside the scope.
THE WITNESS: I have no way of knowing that.
BY MR. JALALPOUR:
**Q. Okay. You've previously worked at different employers, for different employers, correct?**
A. Yes.
**Q. And you worked for the ARDC before, correct?**
A. I did.
**Q. And when you worked at the ARDC, you had access to their internal computer system, correct?**
A. Yes.

Page 71

**Q. And at some point in time, you stopped working for the ARDC, correct?**
A. Correct.
**Q. And you no longer have access to those internal ARDC systems, correct?**
A. Correct.
**Q. And it wouldn't make sense if you, as a former employee, would have access to those systems, correct?**
A. Correct.
**Q. Okay. Turning to page 5, paragraph 10 of your report, towards the end of paragraph 10, you write here, quote: Seinitz recorded and used images of plaintiff in areas of his property in which he had a reasonable expectation of privacy.**
**Do you see that?**
A. I see those words, yes.
**Q. And we concluded here that you don't actually know who owned or leased the property, correct?**
A. That's correct.
**Q. Okay. So it's possible that when you refer to the property as his property, that's a -- either that can be a misstatement or misleading,**

Page 72

**correct?**
A. I disagree that it's misleading.
But it's based on my understanding at that time, which was that either Mr. Seinitz -- I'm sorry -- Mr. Ivankovich himself owned the property or an entity with which he was associated owned the property.
**Q. Well, what if it was an entity in which he held no ownership interest whatsoever? Would you still consider that property to be, quote, his property?**
A. Well, I would probably phrase that differently, although --
**Q. So for example, if --**
MR. TRUPPMAN: Let him finish the answer.
BY MR. JALALPOUR:
**Q. Go ahead.**
A. Although when people rent apartments, they will often say, This is my apartment, and not indicating that they own it but indicating that they possess it.
**Q. Okay. But if he neither leased or owned the property and he neither held an ownership interest in the company that leased or owned the**

Page 73

**property, would you agree that the phrase, quote, "his property," would not be accurate?**
A. I would agree that it would be -- it could be inexact. But again, the information that I had available to me at the time I wrote this report was that there was either an ownership interest in the property or at least some sort of leasehold interest.
**Q. Okay. But if it turns out that a company leased the property and Mr. Ivankovich was not employed by that company and didn't own any part of that company, would you agree that the phrase "his property" would be misleading?**
A. No, because he could have had some kind of possessory interest in the property, which would be -- which would enable the property to be identified as, quote-unquote, his, even if his would not refer to an ownership interest.
**Q. Is it fair to say sitting here today that you don't actually know what his relationship to the property was?**
A. The only information I got that suggested that it wasn't an ownership or leasehold interest on behalf of himself or another entity was

in Mr. O'Hara's report, and I don't recall the specifics of what it said. But it tended to indicate there was some entity that owned the property.

Beyond that, I don't know what the -- or what any arrangements were with respect to the property.

**Q. Now, are you aware that the security camera was placed in a location such that it could only record images and video of what was already in public view to anyone walking on the street along -- outside of the property?**

A. I'm not aware of that.

**Q. Would that impact your opinions at all in this case?**

A. No.

**Q. You wrote here again in paragraph 10 that Steven had -- quote, had a reasonable expectation of privacy, right?**

A. That's what it says.

**Q. And you stand by that opinion, correct?**

A. Based on what I reviewed, yes.

**Q. Did you analyze what law would apply in determining whether Steven had a reasonable**



**expectation of privacy?**

A. No.

**Q. And the expectation of privacy would arise out of some law or statute or common law or constitution, correct?**

A. No, that's not what I intended to refer to when I used those words.

**Q. So what did you mean when you wrote here "reasonable expectation of privacy"?**

A. Well, I meant what a person would expect to have in a place that they either owned or leased or possessed or resided in.

I did not intend to refer to -- although I know I used the language of the constitutional law in a sense, I did not intend to imply that the Schiller firm or Ms. Stanish was some sort of state actor that was capable of violating the Fourth Amendment. That's not what I intended to refer to.

I was simply using words that I intended to denote what a person would believe they had in premises they either owned or possessed or resided in.

**Q. You assert that -- you talk about**



**Rule 4.4(a) in your report, correct?**

A. That's correct.

**Q. And just so we're clear on all the rules -- or actually, you've already testified to it. Never mind, strike that.**

**With respect to Rule 4.4(a), that rule states, quote: In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.**

**Do you see that?**

A. Yes.

**Q. And in your opinion, my client's conduct may have been inconsistent with Rule 4.4(a) with respect to violating, quote, the legal rights of Steven Ivankovich, correct?**

A. Yes.

**Q. And again, just so we're clear, you testified to it earlier, but your testimony with respect to all these rules is that my client's conduct may have been inconsistent with them, but you have not reasonably inferred that they have actually violated these rules, correct?**



A. That's fair to say, yes.

**Q. And so Rule 4.4(a) talks about legal rights, right?**

A. Yes.

**Q. And as far as I can tell in your report, the only legal right that you plausibly allude to throughout your report is a reasonable expectation of privacy; is that fair?**

A. My --

**Q. Well, strike that.**

**What legal right did my clients potentially violate?**

A. The concept of legal rights under Rule 4.4(a) is not specifically defined in the terms of the rule itself or in the comments to it. It is not limited to the concept of constitutional rights or any other particular kind of right.

So my view of it and my understanding of the rule, based on my experience in interpreting it, is that it refers to a person's rights in a broader sense than just constitutional rights or a right to privacy or what have you.

So when I concluded what I concluded in my report, what I meant is to say that my opinion

is that Ms. Stanish's conduct, to the extent that Seinitz used access to the security camera images that he was not entitled to access and to the extent that she then used those images, that was in violation of Mr. Ivankovich's rights not to be surreptitiously photographed; not to have his surreptitiously photographed image transmitted to opposing counsel in the divorce case; not to have his employee, or former employee, whichever it was, using, unauthorizedly, equipment that was installed to benefit him.

My concept is that those were rights that Mr. Ivankovich had that were violated by what occurred here.

**Q. And rights can arise out of the Constitution, for example, right?**

A. Yes.

**Q. And rights can, for example, arise out of statutes, correct?**

A. Yes.

**Q. Rights can arise out of the common law, correct?**

A. Yes.

**Q. Rights can arise out of regulations,**



**correct?**

A. Yes.

**Q. Your testimony today here is that Rule 4.4(a), in referencing legal rights, also includes rights that don't actually arise out of -- they can -- strike that.**

**Your testimony today is that 4.4(a) includes all of those legal rights, but also rights that don't actually arise out of law in any form or fashion. Is that your testimony?**

A. No, I would disagree with that. I think --

**Q. So the rights that you're talking about were violated, where did those rights arise out of?**

A. Well, Mr. Seinitz's -- I'm sorry -- Mr. Ivankovich's relationship with Seinitz created rights in Mr. Ivankovich not to have Seinitz abuse his trust in the way that he appeared to have done, or invade his access to the security camera in order to gain the images that he gained.

**Q. But what -- what legal basis is there?**

MR. TRUPPMAN: Let him finish the answer.

BY MR. JALALPOUR:

**Q. What legal basis is there for what --**



**for the rights you're referring to?**

**You stated that it arose from a relationship, but where are you basing that legally out of?**

A. Well, my understanding at the time of this -- I wrote this opinion was that there was an employment relationship between Seinitz and Ivankovich.

**Q. Okay. And so which --**

A. That there had been.

**Q. Which employment laws or rules or regulation then are you ultimately referring to then?**

A. Well, I don't have a specific one in mind.

**Q. Okay. And you don't even have what state law you're referring to here, correct?**

A. No.

**Q. You didn't do any actual analysis in identifying the source of any legal right that may or may not have been violated; is that fair?**

A. My interpretation of Rule 4.4 is not one that requires that because my understanding is that the concept of legal rights is broad.

**Q. But it's not infinite, right?**



A. I don't think so, but I don't --

**Q. So for example, if an attorney calls somebody a bad word, it might be upsetting to the other person, but that wouldn't be a violation of 4.4(a), violating the legal rights of somebody because they upset them?**

A. Well, it could be if the lawyer -- if, first of all, if the lawyer is representing a client; and second of all, if the lawyer's conduct had no purpose other than to embarrass or burden a third party or violate their legal rights.

So that still could be a violation of Rule 4.4(a).

**Q. Okay. Well, that's a good point.**

**When I talk about 4.4(a) for purposes of this discussion, I'm only referring to the second provision, the provision that bars an attorney from obtaining evidence that violates the legal rights of a person.**

A. Okay.

**Q. Okay?**

MR. TRUPPMAN: RJ, whenever you have a good breaking point, if we can take a comfort break.

MR. JALALPOUR: It will be soon.

Page 82

BY MR. JALALPOUR:
**Q. With respect to that portion of 4.4(a), somebody -- an attorney making an inappropriate joke about a non-client that might have offended that person, that generally wouldn't fall under 4.4(a) with respect to violating somebody's legal rights, fair?**
A. I'm not aware of authority that would suggest that it would.
**Q. Okay. So there has to be some sort of legal basis for the legal right to apply such that if an attorney violates it, then they have triggered 4.4(a), the latter provision of it, correct?**
A. I think that's fair to say, given the use of the phrase "legal rights."
**Q. But you haven't -- in forming your opinions in this case, you haven't actually identified what specific legal right may or may not have been violated, fair?**
A. Well, I think I did refer to Mr. Ivankovich's right to privacy in the premises he was occupying. I think that he had rights as against Seinitz not to have Seinitz unauthorizedly access his personal property, either by using the

Page 83

security camera or by accessing the security camera itself. I think that Ivankovich had rights -- legal rights as a party in the divorce case. And I think it was Ms. Stanish's responsibility not to violate those rights by obtaining information from Seinitz in the manner that she did.
**Q. So let's tackle those three, and then we can take a break.**
**It seemed like you identified three different purported rights: The right to privacy, the right to Seinitz not accessing Steven's personal property, and then the rights that he had in the divorce proceeding.**
**Is that fair?**
A. That's -- that's what I just said.
**Q. Okay. So with respect to the right to privacy, that arises out of statutory or common law bases -- well, strike that.**
**Right to privacy can arise out of the Constitution, correct?**
A. It can.
**Q. But is it fair to say that you're not alleging that Stanish violated Mr. Ivankovich's constitutional rights, correct?**

Page 84

A. No.
**Q. Right to privacy can arise out of a state statute, right?**
A. It can.
**Q. Okay. But you have not identified a specific state statute in formulating your opinion, correct?**
A. That's correct.
**Q. And the right to privacy can arise out of common law, correct?**
A. I presume so, yes.
**Q. And generally speaking, when it comes to rights to privacy under common law, that's state by state, correct?**
A. Again, I assume so.
**Q. Okay. But you didn't do an analysis of which state's common law right to privacy applies and therefore was that particular right to privacy under that particular state common law violated in this case, correct?**
A. I did not do that analysis, no.
**Q. Now, with respect to the second category, right to not access Steven's personal property.**

Page 85

**Now, that presumes that the security camera was his personal property; is that fair?**
A. Or that he had some sort of beneficial interest in it or something.
**Q. Which you don't know sitting here today; is that fair?**
A. I don't specifically know, but the information I reviewed at the time I created this report indicated that to me that it was true.
**Q. Okay. And where does that legal right to not access the personal property arise out of? I'm kind of unfamiliar with that. And -- or strike that.**
**Personal property rights generally arise out of state law; is that fair?**
A. Yes.
**Q. And you haven't identified, first of all, which state law might apply to Steven's personal property rights that may have been implicated here, correct?**
A. I did not identify that in my opinion.
**Q. And then the last category is rights in the divorce case.**
**What legal authority do you have to**

**state that Steven had certain rights in the divorce case that were implicated in any way by the security camera usage?**

A. I think every party in every civil and criminal case has rights as a party. I think they have rights to have evidence and information obtained only in certain ways and through certain processes. They have rights not to be contacted by opposing counsel, for example, if they're represented. They have rights to dispute the -- to contest or dispute discovery requests. They have rights to --

**Q. I don't mean to interrupt you.**

**I understand that there are different rights that come into play when you're in litigation, but with respect to the camera specifically, what legal rights arose from Steven's participation in the divorce proceeding that implicate how that security camera was used?**

A. The information I have reviewed indicates to me that the images from the security camera were obtained without Ivankovich's consent, knowledge, or authorization. And that they were provided to his opposing counsel, who then used the



images as part of an effort to locate him and have him taken into custody.

**Q. You're aware that in a case -- strike that.**

**Have you practiced personal injury law before?**

A. No.

**Q. Are you familiar with in a personal injury case the defendant sometimes will hire a private investigator to follow the plaintiff and see if the plaintiff is actually injured or not? Have you heard of that?**

A. I've heard of that, yes.

**Q. Okay. And so that's done pretty commonly. Would that be fair to say?**

A. I don't know.

**Q. Okay. But that wouldn't be a violation necessarily of the plaintiff's legal rights that their images and videos were being taken without their consent. Just on those facts; is that fair?**

A. It may or may not be.

**Q. Okay. But you stated earlier that he had a right in the divorce case not to have images or video of him done without his consent, but that's**



**not true. There is no bright line legal rule against that when two parties are in litigation, fair?**

MR. TRUPPMAN: Form.

THE WITNESS: I don't know if there's a bright line rule.

What I'm saying is he had a right, in my view, as a party not to have opposing counsel access images that would have otherwise been taken only for his benefit and for his protection but were accessed unauthorizedly without his knowledge, permission, or consent.

BY MR. JALALPOUR:

**Q. And it's --**

A. Using -- using a means that he either owned or controlled or deployed to his own benefit.

**Q. And is your opinion there based on any local court rule?**

A. No.

**Q. Is it based on any state statute?**

A. No.

**Q. Is it --**

A. Other than Rule 4.4(a).

**Q. Okay. Is it based on anything in**



**writing, whether through a court opinion, appellate precedent, statute, constitution, court rule, is it based on anything like that, aside from 4.4(a)?**

A. No.

MR. JALALPOUR: Okay. We can take a break now.

(Recess taken.)

BY MR. JALALPOUR:

**Q. Mr. Doppke, what images, if any, of Steven were sent by Seinitz to the Schiller firm?**

A. My understanding was that there was a video.

**Q. Sorry, I'm going to ask you about video in a second. I just want to talk about photos. I should have clarified.**

**What photo images of Steven were transmitted by Seinitz to the Schiller firm?**

A. My understanding is that there was one still image transmitted, and I believed at the time that I wrote my original opinion that it depicted "Mr. Seinitz" inside a vehicle.

