**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

STEVEN IVANKOVICH,

Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP, and JOSEPH SEINITZ,

Defendants.
_______________________________________ /

Case No. 1:25-cv-25402-KMW

Hon. Judge Kathleen M. Williams

Magistrate Judge Enjolique A. Lett

# DEFENDANTS' REPLY STATEMENT OF FACTS TO PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS

Dated: September 23, 2026.

Respectfully Submitted,

/s/ *Ramses Jalalpour*
Ramses Jalalpour, Esquire
Illinois Bar No. 6313128
rj@konicekdillonlaw.com
*Admitted Pro hac vice*
KONICEK & DILLON, P.C.
70 W. Madison St., Ste. 2060
Chicago, IL 60602
Telephone: (630) 672-3728
Telecopy: (630) 262-9659

/s/ *Alexandra Tifford*
Alexandra L. Tifford, Esquire
Fla. Bar No. 0178624
atifford@fowler-white.com
FOWLER WHITE BURNETT, P.A.
Citigroup Center
201 S. Biscayne Blvd., 20th Floor Miami, Florida 33131
Telephone: (305) 789-9200
Telecopy: (305) 789-7549

***Attorneys for Defendants***

Defendants, Schiller DuCanto & Fleck, LLP ("SDF") and Joseph Seinitz ("Seinitz") (collectively, "***Defendants***"), in Support of their Motion for Summary Judgment (ECF 71), hereby submit this Reply Statement of Facts to the Additional Statement of Facts ("ASOF") (ECF 82) of Plaintiff, STEVEN IVANKOVICH ("Steven"). In support thereof, Defendants state as follows:

47. Disputed in part. Undisputed that Seinitz was hired by the Ivankovich family starting in 2021. Disputed that his role when hired was to "secure property and providing personal security for Steven's parents." Seinitz testified that he was hired as "head of security," which included security for the whole family, not just Steven's parents. (Seinitz Dep., ECF 72-20 at 17:8-18:1). Disputed that "Steven and his mother, Dr. Olga Ivankovich, decided to transition Seinitz out of his security role." While Steven testified to this effect, Dr. Ivankovich testified that she had no recollection of any change in Seinitz's role with the family. *See* **Exhibit 1**, Dr. Ivankovich Dep., 101:24-102:5. She further denied having any knowledge as to why or when Seinitz stopped working for the family. *Id*. at 109:13-18. For these reasons, Defendants also dispute the assertion that Steven and his mother collectively identified a replacement Seinitz in his role as head of security. Further disputed that Seinitz stole any money from the Ivankovich family, which assertion is backed merely by Steven's self-serving testimony and nothing else. Seinitz adamantly denies this accusation. *See* **Exhibit 2**, Declaration of Seinitz, ¶ 3.

48. Undisputed.

49. Undisputed.

50. Undisputed.

51. Undisputed.

52. Disputed in part. Undisputed that the referenced announcement was sent on March 1, 2025. Disputed to the extent that the referenced announcement is meant to imply that Seinitz no longer had any security duties after March 1, 2025. Seinitz testified that he no longer had the title of "director of global security" after the March 1, 2025 announcement. *See* Seinitz Dep., ECF 72-20 at 107:10-18. However, Seinitz also testified that after the announcement, he was still providing security services since he was in the process of transitioning out of the role of security director and transitioning Jim Ayule ("Ayule") into that role. *Id*. 108:21-109:1; 114:12-18; 310:24-311:10. As even Ayule testified, after Ayule started working for the Ivankovich family on March 1, 2025, his "initial role was to slowly integrate into the organization." *See* Ayule Dep., ECF 82-

19 at 48:18-25. Even Steven conceded that the turnover from Seinitz to Ayule would not be automatic and would involve a transition period. *See* Steven Dep., ECF 82-20 at 119:21-25.

53. Undisputed.

54. Disputed in part. Undisputed that Seinitz sent the referenced message on April 4, 2025. Undisputed for the reasons stated in Paragraph 52, above.

55. Disputed in part. Undisputed that Seinitz provided the referenced testimony. Disputed since Seinitz clarified in his testimony that he no longer had the title of director or head of security but was still providing security services. *See* Paragraph 52, above.