The contention in Mr. O'Hara's response to my report was that it depicted only a vehicle and not Mr. Ivankovich in the vehicle. I don't know if -- I haven't restudied the photograph

before today, so I don't know exactly what it does depict, but it may or may not feature Mr. Ivankovich in that image.
**Q. If Steven is not featured at all in that image, would you agree that that image doesn't affect any privacy rights Steven may or may not have had?**
A. No.
**Q. That particular image.**
A. No, I don't agree.
**Q. Okay. So your testimony is that an image that doesn't depict Steven in any way or his property in any way can somehow still impact his expectation of privacy?**
A. My understanding is it did depict the property, either the real property or his vehicle.
**Q. Okay. So your testimony there was his vehicle.**
**What's your basis for stating that it was his vehicle?**
A. Well, that was my understanding again at the time I wrote the report.
**Q. What's your understanding based on?**
A. Just that -- the information that I had



which was -- which included the fact that Seinitz was transmitting this image to Ms. Stanish as an indication that Mr. Ivankovich was present in Florida.
Do I know the exact ownership status of the car? I do not.
**Q. If I borrowed a friend's car and then somebody took a picture of it sitting in a parking lot, would that violate my expectation of privacy?**
A. I think it could, but that's a hypothetical that isn't this case.
My understanding was that Seinitz was transmitting the image as a way of saying Ivankovich is here in Florida, and one of the ways you know that is because this vehicle is here.
**Q. Are you aware that the image of that vehicle could have been similarly photographed by somebody standing right outside the property?**
A. No.
**Q. If somebody was standing right outside the property and looked at the vehicle, maybe even took a picture, would that be a violation of somebody's expectation of privacy?**
A. Again, I can't opine on a pure



hypothetical like that. That's not this case.
This case indicates that the photograph was not taken from the sidewalk. It was taken by a camera that Mr. Ivankovich either himself controlled or at one time allowed Seinitz to control.
**Q. But answer my question though. If you can't, you can't.**
**In your opinion, would it be a violation of Steven's right to privacy or expectation of privacy if someone standing on the public road outside of the house took a picture of him?**
A. There could be circumstances that could lead someone to conclude that there was a violation of his right to privacy, but I don't know if those circumstances would be present.
**Q. Did you -- you didn't factor in at all whether the photo image taken of the vehicle outside of the property could also be obtained by somebody standing right outside the property when coming to your conclusion in this case; is that fair?**
A. I did not, partly because I understood the vehicle to be on the property, not outside the



property.
**Q. Okay. Well, let me rephrase then.**
**You didn't factor in at all whether the image of the vehicle could similarly be obtained by somebody standing outside of the property.**
A. I did not, and that would not affect my opinion.
**Q. And what video recording or video recordings of Steven were transmitted from Seinitz to the Schiller firm?**
A. The one that I recall is the video recording of him being arrested, or that's what it appears to depict.
**Q. And what do you base that off of?**
A. The information I was given to review.
**Q. Are you referring to the police body cam footage?**
A. It was a video from some -- it appeared to me that it was video taken by the security camera from the same vantage point roughly that took the picture of the still image of the car.
**Q. And when you say the video recording showed Steven being arrested, from your recollection, is Steven actually visible in that**

**video?**
A. My understanding is yes.
**Q. Okay. And if he wasn't visible in that video, would that affect your opinion at all in this case?**
A. No.
**Q. Was any sensitive information conveyed by Seinitz to the Schiller firm?**
A. I don't know what you mean by sensitive.
**Q. Well, you agree that general public -- publicly available information about somebody wouldn't constitute sensitive or private information about that individual; is that fair?**
A. Well, if it's public, it's probably not private.
But it may be something that the person intended to remain private and would consider sensitive because -- and therefore wanted it to remain private. And the fact that it became public is adverse to them in some way.
**Q. Okay. Do you understand what I mean when I say sensitive information?**
A. No.
**Q. Do you understand if I say the phrase**



**personally sensitive information?**
A. I mean, that's -- you're adding another modifier onto it, but sensitive is a very subjective word. It's -- it can mean a lot of things to a lot of different people.
A lot of people become sensitive about something that other people wouldn't become sensitive about. I can't really -- I'm not sure how to define what is sensitive or not sensitive in this case.
**Q. Was any private information of Steven conveyed by Seinitz to the Schiller firm?**
A. Again, I don't know how to answer that without speculating about what Mr. Ivankovich would have considered private information.
**Q. Was any objectively private information of Steven conveyed by Seinitz to the Schiller firm?**
A. I don't know what objectively private information is.
Again, people can consider something themselves to be private, and they're entitled to do that, and they're entitled to take measures to protect that information from disclosure, whether it's objective -- their objective consideration is



at play or not.
**Q. Now, 4.4(a), the provision we've been talking about, quote, violate the legal -- strike that.**
**In 4.4(a), it states, in pertinent part, quote: Use methods of obtaining evidence that violate the legal rights of such person.**
**Do you recall that?**
A. Yes, yes.
**Q. The word "evidence" there, what's the meaning of evidence, at least as it's used in that rule?**
A. My understanding of the rule is not that there is authority that suggests that the word "evidence" is meant to be construed strictly to refer to items or materials marked for admission in a legal case.
My understanding of the word "evidence" when it comes to Rule 4.4 is again that it can be broadly construed to include information that can be made available to lawyers for some purpose that a lawyer is seeking to be used for some purpose in connection with the legal proceeding.
**Q. And what do you base that off of?**



A. Just the fact that I'm not aware of authority to the contrary. I'm not aware of authority that indicates that Rule 4.4(a) refers only to, you know, exhibits or items produced in relation to litigation.
**Q. And are you aware of any authority that states otherwise?**
A. No.
**Q. Okay. So it's strictly your interpretation of evidence, as that term is used in Rule 4.4(a), correct?**
A. That's fair.
**Q. Now, I'm going to quote here from an appellate opinion from the State of Illinois in the case --**
MR. TRUPPMAN: Can you provide a copy of the opinion, please?
MR. JALALPOUR: I'll cite it for the record here.
BY MR. JALALPOUR:
**Q. The citation is County Treasurer v. First National Bank of Lake Forest, 87 Ill. App. 2d 133. It's a 1967 opinion.**
**And it states, quote: The word**

Page 98

**evidence, in legal acceptance, includes all the means by which any alleged matter of fact is established or disproved.**

**Do you agree or disagree that that definition of evidence would apply to 4.4(a)?**

MR. TRUPPMAN: I'll object to the form, and I'll note for the record that we don't have a copy of the case so I have no idea what it says. And the witness doesn't have a copy either.

If you can answer, go for it.

THE WITNESS: It's hard for me to conclude that a 1967 case applies to Rule 4.4, because Rule 4.4, as it currently exists, was not enacted until 2010.

There was a version of Rule 4.4 that existed in the 1990 rules, and I still can't conclude that a 1967 case bears on the interpretation of that rule either.

There was a code of professional responsibility before that. I don't think it had a precise analog to Rule 4.4. It was differently formulated and worded and numbered.

In 1967, I don't know exactly what the status of any Rules of Professional Conduct or

Page 99

codes were. It becomes kind of murky, and there were canons of ethics and things like that.

But if you're asking can a person now reading Rule 4.4 use the definition that you referred to from that case as a way of interpreting what Rule 4.4 means by evidence, I would say it could be one source of that. I don't know if that case was ever overturned or questioned in any way or if the holding there was ever deprecated by a later court.

But I would say if someone were to want to use that definition of evidence to interpret in part or as part of an interpretation of Rule 4.4(a), I don't think it would be unreasonable. And I would say that it fits, broadly speaking, with the opinions that I've expressed here.

BY MR. JALALPOUR:

**Q. Okay. And so what information conveyed from Seinitz to the Schiller firm could be used to help establish or disprove an alleged matter of fact?**

A. Steven Ivankovich's location.

**Q. Okay. But that wasn't an alleged matter of fact in the divorce proceeding, was it?**

A. It was a very much contested issue as of

Page 100

late 2024 where he was, whether he could be detained, what -- my understanding was that the body attachment orders that were issued that I have been asked in part to re -- not to review the body attachment orders themselves, but it's part of the basis of the matters that I've been asked to review, my understanding was that those were entered after he failed to appear for certain hearings in the divorce case. And as such, his whereabouts were an enormously important issues from what I could understand.

The parties were engaged in relating information about that to the Court. The -- Ms. Stanish in particular was relating information to the Court about what needed to be done from her point of view and her client's point of view to enforce the body attachment orders against Mr. Ivankovich, and the methods that they were going to use to do that.

Mr. Ivankovich's physical location was, based on my review, important to all of those issues. And as such, information about it constituted evidence within my understanding of the meaning of that word in Rule 4.4(a).

Page 101

**Q. And in what context in the divorce case was Steven's location an alleged issue in dispute in the divorce case?**

A. I think I just explained that.

**Q. Well, I'd like you to answer my question because I don't think it did.**

A. If you're talking about the term allegation in a sense of something that appears in a divorce petition as an allegation or a response or a counter pleading of some sort, I don't know the answer to that question.

But what I can say from my review is that his location was something that was being considered by the Court in late 2024 and into early 2025 and into the middle of 2025; that it was during the time frame of the events that I've been asked to review information about.

**Q. And when you say "was being considered by the Court," you're talking about with respect to enforcing the body attachment orders, correct?**

A. Yes.

**Q. Okay. And you agree that the Schiller firm was using the information about Mr. Ivankovich's whereabouts to enforce those body**

**attachment orders, correct?**
A. To achieve their legal aims and goals, yes.
**Q. But as far as you know, they didn't have any intent on using the location whereabouts information to prove or disprove any claim in the actual divorce proceeding; is that fair?**
A. I have no idea of what their intentions may or may not have been with respect to that.
**Q. But sitting here today, you don't have any knowledge of how Mr. Ivankovich's whereabouts could be used to prove or disprove any allegation in the divorce proceeding, correct?**
A. I can't speculate about that.
**Q. Okay. So sitting here today, you don't know. It could exist but you don't know.**
A. That's correct.
But I would also say that that's not -- that's not how I understand the meaning of the rule of the word "evidence" in Rule 4.4(a).
**Q. Okay. And Rule 4.4(a) talks about obtaining evidence. It doesn't say obtaining information, correct?**
A. That's correct.



**Q. And would you agree that the word information is broader than evidence?**
A. Yes.
**Q. But your interpretation is effectively evidence means information.**
A. No.
**Q. Okay.**
MR. TRUPPMAN: Did you finish your answer?
THE WITNESS: No, I'm done.
BY MR. JALALPOUR:
**Q. Returning to your report, Exhibit 1, paragraph 22, towards the middle, you write, quote: Further, Rule 3.4(a) required Ms. Stanish, and any other Schiller attorney, not to "unlawfully obstruct another party's access to evidence."**
**You see that?**
A. Yes.
**Q. Actually, strike that. We're going to come back to that.**
**With respect to the video recording that you recall of Steven, was there any audio that you could discern from that video?**
A. I don't recall. I remember watching it wondering if there was audio, and I remember trying



to turn up the volume on my laptop to see if I could hear anything, and I just don't recall right now if I could.
**Q. Okay. Let's turn to the next opinion in your report, which concerns Kevin Cremoux's call with the Monroe County Sheriff's Office.**
**And you're familiar with that aspect of your report, correct?**
A. Yes.
**Q. And for purposes of this deposition, is it okay if I refer to the Monroe County Sheriff's Office as the MCSO?**
A. Yes.
**Q. Okay. Paragraph 17 of your report, second sentence states, quote: The materials I have reviewed also do not contain a record of an affirmative communication by Mr. Cremoux to the effect that he was acting in his capacity as attorney for Plaintiff's ex-spouse. Rules 4.1, 4.3, and 8.4(c) of the Illinois Rules of Professional Conduct required Mr. Cremoux, in his communications with the Monroe County Sheriff's Office, to communicate truthfully with them concerning his role in the matter, and not to allow any misimpressions**



**regarding his role to arise by means of any misrepresentations or omissions.**
**Did I read that accurately?**
A. Yes.
**Q. Is it your testimony that Cremoux knowingly misled the MCSO dispatcher?**
A. I can't determine that based on the materials I reviewed, so no.
**Q. And one of the documents you did review in coming to your opinions was the MCSO call record document. Do you recall that?**
A. Yes.
(Deposition Exhibit No. 13, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, we've handed you Exhibit 13, which is a document titled Monroe County Sheriff's Office, Call History, which I'll refer to as a call record going forward; is that fair?**
A. Yes.
**Q. And there's a box towards the middle of this document labeled Remarks. Do you see that?**
A. Yes.

**Q. And in the third line, the following words are written, quote: RP is calling from Chicago PD and has a civil warrant.**

**Did I read that accurately?**

A. Yes.

**Q. Have you assumed based on this document that the person who wrote that comment believed that Kevin Cremoux was a member of the Chicago Police Department?**

A. Well, it says he was calling from Chicago PD, and a further entry at the top of the box marked Remarks indicates complaint type changed from Warrant Service to Assist Agency.

So reading those two things together, I concluded that the -- whoever was writing in the field entitled Remarks believed that Cremoux was calling from the Chicago Police Department and that the matter was involving assisting the Chicago Police Department.

**Q. Okay. Do you know the name of the dispatcher that Mr. Cremoux spoke with?**

A. I do not.

**Q. Do you know if the dispatcher was actually the person who typed these comments?**



A. I do not.

**Q. Have you seen any testimony from the dispatcher?**

A. No.

**Q. You listened to the audio of the conversation between Cremoux and the dispatcher, correct?**

A. I did.

**Q. Did Cremoux ever state that he was a member of any law enforcement agency in that call?**

A. Not that I heard.

**Q. And I'm going to quote for you part of the conversation here, quote:**

**Dispatcher: It's going to be a warrant service?**

**Cremoux: It's going to be a civil warrant service. Obviously I -- I -- you know, they're going to want to make sure that they see the warrant on their side because this is a warrant that comes out of Chicago, Illinois, Cook County.**

**Dispatcher: Okay, where are you calling from again?**

**Cremoux: Chicago, Illinois.**

**Did that restatement of the**



**conversation, at least that portion of it, does that ring a bell to you?**

A. I recall hearing words to that effect exchanged. I couldn't reproduce them exactly, but --

**Q. Would it help if I actually played it for you?**

A. I mean, I'll -- I'll take your representation that that's what was said.

**Q. Okay. So in that part of the conversation, the dispatcher did not ask Cremoux what police department he was calling from, correct?**

A. Not that I recall, and not that I heard you just say.

**Q. She asked where Cremoux was calling from, correct?**

A. Yes. And he answered by saying the location, Chicago, Cook County.

**Q. And the term where can be reasonably interpreted to be referring to a location, correct?**

A. It can be.

**Q. It's not your testimony sitting here today that Cremoux understood the dispatcher to be asking what police department he was calling from and that he purposefully chose not to inform her**



**that he wasn't part of any police department; is that fair?**

A. I don't know what he understood about her questions, so I didn't -- do not opine about that.

**Q. And then later on in that conversation, the dispatcher states this, and Mr. Cremoux responds.**

**Quote, Dispatcher: And you said so you have the warrants and they're registered in NCIC?**

**Cremoux: That's correct. And due to protocol, the sheriff's department in Cook County, Illinois, they could not give me the NCIC number. But they have the NCIC number themselves, and they told me it's registered nationally in the system.**

**Okay. Does that back and forth ring a bell to you?**

A. Yes, I recall that.

**Q. Okay. And if -- theoretically Mr. Cremoux could have possibly been -- strike that.**

**If Mr. Cremoux was intending to mislead the dispatcher into believing he was part of law enforcement, would it make sense for him to inform the dispatcher that he didn't have access to**

**the NCIC?**

MR. TRUPPMAN: Form.