56. Disputed in part. Undisputed that on April 16, 2025, Seinitz sent a text message to Olafur Hand ("Hand"), an employee of the Ivankovich family, stating: "We need to discuss my severance terms." (ECF 82-13, Text Chain with Seinitz and Hand, p. 22). Disputed to the extent this text message (and any other alleged demand by Seinitz for severance) supports an inference that Seinitz was no longer employed by the Ivankovich family at the time he requested severance. Seinitz testified that by April 2025, his relationship with Steven had deteriorated and that he brought up the subject of severance "for if I'm going to no longer" be working for the Ivankovich family "because that's the direction we were headed." (Seinitz Dep., ECF 72-20 at 173:9-18; 313:3-315:2). Seinitz's testimony is corroborated by multiple text messages. For example, on April 14, in a text thread between Seinitz, Hand, and Rodney Balais (another Ivankovich family employee), Hand lamented that Seinitz and Steven were not on speaking terms and how this was making it difficult to conduct business. Hand's text message led to the following exchange:

> HAND: **<u>You and Steven need to talk</u>** and Cody is not part of that. **<u>This business is not working if the team can not communicate</u>**.
> ***
> SEINITZ: I won't talk to Steve after how he talked to me…too much bullshit…you 3 can call me and Cody on a conference call on Tuesday.
> ***
> BALAIS: Then Joe, how can you work for him
> SEINITZ: Ask Steve
> HAND: **<u>Jesus we have to stop this. We are trying to run this and make it work</u>**.
> SEINITZ: Tell Steve. That.

*See* **Exhibit 3**, Text Thread (Seinitz, Hand, Balais), at p. 7 (emphasis added). Later text messages further corroborate that Seinitz was still employed throughout April. On April 24, Hand texted Seinitz asking him to prepare an inventory list that Steven requested. *See* **Exhibit 4**, Text Thread (Seinitz and Hand), at p. 23 ("Can you send me the inventory list SI is asking for it"). Seinitz

responded: "Sure." *Id*. Any remaining doubt on this issue is extinguished by the April 24 text message exchange between Steven and Hand described in Paragraph 34 of Defendants' SOF. *See* ECF 70 at ¶ 34.

57. Disputed as this assertion is a mischaracterization of Seinitz's testimony. Early in his deposition, Seinitz testified that he voluntarily stopped working for the Ivankovich family sometime in May or June 2025. *See* Seinitz Dep., ECF 72-20 at 177:1-178:10 ("I probably walked away, May twenty – May 25th of – June of '25. But as of today, no, I'm not employed by them."). Later in his deposition, Seinitz was asked about a text message he wrote to Hand on May 1, 2025, wherein he notified Hand: "Olafur, we have decided we don't want any type of severance pay from our former employer, Steven Ivankovich." *Id*. at 254:20-23. This text message refreshed his recollection that he quit on May 1, 2025. *Id*. at 255:3-10 ("That's when I quit working, basically, right around that time."); *see also* Ex. 4, Text Thread (Seinitz and Hand), at p. 24.

58. Undisputed.

59. Disputed as this assertion is a mischaracterization, by omission, of Seinitz's testimony. While Seinitz did, at first, testify that he could not recall whether Stanish asked about his employment status, he later clarified that he did have a recollection of such discussion. *See* Seinitz Dep., ECF 72-20 at 307:23-24 ("I think I did tell her that I was still employed by the Ivankoviches."). Seinitz's later clarification is unsurprising since he has previously issued interrogatory answers stating, under oath, that he informed Stanish that he was still working for the Ivankovich family. *See* **Exhibit 5**, Seinitz Answers to Interrogatories, at No. 3.

60. Disputed in part. Undisputed that Stanish provided the referenced testimony. Disputed on the ground that this testimony was "in direct contradiction" to Seinitz's testimony, for the reasons stated in Paragraph 59, above.

61. Undisputed.

62. Undisputed.

63. Undisputed.

64. Undisputed.

65. Undisputed.

66. Disputed in part. Undisputed that Seinitz accessed the Security Camera at the Islamorada House through an application on his cell phone. Disputed that Seinitz "repeatedly" access the Security Camera through said phone, as the referenced testimony says no such thing.