THE WITNESS: I don't know what it would have occurred to him to say or not say if he had an intention to deceive. What I affirm is that he did not state himself that he himself was a law enforcement officer.

BY MR. JALALPOUR:

**Q. Okay. But logically speaking, if he intended on misleading the dispatcher, would it make sense logically to inform the dispatcher that he did not have access to the NCIC?**

MR. TRUPPMAN: Form.

You're asking about logic?

MR. JALALPOUR: Yeah.

THE WITNESS: Again, I can't speculate.

My experience in handling matters in which lawyers are accused of engaging in conduct intended or calculated to deceive is that they, like many people, say a lot of things when they intend to deceive. And sometimes it makes sense, sometimes it doesn't.

BY MR. JALALPOUR:

**Q. Okay. Would you agree that if he was**



**intending to deceive the dispatcher into believing he was a law enforcement member, it would not make sense to disclose that he had no access to the NCIC; is that fair?**

MR. TRUPPMAN: Form.

THE WITNESS: I wouldn't agree, because he could be intending to deceive in some other way other than by implying access to NCIC.

That is, he could be -- and again, understand this is speculation. He could say, I do not have access to NCIC, and still intend to convey that he was some kind of law enforcement officer that lacked that kind of access for whatever reason.

And I'm not saying in that testimony that he did do that. I am not concluding that. I'm saying it's possible.

BY MR. JALALPOUR:

**Q. And I get that. I'm not asking you to say dispositively does that fact that he conveys a lack of access to the NCIC completely disprove any intent to deceive. That's not my question. My question is different.**

**If his true intent was to deceive the dispatcher into believing he was a law enforcement**



**member, do you agree that it would not make sense to disclose that he lacked access to the NCIC?**

MR. TRUPPMAN: Form.

THE WITNESS: No, I can't agree.

BY MR. JALALPOUR:

**Q. Would you agree that a person not having access to the NCIC makes it more likely than not that they are not law enforcement member?**

MR. TRUPPMAN: Form.

THE WITNESS: No, because I am not experienced with NCIC.

But I believe it's possible that not every law enforcement agency has access to it. And part of my reason for believing that is based on some of the materials I've received in this case and reviewed in this case in which even -- I think it was the Summit County, Colorado, sheriff's office was having trouble accessing some information through NCIC. There was also information input into a LEADS system, which I understand is Illinois only.

And so it appears to me, and I have only a generalized understanding of this, that some agencies can have access to some systems while others do not.



And therefore, it appears to me that Cremoux could have made any kind of representation about what his access was or was not and still had an intent to deceive.

BY MR. JALALPOUR:

**Q. Are you aware of which police departments in the U.S. lack access to the NCIC?**

A. I'm not.

**Q. Are you aware of any police departments in the country that lack access to the NCIC?**

A. I'm not.

**Q. Are you aware of whether Chicago Police Department does or does not have access to the NCIC?**

A. I have no idea.

**Q. Would you agree that informing the dispatcher that he lacked access to the NCIC, to the extent it had any effect on the listener, it would dissuade the listener from believing -- it would tend to dissuade the listener from believing he was a law enforcement member?**

MR. TRUPPMAN: Form.

THE WITNESS: I can't speculate on that. The listener here was a law enforcement officer of a certain kind himself, or themselves, or at least was

a dispatcher employed by a law enforcement agency and would have understood that question in a way -- or that statement, I should say, in a way that I can't surmise about.

BY MR. JALALPOUR:

**Q. You discuss in your report Rule 4.3?**

A. Yes.

**Q. And if you want to turn to your rule packet, the first sentence of 4.3 states, quote: In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.**

**Did I read that correctly?**

A. Yes.

**Q. Did Cremoux ever state in his call with the MCSO dispatcher that he was disinterested?**

A. Not that I'm aware of.

**Q. And in fact, he was advocating for the arrest of Mr. Ivankovich, correct?**

A. Well, that's one way of putting it, I suppose, but he -- from my analysis, the part of his conversations with the MCSO that I was focusing on was the fact that he did not state or imply that he was a litigant -- I'm sorry -- an attorney for a



litigant against Mr. Ivankovich, or that he was a representative of a law firm that was itself a creditor of Mr. Ivankovich.

**Q. The next sentence states, quote: When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.**

**Do you see that?**

A. Yes.

**Q. The only basis you have to assert that the dispatcher was operating under the mistaken belief that Cremoux was a law enforcement member is the call history log in Exhibit 13, correct?**

A. That's a powerful piece of evidence of it because that's what it does tend to indicate.

I would also say that beyond that, Cremoux used the word "warrant" to refer to body attachments, and that was another piece of evidence that indicated to me that someone hearing that could conclude that he was not a lawyer but rather a law enforcement officer.

**Q. Okay. But my question is: Besides Exhibit 13, the call log, is there any other**



**document or evidence that leads you to conclude that the dispatcher was operating under the mistaken belief that Cremoux was a member of law enforcement?**

A. Well, the document in Exhibit 13 I would say is the strongest evidence of it, although as I say in my report, not conclusive.

And I just described another factor that I think could have assisted in creating the impression that Cremoux was a law enforcement officer and not an attorney.

Those are -- those are the principal ones that I can think of right now that I would rely on.

**Q. But my question isn't about what factors may have led to that mistaken belief. I'm asking specifically about the mistaken belief.**

**Aside from Exhibit 13, do you have any document, recording, transcript that supports the conclusion that the dispatcher was operating under the mistaken belief?**

MR. TRUPPMAN: Form, asked and answered.

THE WITNESS: No, I don't.

BY MR. JALALPOUR:

**Q. Okay. And as far as you know, Cremoux**



**did not have a copy of this call record, Exhibit 13, at or around the time of his call with the dispatcher, correct?**

A. I don't know, but I assume he didn't.

**Q. Okay. Cremoux had no reasonable basis to believe that the dispatcher thought he was a police officer, correct?**

A. Well, that I can't opine on.

**Q. Well, did the dispatcher ever refer to him as a member of law enforcement?**

A. Not -- you mean in the conversations that they were having?

**Q. Correct.**

A. Not that I'm aware of.

**Q. Did the dispatcher ever refer to him as "Officer"?**

A. Not that I'm aware of.

**Q. And mistakes can happen, right?**

A. Of course.

**Q. And as we saw in your report, there was a mistake in your report, right?**

A. Yeah.

**Q. And that wasn't intended to deceive, correct?**

A. Certainly not.
**Q. And one could reasonably conclude that there was no intent to deceive here by Cremoux, correct?**
A. It's possible to conclude that, as I said in my report, yes.
**Q. I want to now discuss your opinion with respect to the NCIC order. And I've grouped that part of your report into two different opinions: One relates to what transpired and was stated in court; and then the next opinion relates to what was communicated by Cremoux to the Cook County Sheriff's Office. Is that fair?**
A. Yes.
**Q. Okay. So let's start with what transpired in court.**
**You base your opinion in part on the court transcript from November 6, 2024, correct?**
A. Yes.
**Q. Paragraph 22 of your report, first sentence states, quote: The materials I have reviewed further indicate that Ms. Stanish did not provide copies of her or Mr. Cremoux's correspondence with the various law enforcement**



**agencies concerning LEADS and NCIC. Rules 3.3(a) and 8.4(c) required Ms. Stanish, and any other Schiller attorney, to truthfully state her or their intentions concerning providing copies of documents or other materials to plaintiff's attorneys.**
**Did you see that?**
A. Yes.
**Q. And you base that statement in large part on the transcript from the November 6, 2024, hearing, correct?**
A. Yes.
**Q. And then when did Cremoux communicate with the Cook County Sheriff's Office as far as you can recall?**
A. I believe it was in late April of 2025.
**Q. So about five months later?**
A. Yes.
**Q. Now, in that sentence we read in paragraph 2022 -- paragraph 22, you're not stating that Ms. Stanish at that hearing intended to have Cremoux five months later have correspondence with the CCSO, and that she knew it at that time at the hearing and she didn't disclose it; is that fair?**
A. That's correct. I'm not saying that.



**Q. Okay. And when you write in that first sentence of paragraph 22, quote, documents or other materials, what do you mean by that phrase? Documents or other materials.**
A. In her colloquy with the Court on November 6th of 2024, Ms. Stanish was discussing the process that she was envisioning for providing the body attachments to NCIC or having them entered into a database administered by the NCIC.
There was a discussion between her and Mr. Wittenberg and the Court of forms that were possibly going to need to be generated in order to do that. But beyond that, there was a discussion of Ms. Stanish -- what Ms. Stanish referred to as whatever we need to submit. And her statement to the Court was that she would provide whatever they needed to submit to Mr. Wittenberg and his firm.
So that's what I'm referring to when I say documents or other materials.
**Q. Well, let's take a look at that transcript.**
(Deposition Exhibit No. 18, Witness Doppke, was marked for identification 05/20/2026.)



BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 18, which is an excerpt from the November 6, 2024, hearing transcript. And I want you to turn your attention to page 28.**
A. Okay, I have it.
**Q. And this might take us a little bit, but I want to read for the record a portion of what transpired here at the November 6 hearing, quote:**
**"The Court: Okay. Enough. This is not the first time this issue has been brought by the suggestion of the Cook County Sheriff's Office in cases similar to this. And orders have been entered and what will happen, will happen with respect to the National Crime Information Center."**
**Later on, the Court states, quote:**
**"No, I am entering -- put the body attachments in there. Whatever happens, happens. If they are rejected and information is incorrect in the center, send it back saying this doesn't fit with our protocol, then we'll --**

**we'll have that answer. If they accept it, they accept. Let's move on. What's the next issue."**

**Did I read that accurately?**

A. Yes.

**Q. And then if we go to the next page, page 29, Mr. Wittenberg states, quote:**

**"Judge, my guess, knowing the NCIC from what I've looked at, is they are going to require certain documents to be filled out. If your order is all they're entitled to do as part of this process is hand them your order or your body attachment, that's one thing. My strong suspicion [sic] is that what's going to happen is they're going to fill out documents that are going to have certain questions and certain answers. And I think if -- before we allow somebody to go into the system and just fill things in as they believe it's appropriate, we should have a right to review what's being filled out and what's being submitted."**



**The next page, Ms. Stanish states, quote:**

**"So, Judge, we will fill out whatever paperwork is necessary to complete the process. We will do it with our ethical rules in mind as to what we're spinning to the NCIC. We will offer a copy of whatever we have to submit to counsel so that they can have transparency."**

**Did I read that accurately?**

A. Yes.

**Q. Now, where in that transcript that we just looked at does Stanish obligate herself to forward all communications with the Cook County Sheriff's Office to Steven's attorneys?**

A. She says on page 30 beginning at the end of line 10:

"We will offer a copy of whatever we have to submit to counsel so that they can have transparency, a word that they should know about. We will offer all of that on our side of the equation."



**Q. And so your interpretation of that is that she was committing to sending any and all correspondence with the Cook County Sheriff's Office to Steven's attorneys?**

A. My opinion is that, at minimum, she committed to sending to Mr. Wittenberg and his office that which they were submitting to whichever agency it was necessary to submit something to to enter the orders into the NCIC.

And whether that is characterized as every single email between her office and Mr. Cremoux and the Cook County Sheriff's Office, I don't know. But my understanding from my review is that none of it was submitted, and that that is not consistent with the obligation that she undertook on that date.

**Q. And then if you read line 15, the Court says: "Okay, include it in the order."**

**You see that?**

A. I see that.

**Q. And was there any language in the NCIC order about having to convey the information you purport to say Ms. Stanish was obligated to?**

A. Not that I'm aware of, but I'm not



exactly sure what Judge Scannicchio when she said "it," when she said, include it in the order, I'm not sure what she was referring to.

**Q. And is it your opinion that this portion of what Ms. Stanish said was an important part of what transpired at that hearing?**

A. Well, I think probably if you ask the attorneys it was all important, but I -- reading this part was important to my analysis.

**Q. Okay. And if it was that important and it created an ethical obligation on her behalf, you would expect that that -- that the court order would reflect that, correct?**

A. I don't know who drafted the order. I don't know how the order was drafted. I don't know what process it went through in order to be reviewed, drafted, approved, and signed and entered.

I have seen situations where something is said by a Court, even ordered orally by a Court that doesn't make it into an order. That doesn't lessen the obligations of the parties.

**Q. Okay. But your testimony is this created an ethical obligation on her behalf, what she stated in that -- at that hearing, correct?**

Page 126

A. I'm saying she actually had an ethical obligation that existed to be truthful with the Court about what she was saying and what she was going to do.
I also believe that she undertook an obligation -- and whether you characterize it as an ethical obligation or not, she undertook an obligation as an officer of the Court to do something that the Court was interested in her doing.
**Q. Okay. And is it your interpretation that the Court ordered her to do that?**
MR. TRUPPMAN: Form.
THE WITNESS: I don't know what Judge Scannicchio's mindset was or what her intention was when she was entering the order or dealing with the issues that are represented in this transcript.
But I think Ms. Stanish said what she said for a reason, and I think it was to convey to the judge that there would be transparency. And she even, you know, worked in a sort of zinger to Mr. Wittenberg, referencing some prior dispute about where she appeared to think that Mr. Wittenberg had not been transparent.
And I think the intention was to

Page 127

undertake an obligation. Whether Judge Scannicchio was going to order it or not, the intention was to undertake an obligation to offer, quote-unquote, all of that, or, quote-unquote, whatever we have to submit to Mr. Wittenberg and his firm.
BY MR. JALALPOUR:
**Q. Did Steven's attorneys believe that she -- that Stanish was obligating herself to provide all the information you claim she was obligating herself to provide?**
MR. TRUPPMAN: Form.
THE WITNESS: I don't -- I don't know what they believed.
BY MR. JALALPOUR:
**Q. Okay. But if it was an obligation that she undertook, you would expect that to be in the court order, wouldn't you?**
A. Not necessarily.
**Q. And you stated earlier you don't know who drafted the court order, correct?**
A. I do not.
**Q. And that could play a role in how you construe the court order, correct?**
A. What could?