Further disputed that the "camera saved videos and photographs in electronic storage, or what Seinitz testified was the 'cloud.'" This assertion completely mischaracterizes Seinitz's testimony. The referenced deposition testimony (which occurs at page 249, not page 294) was made in the context of Seinitz being questioned about a text message in which someone (not Seinitz) sent another person (not Seinitz) a photograph from the Security Camera of Steven in handcuffs on the day of his arrest. *See* Seinitz Dep., ECF 72-20 at 246:14-247:15. Seinitz was asked if he was the person who took the picture, to which he responded that he did not know. *Id*. at 247:16-22. Seinitz was then asked if he watched any of the Security Camera footage of Steven's arrest:

> Q: Okay. And did you watch any of this footage while the Monroe County Sheriffs were in the process of arresting Steve?
> A: I may have, and then I possibly shut it off.
> Q: Why did you possibly shut it off?
> A: Because it's not my -- what I wanted to be doing with my whole day, is watching, worrying about -- watching a video on Steve Ivankovich getting arrested. If there's snapshots, those snapshots could have been pulled off of that camera by anybody. You know, there are pictures on the camera. Is there – there's a -- there was a -- you know, the thing saved things. **There was a cloud, right? I don't know.** There are things that are on there, and you guys should have access to it.

*Id*. at 249:4-19. In that context, Seinitz was addressing the fact that other people could have accessed the Security Camera and taken the snapshot of Steven's arrest that Seinitz had just been questioned about. In the process of noting that possibility, Seinitz testified that footage is saved somewhere and speculated that it might be on "a cloud" but immediately noted that "I don't know" how or where exactly the footage is stored. Indeed, no foundation was established at Seinitz's deposition establishing how he could possibly know the mechanisms by which the Security Camera was programmed to store footage. Furthermore, Seinitz's cited testimony makes no mention of where ***Seinitz*** accessed information from the Security Camera.

67. Disputed in part. Undisputed that on December 20, 2024, at the request of SDF, the divorce court entered an order authorizing the entry of the two body attachment orders into the NCIC database and that the order did not explicitly contain any language regarding "extraditable" or "nationwide extraditable." Disputed in that this assertion lacks critical context. At a hearing on SDF's request to have the body attachment orders entered into the NCIC database, Steven's attorney objected on the ground that the NCIC database was meant for criminal, not civil, warrants. *See* 11/6/2024 Hearing Trans., **Exhibit 6**, at 20:2-19. Over Steven's objection, the divorce court

granted SDF's request and made clear that it would be up to the NCIC to determine whether to accept entry of the body attachment orders:

> THE COURT: Okay. Enough. This is not the first time this issue has been brought by the suggestion of the Cook County Sheriff's Office in cases similar to this. And orders have been entered and what will happen, will happen with respect to the National Crime Information Center.
>
> ***
>
> …I am entering the -- put the body attachments in there. Whatever happens, happens. If they are rejected and the information is incorrect in the center, send it back saying this doesn't fit with our protocol, then we'll – we'll have that answer. If they accept it, they accept. Let's move on.

*Id.* at 28:1-19.

68. Disputed on the ground that the referenced testimony of Stanish was in response to questioning about a supposed Operating Manual for the NCIC. *See* Stanish Dep., ECF 72-23 at 46:10-21. There is, however, no evidence that the Operating Manual is authentic. *See, e.g., Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."). The Operating Manual is dated December 5, 1982. *See* ECF 82-35 at p. 2, ECF 82-36 at p. 2. Steven has offered no evidentiary basis demonstrating that this Operating Manual was in place at the time of Steven's arrest. Moreover, the FBI's website shows that the FBI has updated its operating manual for the NCIC database. *See* **Exhibit 7**, Updated NCIC Operating Manual Part 1; **Exhibit 8**, Updated NCIC Operating Manual Part 2. The updated NCIC operating manual can be found at https://vault.fbi.gov/national-crime-information-center-ncic-operating-manual.

69. Disputed for the reasons stated in Paragraph 68, above.

70. Disputed for the reasons stated in Paragraph 68, above.

71. Disputed for the reasons stated in Paragraph 68, above. Additionally, the updated NCIC operating manual does not include the referenced language. *See* Exs. 7 and 8.

72. Disputed for the reasons stated in Paragraph 68, above. Additionally, the updated NCIC operating manual does not include the referenced language. See Exs. 7 and 8.

73. Disputed for the reasons stated in Paragraph 68, above.

74. Disputed to the extent the word "nonetheless" is meant to imply that SDF's actions were in contradiction of the unauthenticated, out-of-date NCIC Operating Manual described in Paragraphs 71-73 of Steven's Additional Statement of Facts.

75. Disputed in part for the reasons stated in Paragraph 67, above. As the divorce court made clear, it would be up to law enforcement to determine how, if at all, to input the two body attachment orders into the NCIC database.