Page 128

**Q. Who drafted or participated in the drafting of the court order could impact your opinion on this issue, correct?**
A. I don't know. Because I don't know what the fact is, I don't know how -- if or how it could affect my opinion.
(Deposition Exhibit No. 17, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 17, which is the NCIC order, correct?**
A. I see it, yes.
**Q. And it's actually stamped December 20, '24, but near the judge's signature, it says, nunc pro tunc November 6, 2024, correct?**
A. I see that.
**Q. And nothing in this order references Stanish or the Schiller firm's obligations to send copies of their communications with the Cook County Sheriff's Office to Steven's attorneys, correct?**
A. It does not contain language to that effect.
**Q. And by the way, turning very briefly to**

Page 129

**Exhibit 18, page 2 shows a number of attorneys that appeared at the hearing on behalf of Steven.**
**Do you see the Beermann attorneys there?**
A. Yes.
**Q. And that's there's Matthew Elster, Thomas Field, and Jason Krawetz, K-r-a-w-e-t-z? Do you see that?**
A. I see that.
**Q. And on the next page, we also have Michael Wittenberg and Kathleen Opal on behalf of Steven at that hearing, correct?**
A. I see that.
(Deposition Exhibit No. 19, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 19 which is an excerpt from the December 20, '24, hearing transcript in the divorce case.**
**Do you see that?**
A. I see that, yes.
**Q. And if we look at page 2, we see that**

Page 130

again Matthew Elster and Jason Krawetz as well as Steve Wittenberg and Kathleen Opal were all present again for Steven. Do you see that?

A. I see that.

Q. So let's turn to page 78 of the transcript. Actually, let's go back one page, 77, and I'll read for the record here and then ask some follow-up questions.

Bottom of page 77, quote, from Ms. Stanish:

"These are the two, your Honor. Judge, I don't know if you need them, but from the sheriff's office we have the sheriff ID numbers for those body attachments if you need them.

"The Court: Why don't you give them to me? That might be helpful.

"Ms. Stanish: Okay. So for the body attachment that was entered in May, that ID number is 20109614.

"The Court: Okay.

"Ms. Stanish: And for the body attachment that was entered -- the one that was entered September 2024, that ID

Page 131

number is 20145526.

"The Court: Okay.

"Ms. Stanish: Okay, I think that's it.

"The Court: I think that's it.

"Ms. Stanish: Thank you, Judge.

"The Court: Thank you, all.

"Mr. Wittenberg: Are we done?

"The Court: Unless you want to wait for the signed copy of the order and ruling everything into NCIC, which you can if you'd like.

"Ms. Stanish: We'll wait, your Honor.

"Mr. Elster: Can we go off the record?

"The Court: Sure. Off the record."

They then came back onto the record, quote:

"The Court: Counsel, can you just look at this order quickly?

"Mr. Elster: Is it an oral motion?

Page 132

"The Court: Yes.

"Mr. Elster: You have 204 instead of 2024. I believe it was May 8th.

"The Court: Where else?

"Mr. Elster: The preamble it says 2204. An oral motion. It says former marriage.

"The Court: I apologize. And the date of this hearing?

"Mr. Elster: I want to say it's a Monday.

"Ms. Dice -- D-i-c-e -- Is it November 6th?

"The Court: November 6th, okay.

"Mr. Wittenberg: You are stamping the order November 6th?

"The Court: I'm nunc pro tuncing it to November 6th. Anything else with that order? Otherwise, I'll print out a few more copies.

"Mr. Wittenberg: Not that we saw.

"The Court: Okay. Everyone have a good holiday."

Page 133

Did I read that accurately?

A. Yes.

Q. And had you seen this transcript before?

A. No.

Q. And that discussion that we just went through from the transcript, that was about the NCIC order, correct?

A. It appears to be.

Q. And Mr. Wittenberg and all the other attorneys that Steven has in the divorce case, none of them brought up the -- including in the order any language about the Schiller firm having to forward communications and other materials to Steven's attorneys, correct?

A. Well, I would say that first by noting that I think it's only Mr. Wittenberg and his firm representing Mr. Ivankovich personally.

But in any event, there was no corollary -- or colloquy, I should say, in the portion of the transcript that you read that addressed the sharing of information.

Q. Okay. And at least in what you saw, none of Steven's attorneys asked that the order be modified to include language about the Schiller firm

Page 134

**having to forward all of their communications with**
**the CCSO to Steven's attorneys, correct?**
A. Not in the portion of the transcript that was just read to me.
**Q. And just so we're clear, when you talked about who Steven was being represented by, I want you to refer again to page 2.**
**Page 2 lists two attorneys from the Beermann firm, Matthew Elster and Jason Krawetz, as appearing on behalf of Steven, correct?**
A. You're correct. I apologize. I didn't catch that they were appearing personally.
**Q. And then also just so we have a clear record, two attorneys from the Wittenberg firm, Steven Wittenberg and Kathleen Opal were there for Steven, correct?**
A. Yes.
**Q. So we have four attorneys for Steven all present, and they were all present at the prior hearing from November 6th, correct?**
A. As far as I know.
**Q. Okay. And none of them chose to mention to put in the order an obligation requiring Stanish and the Schiller firm to forward their**

Page 135

**communications with the CCSO to Steven's attorneys, correct?**
A. That appears to be the case.
**Q. And Steven's attorneys, as far as you know, never filed a motion with the Court subsequent to the entry of the NCIC order asking to modify it, correct?**
A. I do not know if they did or didn't.
**Q. And as far as you know, there was nothing to prevent them from doing so, correct?**
A. I know no bar to it.
**Q. Okay. Returning to your report, Exhibit 1, paragraph 22 -- actually, before we get to that, you're of the opinion that Ms. Stanish's statements during that November 6th hearing created certain obligations, correct?**
A. That's fair to say, yes.
**Q. But that's your interpretation of what was stated, fair?**
A. Yes.
**Q. Could Stanish or any other person reasonably interpret it in a different manner?**
A. I -- I don't -- I can't -- I can't speculate on what Ms. Stanish might surmise or not

Page 136

surmise about her own words, but my opinion is that my interpretation of it is a reasonable one.
**Q. Okay. Setting aside what Ms. Stanish did or did not think, could somebody arrive to a different conclusion than you, and it being a reasonable conclusion, about how to interpret what Ms. Stanish said at that hearing?**
A. I really don't know how to answer that without speculating.
**Q. Okay. Again, paragraph 22, towards the middle, you write, quote: Further, Rule 3.4(a) required Ms. Stanish, and other any other Schiller attorney, not to "unlawfully obstruct another party's access to evidence."**
**Do you see that?**
A. Yes.
**Q. And Rule 3.4(a) states that a lawyer shall not unlawfully obstruct another party's access to evidence.**
**In part, that's what the rule says, right?**
A. Yes.
**Q. And is it your contention that Cremoux's emails with the CCSO constitute evidence under Rule**

Page 137

**3.4(a)?**
A. Yes.
**Q. Okay. And the rule talks about unlawful obstruction, right?**
A. Yes.
**Q. And is it your -- is your interpretation of 3.4(a) that unlawful obstruction can also include failing to disclose?**
A. Yes.
**Q. Steven was able to obtain the emails between Cremoux and the CCSO, correct?**
A. I believe that occurred in this litigation, but yes.
**Q. And are you also aware that in responses to requests to produce in this case the Schiller firm did produce those emails?**
A. I believe so. I don't have any specific knowledge of that though.
**Q. Does the fact -- or strike that.**
**You understand that the emails between Cremoux and the CCSO did not include Tanya Stanish.**
A. I didn't see any emails that did include her. I don't know if there exists any, but based on

Page 138

what I've reviewed, she was not on the email messages or chains that I reviewed.

**Q. And as far as you know, Kevin Cremoux was not at that November 6th hearing, correct?**

A. I don't know, but I believe the transcripts don't say that he was.

**Q. Okay. And are you aware of any evidence that Stanish was aware of those email -- of that email correspondence between Cremoux and the CCSO?**

A. I have no way of knowing what she was aware of other than to say that she wasn't herself copied on the email messages that I saw. They could have been forwarded to her. She could have gained knowledge of them some other way. I do not know and cannot speculate.

**Q. And with respect to Cremoux, you're not aware of whether he ever reviewed that November 6th, 2024, hearing transcript, correct?**

A. I don't know one way or another.

**Q. And isn't that part of the reasons why if something important is ruled upon or ordered at a hearing that that be placed into a court order, so that the parties and the attorneys can all be on the same page as to what the Court's requiring?**

Page 139

MR. TRUPPMAN: Form.

THE WITNESS: Again, to the extent that the transcript in Exhibit 19 indicates that Judge Scannicchio herself drafted the order, then I can't speculate on what was in her mind as she chose what to include or not to include, or why she reasoned the way she did.

I can affirm that the language relating to Ms. Stanish's commitment to provide copies of materials submitted in connection with the NCIC submission was not in the order. I understand that it wasn't.

Why that is, I can't speculate about. But it doesn't change my opinion, the fact that it's not.

BY MR. JALALPOUR:

**Q. You understand that Steven's attorneys were informed when the body attachment orders and the NCIC order were submitted to the Cook County Sheriff's Office, correct?**

A. I have no knowledge of that.

**Q. Okay. Let's move on to the next aspect of your opinion as it relates to the NCIC order.**

**Paragraph 21, first sentence from your report states, quote: Mr. Cremoux's conduct as described in paragraph 20, above, appear to represent efforts not just to enter the orders into the NCIC database, but to cause the orders to be entered after being advised that they could not be entered in their then-present form.**

**Do you see that?**

Page 140

A. Yes.

**Q. And the emails between Mr. Cremoux and the CCSO, those occurred in April of 2025, correct?**

A. Correct.

**Q. Did you -- were you aware that the body attachment orders had already been entered into the NCIC system months prior to that?**

A. No.

**Q. You weren't -- you're not aware that they were actually already in the NCIC system as of April 2025. Is that your testimony?**

A. No. My understanding was that the orders required them to be entered, and then these communications took place to ensure that they were entered and that they reflected as nationwide extraditable.

**Q. And in that paragraph 21, the phrase, could not be entered in their present form, who advised Cremoux about that?**

Page 141

A. Well, my recollection of the colloquy he had with -- I believe the main one he was corresponding with was a Cook County sheriff's officer named Colin Luce, L-u-c-e, centered around whether the orders reflected the terminology "nationwide extraditable."

And that to the extent they did not, Cremoux or his colleagues would need to ensure that that kind of terminology would be inserted into the orders, or that the orders would be amended to include it, such that a law enforcement agency could act on them out of state.

And so the fact that that was what the colloquy was about led me to conclude that what we were talking about was -- what they were talking about was entering the orders so that the orders could be enforced, and that the present form of the orders at that time did not allow for what Cremoux was asking for.

**Q. And your testimony is that that exchange occurred between Cremoux and Mr. Luce?**

A. That's my recollection.

**Q. And if it turns out that that's incorrect, that would affect your opinion, right?**

A. It could, as I said in the introduction to my opinion.

(Deposition Exhibit No. 21, Witness Doppke, was marked for identification 05/20/2026.)

BY MR. JALALPOUR:

**Q. Before we turn to Exhibit 21, from your recollection, how was that information conveyed by Mr. Luce to Kevin Cremoux?**

A. Was what information?

**Q. You talked -- you testified that Luce informed Cremoux that the body attachment orders couldn't be entered into the NCIC system in their present form to allow for nationwide extradition, and that that's what the colloquy was about.**

**How was that all communicated from your recollection?**

A. Well --

**Q. Well, let's set aside Exhibit 21.**

**From your recollection, how was that communicated?**

A. My recollection was that there were a



series of emails between Mr. Cremoux and Mr. Luce and another sheriff's department employee who was actually just emailing with Mr. Luce and not Mr. Cremoux, and I can't remember her name.

But -- and there were sort of gaps within -- or between the emails in time that I couldn't quite decipher. That is, I don't know who was communicating with who when about what.

But the import of reading the entire thread seemed to me to be that Cremoux was asking for the orders to be entered into NCIC such that they could be enforced on a nationwide basis, wherever Mr. Ivankovich happened to be. And that the Cook County State's Attorney -- I'm sorry -- the Cook County Sheriff's Office was taking the position that that couldn't happen unless additional language were entered.

And there's an email from Mr. Luce to the other sheriff's office employee saying, the attorney, meaning Mr. Cremoux, can get any language added to the order that you all need. And he didn't say this, but in order to get that done.

And then that other employee writes back and says they're updated, they're in, and the



import of that was that they would be able to be nationwide extraditable, according to what Mr. Cremoux was asking for.

So there wasn't an exact one-to-one correspondence between what Mr. Luce was saying -- that is I don't recall an email in which Mr. Luce told Mr. Cremoux, no, we cannot do that. But that appeared to be the import of the conversation because additional steps did need to be taken. Mr. Cremoux was following up on that and trying to ensure that those steps would be taken.

That's what I -- that was my interpretation of the email exchanges.

**Q. You're extrapolating quite a bit though there, aren't you?**

A. I don't know that I am. I'm just reading them the way I read them.

**Q. Let's go through first Exhibit 21, and let's start at the bottom email on the last page.**

MR. TRUPPMAN: RJ, I don't mean to rush you. Just trying to get a sense of timing.

MR. JALALPOUR: Probably about 30 minutes.

THE WITNESS: I have to stop at 1:45. I have to get back to the suburbs. I mean, I was here



before 10 o'clock, so it's a three-hour dep.

MR. JALALPOUR: Well, we're in federal court, but let's see what we can hammer out here.