76. Undisputed.

77. Disputed in part. Paragraph 77 is premised on an email exchange between SDF attorney Kevin Crémoux and Colin Luce, a member of the Cook County Sheriff's Office. The pertinent email from Crémoux is not fully quoted in Paragraph 77. The full quote is as follows:

> Can you confirm that the body attachment orders have been entered into the NCIC system as "Nationwide Extraditable"? I've been told that this designation needs to be added in order for the body attachment orders to appear outside of Illinois. Please advise and thank you for your help with this!

*See* ECF 82-37 at p. 3.

78. Disputed with respect to the phrase "which it did not." Cathy Ryan, who was responsible for NCIC entries by the Cook County Sheriff's Office, did state that the NCIC entries for Steven's body attachment orders would be updated to reflect nationwide extradition "provided the actual order is showing nationwide extradition." The "actual order" being referenced by Cathy Ryan are the body attachment orders themselves, not the court order authorizing entry of those orders into the NCIC system. *See* ECF 82-37. The body attachment orders each contain language indicating nationwide enforcement. For example, both orders include the following language:

> THE COURT ORDERS: The Sheriff of Cook County, the Sheriff of any County in Illinois, ***or any other duly deputized law enforcement agent***, to seize and apprehend Steven Ivankovich, Respondent, for incarceration in the Cook County Jail[.]

*See* ECF 70-5 at p. 1 (emphasis added); ECF 70-7 at p. 1. Each body attachment order also states that the "***order is directed*** to any Sheriff of any County in Illinois or ***any duly deputized law enforcement agent***." *Id.* at p. 3 (emphasis added). Further, each order identifies a Florida address as Steven's "Last Known Home Address[] in Florida." *Id.* at p. 2. Thus, the body attachment orders—particularly when interpreted in conjunction with the NCIC court order—could be interpreted to authorize nationwide extradition and enforcement, which is presumably why Cathy Ryan's unit made the decision to mark the body attachment orders as nationwide extraditable in the NCIC system without requesting that the divorce court modify its orders in any way.

79. Disputed in part due to the phrase "because Crémoux asked him to." This assertion is based on a mischaracterization of the email Crémoux sent to Colin Luce, as fully quoted in

Paragraph 77, above. In that email, Crémoux never "asked" Colin Luce of the Cook County Sheriff's Office to do anything besides confirm whether the Cook County Sheriff's Office had marked the body attachment orders as nationwide extraditable in the NCIC system. *See* ECF 82-37 at p. 3. Crémoux did not ask Colin Luce to modify the NCIC entry in any way. *Id.*

80. Undisputed.

81. Disputed. As Stanish testified at her deposition, she represented to the divorce court that she would provide Steven's attorneys a copy of any *paperwork* that SDF had to submit to the NCIC in order to get the body attachment orders entered into the NCIC system. *See* Stanish Dep., ECF 72-23 at 77:24-84:4. Stanish did not obligate her firm to provide any and all communications with the Cook County Sheriff's Office to Steven's attorneys. *Id.*

82. Disputed in part with respect to the assertion that Crémoux "caused" the Cook County Sheriff's Office to mark the body attachment orders as nationwide extraditable in the NCIC System, for the reasons stated in Paragraph 81, above.

83. Undisputed.

84. Undisputed.

85. Undisputed.

86. Undisputed

87. Undisputed.

88. Undisputed.

89. Undisputed.

90. Undisputed.

91. Disputed in part, to the extent Paragraph 91 is meant to imply that Crémoux misled the Monroe County Sheriff's Office dispatcher in any way. His call with the dispatcher was recorded. The audio reveals that Crémoux never claimed to be from the Chicago police department or a member of law enforcement of any kind. Instead, when Crémoux was asked where he was calling from, Crémoux understood the Florida-based dispatcher to be asking about his location and therefore replied that he was calling from Chicago, Illinois. The pertinent exchange is as follows:

> DISPATCHER: It's going to be a warrant service?
> CRÉMOUX: It's gonna be a civil warrant service, obviously I, I, you know, they're going to want to make sure that they see the warrant on their side because this is a warrant that comes out of Chicago, Illinois, Cook County.
> DISPATCHER: Ok. Where are you calling from again?
> CRÉMOUX: Chicago, Illinois.

*See* 4/28/2025 MCSO Dispatch Audio, **Exhibit 9,** at 0:55 – 1:31.

That Crémoux neither misrepresented nor intended to misrepresent himself as law enforcement is further confirmed later in the call when Crémoux informed the dispatcher that the sheriff's department in Cook County would not give him the NCIC number associated with the civil warrants placed into the NCIC system for Plaintiff's arrest. *Id*. at 4:25 – 4:50.