BY MR. JALALPOUR:

**Q. Bottom of Exhibit 21 is an email from Kevin Cremoux dated April 24, 2025, to Chris Kimble from Summit County and Colin Luce from the CCSO, correct?**

A. Yes.

**Q. And in the email, he says, quote: Hi Chris, I'm attaching the two civil body attachment orders against Steven Ivankovich, as well as the court order requesting entry of these orders into the national NCIC system. I am CCing to this email Colin Luce, who is the superintendent of the Cook County Sheriff's Office Civil Division. He has agreed to provide you with the NCIC numbers if you call his cell phone number, which I've provided to you earlier.**

**You see that?**

A. I see that.

**Q. And by the way, doesn't that indicate to you that the orders are already in NCIC if there's already NCIC numbers for the two orders?**

Page 146

A. It could indicate that, but I don't know as of when those were in compared to when these emails are dated.
**Q. Okay. And then the next email is actually again from Kevin Cremoux, later that day, and he says, quote: Colin, can you confirm that the body attachment orders have been entered into the NCIC system as "nationwide extraditable"? I have been told this designation needs to be added in order for the body attachment orders to appear outside of Illinois. Please advise and thank you for your help with this.**
**Did I read that accurately?**
A. I think so, yes.
**Q. Mr. Luce responds 3 minutes later.**
**Do you see that?**
A. Yes.
**Q. He states, quote: If not, I'll get it done. Might take a day or two.**
**See that?**
A. Yes.
**Q. Okay. From what we've so far read from this email chain, has Mr. Luce advised Cremoux that the body attachment orders can't be marked as**

Page 147

**nationwide extraditable on NCIC?**
A. No.
**Q. The next day, there's an email from Colin Luce to Cremoux and Chris Kimble on April 25, 2025, and he states, quote: The LEADS entry should now reflect the full extradition.**
**And then he provides a LEADS number.**
**Do you see that?**
A. Yes.
**Q. Cremoux then responds: Thank you, Colin. Chris, can you let us know if the civil warrants appear on your end now?**
**Did I read that accurately?**
A. Yes.
**Q. Chris Kimble responds that same day, April 25: Good afternoon. Unfortunately, we don't use LEADS here in Colorado and we're still not seeing it in NCIC.**
**Okay? Is that correct?**
A. Yes.
**Q. Did I read that accurately?**
A. Yes.
**Q. And then Kevin responds that same day: Hi Chris, slash, Colin. Any update on the**

Page 148

**extradition label being added in NCIC? My understanding was that it was done through LEADS but that Colorado only has access to NCIC orders. LEADS is Illinois only.**
**And he says: Sorry for continuing to reach out, slash, asking for updates. I'm receiving a lot of pressure from my firm about getting this fixed. Any help, slash, assistance is much appreciated.**
**Did I read that accurately?**
A. Yes.
**Q. Colin then responds on Monday, April 28th, quote: Have the local agency check him again in NCIC and make sure you ask them to run him by name and DOB.**
**He later states in that email: It should be in NCIC without issue now.**
**You see that?**
A. Yes.
**Q. So far, has Mr. Luce advised Cremoux that the body attachment orders can't be marked as nationwide extraditable in their present form?**
A. No.
**Q. Based on this email chain?**

Page 149

A. No, not based on this email chain.
**Q. In fact, he never even mentions a peep about that in this email chain, correct?**
A. He does not say those words.
**Q. Okay. Now let's turn ...**
**Do you still stand by the statement in paragraph 21 of your report that Cremoux was, quote, advised that they could not be entered in their then-present form?**
A. I wouldn't say in these emails he was so advised explicitly, but what he was told was that steps needed to be taken. Mr. Luce said in response to a question of whether the body attachment orders have been entered into the NCIC system as nationwide extraditable, he said, if not, I'll get it done. Meaning, additional steps would have to be taken in order to get it done. He said it might take a day or two, meaning it would take some at least internal processes, if not external.
The other emails that I reviewed between Mr. Luce and the other sheriff's office employee, whose name I can't remember, indicated that certain steps did need to be taken.
So I think it is still correct to

state that the orders couldn't be entered as nationwide extraditable in their then present form.

And I realize I didn't say as nationwide extraditable; I said entered. And that's because that was my understanding of the status of the body attachments at that time.

If that's incorrect, that still doesn't change my opinion. I would just simply add the words, entered as nationwide extraditable, after the word "entered" in the latter part of the first sentence of paragraph 21.

**Q. Okay. So but the emails between Cremoux and Colin Luce do not indicate that Cremoux was advised by Mr. Luce that the orders cannot be entered as nationwide extraditable in their present form; is that correct?**

A. Not in those emails.

**Q. Okay. And have you seen any testimony from the participants to any conversations between Cremoux and Luce in which somebody testified that that is what Cremoux was advised?**

A. No.

**Q. Okay. And so you're extrapolating from the other -- the emails between the two CCSO**



**employees to come to your conclusion that Cremoux was advised that the orders couldn't be entered as nationwide extraditable in their present form?**

A. I'm saying the totality of the materials I reviewed, including the emails in Exhibit 21, even if they don't say from Mr. Luce, Dear Mr. Cremoux, we cannot enter these orders in their present form, the connotation and the implication of them is that that is the case, and --

**Q. Where in this email chain is there any connotation, and I want you to specify the exact email.**

**Where is there any connotation that there would be an issue entering the body attachment orders as non extra -- nationwide extraditable?**

A. Well, when you say "an issue," that's not very exact. But I would point back to the question from Cremoux and the answer from Mr. Luce on April 25th, 12:05 p.m. -- I'm sorry, I'm looking at the wrong one -- April 24th at 5:26 p.m., page 5: If not, I'll get it done. Might take a day or two.

**Q. And so from that -- those two sentences, If not, I'll get it done, might take a day or two,**



**that to you implies that the body attachment orders can't be entered as nationwide extraditable in their present form?**

A. It -- that along with the fact that the sheriff's office did have to take additional steps and did have to have a conversation within their own office about how to do this and what needed to happen, that indicated to me that it couldn't just happen. They couldn't simply enter it in with no additional action.

**Q. Okay. But I'm -- Mr. Cremoux wasn't involved in the internal communications amongst the CCSO employees, correct?**

A. I understand that.

**Q. So I'm focusing from Mr. Cremoux's perspective here.**

**Based upon what you see in this email chain, including that specific email from April 24 from Colin Luce, is it your testimony that Mr. Cremoux should have interpreted that email as implying that there was an issue with the way the body attachment orders were phrased such that they couldn't be entered as nationwide extraditable?**

A. I think he knew that they couldn't be



entered as nationwide extraditable because he was asking in his email of April 24th, 2025, pages 5 to 6, I've been told that this designation needs to be added in order for the body attachment orders to appear outside of Illinois.

So my indication from that alone is that he understood that something else needed to be added.

**Q. Okay. But to add it to the body attachment orders, or to add it to the NCIC?**

A. I don't know. He just said added.

**Q. He didn't say anything about adding to the body attachment orders there, sir. Can you please make sure you read the email closely?**

**You're referencing the email at the top of page 6, correct?**

A. That's correct.

**Q. Okay. He says, Can you confirm that the body attachment orders have been entered into the NCIC system as "Nationwide Extraditable"? I have been told that this designation needs to be added in order for the body attachment orders to appear outside of Illinois.**

**When he says "this designation," he's**

**referring to the designation in NCIC, correct?**
A. I don't know that.
**Q. Okay. But is that not a reasonable interpretation of what he's saying there?**
A. It's one interpretation.
Another is that he means the modification of the orders themselves.
**Q. Okay. Now, paragraph 23 of your report towards the middle, you write, Rules 4.1(a) and 8.4(c) require that Mr. Cremoux (and any other attorney responsible for the communications) not make any misleading statements by omission, or by stating partial truths. Further, those duties would** require Mr. Cremoux (or any other attorney responsible for the communication) correct any misimpressions that they knew had arisen.
Do you see that?
A. Yes.
**Q. Now, returning briefly to paragraph -- or Exhibit 21, let's just very quickly walk through his emails.**
**Bottom email on page 6, does he offer any commentary or analysis of the body attachment orders in the NCIC order that he attaches to his**



**email? Strike that.**
**When he sends the two body attachment orders and the NCIC order on April 24, 2025, does he provide any commentary or analysis of those three orders?**
A. He describes them as two civil body attachment orders against Steven Ivankovich.
**Q. And wait, start there.**
**Was that misleading at all?**
A. Not that I can conclude from just reading the email, no.
**Q. The next phrase, as well as the Court Order requesting entry of these orders into the national NCIC system. You see that?**
A. I see that.
**Q. Is there anything misleading about that?**
A. Not on its face, no.
**Q. Now, is there anything misleading about the rest of that email?**
A. Not that I'm aware of.
**Q. And then the email above that we've talked about, is there anything misleading about the body attachment orders in that email?**
A. Where now?



**Q. The top of page 6.**
MR. TRUPPMAN: I'll object to the form.
BY MR. JALALPOUR:
**Q. Is there anything misleading about his email at the top of page 6 to Colin Luce and Chris Kimble?**
A. Not that I'm aware of.
**Q. Okay. His next email is the top of page 5 where he says, Thanks so much, Colin.**
**Do you see that?**
A. Yes.
**Q. Is there anything misleading about the body attachment orders or the NCIC order there?**
A. Not that I'm aware of.
**Q. His next email is on page 3.**
**Is there anything misleading about the NCIC order or the two body attachment orders in that email on page 3 from Cremoux to Kimble and Luce?**
A. Not that I'm aware of.
**Q. Okay. Paragraph 25 of your report.**
**I'm going to quote all of paragraph 25: In light of the foregoing, it appears that Mr. Cremoux, or another employee or agent of Schiller, was able to persuade the relevant law**



**enforcement agencies to add the orders to the NCIC database without amending the orders to contain language to the effect that the orders were "nationwide extraditable." To the extent that Mr. Cremoux or another employee or agent of Schiller did so knowing that the registry of the orders was not permitted absent that language, i.e. knowing that the law enforcement agencies were operating under a misimpression concerning the content of the orders, that conduct would have been inconsistent with Rules 4.1(a) and 8.4(c).**
**See that?**
A. That's what it says.
**Q. And do you still stand by that?**
A. Yes.
**Q. And when you talk about -- you use the phrase "law enforcement" in this paragraph.**
**Which law enforcement are you referring to?**
A. Either the Cook County Sheriff's Office or the Monroe County Sheriff's Office.
**Q. Okay. Well, we're talking about -- it seems to me you're talking about Cook County Sheriff's Office. If you look at the preceding**

**paragraph, there's nothing about Monroe County in this portion of your report.**
A. Okay.
**Q. Is it fair to say 25 relates to Cook County?**
A. Yes.
**Q. And you state that the CCSO was, quote, operating under a misimpression concerning the contents of the orders.**
A. No, I do not.
**Q. Wait.**
**You state here in the last part of paragraph 25: i.e. knowing that the law enforcement agencies were operating under a misimpression concerning the contents of the orders.**
**Is it your testimony that the CCSO was operating under a misimpression concerning the content of the orders?**
A. No. You're leaving out the first part of that sentence, which appears on page 10: To the extent that Mr. Cremoux or another employee or agent of Schiller did so knowing that registry of the orders was not permitted absent that language, i.e. knowing that the law enforcement agencies were



operating under a misimpression concerning the content of the orders, that conduct would have been inconsistent with Rules 4.1 and 8.4(c).
I'm not saying that there was a misimpression; I'm saying if there was, and if Cremoux operated to engender or further that misimpression by omission or by commission, that conduct would be inconsistent with the rules.
**Q. So there are two qualifications there.**
**There's if the CCSO was operating under a misimpression, and if Kevin Cremoux knew about that, correct?**
A. Correct. It's --
**Q. But you have no basis to state that the CCSO was operating under a misimpression, correct?**
A. At this time, I don't.
**Q. And in fact, the CCSO had the copies of the orders themselves, correct?**
A. I don't know. I assume so, but I don't know.
**Q. Okay. But were you not aware that the judge actually directly sent the CCSO copies of the two body attachment orders and the NCIC order?**
A. I became aware last night that the judge



communicated with the CCSO. That was in part of the emails that were produced to me very recently and that I reviewed last night. Before that, I was not aware of that.
**Q. And do you -- is it your testimony that Cremoux persuaded the CCSO to do something?**
A. I said at the time I wrote my original opinion that it appeared as though that was true. Again, that was based on --
**Q. But sitting here today --**
MR. TRUPPMAN: Let him finish.
BY MR. JALALPOUR:
**Q. -- is it your testimony that he did in fact persuade them?**
A. Do you want me to finish my answer or ...
**Q. Please go ahead.**
A. At the time I wrote my original opinion, the materials I reviewed led me to state that it appeared as though he was able to persuade the Cook County Sheriff's Office to enter the NCIC orders as nationwide extraditable. That could change based on additional information.
Right now, I would not say that I can conclude, nor did I conclude in my original opinion



that he did persuade.
(Deposition Exhibit No. 20, Witness Doppke, was marked for identification 05/20/2026.)
BY MR. JALALPOUR:
**Q. Mr. Doppke, you've been handed Exhibit 20, which consists of an email chain involving Colin Luce and Cathy Ryan from the CCSO.**
**Do you see that?**
A. Yes.
**Q. Have you seen this document before?**
A. Yes.
**Q. If we turn to the third page, this is an internal email between Colin Luce and Cathy Ryan -- from Colin Luce to Cathy Ryan dated April 28, 2025, at 11:26 a.m.**
**He states, quote: Hey, Cathy, is there any contact we have to have NCIC updated? I am not sure -- I'm not even sure a civil body attachment can be in NCIC. I know you had staff update LEADS, but we are working with agencies in FL and CO that don't use LEADS or have access to it. Any ideas, question mark?**
**Do you see that?**

A. Yes.
**Q. And then Cathy Ryan responds: We would do that provided the actual order is showing nationwide extradition. If you send me the name, slash, case number, I can look for you.**
**You see that?**
A. I do.
**Q. Colin Luce responds that day, April 28: I see an order dated 12-20-2024 stating -- saying that we are ordered to put it in NCIC. The civil body attachments list, quote, "any sheriff of any county in Illinois or any duly deputized law enforcement agent."**
**Do you see that?**
A. That's what it says.
**Q. And he's quoting from the body attachment orders there, right?**
A. I believe so.
**Q. And you've read those body attachment orders, correct?**
A. Yes.
**Q. And somebody reading those body attachment orders can reasonably interpret that phrase, any duly deputized law enforcement agent, to**



**refer to any law enforcement agent in the country, correct?**
MR. TRUPPMAN: Form.
THE WITNESS: I agree that someone could conclude that. I cannot conclude that that's a reasonable interpretation.
BY MR. JALALPOUR:
**Q. You can't conclude that it's an unreasonable interpretation, correct?**
MR. TRUPPMAN: Form.
THE WITNESS: I'm not an expert on the wording of orders of body attachments so that they can be enforced in different jurisdictions. So I can't conclude one way or another what is reasonable or not reasonable about that.
BY MR. JALALPOUR:
**Q. Okay. And then the next sentence in Colin Luce's email, April 28th, he says, quote, The attorney can get whatever language you need added to the order to have what y'all need to have an update -- have to update NCIC.**
**You see that?**
A. I do.
**Q. And presumably that's a reference to**



**Cremoux, correct?**
A. That's my understanding.
**Q. Okay. And so based on what Mr. Luce says to Ms. Ryan, he's telling her if we -- if you need the body attachment orders or any orders amended or updated to get this into NCIC nationwide extraditable, the attorney says he'll get that for us.**
**Is that the way you interpret that?**
A. Yes.
**Q. And so does that not imply, if not explicitly demonstrate, that Mr. Cremoux didn't tell anybody from CCSO, no, these orders are sufficient, put them in nationwide extraditable; that's what they have -- that's what they say, and that's what you need to do.**
**He said the opposite. He said, If you guys need something different, any modified language, let me know, and I'll go get that for you.**
**Is that fair?**
A. Well, I don't know what he said, because I didn't review a communication in which he said anything about that, which indicates to me that he was having communications with the Sheriff's Office



that were not via email, which is something I gleaned from reading the emails themselves.
And what it indicates to me is that the question was what is the language of the orders, and does it say nationwide extraditable.
And the answer that I gleaned from reading these emails is that it does not say nationwide extradition. And my reading of the body attachment orders is that they did not say nationwide extradition.
And then my understanding is that the orders were nevertheless entered into the NCIC or updated in the NCIC.
**Q. So we're going to get to that in a second, but this comment from Colin Luce to Cathy Ryan suggests that -- strike that.**
**Mr. Luce doesn't say to Ms. Ryan, I spoke with the attorney and he says that these orders are sufficient and that there's nothing else necessary to upload them or update them as nationwide extraditable.**
**He doesn't say anything along those lines, correct?**
A. He does not say that.