92. Disputed in part. Crémoux informed the dispatch that "I've been told" that Steven had "guns and arms in the house" and "there's a chance of him wanting to get out, of escaping, going through the back." *See* Ex. 9, 4/28/2025 MCSO Dispatch Audio at 8:20-9:15. Crémoux received that information from Seinitz. *See* Crémoux Dep., ECF 82-2 at 168:5-14.

93. Undisputed.

94. Undisputed.

95. Undisputed.

96. Undisputed.

97. Undisputed.

98. Undisputed.

99. Disputed in part. Undisputed that Investigator Ponce testified that Steven could only be extradited upon a signed Governor's warrant. Disputed on the ground that said testimony is a legal conclusion and also inaccurate, as detailed in Paragraph 100, below.

Further disputed that "at no time during those 35 days was any paperwork sent to request a Governor's warrant." Investigator Ponce testified that the Cook County State's Attorney's Office originally approved his extradition request on May 2, 2025, at which point in time the State's Attorney's Office began working on the Governor's warrant paperwork. *See* Ponce Dep., ECF 82-40 at 134:23-136:10. Ultimately, though, the State's Attorney's Office changed its mind on June 2 and declined the extradition request. *Id*. at 136:20-137:4. Thus, the Governor's warrant paperwork was never submitted to the Governor's office.

100. Disputed, as there is no statute or caselaw preventing an Illinois state court from ordering the extradition of a party pursuant to a civil body attachment order. Even Kevin DeBoni, the Chief of the Criminal Prosecutions Bureau at the Cook County State's Attorney's Office, conceded this fact. DeBoni Dep., ECF 82-41 at 59:16-60:13. Furthermore, Illinois' Uniform Interstate Family Support Act (750 ILCS 22/801) provides that the Illinois governor may make an

extradition demand to another state of a person who has been charged criminally for failing to pay child or spousal support. While Steven had not been criminally charged for failing to pay child or spousal support, there was nothing preventing the Illinois State's Attorneys' Office from filing such a charge, since his failure to pay support had already been established and was, in fact, the basis for the second body attachment order entered against Steven. *See* ECF 70-7.

101. Disputed for the reasons stated in Paragraph 100, above.

102. Disputed for the reasons stated in Paragraph 100, above.

103. Disputed in part to the extent Paragraph 103 is intended to imply that SDF's actions, which included sending a handful of emails to the MCSO and CCSO, caused Steven's continued detention. Once Steven was arrested, the MCSO opposed his attempts to be released, not SDF. The Assistant General Counsel of the MCSO, Christina Cory, testified that throughout Steven's 35-day incarceration, the MCSO advocated for his continued detention based upon the MCSO's review of pertinent documents, the MCSO's own research and interpretation of the law, and Cook County's confirmation that it was attempting to extradite Steven. *See* **Exhibit 10**, Christina Cory Dep., at 118:11-119:24, 122:3-123:8, 127:16-132:2; 137:21-138:7.

104. Undisputed.

105. Undisputed.

106. Undisputed.

107. Disputed in part with respect to the phrase that "there was no avenue for extradition," for the reasons stated in Paragraph 100, above.

108. Disputed for the reasons stated in Paragraph 100, above.

109. Disputed. Judge Wilson's Order states that "Cook County, Illinois has confirmed that they will not extradite Steven Ivankovich." *See* ECF 82-50. The order does not state that Illinois confirmed "it could not extradite" Steven.

110. Undisputed.

111. Disputed on the ground that this assertion calls for a legal conclusion which is not accurate.

112. Undisputed.

113. Undisputed.

114. Disputed to the extent the phrase "correct information" implies that the Cook County Sheriff's Office incorrectly marked the body attachment orders as nationwide extraditable.

For the reasons stated in Paragraph 78, above, the Cook County Sheriff's Office reasonably interpreted the body attachment orders to allow nationwide extradition. For the reasons stated in Paragraph 100, above, there is no law prohibiting an Illinois trial court from ordering the nationwide extradition of a party pursuant to a civil body attachment order.