**Q. He actually -- the comment is the exact opposite, is it not?**

MR. TRUPPMAN: Form.

THE WITNESS: The comment is what is it is.

BY MR. JALALPOUR:

**Q. The comment is if we -- if CCSO needs different language in the order that they believe needs to be there, then he'll go get that.**

**Is that not --**

A. That's the -- that's the import of it, yes.

**Q. And then Cathy Ryan, after receiving that email from Colin Luce, her next email says it's updated.**

**And so by that point, she chose to move forward updating the NCIC entries as nationwide extraditable, correct?**

A. That appears to be what the email says.

**Q. And as far as we can tell, Cathy Ryan, or whomever from the CCSO, made their own determination to do that, correct?**

A. I don't know if it was Ms. Ryan or someone else but someone did.

**Q. And they did that knowing that to the**



**extent that they needed different language in the orders that they could ask for it, right?**

MR. TRUPPMAN: Form.

THE WITNESS: Well, I don't know what they knew about that, but the suggestion was that the orders could and perhaps should be modified.

BY MR. JALALPOUR:

**Q. Well, the email from Colin Luce to Cathy Ryan regarding whatever language you need added, that is Mr. Luce conveying to Ms. Ryan that to the extent we need modifications to the orders, Kevin Cremoux says he can go get that for us, right?**

MR. TRUPPMAN: Object to the form.

You can answer.

THE WITNESS: That that would be what Mr. Luce appeared to be indicating, yes.

BY MR. JALALPOUR:

**Q. Okay. And so is it reasonable to conclude -- is it a reasonable conclusion to state that the CCSO came to its own determination as to whether or not the body attachment orders, along with the NCIC order, were sufficient on their own to update the NCIC system as nationwide extraditable?**

MR. TRUPPMAN: Form, outside the scope.



THE WITNESS: I don't know what communications the sheriff's office had with anyone else other than these emails. It could be they had additional communications with Mr. Cremoux. Could be they had internal communications with other people. It could be they had communications with the State's Attorney's Office. It could be that they made a decision in any number of ways that I cannot speculate about.

BY MR. JALALPOUR:

**Q. So okay. So you don't know what -- you don't sitting here know how they came to the conclusion that they could update the NCIC entries as non -- as nationwide extraditable without modifying the court orders, correct?**

A. Correct.

**Q. And then real quick, if you look again at Exhibit 21, the first email, page 6 is the email from Cremoux to Luce and Kimble on April 24, 2025, at 2:04 p.m., correct?**

A. Yes.

**Q. And that's where he initially sends out the body attachment orders and the NCIC order, correct?**



A. It appears that he was attaching them. I don't know if it was the first time, but it appears he was attaching them.

**Q. Okay.**

(Deposition Exhibit No. 23, Witness Doppke, was marked for identification 05/20/2026.)

BY MR. JALALPOUR:

**Q. Mr. Doppke, you've been handed Exhibit 23, which is a document Bates numbered Luce 38. Do you see that?**

A. Yes.

**Q. Have you seen this document before?**

A. This is again one that came to me very recently and that I reviewed last night.

**Q. And if you -- it's an email from Colin Luce to Chris Kimble from Summit County, correct?**

A. It appears to be, yes.

**Q. And the date is April 24, 2025, at 2:56 p.m., correct?**

A. I see that.

**Q. So that's about 50 minutes after Kevin Cremoux's email to Colin Luce and Chris Kimble with the body attachment and NCIC orders, correct?**

A. Yes.

**Q. In this email, Colin Luce has taken Cremoux off the chain, correct?**

A. Cremoux is not on the chain.

**Q. And it says from Colin Luce to Chris Kimble, quote, Greetings. It shows in our LEADS system that he is wanted on civil body attachments out of Cook County as an add on. Civil BAs are a difficult thing and sometimes aren't showing in NCIC the same way as a criminal warrant.**

**And then he provides information including the NCIC number, right?**

A. That's what it says.

**Q. And then he says, Let me know what info your agency would need to get this rolling.**

**You see that?**

A. I see that.

**Q. And so this is what he sends almost immediately after receiving the email from Cremoux, correct?**

A. Well, yeah, within the hour, yes.

**Q. And so this indicates that he didn't need any pushing or prodding or persuasion from Mr. Cremoux to get the orders into NCIC so that they**



**can be enforced outside of Illinois, correct?**

MR. TRUPPMAN: Form.

THE WITNESS: I don't know that I can agree to that. I just -- that would take too much speculation for me to agree.

BY MR. JALALPOUR:

**Q. Are you aware that the assistant general counsel for the Monroe County Sheriff's Office testified in this case?**

A. I am not.

**Q. Are you aware that she testified that her office came to its own conclusion that Steven was validly arrested and jailed pursuant to the body attachment orders entered in the Illinois divorce proceeding?**

MR. TRUPPMAN: Objection to the form.

THE WITNESS: I'm not aware.

MR. JALALPOUR: Let's take just a 2-minute break.

THE WITNESS: Okay.

(Recess taken.)

MR. JALALPOUR: So due to time constraints today, we're going to be postponing the rest of the deposition. We're going to figure out when we're



going to close out the deposition. The parties have discussed doing the second part of this deposition via Zoom and probably slotting one hour for the remainder of this deposition.

And so we're not finishing today. We're continuing today's deposition at a later date that the parties will agree to; is that fair?

MR. TRUPPMAN: Yeah, that's fair. I agree to that.

And then the only other thing is obviously, you know, you won't retread ground you already asked him about.

MR. JALALPOUR: I'm not.

MR. TRUPPMAN: It's just finishing the deposition.

MR. JALALPOUR: Absolutely. I don't want to waste anyone's time.

THE WITNESS: And for the record, I apologize for the time constraint.

(Deposition Exhibit No. 24, Witness Doppke, was marked for identification 05/20/2026.)

(The proceedings were adjourned at 1:54 p.m.)



REPORTER'S CERTIFICATE

I, Katie K. Elliott, do hereby certify that JAMES A. DOPPKE, JR. Was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 27th day of May 2026.

Katie K. Elliott

Illinois CSR No. 084-004537

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

STEVEN IVANKOVICH, )
)
Plaintiff, )
)
vs. ) No. 1:25-CV-25402-KMW
)
SCHILLER, DUCANTO & FLECK, )
LLP, and JOSEPH SEINITZ, )
)
Defendants. )

VOLUME II - Pages 174 through 222

The continued deposition of JAMES A. DOPPKE, JR, taken pursuant to the Federal Rules of Civil Procedure, before Nicole M. Cheney, Certified Shorthand Reporter No. 084-004744, via Zoom, on Tuesday, May 26, 2026, commencing at 11:31 a.m., pursuant to notice.

APPEARANCES:

BRODSKY FOTIU-WOJTOWICZ, PLLC, by
MR. JOSHUA TRUPPMAN
(44 West Flagler Street, Suite 2200
Miami, Florida 33130
305.503.5054
joshua@bfwlegal.com)
appeared on behalf of the plaintiff;

APPEARANCES: (Cont'd)
KONICEK & DILLON, P.C., by
MR. RAMSES JALALPOUR
(21 West State Street
Geneva, Illinois 60134
630.262.9655
rj@konicekdillonlaw.com)
appeared on behalf of the defendants.
ALSO PRESENT:
Ms. Kathleen Opal, Dussias Wittenberg &
Koenigsberger, Counsel for Ivankovich
in different case (observing).
* * * * * * *



I N D E X


| Witness: | Page |
|---|---|
| JAMES A. DOPPKE, JR | |
| Examination by: | |
| Mr. Jalalpour.................. | 177 |
| Mr. Truppman................... | 199 |
| Mr. Jalalpour.................. | 209 |


E X H I B I T S


| No. | Description | Marked/Referenced |
|---|---|---|
| 4 | Invoice dated 4/21/26................. | 195 |
| 24 | Various rules of professional conduct.. | 199 |


(Exhibit 24 attached/scanned.
Exhibit 4 retained.)

\- - -



(Witness sworn.)
MR. JALALPOUR: Okay. Let the record reflect
that this is the continued deposition of James
Doppke, Jr.
JAMES A. DOPPKE, JR
called as a witness herein, having been first duly
sworn, was examined and testified as follows:
EXAMINATION (Cont'd)
BY MR. JALALPOUR:
**Q. Mr. Doppke, at last week's deposition,**
**I didn't get a chance to go through your professional**
**history, so that's where I'm going to start off**
**right here -- right now.**
A. Okay.
**Q. Where did you graduate college?**
A. University of Notre Dame.
**Q. What year was that?**
A. 1992.
**Q. And what degree did you obtain from**
**Notre Dame?**
A. A bachelor of arts, majored in English
and classical Greek.
**Q. And did you go to law school directly**
**after graduating from Notre Dame?**



A. Yes.
**Q. What law school did you attend?**
A. Loyola University Chicago School of
Law.
**Q. And what year did you graduate from**
**there?**
A. 1995.
**Q. And after you graduated from Loyola**
**School of Law, what was your first employment?**
A. I had a 711 employment that began while
I was in law school and I believe continued for
some months afterward. And that was as a law clerk
with the City of Evanston law department.
But my first actual job after I
became licensed was as a staff attorney at the Will
County Legal Assistance Program in Joliet, Illinois.
**Q. And just so the jury is not confused**
**about what a 711 appointment is, can you go ahead**
**and explain that for us?**
A. Yes. It's a license conferred upon
eligible law students pursuant to Supreme Court
Rule 711. That allows -- or at the time it allowed
eligible law students to work for governmental
agencies or I believe law school-sponsored law

clinics and to perform some legal services under the supervision of licensed attorneys.
The rule has actually been amended recently to expand the categories of law students who are eligible and to -- and to allow, in some circumstances and in some locations, those eligible law students to work for private firms. But that was not true in 1995, '6, when the rule applied to me.
**Q. And you stated that you began your employment after law school as a staff attorney for Joliet County; was that correct?**
A. No. For the Will County Legal Assistance Program in Joliet. I don't know if that still exists. It was eventually -- it was originally part of Prairie State Legal Services, and then I believe it was later folded back into Prairie State Legal Services.
**Q. And how long did you work for Will County?**
A. That was approximately -- it was almost three years. I don't know exactly how far short of three years it was, but it was close to three years.
**Q. And what type of work did you do there?**



A. I represented indigent populations or populations that qualified for legal services under the federal Legal Service Corporation guidelines, mostly in matters relating to housing and consumer law.
I did also work on some family law matters because there -- that was an area of great and expanding need.
But principally I focused on eviction matters, foreclosure matters, defense of those matters, and consumer law matters as well.
**Q. You say you handled some family law-type matters during that period; is that correct?**
A. That's correct.
**Q. And so what in that area of law did you practice?**
A. I believe my first contested trial was a hearing on two-year plenary order of protection, and I handled other order of protection matters as well.
I handled some divorce matters. We were limited in the number and nature of divorce matters that we could handle by the Legal Service Corporation regulations and by legislation that was



passed while I was working there such that we could only handle divorce cases if allegations of domestic violence were involved.
And I can't tell you exactly how many divorce cases I handled. It was not many. Probably fewer than ten. And if guardianship would count as a family law matter, I did perform some work on a -- on a contested guardianship matter as well.
**Q. With respect to the divorce cases that you did handle, did you also handle the marital property distribution and split issues?**
A. You know, for the -- from what I can recall, those issues were not prominent in the cases that I handled or that we tended to handle because our clients tended not to have a lot of property to divide.
But I can say that, you know, there -- sometimes those issues arose in order of protection matters as well in terms of the possession of a home in the -- in the near term and things like that, and I'm sure I would have handled those kinds of matters. But not at a -- not at a level that was particularly -- how can I say it?



Not at a level that was like the Schiller firm would be used to let me say.
**Q. And after you left Joliet County, where did you work next -- or, sorry, Will County? Excuse me.**
A. I then went to the ARDC.
**Q. Okay. So for roughly three years, you were working in a governmental role for Will County, and then you began working for the ARDC; is that correct?**
A. That's correct. Technically, the Will County Legal Assistance Program was incorporated. It was an entity that was not itself a part of the government, but it received federal funding and probably some state funding as well.
But in any event, yes, I went from that employment to ARDC.
**Q. Did you consider your employment for that Will County entity to be private practice or public practice?**
A. I would have said I was a public interest lawyer. And, you know, it was -- again, I don't remember exactly, but I'm sure it was some kind of entity organized as a 501(c)(3) or

something of that nature. It was not the private practice of law as such. But -- and again, I conceived a bit knowing that it had governmental funding as a government job.

**Q. Okay. And how long did you work for the ARDC?**

A. 14 and a half years.

**Q. And by the way, why did you leave the Will County job?**

A. It was -- it was a demanding job, and I felt some stresses associated with that.

Also, my wife's employment was in -- not in Will County but in a different area of DuPage County, and we wanted to be closer to that, ultimately to move from our house where we lived in Naperville at the time. And we -- we didn't actually move for another couple of years. But in any event, considerations like that.