115. Disputed. This assertion implies that Jim Ayule was paid as a result of the supposed work he did with respect to the Security Camera. This is factually incorrect. Ayule had a Consulting Services Agreement with the "Ivankovich Family Office" dated February 24, 2025, pursuant to which Ayule was paid a monthly consulting fee of $8,500. *See* **Exhibit 11**, Ayule Contract, at p. 3. Steven signed the Consulting Services Agreement on behalf of the Ivankovich Family Office in his capacity as Managing Directo of Contessa Marine Research, LLC. *Id.* Ayule's consulting agreement was not with Steven personally, a fact which Ayule conceded at his deposition. *See* Ayule Dep., ECF 82-19 at 51:16-22. Only two invoices for Ayule's services have been produced in this case, both of which were generated by Ayule's company, Integrated Operations Solutions. The invoices show that, apart from minor travel expenses, the only fee charged by Ayule was his monthly $8,5000 consulting fee, per his contract with the Ivankovich Family Office. See ECF 82-53, May 2025 Invoice; ECF 82-54, June 2025 Invoice. At his deposition, Ayule confirmed that all of the fees and expenses in both invoices were submitted pursuant to his Consulting Services Agreement. *See* Ayule Dep., ECF 82-19 at 49:10-51:11. In other words, these fees and expenses would have been incurred regardless of whatever work Ayule supposedly did in connection with the Security Camera. Moreover, those fees and expenses were neither paid by nor owed by Steven personally, since Ayule was working for the Ivankovich Family Office, not for Steven individually. *See* Ex. 11, Ayule Contract. As such, Steven did not personally pay Ayule's invoices. *See* Steven Dep., ECF 82-20 at 295:4-6. Rather, the invoices were paid by Dr. Olga Ivankovich, who also confirmed that she does not believe that Steven has any obligation to pay her back. *See* Ex. 1, Dr. Ivankovich Dep., 132:3-133:3.

116. Disputed for the reasons stated in Paragraph 115, above.

117. Disputed in part. Undisputed that SDF filed, on behalf of its client (Jeanette Ivankovich), an *ex-parte* motion to appoint a receiver. Disputed that the motion was filed "to seize assets of third parties to pressure Mr. Ivankovich and his family in the divorce case." Steven provides no evidentiary support for this assertion, which is contradicted by the motion itself. *See* **Exhibit 12**, Jeanette Ivankovich's *Ex-Parte* Motion to Appoint Receiver.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

STEVEN IVANKOVICH,

Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP, and
JOSEPH SEINITZ,

Defendants.
________________________________________/

Case No. 1:25-cv-25402-KMW

Hon. Judge Kathleen M. Williams

Magistrate Judge Enjolique A. Lett

**APPENDIX OF EXHIBITS TO DEFENDANTS' REPLY STATEMENT TO**
**PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS**

| Exhibit | Description | Date |
|---|---|---|
| 1 | Deposition Transcript - Dr. Olga Ivankovich | 8/12/2026 |
| 2 | Declaration of Joseph Seinitz | 9/22/2026 |
| 3 | Text Thread - Seinitz, Hand, Balais | 1/1/2025 – 4/14/2025 |
| 4 | Text Thread – Seinitz, Hand | 1/1/2025 – 1/21/2026 |
| 5 | Seinitz Answers to Interrogatories | 4/13/2026 |
| 6 | Divorce Case - Hearing Trans. (excerpt) | 11/6/2024 |
| 7 | Updated NCIC Operating Manual Part 1 | |
| 8 | Updated NCIC Operating Manual Part 2 | |
| 9 | Dispatch Audio – Monroe County Sheriff's Office | 4/28/2025 |
| 10 | Deposition Transcript – Christina Cory | 4/15/2026 |
| 11 | Jim Ayule - Consulting Services Agreement | 2/24/2025 |
| 12 | Jeanette Ivankovich's *Ex-Parte* Motion to Appoint Receiver | 5/13/2025 |

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2026, the foregoing document was electronically filed with the Clerk of Court using CM/ECF. I further certify that the foregoing document is being served this day on all counsel of record on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or by other authorized means for counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.

s/ Alexandra L. Tifford
Alexandra L. Tifford

| **SERVICE LIST**<br>*Ivankovich v. Schiller, DuCanto & Fleck, LLP and Joseph Seinitz* | |
|---|---|
| Joshua Truppman, Esq.<br>Benjamin Brodsky, Esq.<br>Brodsky Fotiu-Wojwoticz, PLLC<br>44 W Flagler St., Suite 2200<br>Miami, Florida 33130,<br>Telephone: (305) 503-5054<br>Email: bbrodsky@bfwlegal.com<br>Email: joshua@bfwlegal.com<br>*Counsel for Plaintiff* | |