**Q. And what was your first role at the ARDC?**

A. Litigation counsel.

**Q. And when you left, what was your role?**

A. Senior counsel.

**Q. And from the day you started until your**



**last day, did your -- did your title change at all aside from going from litigation counsel to senior counsel?**

A. There was a period of time when I was assigned the task of managing a small group of litigation attorneys. I believe -- the way that they handled those matters was not necessarily to change the title. I still was really referred to as a senior counsel. But I did have that responsibility for a period of time. So that's the clearest way I can answer that question.

**Q. Okay. And what were the duties as litigation counsel that you had?**

A. Conduct investigations into allegations or claims regarding attorney misconduct and to subpoena records relating to that -- those matters in connection with those investigations, to interview witnesses, to conduct sworn statements of the respondent attorneys when that was necessary, sworn statement being something like a deposition but meant to be somewhat less formal and done within the auspices of a confidential commission, investigating with a view determining whether clear and convincing evidence of misconduct was present.



If that kind of evidence appeared to be present, the -- I would be responsible for referring the investigation to the inquiry board of the commission which functions something like a grand jury in the system. I would present the matter to the inquiry board and determine whether the board was going to vote that a formal disciplinary complaint be filed or some other resolution of the confidential investigation.

If they authorized the filing of a formal complaint, I would be assigned in whatever case it was to prosecute that case to the conclusion of proceedings before the hearing board of the comission.

There were other attorneys who handled matters before the review board and who briefed contested disciplinary cases before the Supreme Court. Litigation counsel did have some responsibility to file -- to draft and file some pleadings before the Supreme Court, so it wasn't always the responsibility of the appellate lawyers to do that; sometimes that responsibility devolved down -- back down to us.

And if the case was being resolved



not in a contested way but by a petition for discipline on consent, I would handle all of those proceedings as well, both the consent hearing before the hearing board and any pleadings that needed to be filed before the Supreme Court.

We also had other incidental responsibilities that included sometimes handling petitions for reciprocal discipline for cases originating out of state. We had responsibility for creating and presenting continuing legal education programs and presentations on behalf of the commission. This was post-2005 when the CLE requirements were enacted in Illinois. And other -- other duties as assigned.

**Q. Now, you stated earlier that you would present your -- the results of your investigation to a board who would then determine whether to file a formal complaint; is that correct?**

A. Yes, but not in every case. The procedure was if -- as litigation counsel, I would review the evidence that I could gather and that the relevant parties made available to me and determine whether I thought the case would or could or should be voted as a disciplinary complaint.

As litigation counsel, I would have to approach a group manager and ask them for their approval to, for example, close the investigation if I thought that the evidence was neither clear nor convincing that -- in such a way as to support formal charges.

Later, as senior counsel, I had the ability to sign off on a closed room myself and did so many times.

It was in cases where either we -- the "we" being staff of the administrator -- administrator's office, where we knew we wanted to ask the inquiry board to vote a complaint that had to be done by referring it to the inquiry board or sometimes there were other -- other investigations in which we were seeking not the filing of a complaint but the -- perhaps a period of deferred prosecution which the inquiry board would also have to vote on.

So it wasn't every single case that went to the inquiry board. It was some of them. But if it was -- if we were proceeding in that way, then I would be the one doing so.

**Q. But to get to the filing of a formal**



**complaint, that would have to ultimately go through the inquiry board, correct?**

A. In almost every case, yes. There are some cases that if a lawyer is convicted of a crime involving moral turpitude, this is under Supreme Court Rule 761, then a complaint is filed and a petition for interim suspension is filed with the court at the same time and that doesn't have to go through the inquiry board.

But otherwise, yes, everything else that involves formal charges does.

**Q. And the formal charges, that's a reference to a complaint filed with the Illinois Supreme Court, correct?**

A. Well, it's -- it's filed before the hearing board of the commission that is a body made up of panels of lawyers -- well, I'm sorry, panels of hearing board members who -- and each hearing is assigned a three-member panel, two lawyers and one nonlawyer.

The complaints are -- themselves are not filed before the Supreme Court. They're litigated first at the hearing board level if -- which issues an advisory recommendation about what



should happen to the lawyer, if anything, what kind of discipline should be imposed.

If either party accepts to those -- to that recommendation, it is -- the matter proceeds before the review board of the commission which functions kind of like an appellate court.

And then ultimately the Supreme Court has authority to enter an order on every disciplinary matter whether they're accepting the recommendations of those boards or whether they're doing something other than those recommendations.

But the complaints themselves are filed before the hearing board.

**Q. And prior to a formal charge being entered, the investigation being undertaken by the ARDC, that's supposed to be confidential, correct?**

A. Supreme Court 766 requires the administrator of the ARDC and their staff to keep the matter confidential, yes.

**Q. Does Rule 766 only apply to the administrator and the administrator staff?**

A. That's who it binds. I know that the administrator and their staff, when they're dealing with, for example, complainants who have reported



an investigation, will sometimes ask the complainants not to discuss the matter publicly.

And that can go for other people who are associated with complainants like their attorneys or just other witnesses who become aware of the investigation. Sometimes the administrator will take the step of asking those people to keep the existence of the investigation confidential.

But those people are not bound by Supreme Court Rule 766, only the administrator and her staff is.

**Q. And where do you draw that conclusion from?**

A. Just from my experience and from having read Supreme Court Rule 766 and worked with it over many years, having been employed at the ARDC, that is how we would handle it.

I know from experience that sometimes when -- particularly when an investigation involves underlying litigation, the fact of -- that the ARDC investigation is mentioned, and that is not always an experience that anybody wants and occasionally when that happened in cases

Page 191

that I was handling or investigations, I should say, that I was handling, I would -- having not known that that was going to happen, I would contact the person who mentioned it and ask them not to do that again.

But I didn't have any method with which to enforce that because 766 binds the administrator's office and not other parties.

**Q. Now, so you worked for the ARDC I think you said about 14 and a half years; is that correct?**

A. That's correct, yes.

**Q. And in your role as senior counsel, does that basically entail the same duties as before except you had a little bit more authority in that role?**

A. Yes. That's about right.

**Q. Okay. And what year did you leave the ARDC?**

A. 2013.

**Q. And why did you leave?**

A. It was just time to -- to move on and try to -- try something different. The opportunity became available to me to work with Mary Robinson who had been the administrator at the ARDC when I

Page 192

was hired.

She was then operating what was known as Robinson Law Group, and I wanted the chance to work with her again and was lucky enough to get it.

**Q. And what law firm was that?**

A. It was called Robinson Law Group.

**Q. And how long did you work for that firm?**

A. Well, it -- through 2019 because at that time we reorganized as Robinson, Stewart, Montgomery & Doppke with the addition of my current partner, Stephanie Stewart.

Mary remained in the firm as a partner. My partner -- or Sari Montgomery was our -- my other of counsel at Robinson Law Group and we all came together in the partnership in 2019.

**Q. Okay. And so where do you work currently?**

A. That same firm, Robinson, Stewart, Montgomery & Doppke. Mary did transition herself to being of counsel, as of last year is basically for all practical purposes retired. She's not taking on any new matters. She is of counsel to

Page 193

the firm, though, and that's why her name remains in it. And so we continue in that form.

**Q. And what type of work do you do?**

A. I represent attorneys in many different kinds of proceedings including but not limited to investigations at the ARDC and informal proceedings at the ARDC as well.

I represent applicants to the bar in their -- in connection with their applications to be admitted to the practice of law. Often that is in proceedings relating to their character and fitness before that committee. But sometimes there is -- there are proceedings that need to occur that don't relate to character and fitness but rather the waiver or potential waiver of certain admissions-related rules as applied to those applicants, and I represent those applicants in those proceedings which are original in the Supreme Court.

I have represented lawyers in connection with proceedings in which rules to show cause have been entered against them and in which the court is considering imposing sanctions against them.

Page 194

I have represented lawyers in the defense of legal malpractice actions. And I have consulted with lawyers and others concerning the application of the rules of professional conduct to different business models and law firms, structures, corporate business models, and matters of that nature.

I provide opinion letters upon request in connection with those and other matters involving the Rules of Professional Conduct.

I don't limit myself to only representing lawyers, but -- and so I do consult with people who are not licensed attorneys sometimes. But it -- it is a very lawyer-focused practice.

**Q. And outside of the limited family law work you did for Will County back in the '90s, have you done any other divorce law-related practice?**

A. No. No. I reviewed a lot of investigations or a number of investigations when I was at the Attorney Registration and Disciplinary Commission that involved family law, and I became familiar with some, you know, applicable principles of it and the way that the practice is conducted

and so forth through that. But I did not practice it myself.

**Q. Okay. Mr. Doppke, I'm placing on your screen what I've marked as Exhibit 4.**

**Do you see that on your screen?**

A. Yes.

**Q. Okay. So Exhibit 4 is an invoice dated April 21, 2026, from your firm, Robinson, Stewart, Montgomery & Doppke.**

**Do you see that?**

A. Yes.

**Q. And so this is an invoice that you produced in response to my subpoena, correct?**

A. I produced it to Mr. Rosenzweig so I could produce it to you, yes.

**Q. Okay. And this invoice purports to show the work that you did through April 21, 2026, correct?**

A. I believe so, yes.

**Q. Okay. And generally speaking, you made sure to make -- to ensure that your time records were accurate for the work you did in this case, correct?**

A. Yes.



**Q. If you look to the third entry on the first page of Exhibit 4, there's an entry for April 12, 2026, that says, quote, Draft Declaration.**

**Do you see that?**

A. Yes.

**Q. And do you know what "declaration" refers to there?**

A. It was a word that I used meaning what we -- what later became filed as my -- as my written opinion in this case.

When I function as an expert witness, previously in written reports or written up what my opinion is, it's called different things in different kinds of litigation.

Sometimes it's called declaration; sometimes I've -- I've seen it done as an affidavit. And I didn't know exactly what it was going to be called in this proceeding, so I called it "declaration."

**Q. Okay. And so you began writing that declaration which ultimately became your report on April 12th, 2026, correct?**

A. I -- yes.



**Q. Okay. And the first work you did in this case happened the day prior on April 11, 2026, correct?**

A. I think that's fair to say, yeah.

**Q. And so let's just go through your first couple entries here before we get to that third one.**

**The first entry is dated April 11, 2026, and it's an entry of 1.1 hours, correct?**

A. Yes.

**Q. And the entry is described as, quote, review materials forwarded by W. Rosenzweig, correct?**

A. That's what it says, yes.

**Q. And then the next day, you have an entry on April 12, 2026, for .8 hours, correct?**

A. Yes.

**Q. And that entry is described as, quote: Review additional materials forwarded by W. Rosenzweig, correct?**

A. Yes.

**Q. And then the next entry is the one we previously discussed. It's again on April 12, 2026, and that's when you begin drafting the**



**report, correct?**

A. Yes.

**Q. Okay. So you reviewed records for 1.9 hours, and then you began drafting your report, correct?**

A. Yes.

**Q. And so in your opinion, you believed 1.9 hours of reviewing records in this case was sufficient for you to begin drafting your report supporting the opinions and conclusions that you made in this case; is that correct?**

A. I performed the review that I performed, and I understood there to be a date by which the report was due, and that that date was coming up shortly. And so I reviewed the materials that I was provided in the depth that I felt I needed to understand them and began work on the opinion that I was requested to provide.

**Q. And less than two hours of reviewing records was enough for you, correct?**

A. I had the time that I had, and I spent the time that I spent, and I understood what -- I believed that my understanding of the materials was sufficient in order to start drafting the

declaration or the opinion, rather, when I did.
MR. JALALPOUR: Okay. That's all the questions I have.

EXAMINATION

BY MR. TRUPPMAN:

**Q. Okay. Mr. Doppke, thank you for your time. I just have a couple of clarifications. You know, obviously this is a little bit unconventional where it's been a few days since the initial topics were covered that I'm going to ask you about. So if you don't remember or you need clarification, just let me know. Okay?**

A. Okay.

**Q. First, you were asked questions about Rule 8.3 which is the Reporting Professional Misconduct Rule.**

**Do you recall that?**

A. I do.

**Q. Okay. So I'm going to -- and that was marked as part of the packet which was marked as Exhibit 24. I'm going to share my screen and show that rule to you and ask you a couple of questions. Okay?**

A. Yes.



**Q. Okay. Can you see my screen?**

A. Yes.

**Q. Okay. Is this Rule 8.3 of the Illinois Rules of Professional Conduct?**

A. Yes.

**Q. Okay. And you were asked about this rule and any obligation that you would have to report professional misconduct. Do you remember that?**

A. Yes.

**Q. Okay. But you remember you were asked if you have a duty to perform -- to report, excuse me, any professional misconduct you discovered in your capacity as an expert in this case?**

**Do you recall?**

A. I recall having a colloquy about that, yes.

**Q. Okay. Could you please read -- or I'll read footnote 4. It says: The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question or to a lawyer consulted in a professional capacity by another lawyer on whether the inquiring lawyer has a duty to report a**



**third-party lawyer's professional misconduct.**

**Did I read that correctly?**

A. Yes.

**Q. Okay. Does this footnote have any relevance in your mind to your reporting duties under this rule as it relates to this case?**

A. Well, I think -- I think comment 4 does have some relevance. I think that -- I have not received and reviewed the information relating to this case within the confines of an attorney-client relationship because that's not the relationship I have with anyone in this case.

But I would say that -- the relationship I have is analogous to those described in comment 4 in the sense that I have been consulted concerning my opinion regarding the matter as opposed to having had actual knowledge of the conduct that was described in the -- in the materials that I reviewed.

**Q. Okay. And now having read that and given that answer, do you believe there is an obligation for you in your capacity as an expert in this case to report any professional misconduct that you uncover or see in the course of your**



**expert duties?**

MR. JALALPOUR: Objection. Form.

BY MR. TRUPPMAN:

**Q. You can answer.**

A. I do not believe that the reporting duty described in Rule 8.3 has arisen.

**Q. Okay. I want to move on to a different topic. And I will stop sharing my screen if it will.**

**There we go.**

**Separately you were asked questions about whether Joe Seinitz was terminated and the date of that termination.**

**Do you recall being asked those types of questions?**

A. Yes.

**Q. Okay. Is whether or not Joe Seinitz was, in fact, employed when he provided surveillance footage to the Schiller Law Firm dispositive of your opinions with respect to him and his conduct and the attorneys conduct?**

MR. JALALPOUR: Objection. Form.

BY MR. TRUPPMAN:

**Q. Do you understand my question or do you**

**want me to ask it differently, Mr. Doppke?**
A. Oh, I understand it and my answer is no, it's not dispositive. It's one factor that I can say I thought about and reviewed as part of the materials that I reviewed, but it is -- it does not dictate the way that my opinions were formed.
**Q. Okay. Could you explain why it does not dictate the way that your opinions were formed?**
A. Well, because it's something to know, it's a fact that -- that can be known and may yet be elaborated on as the evidence develops in this matter.
And -- but whether Mr. Seinitz was employed at the time of his communications that are at issue with the Schiller firm is only so relevant because, to me, it's the nature of the communications that he had, the things that he was saying to the Schiller attorneys, Ms. Stanish was the one that he was communicating with principally in the materials that I reviewed.
The -- it was the manner and substance of those communications that I found to be more meaningful than the simple fact of whether he was employed at the time that he made them or



not.
And what I mean by that is the import of what he said and what he was sending her was that he was adverse to Steven Ivankovich, wanted to assist the Schiller firm in locating and ultimately apprehending Steven Ivankovich, and that he had access to and was willing to provide them with images that gave the Schiller firm information concerning, at the very least, Mr. Ivankovich's whereabouts.
**Q. Okay. And those communications that you're talking about between Mr. Seinitz and Ms. Stanish, would they in your review allow Ms. Stanish to reasonably believe that Mr. Seinitz had authorized access to the video surveillance?**
MR. JALALPOUR: Objection. Form.
BY MR. TRUPPMAN:
**Q. You can answer.**
A. My opinion would be that that would not be a reasonable belief based on the nature and substance of the communications.
I would think a reasonable attorney would look at those communications and determine either that Mr. Seinitz was no longer employed by



Mr. Ivankovich given that he was adverse and how strongly he was expressing adverse sentiments, vis-à-vis Mr. Ivankovich or a reasonable attorney would conclude that if Mr. Seinitz were still employed, he was acting in derogation of the duties that would have been -- that he would have been required to observe as part of that employment.
**Q. Okay. I want to ask you about a different topic.**
**You were asked about private investigators and how attorneys will sometimes hire private investigators.**
**Do you remember that line of questioning?**
A. Yes.
**Q. Okay. Do you think that hiring a private investigator to surveil an individual is analogous to what happened in this case?**
A. I don't think so.
**Q. Could you explain why not?**
A. Ms. Stanish did not hire Mr. Seinitz to do anything, did not establish a series of -- either a task for him to -- to accomplish as you would if you hired a private investigator and



rather accepted information from him that was being accumulated or accessed by Mr. Seinitz in some way that was adverse to Mr. Ivankovich.
If the lawyer -- if a lawyer hires a private investigator, the lawyer understands where that private investigator is going to get the information that they're going to get and does not have a concern that the -- the private investigator will be acting in derogation of duties already owed to the subject of the investigation.
Mr. Seinitz presented a different situation in that he was affiliated with the -- with Steven Ivankovich or at the very minimum Mr. Ivankovich's family.
Another difference between hiring a private investigator and doing what Ms. Stanish did vis-à-vis Mr. Seinitz is that Ms. Stanish was acquainted with Mr. Seinitz's history with the Ivankoviches -- with the Ivankovich family and with what she asserted to be negative aspects of his character.
An attorney hiring a private investigator would hire a reputable private investigator who did not have the negative

characteristics that Ms. Stanish attributed to Mr. Seinitz, especially characteristics regarding truth-telling.

So a lawyer hiring a private investigator involves the lawyer vetting that private investigator, supervising that private investigator, and ensuring that the information that is being procured is being done on an authorized or colorable basis and not in derogation of duties that the private investigator would hold to the subject of the investigation.

**Q. Okay. You were also -- separately now I want to ask you about the order regarding entering the bodily attachment orders into NCIC in that hearing.**

**Do you recall being asked about that subject?**

A. Yes.

**Q. Okay. Is your expert opinion focused on the language contained in the judge's order or the representations made by Ms. Stanish at the hearing?**

A. I read the language contained in the body attachment orders and in the order directing



that the orders be placed into NCIC. But I think -- and so those did form a part of the basis for my opinion.

But I think the statements at the November 6th, 2024 hearing were significant, perhaps more significant even than the wording of the rule themselves because it was Ms. Stanish as an officer of the court making representations to the court concerning what she intended to do with the authority that the court was conferring on her and as a representative of Jeanette Ivankovich. I found that to be significant even beyond what was actually said in the orders themselves.

**Q. Okay. And if I'm misstating, please correct me, but I think what you're saying is that Ms. Stanish had an obligation to be truthful and have candor to the tribunal even if the order didn't have that obligation in the body of the order; is that a fair statement?**

MR. JALALPOUR: Objection. Form.

THE WITNESS: That's a fair statement, and that's what I have expressed in my -- in my opinion as well, that that obligation exists no matter what the language of the court orders was or is, and it



extends to Ms. Stanish's representations about the manner in which she and her colleagues would attempt to enter the orders into the NCIC.

**Q. And last week and today, you've been asked, you know, questions by opposing counsel about your expert opinions.**

**Are the answers that you provided in this deposition and your expert reports all of the expert opinions you have as of today's date, May 26th, 2026?**

A. Yes.

**Q. Okay. I don't have any further -- and are those expert opinions reached to a reasonable degree of professional certainty?**

A. Yes.

MR. TRUPPMAN: I don't have anything else. Thank you.

FURTHER EXAMINATION

BY MR. JALALPOUR:

**Q. I've got a few follow-up questions, Mr. Doppke.**

**I'm going to share my screen for the first line of questioning.**

**And I placed on your screen once**



**again Rule 8.3 of the Illinois Rules of Professional Conduct.**

**Do you see that?**

A. Yes.

**Q. And you were asked a few questions by counsel regarding comment 4.**

**Do you recall?**

A. Yes.

**Q. And so let's go through comment 4 briefly. Rule 4 states, quote: The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question or to a lawyer consulted in a professional capacity by another lawyer on whether the inquiring lawyer has a duty to report a third-party lawyer's professional misconduct.**

**Did I read that accurately?**

A. Yes.

**Q. Okay. So comment 4 provides two exceptions to the duty to report; is that fair?**

A. That's -- yes.

**Q. And the first exception applies when the lawyer is retained to represent the lawyer whose professional conduct is in question, right?**

A. Correct.
**Q. And here, the supposed lawyers' conduct in question, is that of the Schiller DuCanto firm, right?**
A. Correct.
**Q. Okay. You weren't retained by the Schiller DuCanto firm, correct?**
A. That's correct.
**Q. You weren't retained by any of their attorneys, correct?**
A. That's correct.
**Q. Okay. So that first exception clearly does not apply to you, correct?**
A. Correct.
**Q. Okay. Now, the second exception applies where the lawyer is consulted in a professional capacity by another lawyer on whether the inquiring lawyer has a duty to report a third-party lawyer's professional misconduct, right?**
A. That's correct.
**Q. And so in this case, you weren't retained by -- strike that.**
**First of all, who retained you, Mr. Doppke?**



A. Mr. Rosenzweig of the Meland Budwick firm.
**Q. And he didn't retain you because he wanted you to inform him as to whether he had an obligation to report the Schiller attorneys to the ARDC, correct?**
MR. TRUPPMAN: I'll object --
THE WITNESS: That's correct.
MR. TRUPPMAN: -- to the form.
BY MR. JALALPOUR:
**Q. What was your answer, Mr. Doppke?**
A. I said that's correct.
**Q. Okay. So that exception also doesn't apply to you in this case, right?**
A. That's right.
**Q. Okay. But you stated earlier that the -- that comment 4 is analogous to your role in this case? Was that your testimony?**
A. I said that the reasoning -- what I meant to say -- I did say the word analogous -- is that the reasoning behind the comment has some bearing on what my role would be as well, because I -- these are -- the rule -- comment 4 does apply to attorney-client relationships. And as I



clarified, I do not have attorney-client relationships as part of my retention in this case.
But I think there is an analogy to be made there to receiving information and evaluating it as opposed to being a direct participant in the acquisition of the knowledge in question.
**Q. Okay. But that's up to the Supreme Court as to whether -- to carve out another exception that would apply to you in this case, right?**
A. Yes.
**Q. Okay. You can't make that exception on your own because of how you believe the opinion -- the rule should apply, right?**
A. I can't alter the text of the -- of Rule 8.3 or the comments.
**Q. Okay. You also testified about a few questions regarding private investigators.**
**Do you recall that?**
A. Yes.
**Q. Now, I want to give you a hypothetical question, and then I want you to answer.**
**Hypothetically, let's say the Schiller firm had hired a private investigator.**



**Are you with me so far?**
A. Yes.
**Q. Just on that fact alone, would the Schiller firm have violated any rules of professional conduct, just on that fact alone by hiring a private investigator?**
A. No.
MR. TRUPPMAN: Object to the form. Calls for speculation.
THE WITNESS: The hiring -- there is no rule that says a lawyer or law firm must not hire a private investigator.
BY MR. JALALPOUR:
**Q. Okay. Now, let's say that private investigator stood outside the Florida property that's at issue in this case. And do you know what property I'm referring to, Mr. Doppke?**
A. Yes.
**Q. Okay. And you're aware that's -- are you aware that somebody could stand outside of that property on public property and just stand outside and look at the property from the outside? Are you aware that that's physically possible?**
A. I don't specifically know the ownership

Page 215

status of the properties of the land surrounding the property at issue but I'll take your representation that there is a public way that can be stood upon at or near that property.

**Q. Okay. Now, let's say that the private investigator hypothetically hired by the Schiller firm stood outside the Florida property whilst on public property and took the same exact images and videos that the security camera took that Mr. Seinitz transmitted over to the Schiller firm.**

**Are you still with me there?**

A. Yes.

MR. TRUPPMAN: Object to the form.

BY MR. JALALPOUR:

**Q. Okay. And by exact same images and videos, I mean the same content, right?**

**Do you understand that, Mr. Doppke?**

A. Yes.

**Q. Okay. Now, would that -- would that scenario be a violation of the Schiller Firm's ethical obligations?**

MR. TRUPPMAN: Object to the form.

THE WITNESS: Well, again, I can't speculate on what the Supreme Court might deem to be a

Page 216

violation based on facts that would be presented to it.

But I would say that the -- as I've said, the hiring of the investigator itself is not inconsistent with any rule of professional conduct that I'm familiar with because lawyers and law firms can hire assistants, a-n-t-s, that is people who provide them with assistance or vendor corporations that provide them with assistance.

If they do that, then the lawyer has the duty to supervise the work of those assistants to ensure that the assistants' work is commensurate with the lawyer's own professional obligations.

Assuming all of that, then it would not be inconsistent with the rules of professional conduct if the Schiller firm were to have hired a private investigator in order to obtain information concerning Mr. Ivankovich and his whereabouts.

In further answer to your question, I don't know that photographs or other images can be taken from a public way that are the same as that which was taken by the security camera in this instance.

But what I would say is that if the

Page 217

Schiller firm had hired a private investigation firm, its obligation would be to ensure that that private investigator or private investigation firm would acquire the information concerning Mr. Ivankovich in a manner that was lawful and consistent with Mr. Ivankovich's legal rights.

**Q. Okay. But let's assume that the private investigator standing outside of the Florida property but on public property is able to obtain images and videos that capture in substance the same information that was conveyed from Seinitz to the Schiller firm.**

**Okay? I want you to accept that premise as part of this hypothetical. Do you understand that?**

A. For purposes of the hypothetical, I will.

**Q. Okay. And so let's say the private investigator takes those images and sends them to the Schiller firm. Has the Schiller firm violated any ethical violations?**

MR. TRUPPMAN: Objection to the form. Calls for speculation.

THE WITNESS: It would depend on whether

Page 218

the investigator in arriving at and obtaining the information transmitted back had violated Mr. Ivankovich's legal rights in doing so.

My opinion in this case is premised on not the location of the photographer or the photographic equipment but on the nature of Mr. Seinitz' relationship with the Ivankovich family, whether that was --

**Q. Mr. Doppke, I'm not -- I'm not asking --**

MR. TRUPPMAN: No, no, no, no.

BY MR. JALALPOUR:

**Q. I'm not asking about Seinitz at all, Mr. Doppke.**

MR. TRUPPMAN: RJ -- RJ, you have to let him finish the answer, please.

MR. JALALPOUR: He's not answering my question.

MR. TRUPPMAN: You may not like the answer, but he's answering your question. Please let him finish and then you can follow up with another question.

MR. JALALPOUR: But he's not answering. The hypothetical has nothing to do with Seinitz.

Page 219

He can bring up Seinitz if you want to ask him questions about that. But my hypothetical had zero reference to Seinitz.

BY MR. JALALPOUR:

**Q. So, Mr. Doppke, I understand you want to revert this back to your opinion, but you can do that later on if Mr. Truppman ask you questions to do so. Okay?**

MR. TRUPPMAN: And that's not correct.

MR. JALALPOUR: The hypothetical is clearly --

MR. TRUPPMAN: Please let me respond. That is not correct.

Mr. Doppke, you're entitled to answer the question fully and completely whichever way you deem to be responsive to Mr. Jalalpour's question. Even if he doesn't like it or appreciate the answer, you are free to answer the question fully without being cut off. Hopefully that will not happen again.

You may continue.

BY MR. JALALPOUR:

**Q. Okay. Mr. Doppke, in the hypothetical scenario where the private investigator relays**

Page 220

**images and video whilst never entering the private property of the Florida property, is that -- would that entail a violation of the Schiller Firm's ethical obligations?**

MR. TRUPPMAN: Objection to the form.

THE WITNESS: There could be some other way in which the photographer in question violates the legal rights of the person that they are surveilling, in this case, in this hypothetical, Mr. Ivankovich.

If that were to happen, then the taking of the images would again be inconsistent with inter alia of Rule 4.4(a).

Otherwise there could be -- it could be that the photographer's or the private investigator's conduct was consistent with Rule 4.4(a).

That's the only way I can really answer the question.

MR. JALALPOUR: That's all the questions I have.

MR. TRUPPMAN: I don't have anything. Thank you for your time.

THE WITNESS: Okay. Thank you.

Page 221

MR. JALALPOUR: Nikki, do you want to ask for if we're going to take copies, reserving signatures, all that stuff?

THE REPORTER: Sure. Did you want to talk about signature?

MR. TRUPPMAN: So obviously you have the right to read or waive, Mr. Doppke, as you know. It's up to you.

THE WITNESS: Yeah, I'll waive.

MR. JALALPOUR: And then I'll be ordering the transcript.

MR. TRUPPMAN: And we'll take a copy of regular.

(The proceedings adjourned at 12:23 p.m.)

Page 222

REPORTER'S CERTIFICATE

I, Nicole M. Cheney, do hereby certify that JAMES A. DOPPKE, JR, was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 10th day of June 2026.

Illinois CSR No. 084-004744