# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| STEVEN IVANKOVICH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) 1:25-CV-25402-KMW |
| | ) |
| SCHILLER, DuCANTO & FLECK, LLP, | ) Judge Williams |
| and JOSEPH SEINITZ, | ) Magistrate Lett |
| | ) |
| Defendants. | ) |

The videotaped deposition of OLGA IVANKOVICH, MD, taken pursuant to the Federal Rules of Civil Procedure, before Laura L. Kooy, Certified Shorthand Reporter No. 084-002467, via videoconference, on Wednesday, August 12, 2026, commencing at 1:03 p.m.

Page 2

APPEARANCES:

BRODSKY FOTIU-WOYTOWICZ, PLLC by
MR. JOSHUA TRUPPMAN
44 West Flagler Street
Suite 2200
Miami, Florida 33130
(305) 503-5054
Joshua@BFWLegal.com
on behalf of the Plaintiff;

KONICEK & DILLON, PC by
MR. RAMSES JALALPOUR
21 West State Street
Geneva, Illinois 60134
(630) 262-9655
RJ@KonicekDillonLaw.com

on behalf of the Defendant;

SCHOENBERG FINKEL BEEDERMAN BELL GLAZER, LLC by
MR. JEFFERY M. HEFTMAN
300 South Wacker Drive
15th Floor
Chicago, Illinois 60606
(312) 648-2300
Jeffery.Heftman@SFBBG.com

on behalf of the Witness.

ALSO PRESENT:

Steven Ivankovich,
Kathleen Opal,
Dussias Wittenberg & Koenigsberger
Nick Trotta, Videographer.

* * * * *

Page 3

INDEX


| EXAMINATION | PAGE |
|---|---|
| by Mr. Jalalpour: | 9 |
| by Mr. Heftman: | 151 |
| Further by Mr. Jalalpour: | 157 |

EXHIBITS

| | |
|---|---|
| Olga Exhibit 1 Subpoena to Testify at a Deposition in a Civil Action | 19 |
| Olga Exhibit 2 9/6/23 Body Attachment Order | 44 |
| Olga Exhibit 3 5/8/24 Body Attachment Order | 48 |
| Olga Exhibit 4 Voluntary Petition for Non-Individuals Filing for Bankruptcy | 93 |
| Olga Exhibit 5 12/15/25 Loan Agreement | 133 |
| Olga Exhibit 6 Tyler Atlas, LLC vs Goldstein, Verified Complaint for Injunctive Relief and Damages and Demand for Jury Trial | 139 |
| Steven Exhibit 2 11/1/21 Promissory Note | 57 |
| Steven Exhibit 6 PAMI Grand Lake, LLC vs Alliance SH2 Limited Partnership, et al. Final Judgment on Guaranty | 52 |
| Steven Exhibit 7 Confidential Settlement Agreement and Mutual Release | 52 |


Page 4

INDEX (Continued)


| | PAGE |
|---|---|
| Steven Exhibit 13 12/29/25 Correspondence from B. Bianco to U.S. Bank, Re: Jeanette Ivankovich v. Steven Ivankovich with attached exhibits | 56 |
| Steven Exhibit 16 Plaintiff's Objections and Responses to SDF's First Set of Interrogatories | 129 |
| Steven Exhibit 20 Residential Lease for Single Family Home or Duplex | 124 |
| Steven Exhibit 22 Extradition Await/Waiver | 27 |
| Steven Exhibit 29 Plaintiff's Amended Answers to Interrogatory Numbers 8-9 of SDF's Second Set of Interrogatories | 113 |
| Steven Exhibit 31 Contribution Pledge and Security Agreement | 63 |
| Steven Exhibit 40 Action by the Some Member of Old Town Property Ventures, LLC | 65 |


(Exhibits attached/scanned.)

Page 5

CERTIFIED QUESTIONS

| | PAGE | LINE |
|---|---|---|
| "Q. And whenever he would need money, you generally wouldn't ask him to pay it back. Correct?" | 23 | 1 |
| "Q. And you wouldn't condition giving him the money on him having to pay you back. Correct?" | 24 | 10 |
| "Q. And who -- what's the name of your advisor?" | 30 | 4 |
| "Q. Turning to the second whereas clause here, the last sentence states, quote, "The documents supporting the loans and capital contributions were documented in promissory notes, loan agreements, contribution agreements, operating agreements, tax returns of the "LLCs" and through the books and records of the respective limited liability companies.' Do you see that? "A. I do. I do. "Q. Are you aware of whether these specific documents exist?" | 90 | 22 |
| "Q. Okay. But do you -- to the extent that documents exist, where would they be?" | 92 | 16 |
| "Q. So my next question is, at some point in time after these bankruptcy petitions were filed, was Steven replaced as manager of those three entities?" | 97 | 17 |
| "Q. Now, why was Steven replaced as manager of those three entities?" | 98 | 19 |
| "Q. Okay. First of all, have you seen this Loan Agreement before?" | 134 | 19 |

Page 6

CERTIFIED QUESTIONS (Continued)

| | PAGE | LINE |
|---|---|---|
| "Q. And so you were willing to pay that over 1.1 million amount in December of 2025, but you were not willing to pay the roughly $670,000 amount at the time that Steven was in jail. Correct?" | 138 | 2 |
| "Q. And, in fact, you were willing in December of 2025 to pay $1.7 million, but you weren't willing in April of that same year to pay roughly $670,000. Correct?" | 138 | 19 |
| "Q. Are you aware of the purchase of Como Residence Dubai in September of 2023 for approximately $25 million?" | 144 | 22 |
| "Q. He was suffering from certain illnesses prior to his death. Is that fair?" | 148 | 24 |

* * * * *

Page 7

THE VIDEO TECHNICIAN: Good afternoon. This is the beginning of Media Unit 1. We are now on the video record at 1:03 p.m. Central Time.

This is the video recorded discovery deposition of Olga Ivankovich, being taken on August 12, 2026.

This deposition is being taken on behalf of the defendant in the matter of Steven Ivankovich versus Schiller, DuCanto & Fleck, LLP, et al. The Case Number is 25-CV-25402-KMW filed in the United States District Court for the Southern District of Florida, Miami Division.

My name is Nick Trotta, Certified Legal Videographer representing Urlaub Bowen & Associates with offices at 20 North Clark Street, Suite 600, Chicago, Illinois.

The court reporter today is Laura Kooy -- (inaudible.)

MR. JALALPOUR: Nick, I think we're losing you a little bit there.

THE VIDEO TECHNICIAN: (Inaudible.)

MR. HEFTMAN: I can't hear him.

MR. JALALPOUR: Yeah, it's -- it's -- all of a sudden it just kind of dropped out for you.

Page 8

Sorry to interrupt you there.

THE VIDEO TECHNICIAN: (Inaudible.)

Is this better for you?

MR. JALALPOUR: Much better.

THE VIDEO TECHNICIAN: Okay. I'm sorry about that. Not sure what happened.

Where we were, our court reporter today is Laura Kooy.

Counsel, please identify yourselves for the video record and the parties which you represent, stating -- starting with the questioning attorney. Excuse me.

MR. JALALPOUR: Ramses Jalalpour, J-a-l-a-l-p-o-u-r, for the defendants.

MR. TRUPPMAN: Joshua Truppman, on behalf of the plaintiff.

MR. HEFTMAN: Jeffery Heftman, on behalf of Dr. Olga Ivankovich.

MS. OPAL: Just for the record, I'm Kathleen Opal from Dussias Wittenberg Koenigsberger, but I'm just here as an observer today.

MR. JALALPOUR: And let's also just let the record reflect that the plaintiff, Steven Ivankovich, is here by phone, but -- I just wanted to make sure

Page 9

that was clear.

THE VIDEO TECHNICIAN: Will the court reporter please swear in the witness.

(Witness sworn.)

OLGA IVANKOVICH, MD,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. JALALPOUR:

**Q Dr. Ivankovich, my name is Ramses Jalalpour, and I represent the defendants in this matter.**

**You've been deposed before. Correct?**

A Correct.

**Q And you've actually been deposed and/or testified under oath via Zoom before. Correct?**

A Correct.

**Q Okay. So I won't belabor you with all of the ground rules today. But I will stress that since we are here via Zoom, if you could make sure to wait until I finish completing my questions before you begin answering my questions. Is that fair?**

A That is fair.

**Q And if at any point in time you don't hear**

**the question or you don't understand the question, please let me know and I will either restate or repeat the question. Is that fair?**

A Understood.

**Q And we know that your attorney, Jeff Heftman, is sitting next to you? Is that correct?**

A That's correct.

**Q Is there anybody else in the room besides Mr. Heftman?**

A No.

**Q And where are you currently located?**

A At 1150 Michigan Avenue, Wilmette, Illinois.

**Q Okay. And is that one of your two primary homes?**

MR. HEFTMAN: Objection. Calls for a legal conclusion.

You can answer.

MR. TRUPPMAN: Join.

THE WITNESS: One of my primary homes. My primary home is in Florida.

MR. JALALPOUR: Okay.

THE WITNESS: But this is one of my homes.

///



BY MR. JALALPOUR:

**Q Okay. And what's the address of the Florida home?**

A That's 791 Crandon Boulevard, Penthouse 6, Ocean Tower II.

**Q Have you reviewed any deposition transcripts in this case?**

A I'm sorry, I didn't hear the question.

**Q That's fine. Have you reviewed any deposition --**

A Can you repeat it?

**Q -- have you reviewed any deposition transcripts in this case?**

A I did.

**Q Okay. And which deposition transcripts did you review?**

A I cannot recall name.

**Q Did you review the deposition transcript of your son Steven Ivankovich?**

A I didn't.

**Q Did you review the deposition transcript of Tanya Stanish?**

A I don't know who that is.

**Q Did you review the deposition transcript of**



**Joseph Seinitz?**

A No.

**Q Did you review the deposition transcript of Kevin Cremoux?**

A No.

**Q Did you review the deposition transcript of Olafur Hand? O-l-a-f-u-r, Hand, H-a-n-d.**

A Can you write that down? I cannot recall that.

**Q Okay. Did you review the deposition transcript of any police officers?**

A No.

**Q Did you review the deposition transcript of any attorneys?**

A No.

**Q But you do recall reviewing some deposition transcripts in this case. Correct?**

A Do I recall what? Please repeat.

**Q You stated earlier that you do recall reviewing deposition transcripts from this case. Correct?**

A No, I did not.

**Q Oh, you -- okay. So your answer is no. I thought you said you had. Okay.**



**But in preparation for this deposition, did you review any documents?**

A Legal documents?

**Q Any type of documents did you review in preparation for this deposition?**

A No.

**Q Did you prepare at all for today's deposition?**

A Briefly.

**Q And what did you do to prepare?**

MR. HEFTMAN: I'm going to instruct the witness that while she can disclose having met with counsel, I'm gonna instruct her not to disclose the subject matter of any communications which she might have had with counsel.

You can answer.

THE WITNESS: Yeah, no, I didn't.

BY MR. JALALPOUR:

**Q Okay. But did you meet with any attorneys to prepare for today's deposition?**

A I did not.

**Q Okay. Did you speak with Steven your son about -- about this case in preparation for this deposition?**

A I did not.
**Q Have you spoken with Steven about this case ever?**
A Sure I did.
**Q Okay. And when is the last time you spoke with Steven about this case?**
A When he was in jail.
**Q Okay. But after he was out of jail, when was the next time you spoke with Steven about this lawsuit?**
**Here, let me take a step back. Strike that last question.**
**Dr. Ivankovich, do you understand what this lawsuit is about?**
A I understand very well.
**Q Okay. It's --**
A The questions don't seem relevant.
**Q Okay. This lawsuit concerns Mr. Ivankovich's arrest in April of 2025. Correct?**
A Correct.
**Q Okay. Now, have you spoken with Steven about this lawsuit since the time he was released from jail?**
A No.



**Q Okay. So just so we're clear, ever since he was released from jail back in May of 2026 -- or excuse me, in June of 2025, you have not spoken with your son Steven about this case. Is that correct?**
A That is not correct. I talked -- spoke to him about the incarceration. But not the lawsuit.
**Q Hey, Jeff, I -- I want to flag this at the beginning here. But I think your guys' internet connection is pretty weak. And so there's a lot of choppiness. And is there a way we can address that before we continue on?**
**And by the way, Laura and Nick, if you guys are seeing that as well, let me know. If not, then maybe it's just my issue.**
THE VIDEO TECHNICIAN: I was seeing that on my end. I was seeing that as well.
MR. HEFTMAN: I'm working with the internet connection that I have.
MR. JALALPOUR: Okay. Is there -- like do you guys know -- can we go off the record briefly?
THE VIDEO TECHNICIAN: Going off the record at 1:14 p.m. Central Time.
(Whereupon, a short recess was taken.)
THE VIDEO TECHNICIAN: This is the beginning of



Media Unit 2. We're going back on the record at 1:20 p.m. Central Time.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, have you met with your attorney in preparation for this deposition?**
A I did.
**Q And how long was that meeting for?**
A I just briefly spoke on the phone.
**Q And who else was on the phone, if anybody else?**
A Nobody.
**Q And your testimony earlier, just so we're clear, is you have not reviewed any documents in preparation for this deposition. Correct?**
A That's correct.
**Q Have you reviewed the Complaint or Amended Complaint that were filed in this case ever?**
MR. HEFTMAN: You can answer.
THE WITNESS: I said no. I have not.
BY MR. JALALPOUR:
**Q Oh, okay. But you earlier testified that you understand very well what this case is about. Correct?**
A I do.



**Q And on what basis do you have knowledge about this case?**
MR. HEFTMAN: I'm going to instruct the witness that to the extent her knowledge is based upon communications with counsel, that she refrain from disclosing the subject matter of what are privileged communications.
Subject to that objection, you can answer.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, can you please answer?**
A I'm not sure what -- what I -- how my answer should be to that.
I did not.
**Q Okay. But aside from your attorney or attorneys, have you obtained any information about this case from anybody else?**
A I did with my son. I told you that.
**Q Okay. Well, you earlier testified that you haven't spoken about this case since he was released from jail. And this case wasn't filed until months later.**
A Well, then I misunderstood.
But I definitely spoke to him about his incarceration. This would be expected.

**Q Okay.**
A Not in a legal form.
**Q Okay. But I'm asking you about this particular lawsuit. Do you understand that?**
A Yes, I do.
**Q Okay. So have you spoken with Steven about this particular lawsuit before?**
A No.
**Q Okay. Do you know who he's suing in this case?**
A I think he's suing his -- you know, Schiller's company.
**Q Anybody else, as far as you know?**
A Joe Seinitz.
**Q Okay. And where did you learn that information from? If you learned it from somebody besides your attorney.**
MR. HEFTMAN: To the extent it's information that you learned through counsel, I'm gonna instruct you not to answer.
THE WITNESS: That's correct.
BY MR. JALALPOUR:
**Q Okay. Are you following your attorney's instruction there?**



A I do it.
**Q Okay. Dr. Ivankovich, I'm going to share on my screen what we'll mark as Exhibit 1 for today's deposition.**
**Is the document showing on your screen, Dr. Ivankovich?**
MR. HEFTMAN: No -- now it is.
MR. JALALPOUR: Okay, great.
MR. HEFTMAN: You need to blow it up, R.J. It's very small.
BY MR. JALALPOUR:
**Q Sure.**
**Can you read that now, Dr. Ivankovich?**
A Well, I'm not very good at reading documents at the deposition and answering accordingly. I would need a little bit more time to study that.
MR. HEFTMAN: He's just asking if you can read the font.
THE WITNESS: I -- I would need much bigger font.
BY MR. JALALPOUR:
**Q Okay. Can you read that now?**
MR. HEFTMAN: You might want to get rid of the



sidebar on the left just to --
MR. JALALPOUR: Sure.
THE WITNESS: Okay, so --
MR. HEFTMAN: There's no question pending.
BY MR. JALALPOUR:
**Q Are you able to read that, Dr. Ivankovich?**
A Yes. I am.
**Q Okay. This is the subpoena that we served on you for your deposition. Correct?**
A I have not seen that before.
**Q Have you seen a subpoena for your deposition in this case before? Regardless of whether it's this document or not, have you seen any subpoena for your deposition in this case before?**
A I -- this one I have not seen -- I don't remember seeing.
**Q Okay. But my question is not about this one. So for my next question, please don't look at the screen here.**
**Have you seen any subpoena for your deposition in this case before?**
A I did. Yes.
**Q Okay. Now, you are familiar with an individual named Nancy Webber. Correct?**



A Yes.
**Q And do you ever send or -- send emails to or receive emails from Nancy Webber?**
A Yes.
**Q Okay. And do you ever send or receive text messages from Nancy Webber?**
A I do.
**Q Okay. And same questions for your son Steven.**
**Do you ever exchange emails with your son Steven?**
A Yes. I do.
**Q Now, Dr. Ivankovich, I want to turn your attention to the last page of Exhibit 1 which is the Rider to the subpoena.**
**Have you seen this before, just the top of this page, Rider to Olga Ivankovich Subpoena?**
A Yes.
**Q Okay. And if we scroll down to the bottom, there's a list of four document requests there.**
**Do you see that?**
A I see it.
**Q Have you seen those document requests before?**

A I don't remember seeing this.
**Q Okay. So if you don't remember seeing these requests, is it fair to say that you didn't take any steps to locate documents that might be responsive to these four requests?**
A I did not.
**Q Okay. Now, Dr. Ivankovich, Steven is your son. Correct?**
A Correct.
**Q And do you have another son?**
A I do.
**Q And that's Dr. Dan Ivankovich?**
**Is that correct?**
A That is correct.
**Q And your husband, who's unfortunately now deceased, and I apologize for that, Anthony Ivankovich was your husband? Correct?**
A Yes.
**Q Is it fair to say that you and Steven have had a continuous relationship throughout his life?**
A Yes.
**Q And whenever Steven needs money, he can get it from you. Correct?**
A That is correct.



**Q And whenever he would need money, you generally wouldn't ask him to pay it back. Correct?**
MR. HEFTMAN: Objection. I'm gonna instruct the witness not to answer. It's beyond the scope of this deposition. It's beyond the scope of this case. It's not relevant. And it's fishing for purposes of the domestic relations action.
MR. JALALPOUR: Mr. Heftman, this is directly relevant to this case.
MR. HEFTMAN: I disagree, Counsel.
MR. JALALPOUR: Well, even if you disagree, that's not a proper basis to -- are you instructing her not to answer? Is that what you said?
MR. HEFTMAN: I am.
MR. JALALPOUR: Well, that's very improper here.
MR. HEFTMAN: Well, having read the depositions in this very matter in which you defended and provided those same instructions, I think it's more than appropriate, Counsel.
MR. JALALPOUR: Well, your objection is improper. It's clearly relevant. The question and the answer will be relevant to this case.
I ask that you reconsider your instruction.
MR. HEFTMAN: I think you should move on to your



next question.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, are you following your attorney's instruction and not answering this question?**
A I do.
**Q And all Steven would have to do is ask you for money and you would give it to him. Correct?**
A Correct.
**Q And you wouldn't condition giving him the money on him having to pay you back. Correct?**
MR. HEFTMAN: Objection. Asked and answered. Not relevant to this litigation. Interposed for purposes of harassment and previously the subject of an instruction not to answer.
MR. JALALPOUR: Well, we'll certify those questions, and I will be filing a motion.
(Questions certified.)
BY MR. JALALPOUR:
**Q Dr. Ivankovich, do you know a man named Gary Goldstein?**
A I do.
**Q Who is Gary Goldstein?**
A One of Steven's lawyers.



**Q Okay. He never served as your personal attorney. Correct?**
A No.
**Q And when you say "no," you mean that's correct, right?**
A That is correct.
**Q Okay.**
A He did not represent me.
**Q Okay. Now, we earlier discussed Steven's arrest which took place in April of 2025 in the State of Florida. Correct?**
A Correct.
**Q Did you have phone conversations with Steven while he was in jail?**
A Never about incarceration.
MR. HEFTMAN: He's just asking you the question of, did you speak with Steven while he was incarcerated?
THE WITNESS: Did I talk to him?
MR. HEFTMAN: That -- can I have the question repeated?
THE WITNESS: Yeah.
BY MR. JALALPOUR:
**Q Doctor, did you ever have any phone**

Page 26

**conversations with Steven while he was in jail?**
A Yes.
**Q Okay. Do you recall what language you used when you spoke with him while he was in jail?**
A Okay. Well, yeah, sometimes one, sometimes another. I don't -- I don't remember.
**Q You also speak Croatian in addition to English. Correct?**
A It's called Serbo-Croatian.
**Q Okay. And sometimes you use that language when you speak with Steven?**
A I do.
**Q And other times you will use English. Correct?**
A Correct.
**Q While Steven was in jail, did you understand that the Florida Court set a bond amount that would have allowed Steven to be released from jail if he paid it or if someone on his behalf paid it?**
MR. HEFTMAN: Objection to form.
MR. TRUPPMAN: I'll object to the form of the question.
MR. HEFTMAN: Join.

Page 27

BY MR. JALALPOUR:
**Q Doctor, you can answer.**
A Can you repeat that?
**Q Yeah. While Steven was in jail, did you understand that the Florida Court set a bond amount that would have allowed Steven to be released from jail if he paid the amount or if someone paid it on his behalf?**
MR. TRUPPMAN: And I object to the form.
MR. HEFTMAN: Join.
You can answer.
THE WITNESS: Yes.
BY MR. JALALPOUR:
**Q Okay. And what was your understanding about what that amount was?**
A Never knew amount.
**Q Did you ever ask for the amount?**
A I did not.
**Q Dr. Ivankovich, I've placed onto your screen what has previously been marked as Steven Deposition Exhibit 22. And I'll go ahead and zoom in at the top of this document.**
**Do you see what the title of this document is?**

Page 28

A Extradition Await.
**Q Okay, yeah. Extradition Await/Waiver. Correct?**
A Yes.
**Q Okay. And I'll zoom in even more here on this sentence that says, "Bond is set in this case at the amount of $672,559.41, cash or surety."**
**Do you see that?**
A Never seen it.
**Q Okay. Were you aware, while Steven was in jail, that this was the amount that could be paid to have him released from jail?**
MR. HEFTMAN: Object to form.
THE WITNESS: I did not.
BY MR. JALALPOUR:
**Q Okay. Did you in late April, slash, early May of 2025 have the financial ability to pay off this roughly $670,000 amount?**
A Naturally I did.
**Q Okay. And let's assume the amount was higher. Let's assume it was closer to $1.5 million.**
**If that was the number, did you have the financial ability to pay that amount?**
A I did.

Page 29

**Q Okay. Did you ever offer to pay whatever amount would be -- strike that.**
**Did you ever offer to pay the amount necessary to have Steven released from jail?**
MR. TRUPPMAN: Object to the form.
MR. HEFTMAN: Join.
THE WITNESS: No.
BY MR. JALALPOUR:
**Q Did Steven ever ask you to pay that -- to make that payment?**
A No.
**Q Okay. And you testified that you did not offer to pay that -- the amount necessary to have Steven released from jail.**
**My question following up on that is, why didn't you make that offer?**
MR. HEFTMAN: Objection. Improper hypothetical. Calls for speculation.
You can answer.
THE WITNESS: There was no -- any -- I was advised that there was no -- any guarantee that after paying a bond, that Steven would not be reincarcerated again.
///

BY MR. JALALPOUR:
**Q And who gave you that guidance?**
A My advisors.
**Q And who -- what's the name of your advisor?**
MR. HEFTMAN: To the extent that the advice that you received was from an attorney, I'm gonna instruct you not to answer.
THE WITNESS: I refrain.
MR. JALALPOUR: Well, Mr. Heftman, she's just disclosed the guidance. So to the extent there was any attorney-client privilege, it has now been waived. And so I think we're entitled to know who provided that guidance.
MR. HEFTMAN: I'm gonna instruct the witness not to answer, Counsel.
MR. JALALPOUR: Okay. Well, let's certify that question as well.
(Question certified.)
BY MR. JALALPOUR:
**Q And so is it your testimony today that if you knew that Steven would not be rearrested, you would have paid the amount necessary to have him released. Correct?**
MR. HEFTMAN: Objection to form.



MR. TRUPPMAN: I'll object to the form of the question.
MR. HEFTMAN: Objection to form. Improper hypothetical. Calls for speculation.
BY MR. JALALPOUR:
**Q Doctor, you can answer.**
A I agree with the answer of my advisor.
**Q Well, they didn't answer. They just asserted objections for the record. So my question still stands.**
A This is -- yeah.
**Q And I'll repeat it, because I'm sure you forgot it by now because of the objections. And we'll let the objections stand. Because it's gonna be the same question.**
**Is it your testimony that if you believed Steven would not be rearrested, you would have been willing to pay the amount necessary to have him released. Correct?**
MR. HEFTMAN: Objection.
MR. TRUPPMAN: Objection.
MR. HEFTMAN: Form. Improper hypothetical. Calls for speculation.
MR. TRUPPMAN: I join.



THE WITNESS: Yeah, this is -- this is assumption and speculation in my mind. I would not make decision on any such a question.
BY MR. JALALPOUR:
**Q Well, I'm asking you to, Dr. Ivankovich. It's a hypothetical question that I'm entitled to ask and you're required to answer.**
**Your attorney has made an objection. And so I'd like an answer. And I'll restate --**
MR. HEFTMAN: Counsel, you received an answer. Which was, she couldn't speculate.
And I suggest you move on to the next question.
BY MR. JALALPOUR:
**Q Well, I appreciate your suggestion, Mr. Heftman.**
**Dr. Ivankovich, you earlier -- you earlier testified that the reason why you did not offer to pay the bond amount was because of the guidance you received that it could not be guaranteed Steven would not be rearrested.**
**Do you recall giving that testimony?**
A Yes, I do remember that testimony. But I did not --



**Q Okay. Okay. So my question is, if you had been advised that he would not have been rearrested, you would have been willing to pay the bond amount. Correct?**
MR. HEFTMAN: Object to form. Improper hypothetical. Calls for speculation. Asked and answered.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q Doctor, you can answer.**
A I don't know how can I answer such a question. If and -- if that would be. And can I answer a question if he was guaranteed? I cannot give you that answer. That wouldn't be fair to ask me or to answer.
Thank you.
**Q Okay. And --**
A I cannot answer.
MR. HEFTMAN: You've answered.
BY MR. JALALPOUR:
**Q And so you were willing to have your son sit in jail because you didn't want to pay the bond and then have him -- strike that.**
**You were willing to have your son sit in**

**jail and not pay the bond amount because you believed he might be rearrested again.**
**Is that your testimony?**
MR. HEFTMAN: Objection to form.
MR. TRUPPMAN: Form.
MR. HEFTMAN: Compound. Asked and answered.
MR. TRUPPMAN: Form. Join.
BY MR. JALALPOUR:
**Q Doctor, you can answer.**
**And moving forward, even if your attorney objects, you are still required to answer unless he instructs you not to answer, at which point you can decide whether to answer or not.**
**Do you recall my question?**
A Look, I don't need instruction from my attorney on such a question. Please do not ask me questions, if and buts.
I am a mother. I would do what is best.
I would not give any money until there is hundred percent assurance that he will ever be incarcerated regarding -- regarding reason that he was in -- in jail. I felt that he was illegally in jail.
And please do not ask me those questions



anymore.
**Q Okay. So you were okay with him sitting in jail, rather than being released, at least temporarily. Correct?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Object to form.
THE WITNESS: Yes.
BY MR. JALALPOUR:
**Q Okay. Do you know if anybody else -- or strike that.**
**Do you know if anybody else offered to pay the bond amount?**
A No.
**Q Do you know if your husband, Anthony Ivankovich, offered to pay the bond amount?**
A He didn't.
**Q Do you know if your other son, Dr. Dan Ivankovich, offered to pay the bond amount?**
A He wouldn't.
**Q And why do you say he would not?**
A That would be too much to ask. It's a huge amount of money.
**Q Okay. So is it your testimony that he would not pay the bond amount because he did not have**



**the money --**
MR. HEFTMAN: Objection. Calls for speculation. Foundation.
BY MR. JALALPOUR:
**Q Well, Jeff, I didn't finish my question. So please let me finish it.**
**Is your testimony, Dr. Ivankovich, that Dr. Dan Ivankovich would not have paid the bond amount because he did not have the financial resources to do so?**
MR. HEFTMAN: Objection. Form. Foundation. Calls for speculation.
MR. TRUPPMAN: Join.
MR. HEFTMAN: You can answer.
THE WITNESS: I don't know. I cannot answer this question.
BY MR. JALALPOUR:
**Q Besides any attorneys, did you speak with anybody else about the issue of whether Steven could be rearrested if he was released from jail?**
A Not -- no.
**Q Did you talk with Steven at all about that issue while he was in jail?**
A No.



**Q Is there a reason why you did not speak with him about that?**
MR. HEFTMAN: Object to form.
MR. TRUPPMAN: Join.
THE WITNESS: I told you why. Because I was advised --
MR. HEFTMAN: I'm gonna instruct the witness not to share information that she was advised from counsel.
THE WITNESS: Okay.
BY MR. JALALPOUR:
**Q Now, Dr. Ivankovich, you previously testified that you love your son Steven, right?**
A Can you please repeat that? I testified what?
**Q You testified earlier that you love your son Steven, correct?**
A I what?
**Q You love your son Steven --**
A Oh, of course.
**Q -- correct?**
A Oh, that's such an odd question.
Yes, of course.
**Q Okay. So wouldn't it make sense, if you**

**had the financial ability to pay the bond amount, to at least inform Steven why you were not paying the bond amount to get him out of jail?**

MR. HEFTMAN: Objection. Form. Improper hypothetical. Calls for speculation.

MR. TRUPPMAN: I'll join.

THE WITNESS: I have to answer that?

BY MR. JALALPOUR:

**Q Yes.**

A I object to answering.

**Q Okay.**

A I don't think this question is appropriate.

**Q It's -- you don't believe it's appropriate because you know it doesn't make sense. Right?**

MR. HEFTMAN: Objection. Argumentative.

MR. TRUPPMAN: Join.

MR. HEFTMAN: And lack of foundation.

There's no question pending.

BY MR. JALALPOUR:

**Q No, there is a question.**

**Dr. Ivankovich --**

MR. TRUPPMAN: I think she answered it.

BY MR. JALALPOUR:

**Q -- you're refusing to answer that question**



**because you know it doesn't make sense that you would not talk about this issue with Steven if that were the case. Right?**

MR. HEFTMAN: Counsel, she's already testified she did not have communications with her son while he was incarcerated regarding this issue.

MR. JALALPOUR: And, Jeff, I understand. I'm asking why. Any reasonable person would wonder why that conversation is not being had between a father and a mother while the -- between a son and a mother while the son is sitting in jail and the mom has the funds to pay off the bond.

And she's claiming that she was not willing to pay it. And I'm asking why she didn't bring that up with Steven.

It's a very obvious question. And so I'm gonna get an answer one way or the other.

MR. HEFTMAN: She's already provided an answer of why she --

MR. JALALPOUR: No, she --

MR. HEFTMAN: -- didn't pay.

MR. JALALPOUR: -- no, she objected. She -- she saw it -- she heard you object. She then launched her own objection, which is improper.



I never got an answer.

THE WITNESS: You want me to give a price on my feeling that I am not ready to share with you or anybody.

Thank you.

BY MR. JALALPOUR:

**Q Okay. So you're not willing to answer that question. Correct?**

A That's all what I can tell.

**Q Okay.**

A My love has nothing to do with anything here. This is not on deposition.

MR. HEFTMAN: You don't need to explain.

BY MR. JALALPOUR:

**Q Well, did you explain to Steven while he was in jail that, Steven, I love you, but here's why I'm not paying to get you out of jail. Did that -- did you ever broach that with him?**

MR. HEFTMAN: Objection. Form. Asked and answered. Lack of foundation.

MR. TRUPPMAN: I'll join.

THE WITNESS: Such a question never was between two of us, Steven and me.

///



BY MR. JALALPOUR:

**Q Did Steven ever ask you why you weren't --**

A He didn't.

**Q Okay, so he -- so you -- let me finish my question so we have a clear record.**

**Did Steven ever ask you why you were refusing to pay the bond amount?**

A That was self-explanatory. He already heard everything.

**Q Okay. And how -- how do you know he heard everything?**

A You heard my answer.

**Q I'm asking you. You said he had already heard everything.**

**First of all, what is everything? When you state the word "everything," what are you referring to?**

A You want to now talk -- you know, bring my feeling to my son and why I didn't go for my feeling.

Please don't ask me this question. That doesn't belong into that deposition.

I don't know what you are trying to extradite from me because I am on a family trial here. I am not in a position.

Page 42

You are trying me. And please don't do that.

MR. TRUPPMAN: Can we just take two seconds, R.J.? I'm sorry, they AC technician is trying to tell me what's wrong with my unit. Give me two minutes.

MR. JALALPOUR: Okay. Let's go off the record.

THE VIDEO TECHNICIAN: Going off the record -- sorry, going off the record at 1:51 p.m. Central Time.

(Whereupon, a short recess was taken.)

THE VIDEO TECHNICIAN: This is the beginning of Media Unit 3. We're going back on the record at 1:57 p.m. Central Time.

BY MR. JALALPOUR:

**Q Dr. Ivankovich --**

MR. HEFTMAN: Counsel, as I stated before we went on the record, my client would like to make a clarifying comment with respect to questions you asked her about document requests of the subpoena rider that was served upon her.

BY MR. JALALPOUR:

**Q Well, there is no question pending regarding that. So we've moved on.**

Page 43

**Dr. Ivankovich, while Steven was in jail and you had phone calls with him, did the two of you ever discuss the issue of paying the necessary money to get him released from jail?**

A No.

**Q Okay. Now, earlier you stated that Steven never asked you to make the payment because he was aware of, quote, everything.**

**Do you recall stating that?**

A Yes.

**Q What did you mean when you said "everything"?**

A That his release is not guaranteed or secured.

**Q Okay. And how did you come to believe that Steven was aware of that?**

MR. HEFTMAN: To the extent that the witness' knowledge is based on communications with counsel, then I'm gonna instruct her not to answer.

BY MR. JALALPOUR:

**Q Dr. Ivankovich, with that instruction, can you -- do you have an answer?**

A No.

**Q Dr. Ivankovich, I'm going to place onto**

Page 44

**your screen what I'll mark as Exhibit 2. And I'll zoom on the first page.**

**Do you see the title of this document?**

A Yes.

**Q And this is a Body Attachment Order. Correct?**

A That's right. Yes.

**Q And this order was entered on September 6, 2023, in the pending divorce proceeding between Jeanette and Steven. Correct?**

A Yes.

**Q Okay. And this Body Attachment Order from September of 2023 concerns, quote, "The court's interim fee award dated May 18, 2023."**

**Do you see that?**

A Yeah, I see it.

**Q Now, first of all, have you seen this document before today?**

A No.

**Q You were aware at some point in time that a Body Attachment Order had been entered in the divorce proceeding against your son. Correct?**

A Yes.

**Q Okay. And you understood that under the**

Page 45

**Body Attachment Order, your son could be arrested. Correct?**

A I don't remember.

**Q Okay. Well, and this Body Attachment Order required your son to pay "$425,000 bond in cash."**

**Do you see that here on Exhibit 2, page 2?**

A What does it say?

Yes.

**Q Okay. And were you aware that in or around September of 2023 there was a Body Attachment Order entered against your son requiring him to pay $425,000 bond in cash?**

MR. HEFTMAN: Counsel, I'm gonna object. These are questions that are two years prior to the time of incarceration. I don't see the relevance to the questions relative to the litigation that is -- for which this deposition is being taken.

I'm gonna instruct the witness not to answer.

MR. JALALPOUR: Jeff, I'm gonna file a motion. I'm gonna seek my fees. Because this is clearly relevant. And it's an improper objection.

MR. HEFTMAN: You're asking about something that's two years prior to the date of incarceration.

And I have read the transcripts in which you had made the same instructions, Counsel. So spare me the hypocrisy.

MR. JALALPOUR: Well, this Body Attachment Order is the basis under which -- is one of the bases under which the plaintiff was arrested. It is central to this case.

And so are you still instructing the witness not to answer?

MR. HEFTMAN: Correct.

BY MR. JALALPOUR:

**Q Dr. Ivankovich, are you following your attorney's instruction not to answer this question?**

A I do.

**Q Okay. At the time this order was entered, were you willing to pay the $425,000 cash bond?**

A Yes.

**Q Okay. And then why did you not pay it at or around the time this order was entered?**

MR. TRUPPMAN: I'll object to the form.

You're asking why she didn't pay the bond? Or why Steven didn't?

BY MR. JALALPOUR:

**Q The question was directed to Dr. Olga.**



**Dr. Olga, why did you not pay this bond amount?**

A This is so complicated. It requires much further discussion. And I'm -- I am not prepared for that to answer.

**Q Okay. But Dr. Ivankovich, this might be my only opportunity to depose you. And we gave you -- you've had well over a month to prepare for this deposition. Correct? Is that correct?**

A I think we -- this is so long ago. I would have to read the documents in order to answer that question properly.

**Q Okay. But you just testified that you were willing to pay this amount. And this order was entered in September of 2023.**

**So my question is, why didn't you pay this amount in or around that time period?**

A Again, I would have to read about that and remind myself why, because this is very complicated. I'm afraid to say something what -- you know, I would like to be exact. And I would have to further look at the documents.

That was 2023. A long time ago.

**Q Dr. Ivankovich, I have now placed onto your**



**screen Exhibit 3, which is another Body Attachment Order from the divorce case. Do you see that?**

A Yes.

**Q And this Body Attachment Order concerns, quote, "Enforcement of the court's order dated November 6, 2023." Do you see that?**

A Yes, I do.

**Q Okay. And this order was entered in May of 2024. Do you see that?**

A I do.

**Q And you became aware of this Body Attachment Order in or around May of 2024. Correct?**

MR. HEFTMAN: Objection. Foundation.

BY MR. JALALPOUR:

**Q You can answer.**

A Again, I am asking -- asked questions that are very old. I have to look at the documents to give you proper answer.

**Q You -- Dr. Ivankovich, you were -- you became aware of this order at some point. Correct?**

A Yes. Vaguely, yes.

**Q Okay. And that would have been sometime in or around May of 2024. Is that fair?**

A That's what you're saying, and I'm looking



at the documents.

**Q Okay. But --**

A The docs -- yes.

**Q Okay. And turning to page 2 of Exhibit 3, this order required the payment of "$672,559.41 bond in cash." Do you see that?**

A Yes.

**Q And you were willing to pay that amount. Correct?**

MR. HEFTMAN: Objection.

THE WITNESS: I am not.

MR. HEFTMAN: You can answer. You answered.

THE WITNESS: No.

BY MR. JALALPOUR:

**Q Dr. Ivankovich, at or around the time you became aware of this order, you were willing to pay that amount. Correct?**

A No.

**Q Do you -- do you know what that -- this number, the $670,000 figure, what that relates to?**

A Bond.

**Q Okay. But did you -- do you have an -- when you became aware of this Body Attachment Order, did you have an understanding that this**

$670,000 figure related to outstanding support and maintenance owed to Jeanette Ivankovich?
A I am not sure.
Q Okay. And just so we're clear, is it your testimony that when you became aware of this particular Body Attachment Order in or around May of 2024, you were not willing to pay that -- this bond amount. Is that correct?
MR. HEFTMAN: Objection. Asked and answered.
BY MR. JALALPOUR:
Q You can answer.
MR. TRUPPMAN: I join.
You can answer.
BY MR. JALALPOUR:
Q Go ahead, Doctor. You can answer.
A Again, that was long time ago. I cannot put it all together what I could and why I couldn't do it.
Q Okay. So just so we have a clear record, is it your testimony that you cannot recall whether you were willing to pay this bond amount in or around May of 2024?
A No. I was not.
Q Okay. So your testimony is you were not



willing. You recall that you were not willing to pay this bond amount. Okay.
My next question is, why were you not willing to pay that amount?
A What I'm here for. His incarceration on divorce.
I am asking questions that I would look in the paper and see why and what.
Q Okay. But sitting here today, you don't know why you were willing -- you were unwilling to pay the 670,000 bond amount per this Body Attachment Order. Is that fair?
MR. TRUPPMAN: Form.
MR. HEFTMAN: Object to form.
BY MR. JALALPOUR:
Q You can answer, Doctor:
A I would have to talk -- I would have to recall documents and study it and give you that answer. I do not know exactly what are reasons why I did not agree to pay that.
Q Okay. Do you recall if Steven ever asked you to pay this amount back in -- in or around May of 2024?
A I don't remember that.



Q Dr. Ivankovich, I'm going to place on your screen what has been previously marked as Steven Deposition 6, which consists of a judgment that was entered against your son in October of 2008 in favor of a company called PAMI Grand Lake, LLC.
Do you see that?
A Yes.
Q Okay. Have you ever heard of PAMI Grand Lake, LLC, before?
A I am not aware of it.
Q Okay. Did you ever become aware, before today, of this judgment that was entered against your son in this Illinois -- Indiana lawsuit back in October of 2008?
A I am not aware of it.
Q Okay. I'm now placing on your screen Exhibit 7, which is a document titled, "Confidential Settlement Agreement and Mutual Release."
Do you see that?
A I do.
Q And this is a Settlement Agreement between, quote, "Edgefield Holdings, LLC, as successor in interest to PAMI Grand Lake, LLC," and Steven Ivankovich. Do you see that?



A I do.
Q Okay. Have you seen this document before?
A I don't recall.
Q Okay. And pursuant to this Settlement Agreement, the judgment that was entered in favor of PAMI Grand Lake, LLC, that we saw in Steven Exhibit 6, would be assigned to, quote, "PAMI Grand Too LLC." Do you see that?
A I do.
Q Okay. Have you heard of a company called PAMI Grand Too, T-o-o, LLC before?
A I don't remember.
Q Okay. Have you ever had any ownership interest in a company called PAMI Grand Too LLC?
MR. HEFTMAN: Objection. Foundation.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
Q Doctor, you can answer.
A I don't recall any of this.
Q As far as you know, you have never had an ownership interest in PAMI Grand Too LLC.
Is that correct?
MR. HEFTMAN: Objection. Foundation. Asked and answered.

MR. TRUPPMAN: Join. She said she didn't remember.
BY MR. JALALPOUR:
**Q Doctor, you can answer.**
A I do not recall.
**Q Okay. Do you recall if any -- do you recall if anybody else -- strike that.**
**Do you have any knowledge as to who owns or owned PAMI Grand Too LLC?**
MR. HEFTMAN: Objection. Foundation.
MR. TRUPPMAN: Join.
THE WITNESS: I do not recall.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, are you familiar with an attorney named Benjamin Bianco? B-i-a-n-c-o?**
A Yes.
**Q And who is Mr. Bianco?**
A That's a family attorney.
**Q And who -- who does he currently represent as it relates to you, your family, or any of your family's entities?**
A To my best knowledge, he has the same function as before. But I am not quite sure of.
**Q Okay. And so who does he represent?**



MR. HEFTMAN: Objection. Asked and answered.
THE WITNESS: Okay.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q You can answer.**
A I -- I'm -- I am not sure who he represents at present.
**Q Does he represent you personally?**
MR. HEFTMAN: Objection. Foundation. Asked and answered.
BY MR. JALALPOUR:
**Q You can answer.**
MR. TRUPPMAN: Join.
THE WITNESS: No.
BY MR. JALALPOUR:
**Q Has he ever represented you personally?**
MR. HEFTMAN: Objection. Foundation.
MR. TRUPPMAN: Join.
THE WITNESS: I already answered that question.
BY MR. JALALPOUR:
**Q No, no, you answered whether he --**
A Family.
**Q Right. But you answered whether he represents you personally now. And you said no.**



**My question is, has he ever personally represented you?**
A No.
**Q Okay. Doctor, I have now placed onto your screen Steven Exhibit 13, which is a letter from Benjamin Bianco dated December 29, 2025.**
**Do you see that?**
A Yes.
**Q And in the first sentence of his letter he states, quote, "I am outside counsel for PAMI Grand Too LLC ('PAMI'), a creditor of Steven Ivankovich." Do you see that?**
A Yes, I do.
**Q He then states, quote, "On July 29, 2022, in the Circuit Court for Miami/Dade County, Florida, my client had a charging order entered against numerous limit liability companies that Steven Ivankovich has or may have had an interest in."**
**Do you see that?**
A I do.
**Q Okay. Did you authorize PAMI Grand Too LLC to obtain the charging order against your son?**
MR. HEFTMAN: Objection. Foundation. Form.
MR. TRUPPMAN: I'll join.



THE WITNESS: No.
BY MR. JALALPOUR:
**Q Okay. Did you authorize Mr. Bianco to send this letter?**
A I said no.
**Q Okay.**
A I don't remember.
**Q Dr. Ivankovich, I've placed onto your screen what has been previously marked as Steven Exhibit 2, which consists of a Promissory Note.**
**Do you see that at the top there?**
A Yes.
**Q And this is a Promissory Note in the amount of $1 million dated November 1, 2021.**
**Do you see that?**
A I do.
**Q And the Promissory Note shows that Steven is the borrower and the lender of the million dollars is a company called Glencoe Family Dwelling LLC.**
**Do you see that?**
A I do.
**Q Do you -- strike that.**
**Have you ever held any ownership interest in Glencoe Family Dwelling LLC?**

MR. HEFTMAN: Object to form.
THE WITNESS: I will have to look at the document.
BY MR. JALALPOUR:
**Q Have you heard of this company before, Glencoe Family Dwelling LLC?**
A Yes, I do.
**Q And to your knowledge, who owns that company?**
MR. HEFTMAN: Objection to form. Foundation. The witness has already testified she'd need to review documents in order to answer that question.
BY MR. JALALPOUR:
**Q Doctor --**
A That's correct.
**Q -- you can answer.**
A That's correct. I need to look at documents to remind myself. This is from 2021.
**Q Okay. Glencoe Family Dwelling LLC currently exists? Correct?**
MR. HEFTMAN: Counsel, I think -- I've given you a little latitude. But I think these are questions that are far afield of the subject matter of the



litigation for which this deposition is being taken. There is no relevance to this discussion -- to that issue for purposes of the litigation for which this deposition is being taken.
BY MR. JALALPOUR:
**Q Well, I disagree with that. And so does the magistrate judge in this case. The financials in this case have been held to be relevant for purposes of discovery, and this is something that even Steven Ivankovich has produced in this case. So I believe you're incorrect.**
**Doctor, my question still stands. And I'll restate it.**
**The company Glencoe Family Dwelling LLC is still in existence today. Correct?**
MR. HEFTMAN: Objection to form.
MR. TRUPPMAN: Join.
THE WITNESS: This is from 2021. I definitely have to review documents.
BY MR. JALALPOUR:
**Q Do you recall ever extending a $1 million loan to Steven Ivankovich back in 2021?**
MR. HEFTMAN: Object to form.
THE WITNESS: I will have to review documents.



BY MR. JALALPOUR:
**Q Okay. And according to this document, the maturity date was October 31, 2023. Do you see that?**
A I see here November, 2021.
**Q I'm looking here in the section called Maturity Date. Do you see that? "Maturity Date shall mean October 31, 2023."**
A Yes. Yes.
**Q Okay. So this -- according to this Promissory Note, this -- this note matured on October 31, 2023. Correct?**
A That it says here.
**Q Okay. And Steven never paid back this money. Correct?**
MR. HEFTMAN: Objection to form. Foundation.
MR. TRUPPMAN: Join.
THE WITNESS: I have to review documents.
BY MR. JALALPOUR:
**Q Do you have any recollection of whether Steven paid this money back?**
A I --
**Q Strike that. Strike that.**
**Do you have a recollection of Steven paying this million dollar loan back?**



MR. HEFTMAN: Objection. Asked and answered.
MR. TRUPPMAN: Join.
THE WITNESS: I have to look at documents.
BY MR. JALALPOUR:
**Q And if he did not pay this loan back, is there a reason why Glencoe Family Dwelling LLC did not file suit against Steven?**
MR. HEFTMAN: Objection to form. Foundation. Calls for speculation. Improper hypothetical.
BY MR. JALALPOUR:
**Q You can answer, Doctor.**
MR. TRUPPMAN: Join.
THE WITNESS: Counselor, I would have to look at those documents to give you a proper answer.
BY MR. JALALPOUR:
**Q Well, I'll represent to you that your son testified in this case that he did not pay this money back. So that is not disputable -- not disputed in this case.**
**So my question to you is, why hasn't Glencoe Family Dwelling LLC sued Steven for failing to pay this money back?**
MR. HEFTMAN: Object to form.
MR. TRUPPMAN: Object to the form. Join.

THE WITNESS: Steven will give you best answer.
BY MR. JALALPOUR:
**Q Well, why would Steven know why the lender chose not to sue him?**
MR. HEFTMAN: Objection. Foundation. Calls for speculation.
MR. TRUPPMAN: Join.
THE WITNESS: Unfortunately, I cannot give you answer until I see documents.
BY MR. JALALPOUR:
**Q Did Steven have any role in the company Glencoe Family Dwelling LLC at the time this Promissory Note was executed?**
MR. HEFTMAN: Objection to form. Foundation.
MR. TRUPPMAN: Join.
THE WITNESS: I have to review documents.
BY MR. JALALPOUR:
**Q So sitting here today, you have no knowledge of your role in the company Glencoe Family Dwelling LLC. Correct?**
MR. HEFTMAN: Objection. Form. Foundation. Mischaracterizes the witness' prior testimony. Asked and answered.
///



BY MR. JALALPOUR:
**Q Go ahead.**
MR. TRUPPMAN: Join.
THE WITNESS: I have to review documents.
BY MR. JALALPOUR:
**Q Now, for this next exhibit, Jeff, if I email you the exhibit, do you have a printer available? Because it will be much easier to have the deponent look at a paper company.**
MR. HEFTMAN: I don't.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, I have placed onto your screen what has been previously marked as Exhibit -- Steven Exhibit 31. And the name of this document is, quote, "Contribution Pledge and Security Agreement."**
**Do you see that?**
A I do.
**Q And this document is supposedly dated as of December 7, 2002, and it is between Steven Ivankovich and a company called North American Property Ventures LTD. Do you see that?**
A I do.
MR. TRUPPMAN: I'll object to the form of the question.



MR. HEFTMAN: Join.
BY MR. JALALPOUR:
**Q Have you seen this document before today?**
A I don't recall it.
**Q Have you heard of a company called North American Property Ventures LTD before today?**
A I am owner.
**Q Okay. You are the owner of that company? Is that your testimony?**
A Correct.
**Q Okay. And how long have you been the owner of North American Property Ventures LTD?**
A I cannot quote a date. I have to look at documents to let you know.
**Q Okay. At some point, was Steven an owner in that company?**
A I cannot give you that answer until I see the documents.
**Q Okay. So I'll go ahead and show you a document.**
A I told you that Dr. Anthony no longer -- we are --
MR. HEFTMAN: You answered. There's no question pending, Doctor.



THE WITNESS: I see.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, I've placed onto your screen Steven Exhibit 40.**
A Can you make it bigger?
**Q Yes, I will in just a second.**
A Thank you.
**Q Yes. So I will zoom in on the top of the first page. And this document that's -- Exhibit 40 actually contains two documents.**
**The first document is called Action by the Some Member of Old Town Property Ventures, LLC.**
**Do you see that?**
A Yeah.
**Q And the first paragraph states, quote, "The undersigned, North American Property Ventures LTD, a Cayman Island company, being the sole member of Old Town Property Ventures, LLC, a Delaware limited liability company, does hereby adopt the following resolutions." Do you see that?**
A I do.
**Q Have you heard of a company called Old Town Property Ventures, LLC, before?**
A I think I gave that answer. Yes.

Q Okay. So as far as you know, who is the owner of Old Town Property Ventures, LLC?
A Olga and Anthony Ivankovich.
Q Okay. And at any point in time did Steven Ivankovich have an ownership interest in Old Town Property Ventures, LLC?
A I cannot recall without seeing the documents.
Q Okay. Now, returning back to the North American Property Ventures LTD company, I want to show you the signature block on page 2 of Steven Exhibit 40. Do you see the signature block here?
A Yes.
Q And the signature block says, "Member: North American Property Ventures LTD, a Cayman Island company." Correct?
A Yes.
Q And then below that there is a -- a line for a signature. And underneath that signature line it says, "Steven Ivankovich, Sole Shareholder."
Do you see that?
A I do.
Q And there's a signature on that line. Correct?



A No. This is just S.
Q Okay. Well, this document purports to state that Steven Ivankovich was the sole shareholder of North American Property Ventures LTD. Correct?
MR. TRUPPMAN: Form.
MR. HEFTMAN: Join.
THE WITNESS: Not --
BY MR. JALALPOUR:
Q Is that what the document states, Doctor?
MR. HEFTMAN: Objection. Calls for a legal conclusion. Object to form.
MR. TRUPPMAN: Agree. I join.
BY MR. JALALPOUR:
Q Doctor -- let me restate.
Doctor, does this document state that Steven Ivankovich, at the time of this document, was the sole shareholder of North American Property Ventures LTD?
MR. HEFTMAN: Object to form.
MR. TRUPPMAN: Objection to the form. Lack of foundation. Calls for a legal conclusion.
MR. HEFTMAN: Join.
THE WITNESS: I have to see documents in order --



BY MR. JALALPOUR:
Q Well, Doctor, you earlier stated you would need to see documents to see who owned -- to see whether Steven Ivankovich had an ownership interest in the company.
This is one of those documents, is it not?
MR. HEFTMAN: Objection. Argumentative. Form. And foundation.
MR. TRUPPMAN: And I join.
BY MR. JALALPOUR:
Q Doctor, you can answer.
A I have to look more clearly and -- for understanding to give an answer.
Q Okay. Well, let's return to Steven Exhibit 31, which is the Contribution Pledge and Security Agreement.
And just to refresh our recollection, did you say you had or had not seen this document before?
A I do not remember. I have to see that. I don't remember.
Q Okay. And in this document -- so let's go to the third whereas clause. It states, quote, "WHEREAS The parties agree that Doctors Anthony and Olga Ivankovich and 'LLCs' owned by them, have loaned



to Steven Ivankovich including capital contributions to LLCs managed by Pledgor, the following principal amounts." Do you see that?
A I do.
Q And pledgor here is in reference to Steven Ivankovich. Correct? If you look at the top of the document?
A Yes.
Q Okay. And that third whereas clause then lists a number of entities and sums of money next to those entities. Do you see that?
A Correct.
Q And so let's go through them one by one.
The first entity listed is P2 Managing Member LLC. Do you see that?
A I see.
Q What is your relationship to P2 Managing Member LLC?
A Steven was manager but not decision maker.
Q Okay. But who owned -- who owns P2 Managing Member LLC?
A Olga and Anthony Ivankovich.
Q Has Steven Ivankovich ever held an ownership interest in P2 Managing Member LLC?

Page 70

A Not that I know of.
**Q Okay. And so next to this company's name it says $35 million. Do you see that?**
A Yes.
**Q Do you know what that number relates to?**
A I think I do, but I would have to refresh my memory.
**Q Okay. Well, sitting here today, what can you recall that this number, $35 million, relates to?**
A I would like to look to be sure. I would like to look at the record to totally be -- to give you proper answer.
**Q But sitting here today, you don't have a recollection as to what $35 million relates to. Is that correct?**
A I definitely would have to think about that. This is -- this is huge responsibility to give answering -- those answers -- those companies are all our properties that we financed by loans or by the -- you know. But I have to read all of that and be very, very familiar to answer this. This is complicated.
**Q Okay. But sitting here today, you don't have an answer -- you don't have a recollection as to**

Page 71

**what the $35 million figure relates to. Is that correct?**
A Not until I see --
MR. HEFTMAN: Objection to the form.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q You can answer.**
A Yeah, not until I see the documents.
BY MR. JALALPOUR:
**Q Okay. And before -- we'll come back to this page. But I want to go to the last page of this document first.**
**Schedule 1 to this contribution agreement lists a number of entities and what purports to be Steven's ownership interest in those entities.**
**Do you see that?**
A I do.
**Q And so the first line here says -- shows that the company is Ivankovich Family LLC.**
**You're familiar with that company. Correct?**
A Yes.
**Q And then the next column states Steven Ivankovich, and it describes him as Owner.**

Page 72

**Do you see that?**
A Yes. But I don't agree with that.
**Q Okay. But then the -- and then the next column states Percentage of Membership Interests as 100 percent. Do you see that?**
A I do.
**Q Okay. So this document is purporting to state that at one point, Steven Ivankovich had a 100 percent ownership interest in Ivankovich Family LLC.**
MR. HEFTMAN: Objection. Form. Foundation. Calls for a legal conclusion.
MR. JALALPOUR: Is that --
MR. TRUPPMAN: Objection to form. Also mischaracterizes the document. It says the percentage of his ownership interest that he's pledging, which was just asked about.
You can answer.
THE WITNESS: As a general statement, I cannot give an answer to that. I have to get into very, you know, thoroughly to those statements here.
BY MR. JALALPOUR:
**Q Do you understand that this document purports to pledge all of Steven's ownership**

Page 73

**interests in these various LLCs to North American Property Ventures LTD?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Object to form. Foundation.
You can answer.
THE WITNESS: I can interpret this as a loan, but nothing else.
BY MR. JALALPOUR:
**Q What do you mean by as a loan?**
A To Steven. Not ownership. Not to Steven. To the companies. Loan for the companies to be purchased.
But, listen, this is general question you are asking me. I absolutely cannot answer such a complicated questions over business and investments just yes or no. All right?
**Q What is your understanding of the purpose of this document?**
A I understand that all companies belong to Steven. I am telling you that I have to absolutely study that and see why you're asking me these questions. I cannot give you an answer, unfortunately.
**Q And just to reclarify, you have not seen --**

**you don't recall seeing this document before today. Correct?**

A I have --

MR. HEFTMAN: Objection. Asked and answered.

BY MR. JALALPOUR:

**Q Doctor, you can answer.**

MR. HEFTMAN: Go ahead.

THE WITNESS: I have given answer the best of my knowledge.

BY MR. JALALPOUR:

**Q Okay. But I just want to make sure we have a clear record here.**

**You don't recall seeing this document before today. Correct?**

A Correct.

**Q Okay. Do you recall at any point in time Steven assigning or pledging his membership interests in various companies to a company called North American Property Ventures LTD?**

MR. HEFTMAN: Object to form. Foundation.

MR. TRUPPMAN: Join.

THE WITNESS: I don't recall.

BY MR. JALALPOUR:

**Q Do you recall Steven Ivankovich ever**



**assigning his membership interests to a company -- strike that.**

**Do you recall Steven Ivankovich ever assigning his membership interests in various LLCs to North American Property Ventures LTD?**

MR. HEFTMAN: Objection. Asked and answered on multiple occasions, and I'm gonna instruct the witness not to answer.

MR. JALALPOUR: No, no, no, Jeff. You guys just objected on form grounds. I assumed it's because I said assigned or pledged. Is that why you objected on form grounds?

MR. HEFTMAN: I'm not gonna provide you the reasons. You've asked this question.

MR. JALALPOUR: No. No, I haven't. I asked -- I asked if she recalls Steven assigning or pledging his interests in various LLCs to the North American company. You two objected on form grounds.

The only basis I could see is because I said "assigned or pledged," so I want to split those two up.

If that's not -- if that -- are you saying that that wasn't the basis of your form objection?

MR. HEFTMAN: You can answer if you understand.



THE WITNESS: Well, I'm answering that I have to have total -- this is not enough information for me. So I will -- I cannot answer specifically to the question.

BY MR. JALALPOUR:

**Q I understand that you would like to see documents. But I'm asking about your recollection. And if you don't recall, you don't recall.**

A No, I don't recall it. I don't recall it.

**Q Okay.**

A I don't.

**Q Okay. So is it fair -- so I'm -- I just need to make a clear record here. And I can guess what your answer is gonna be. But I need you to answer them, and we can move on to the next topic.**

**Do you recall Steven Ivankovich ever pledging his interests in various LLCs to North American Property Ventures LTD?**

THE WITNESS: I don't.

MR. HEFTMAN: Object to form.

BY MR. JALALPOUR:

**Q Okay. Do you recall Steven assigning his membership interests in various LLCs to either you or Anthony Ivankovich?**



MR. HEFTMAN: Object to form.

MR. TRUPPMAN: I'll join.

THE WITNESS: I do not recall.

BY MR. JALALPOUR:

**Q And then last question here, do you recall Steven Ivankovich pledging his membership interests in various LLCs to either you or Anthony Ivankovich?**

MR. HEFTMAN: Object to form.

MR. TRUPPMAN: I'll join.

THE WITNESS: I do not recall.

BY MR. JALALPOUR:

**Q Okay. Now, returning back to this list of entities on page 1 of Exhibit 31, the next company listed here is Ivankovich Family LLC, and the figure next to it is $30 million. Do you see that?**

A I do.

**Q Sitting here today, do you know what that $30 million is in reference to?**

MR. TRUPPMAN: Form.

MR. HEFTMAN: Join.

THE WITNESS: I do not recall.

BY MR. JALALPOUR:

**Q Okay. And so we're just gonna go through these different entries and hopefully we can go**

**through them pretty quickly.**
**The next entry is a company called Overlook Managing Member LLC. You've heard of that entity before. Correct?**
MR. HEFTMAN: Object to form.
THE WITNESS: I cannot recall.
BY MR. JALALPOUR:
**Q Okay. And the number next to that entity is $22 million. Do you see that?**
A I do.
**Q Do you, sitting here today, have an understanding as to what the $22 million figure relates to?**
MR. TRUPPMAN: Form.
THE WITNESS: I do not.
BY MR. JALALPOUR:
**Q Okay. The next one is a company called A&O Family LLC. Do you see that?**
A I do.
**Q And you have knowledge about a company called A&O Family LLC. Correct?**
A Yes.
**Q Okay. And the figure next to that entity is $24 million. Do you see that?**



A Yes.
**Q And sitting here today, do you have any knowledge as to what the $24 million figure relates to?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Join.
THE WITNESS: I know it's Olga and Anthony company.
BY MR. JALALPOUR:
**Q Understood. But what -- do you have any knowledge about --**
A I have no recollection.
**Q -- do you have any knowledge about what the $24 million figure --**
A I have no recollection.
**Q Okay. The next company is called Proptex, P-r-o-p-t-e-x, Portfolio. And it supposedly consists of numerous LLCs.**
**Do you know what this relates to? Proptex Portfolio.**
A I have no --
MR. TRUPPMAN: Form.
THE WITNESS: -- I have no recollection of that.
///



BY MR. JALALPOUR:
**Q Okay. And similarly, the $10 million figure next to Proptex Portfolio, do you have any knowledge as to what that relates to?**
A I don't have recollection of that either.
**Q Okay. Then the next one, the last entity here is Bookview LLC.**
**Have you heard of that company before?**
A I have no recollection.
**Q And the figure next to that entity is $17 million. Do you see that?**
A I do.
**Q Sitting here today, do you have any knowledge about what that $17 million number relates to?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Join.
THE WITNESS: I have no recollection.
BY MR. JALALPOUR:
**Q Okay. And now the last entry here is called, quote, "Steven Ivankovich individual loans."**
**Do you see that?**
A I do.
**Q And the figure next to that entry is**



**$17,875,000. Do you see that?**
A I do.
**Q So this document asserts that you and your husband and the LLCs owned by you loaned Steven Ivankovich, through individual loans, a total of $17.875 million.**
**Before I ask you whether you agree with that or not, I just want to make sure that you understand that that's what this document is saying. Correct?**
MR. HEFTMAN: Object to form.
MR. TRUPPMAN: Join.
THE WITNESS: I have no recollection of that.
BY MR. JALALPOUR:
**Q Okay. Okay. So I guess you answered my next question, but I need a clear record here.**
**Do you have any recollection of you and your -- and your husband, whether directly or through your LLCs, having loaned Steven $17.875 million?**
A We have -- we have given -- given loans for purchasing -- yeah, for our business. But I have no recollection of the details. I would have to look at documents to give the proper answer.
We have given loans and -- and money. But

I cannot now pinpoint what questions that you are asking.
**Q Okay. So is it your testimony that you and your husband had personally loaned Steven money before?**
A That's correct.
**Q And do you have any recollection as to how -- the amount those loans total as of -- as of December of 2022?**
MR. HEFTMAN: Object to form. Foundation. No relevance --
MR. TRUPPMAN: Join.
MR. HEFTMAN: -- to the litigation.
THE WITNESS: I would have to look at the documents.
BY MR. JALALPOUR:
**Q Okay. Would $17 million be roughly the amount of money you believe you loaned Steven prior to December 7, 2022?**
MR. HEFTMAN: Object to form. Foundation. Calls for speculation.
MR. TRUPPMAN: I'll join.
THE WITNESS: I do not recall.
///



BY MR. JALALPOUR:
**Q Okay. These various entities listed here -- or strike that. Strike that.**
**Now, Steven has worked for the family business. Is that correct?**
MR. HEFTMAN: Objection to form. Foundation.
THE WITNESS: Representing us.
BY MR. JALALPOUR:
**Q Okay. Is it fair to say that you and your husband have owned various companies over time?**
A That's correct.
**Q And generally speaking, what types of -- what type of business do those companies engage in?**
A Mostly real estate and other businesses.
**Q Okay. And for at least some of those entities, he has provided services. Correct?**
A Repeat that. Provided what?
**Q For at least some of those entities, Steven has provided services. Correct?**
A Yes.
**Q Okay. And but -- has he been paid for those services?**
MR. HEFTMAN: Objection to form. Foundation.
MR. TRUPPMAN: I'll join.



THE WITNESS: I do not know how do you want me -- he never had a salary.
BY MR. JALALPOUR:
**Q Okay. But has he ever been paid for those services relating to those various LL -- various companies?**
A I could not specify that.
**Q Okay. Do you recall when the last time Steven was paid for his services relating to any of the LLCs you and/or Anthony Ivankovich own?**
A Steven was never paid for the services. He was our representative and manager because we were getting older and he was our son. But he never was never paid as a salary.
**Q Was he paid through any other compensation besides salary for his work?**
A He could get money for his needs from us when he requested.
**Q Okay. And so that -- okay.**
**We've been going for a while here, at least an hour, so can we take a five -- maybe a ten-minute break? It's 2:52. We can come back at 3:00?**
MR. HEFTMAN: That's fine.



MR. TRUPPMAN: Sure. R.J., I'm not rushing you. But do you have a sense --
THE VIDEO TECHNICIAN: Going --
MR. TRUPPMAN: -- of where you are in the deposition?
THE VIDEO TECHNICIAN: Let's go off -- do you want to go off? Going off the record --
MR. TRUPPMAN: Yeah, yeah. Yeah.
THE VIDEO TECHNICIAN: -- at 2:52 p.m.
(Whereupon, a short recess was taken.)
THE VIDEO TECHNICIAN: This is the beginning of Media Unit 4. We're going back on the record at 3:03 p.m. Central Time.
BY MR. JALALPOUR:
**Q Dr. Ivankovich --**
MR. HEFTMAN: Just for the record, before you start, before the break, we were joined in the room we're in by Steven Ivankovich who's observing the deposition.
MR. JALALPOUR: Okay. So Steven is in the room currently?
MR. HEFTMAN: That's correct.
BY MR. JALALPOUR:
**Q Okay. And Dr. Ivankovich, have you spoken**

**with Steven since this deposition started?**
A No.
**Q Okay. So you have not spoken any words with him despite the fact that --**
A I said hello.
**Q Okay. Besides hello, did you talk to him at all?**
A No.
**Q Is that a no?**
A No.
**Q Okay. Earlier you testified that you were not guaranteed that Steven would be -- would not be rearrested. Do you recall that testimony?**
A I'm sorry, can you repeat that? I just didn't hear that properly.
**Q Sure. Earlier you testified that you were not guaranteed that Steven would not be rearrested if he was released. Do you recall that?**
A That's correct. Yeah.
**Q Okay. Did you ever ask the Court for confirmation as to whether Steven could be rearrested if the bond was paid?**
MR. HEFTMAN: To the extent that the witness' understanding and information responsive to that



question is based on discussions with counsel, then I'm gonna instruct her not to answer it.
If you can answer it distinct from discussions that you had with legal counsel, go ahead.
THE WITNESS: I prefer to discuss with legal counsel.
BY MR. JALALPOUR:
**Q Well, that -- Doctor, that's not his instruction. His instruction is, if your answer is based on your prior discussions with your attorney, then your attorney's instructing you not to answer the question.**
A No.
**Q Okay. So the answer to my question -- the originally proposed question is no.**
**Did -- do you know if Steven ever asked the Court, any Court, for clarification as to whether he would be rearrested?**
MR. HEFTMAN: Objection. Calls for speculation. Form.
You can answer.
MR. TRUPPMAN: I'll join.
THE WITNESS: I am not aware.



BY MR. JALALPOUR:
**Q Did you ever ask the opposing counsel, Jeanette or her attorneys, whether he would be rearrested if the bond amount was paid?**
A No.
**Q Do you know if Steven ever, through -- directly, or through his attorneys, ever asked Jeanette's attorneys whether he would be rearrested if he paid the bond amount?**
A I would not know that.
**Q Okay. And you understand that Steven was arrested pursuant to those Body Attachment Orders that we showed you earlier. Correct?**
MR. HEFTMAN: Objection. Calls for legal conclusion. Foundation.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q You can answer.**
MR. HEFTMAN: If you know.
THE WITNESS: No.
BY MR. JALALPOUR:
**Q Okay. What was your understanding as to why Steven was arrested?**
MR. HEFTMAN: I'm gonna instruct the witness



that to the extent your understanding of that arrest and incarceration is based on communications that you had with counsel, not to reveal the subject matter of those discussions.
If you had an independent understanding, separate and apart from your discussions with counsel, then you can answer.
MR. TRUPPMAN: And I'll object to the form as vague and ambiguous.
MR. HEFTMAN: Join.
BY MR. JALALPOUR:
**Q Go ahead.**
A I would not answer that question before I talked to my counsel.
**Q Are you following your client -- your attorney's instruction not to answer?**
A That's correct.
**Q Okay. Earlier you testified that you were aware that the Body Attachment Orders called for Steven's arrest. Do you remember that?**
A Yes.
**Q Okay. If he paid off the amounts required by those Body Attachment Orders, why did you believe it was possible he could be rearrested?**

MR. HEFTMAN: Objection to form. Asked and answered. Calls for speculation.
And to the extent that that question calls for the disclosure of information subject to the attorney-client privilege, I'm gonna instruct you not to answer.
MR. TRUPPMAN: Join.
MR. HEFTMAN: And also object to the extent it mischaracterizes the very documents on which the question is relayed -- is based, insofar as they use the term the permissive "may" rather than the "shall" with respect to release. And those documents speak for themselves.
MR. TRUPPMAN: I'll join the objection.
BY MR. JALALPOUR:
**Q Doctor, you can answer.**
A Well, I am in agreement with my counselor.
**Q Dr. Ivankovich, I'm placing back onto your screen Exhibit 31, which is the contribution agreement.**
A Yeah.
**Q Turning to the second whereas clause here, the last sentence states, quote, "The documents supporting the loans and capital contributions were**



**documented in promissory notes, loan agreements, contribution agreements, operating agreements, tax returns of the 'LLCs' and through the books and records of the respective limited liability companies." Do you see that?**
A I do. I do.
**Q Are you aware of whether these specific documents exist?**
MR. HEFTMAN: Objection.
Counsel, this is discovery for purposes of the domestic relations action. It's fishing. And I'm gonna instruct the witness not to answer accordingly.
BY MR. JALALPOUR:
**Q Dr. Ivankovich, are you following your attorney's instruction?**
A I do.
**Q Okay. Well, let's certify that question.**
(Question certified.)
BY MR. JALALPOUR:
**Q With respect to the entry at the bottom of page 1 concerning the, quote, "Steven Ivankovich individual loans," you recall I asked you a few questions about that? Correct?**



MR. HEFTMAN: He's just saying you recall that he asked you some questions about the identification of loans --
THE WITNESS: Yeah.
MR. HEFTMAN: -- to Steven.
Can you restate the question, Counsel?
THE WITNESS: Do that.
BY MR. JALALPOUR:
**Q Doctor, you recall that I asked you some questions about the loans to Steven individually as referenced in Exhibit 31 here. Correct?**
A I do. Yes.
**Q Okay. Do you recall if any of those loans were documented in writing?**
A I will have to look at the document first.
**Q Okay. But do you -- to the extent that documents exist, where would they be?**
MR. HEFTMAN: Objection.
I'm gonna -- this is fishing in purposes of domestic relations matters, Counsel, and I'm gonna instruct the witness not to answer.
BY MR. JALALPOUR:
**Q Doctor, are you going to follow your attorney's instruction?**



A I am following my attorney's instruction.
**Q Okay. Let's certify that question.**
(Question certified.)
BY MR. JALALPOUR:
**Q Dr. Ivankovich, I've placed onto your screen Exhibit 4, which is actually a group exhibit. It contains a number of bankruptcy petitions filed by four different bankruptcy debtors.**
**Before we get into the petitions, you do recall that a number of LLCs that you are affiliated with filed for bankruptcy. Correct?**
A Correct.
**Q And turning to Exhibit 4, the first bankruptcy petition here is for a company called A&O Family LLC (Illinois). Do you see that?**
A Yes.
**Q And that's one of the entities that filed bankruptcy. Correct?**
A Yes.
**Q And what is your ownership interest in that company, if any?**
A It's -- we own -- we are owners of this company.
**Q And who is "we"?**

A My husband and me. A&O.
**Q Okay. And has Steven ever had an ownership interest in A&O Family LLC (Illinois)?**
A Not to my knowledge.
**Q Okay. But he was the manager of that company for some period of time. Correct?**
A Steven?
**Q Yes.**
A Yes.
**Q And, in fact, if we turn to page 4 of this bankruptcy petition, it's signed by Steven Ivankovich as Manager. Do you see that?**
A I don't think it's signed. But it's typed. Okay.
**Q Okay. But it's purported to have been approved by Steven Ivankovich as Manager of A&O Family LLC --**
A Yeah.
**Q -- (Illinois). Correct?**
A That looks like it.
**Q Okay. And then the next bankruptcy petition is by A&O Family LLC, which I believe this one is the Florida entity. Is that correct?**
A That is correct.



**Q Okay. So moving forward, I'll refer to this as A&O Family LLC Florida.**
A Yeah.
**Q Is that fair?**
A Correct.
**Q Okay. And so this petition was actually approved purportedly by Dr. Anthony Ivankovich in his capacity as Manager. Do you see that?**
A I see.
**Q Do you recall if he actually approved this bankruptcy file on behalf of A&O Family LLC Florida?**
A Yes. That is what happened.
**Q And then the next petition is by Ivankovich Family LLC. Do you see that?**
A Yes.
**Q And at some point in time, Steven Ivankovich was the manager of Ivankovich Family LLC? Correct?**
A That's correct.
**Q And, in fact, if we turn to the signature page again, his name is typed out as signing on behalf of Ivankovich Family LLC as its Manager. Correct?**
A Only manager. But --



**Q Ma'am, my question only concerned his -- his capacity as manager. So this was --**
A Yeah.
**Q -- purportedly authorized by Steven in his capacity as manager of Ivankovich Family LLC. Correct?**
A That's correct.
**Q And then the last petition is by a company called Atlas P2 Managing Member LLC. Do you see that?**
A I do.
**Q And at some point in time, Steven was the manager of this entity, too. Correct?**
A That's correct.
**Q And is it true that Steven held an ownership interest in this company at some point in time?**
A Never.
**Q Now, at some point in time with respect to the three -- three -- you know what, strike that. Let's go down to the signature page for Atlas P2 Managing Member LLC's bankruptcy petition. And this one shows that it was, again, authorized by Steven Ivankovich in his capacity as**



**Manager of that entity. Correct?**
A Correct. With instructions from his parents.
**Q Okay. So you were aware of all four bankruptcy filings. Correct?**
A Correct.
**Q The three entities that he was acting as manager when these petitions were filed were Ivankovich Family LLC, A&O Family LLC (Illinois) and Atlas P2 Managing Member LLC. Correct?**
MR. HEFTMAN: Objection. Asked and answered.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q You can answer, Doctor.**
A I agree with my counselor.
**Q Okay. Well, you've already answered that. So my next question is, at some point in time after these bankruptcy petitions were filed, was Steven replaced as manager of those three entities?**
MR. HEFTMAN: I'm gonna object to form. Foundation.
Counsel, as you're well aware, there's an extensive bankruptcy reorganization plan that is a matter of record. Those documents state what they

state. And the prior ownership or management of these entities is not particularly relevant to entities that were in bankruptcy and subject to that plan of reorganization.

So I'm gonna instruct the witness not to answer.

You have access to that plan and who controlled it.

BY MR. JALALPOUR:

**Q Well, again, that's not a proper objection whatsoever.**

**Doctor, are you following your client -- your attorney's instruction not to answer?**

A I do.

MR. JALALPOUR: Okay. I'm gonna certify that question as well.

(Question certified.)

BY MR. JALALPOUR:

**Q Now, why was Steven replaced as manager of those three entities?**

MR. HEFTMAN: This is not relevant to the pending matter before this Court. It's the subject of a bankruptcy plan that has documents that are not in front of my client.



I'm gonna instruct her not to answer.

MR. TRUPPMAN: And I'll also add on the record that the judge has allowed discovery into Steven Ivankovich's finances, which is fair game.

But delving into replacement of managers, which was the decision of other people besides him, has no relevance to what the judge did allow in the case.

MR. HEFTMAN: Join.

BY MR. JALALPOUR:

**Q Doctor, are you following your attorney's instruction?**

A I do.

**Q Certify that, please, court reporter.**

(Question certified.)

THE WITNESS: It's good.

BY MR. JALALPOUR:

**Q Dr. Ivankovich, do you know who Joseph Seinitz is?**

A I do.

**Q And when did you first become aware of Joseph Seinitz?**

A He provided security.

**Q And when -- who did he provide security for?**



A Well, he provided security for -- for me because of a frequent breakage and vandalism in the neighborhood. And he provided security for the company.

**Q Okay. Which company?**

A Everything what was under Ivankovich's name.

**Q Okay. And when did he begin working for the family and the companies?**

A I will have to take a look at the record.

**Q And what was -- was he providing security services at the outset of his work?**

A I would like you to reframe that. What do you mean "outside of his work"?

**Q I think you misheard me.**

**So when he first began working for the Ivankovich family, was he providing security services?**

A Not for me.

**Q Okay. But was he providing service -- security services when he started working for the family and the companies?**

A I believe he did.



**Q Okay. And do you know if his role ever changed with the family or the companies?**

A I believe that I would have to talk -- I would have to get information about that and see what his contract is --

**Q Okay.**

A -- for this.

**Q Who was he -- was he contracted with a particular entity?**

A I would not be able to give you that answer until I see more --

**Q Okay.**

A -- in his contract.

**Q And who -- who did he report to while he was working for the family and the entities?**

A I do not want to guess. I have to look at the documents and his contract.

**Q Okay. And so sitting here today, you don't know if -- you have no recollection as to whether his role ever changed from security to something else.**

**Is that correct?**

A I didn't say I don't know. I said that I would like to look into his contract.

**Q Well, I'm asking you about your**

**recollection today. And based on your recollection, is it fair to say that you don't know if his role ever changed away from providing security?**
A I am not aware of this.
**Q Okay. While he was working for the family, did you ever have any issue with him?**
MR. HEFTMAN: Object to form.
THE WITNESS: I felt very uneasy with him.
BY MR. JALALPOUR:
**Q Okay. And can you -- when did you feel -- begin to feel uneasy with Mr. Seinitz?**
A This is my personal now. It has nothing to do with his contract.
I personally, he didn't strike me -- and some of you can provide -- he didn't strike me as a trust -- trustworthy person.
**Q Okay. And when did you form that belief?**
A The minute I saw him.
**Q And do you recall roughly when you first saw him?**
A Well, I would have to take a look exactly in my notes when he started working for me. I cannot -- no, I will have to look at my record.
**Q Well, who made the decision to hire**



**Mr. Seinitz to work for the family and the companies?**
A I have to look in his contract first.
**Q Okay. Do you know if you were involved in approving his hiring?**
A Steven mentioned that he is hiring security after vandalism and breakage in the families and life-threatening situation that happened two houses down the road.
**Q And roughly when was that?**
A Again, I may not have such a good memory. I have to look in my papers. I definitely have to give you answer appropriate after I look in the papers.
**Q Okay. Is Steven saying anything to you right now while we're in this deposition?**
A What did you say?
**Q Is Steven saying anything to you while we're in this deposition?**
A Why are you asking me that? How would he do it? You would hear everything.
**Q Well, I don't know because he's in the room, which is why I'm asking the question.**
MR. HEFTMAN: She answered your question, Counsel.



MR. JALALPOUR: What's that?
MR. HEFTMAN: She answered your question.
BY MR. JALALPOUR:
**Q Okay. And did you ever have any issue with his job performance?**
A Yes, I did.
**Q And when -- explain when that came about.**
A I didn't think he followed instructions.
**Q Instructions from who?**
A From me while he was providing security for me.
**Q Okay. And roughly when did that happen?**
A You're asking me for dates. I'm sorry, I cannot -- I have to look -- I will know when I look at my notes when he started working.
It was shortly after he started working. I just -- shortly after. I don't know the dates -- I mean, I don't remember the dates. But I will when I look at the documents.
**Q Roughly how long did he provide you personal security services?**
A Probably for -- between two to three months.
**Q Okay. So it was a relatively short period**



**of time?**
A Yes.
**Q Do you recall -- do you have any recollection as to what year that may have been?**
A That was last year.
**Q Okay.**
A Last year summertime.
**Q Was this before or after Steven was arrested?**
A I cannot -- well, I have to look in my record.
**Q Okay. Well, you understand that Steven was arrested in late April of 2025. Correct?**
A Yes.
**Q And so was -- do you recall that Mr. Seinitz was still -- was providing you security services before or after that?**
A To give you exact dates, I have to look in my notes when he -- when he started working and what days that he provided service.
**Q Do you have notes about that?**
A I do have some notes.
**Q And where are nose notes located?**
A I have to find them.

**Q Well, do you know are they handwritten notes or electronic notes?**

A No, handwritten. That was handwritten some -- on my calendars as I do that. So I have to find the calendar and that's ...

**Q Okay. Do you know which house that those notes would be located in?**

A This house. 1150 Michigan Avenue.

**Q Okay. So -- oh, okay, so it's in the -- is that the Trump Tower condo?**

A No.

**Q Oh.**

A That's my house. 1150 Michigan.

**Q And is that in Chicago?**

A Wilmette.

**Q Okay. The Wilmette -- sorry, excuse me. So the Wilmette house. Okay. So it's somewhere in the house that you're currently in. Correct? Is that right?**

A Say this again?

**Q So your testimony is that the notes are somewhere in the house that you are currently residing at. Correct?**

A Not somewhere. Somewhere on my calendars, but ...



**Q Okay. But the calendar you're referencing is in the house that you're sitting in. Correct?**

MR. HEFTMAN: Object to form. Foundation.

THE WITNESS: I believe so.

MR. JALALPOUR: Okay.

THE WITNESS: I'll look for it. I can't guarantee.

BY MR. JALALPOUR:

**Q And why did -- why did Mr. Seinitz stop providing you personal security services?**

A Because I didn't like him.

**Q And did --**

A He didn't provide services the way I wanted.

**Q Okay. And did -- who told --**

A I just didn't feel comfortable with him.

MR. HEFTMAN: Let him ask.

BY MR. JALALPOUR:

**Q Did you tell him not to --**

A No.

**Q -- provide you security services anymore?**

A No, I didn't.

**Q Okay. So how did -- why did he stop?**



A You have to ask Steven.

**Q Okay. But after he stopped providing security services for you personally, he continued working for the company -- or excuse me, for the family in general. Correct?**

A You have to ask --

MR. HEFTMAN: Objection. Foundation. Calls for speculation.

THE WITNESS: Okay.

MR. TRUPPMAN: I'll join.

BY MR. JALALPOUR:

**Q Doctor, you can still answer.**

A You have to ask Steven about that.

**Q Okay. So is it fair to say that Steven, not you, would know when and why Mr. Seinitz stopped working for the company -- for -- excuse me, for the family?**

MR. TRUPPMAN: Form.

MR. HEFTMAN: Join.

THE WITNESS: This is just speculative question for me.

BY MR. JALALPOUR:

**Q Well, you just said that I need to ask Steven about this. Do you recall saying that?**



A Well, I already told you that when I told you that's all what I have to tell you. He knows that.

**Q Okay, so is it fair -- is it fair to say that Steven, not you, would know about when and why Mr. Seinitz stopped working for the company?**

MR. TRUPPMAN: Form.

MR. HEFTMAN: Join.

THE WITNESS: I would like to --

BY MR. JALALPOUR:

**Q Let me restate that because I -- let me restate that.**

**Is it fair to say that Steven, not you, would know why and when Mr. Seinitz stopped working for the family?**

MR. TRUPPMAN: Form.

MR. HEFTMAN: Join.

THE WITNESS: Yes. I would say yes.

BY MR. JALALPOUR:

**Q Okay. And I know you talked about Mr. Seinitz providing you personal service -- personal security services. But you are aware that Mr. Seinitz provided security services for the family and the entities in general as well. Right?**

A That's correct.
**Q Okay. And is it fair to say you were not involved in -- in Mr. Seinitz no longer providing services for the family and the companies in general?**
A I was aware.
**Q Okay. But you were not involved in why that -- in that event taking place. Is that fair?**
A That's correct.
**Q Okay.**
A To an extent.
**Q And when did you become aware that Mr. Seinitz was no longer providing any services at all to the family and the entities in general?**
A He was not providing service for me for sure.
**Q I understand. That's why I'm trying to be specific about the services for the family and the entities in general.**
**So when I say that, do you understand that I'm separating that from the personal security --**
A Correct.
**Q -- he gave to you? Okay?**
A Correct.
**Q Is that okay?**



A I'm giving you answer for myself. But the rest you have to ask Steven.
**Q Okay. But you weren't involved in the decision making as to --**
A No.
**Q -- Mr. Seinitz no longer working for the family and entities in general. Correct?**
A No. Yes.
**Q Okay. So my question was correct. Right?**
A Yes.
**Q Okay.**
MR. HEFTMAN: Counsel, just -- I know we're on Zoom and it gets a little choppy.
Let the attorney ask his question. You're interrupting him. And it's gonna make for a bad record. And it might confuse you.
THE WITNESS: Okay.
MR. HEFTMAN: Let him ask his question. And when he's finished, you can answer.
But don't interrupt him, please.
THE WITNESS: No, but he -- he's speaking --
MR. HEFTMAN: Okay, there's no -- I know he's speaking.
THE WITNESS: Oh, okay.



MR. HEFTMAN: It's just --
THE WITNESS: I think he's finished. All right. You are right.
MR. HEFTMAN: Take your time and let him ask his questions.
THE WITNESS: Yes. Yes.
THE VIDEO TECHNICIAN: I'm sorry, I apologize. Do you mind moving the -- thank you.
MR. JALALPOUR: Jeff, is it possible to -- I don't know if there's a blind or something -- to shut off some of that light that's shining behind Dr. Ivankovich?
THE WITNESS: There. There. There is a --
MR. HEFTMAN: Here.
THE WITNESS: Is it there? Oh.
There's a glare, right?
MR. JALALPOUR: Yeah, that's the glare that --
THE WITNESS: We are going to make it -- Jeff, get it over there.
MR. HEFTMAN: Bear with me for a moment.
THE WITNESS: Okay.
MR. JALALPOUR: Yeah, that's working.
THE WITNESS: Is it better?
MR. JALALPOUR: Much better, right? Right,



Nick?
THE VIDEO TECHNICIAN: Yes, it is. I appreciate that, too.
THE WITNESS: Have it more --
MR. JALALPOUR: Yeah, bring it down a little.
THE VIDEO TECHNICIAN: If she could move more -- yeah, or -- yeah. Right.
THE WITNESS: Get it down. We have enough room there. Enough light. Get it to here. Perfect.
MR. JALALPOUR: Okay, great. Much better.
THE VIDEO TECHNICIAN: Appreciate that.
BY MR. JALALPOUR:
**Q Okay. Doctor, I'm going to place onto your screen what has been previously marked as Steven Exhibit 29, which consists of Steven's answers -- Amended Answers to Interrogatory Numbers 8 through 9 of SDF's Second Set of Interrogatories.**
**Do you see that?**
A Yeah.
**Q Okay. Then I'm going to scroll down to the second page. And the second page contains an interrogatory and a response.**
**I'll start with putting the interrogatory into the record. And the Interrogatory Number 9**

Page 114

states, quote, "State the total amount of legal fees that have been paid on your behalf in the Divorce Proceeding to date and identify the payor(s)."
Okay. Did I read that correctly?
A Yes.
Q And the response by Steven is, quote, "$2,458,940.14 in legal fees has been paid on behalf of Steven Ivankovich in the Divorce Proceeding to date by his parents, Olga and Anthony Ivankovich, and related entities." Do you see that?
A I do.
Q Okay. So -- and then Steven signed this under oath stating that this was accurate.
Do you see that at the bottom?
A Yes.
Q Okay. First, do you have any reason to dispute the statement Steven made here that you and Anthony had paid about $2.45 million in legal fees on his behalf in the divorce proceeding?
MR. HEFTMAN: Object to the form to the extent it mischaracterizes the response and fails to acknowledge related entities.
BY MR. JALALPOUR:
Q Okay, then I'll restate it.

Page 115

Do you have any reason to dispute the statement made here by Steven that you and Anthony Ivankovich and related entities paid about $2.458 million in legal fees on Steven's behalf in the divorce proceeding? Do you have any reason to dispute that?
A No, I don't.
Q Okay. And you testified earlier that the way Steven is paid is -- for all the work that he does for the family and all the companies, is when he needs money, that's how he gets paid. Right? You recall that testimony?
MR. HEFTMAN: Objection to form. Foundation. Mischaracterizes prior testimony. Calls for legal conclusion.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
Q You can answer.
A I will agree with my counselor.
Q Well, they didn't -- they didn't say anything to agree with. They just objected.
So you can still answer my question.
A Yes, I ...
Q Okay, because it -- okay. So then my next

Page 116

question is, so the 2.458 million in legal fees that you paid on Steven's behalf, that was part of what you testified earlier was the compensation Steven would receive for his work. Correct?
MR. HEFTMAN: Object to form. Calls for a legal conclusion. Foundation.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
Q You can answer.
A Yes, I agree.
Q Dr. Ivankovich, do you know an individual named James Ayule? A-y-u-l-e.
A What is -- what is he spelling?
Q James Ayule. A-y-u-l-e. He might also be referred to Jim Ayule. A-y-u-l-e.
A Oh, yeah, this is -- yes, yes, yes.
Q Okay. And --
A He's a -- yeah.
MR. HEFTMAN: There's no question pending.
THE WITNESS: Yeah.
MR. HEFTMAN: Just listen.
BY MR. JALALPOUR:
Q Okay. And when did you first become aware of Mr. Ayule?

Page 117

A Last year.
Q Okay. And he started working for the family and/or some of the family's companies.
Correct?
A To my knowledge, yes.
Q And who made the decision to hire him?
A Steven and me.
Q Okay. And do you recall which specific entity he was hired by?
A Exactly same as the previous security.
Q Okay. But do you know which entity that was?
A It's a personal security. And who is, you know, coming and going in the house and ...
Q No, no, I get -- Doctor, maybe you misunderstood my question.
We've talked about how the Ivankovich family has a large number of companies that it owns.
Correct?
A Yes.
Q Okay. Was Mr. Ayule hired officially by one of those specific entities, as far as you know?
MR. HEFTMAN: Object to form.
MR. TRUPPMAN: I'll join.

THE WITNESS: I have to look at -- I have to look for more information.

BY MR. JALALPOUR:

**Q Okay. Do you -- do you know if he was a W-2 employee of any of the Ivankovich Family entities?**

MR. HEFTMAN: Objection. Foundation. Form.

MR. TRUPPMAN: I'll join.

THE WITNESS: I have to look more into that.

BY MR. JALALPOUR:

**Q Okay. And what was his role when he was hired?**

A He has a contract.

**Q Okay. But what was his role? Like what were his duties when he was --**

A I have to have a contract in front of me to let you know. I don't. When I look into documents.

**Q Okay. Sitting here today, you don't know what his role was. Correct?**

A That's not it. I cannot -- at the moment, I need to -- a little bit more time to review his contract.

**Q Is it your testimony that he had a contract -- like an actual contract with the**



**Ivankovich family or one of its entities?**

MR. HEFTMAN: Objection. Form. Foundation. Calls for speculation.

MR. TRUPPMAN: Join.

THE WITNESS: I agree with my counselor.

BY MR. JALALPOUR:

**Q Well, again, they objected. And it's your duty to answer.**

A I am agreeing with them.

**Q Okay. Well, Doctor, you just testified that you would need to look at his contract. That's what you testified to.**

**So setting aside the outlandish objection that I'm calling for speculation, you just testified that there was a contract. Right? That's what you said. Correct?**

MR. HEFTMAN: Objection to form.

THE WITNESS: This is what I said.

MR. JALALPOUR: Okay.

THE WITNESS: I assume there is a contract.

BY MR. JALALPOUR:

**Q Oh, okay. So now you're assuming there was a contract. So let's make sure we know what you're actually saying here.**



**Do you know whether or not there was a contract with Mr. Ayule?**

MR. TRUPPMAN: I'll object to the form. And there was. And you have it. But I'm objecting to the form.

MR. HEFTMAN: Join.

THE WITNESS: I stated previously that I had to look at the contract.

And I'm stating the same thing now. I need more time to give you appropriate answers.

BY MR. JALALPOUR:

**Q Okay. But when you say "look at the contract," do you, sitting here today, know that there is an actual contract?**

A I assume.

**Q Okay. You assume. What is your assumption based on?**

A You don't employ anybody without contract.

**Q Okay. And do you know if that contract was -- who it was between?**

A Pardon?

**Q Do you know who -- the parties to this contract?**

A Steven.



**Q Okay. So Steven was one of the parties to the contract, is that --**

A And -- Steven. And he would tell me what it is as well.

**Q Okay. So you left it up to Steven to -- to decide whether to hire Mr. Ayule. Is that correct?**

A That's correct.

**Q Okay. And who did Mr. Ayule report to? Was it Steven?**

MR. HEFTMAN: Object to form.

BY MR. JALALPOUR:

**Q Mr. -- let me restate it.**

**Mr. Ayule reported to Steven. Correct?**

MR. TRUPPMAN: Form.

THE WITNESS: That's correct.

BY MR. JALALPOUR:

**Q When is the last time you spoke with Mr. Ayule?**

A About a month ago.

**Q And did you speak to him at all about this lawsuit?**

A About what?

**Q About this lawsuit.**

A No.

**Q Did you speak to him at all about Steven's incarceration?**
A No.
**Q Did you speak to him at all about Joseph Seinitz?**
A No.
**Q Mr. Ayule no longer works for the Ivankovich family. Correct?**
A That's correct.
**Q And do you recall when he stopped working for the Ivankovich family?**
A When he stopped --
**Q Yes.**
A -- was financed --
MR. HEFTMAN: No, when.
THE WITNESS: Oh, when.
BY MR. JALALPOUR:
**Q Do you recall when Mr. Ayule stopped working for the Ivankovich family?**
A Started working.
**Q Stopped. Sorry. Maybe I misstated.**
**Do you recall when Mr. Ayule stopped working for the Ivankovich family?**
A About approximately three months ago.



**Q And did he quit or was he terminated?**
A I would suggest you talk to Steven about that.
**Q Okay. So is it fair to say that you don't know whether he quit or was terminated? Right?**
A Yes.
Actually, I -- I know that he didn't quit. That I know. He didn't quit. I know he didn't quit but ...
**Q Okay. Well, if he didn't quit, the only other option is that he was fired. Right?**
MR. TRUPPMAN: Form.
THE WITNESS: No. That -- he didn't -- talk to Steven about that. Okay?
BY MR. JALALPOUR:
**Q Okay. But -- okay. Well then let's just make sure the record is clear.**
**You don't know whether he quit or was terminated. Fair?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Join.
If you don't know, you don't know.
THE WITNESS: Well, I believe that he took another job.



BY MR. JALALPOUR:
**Q Okay. But that -- but he quit his job with the family. Is that fair?**
A On his own.
**Q Okay. Dr. Ivankovich, I've placed onto your screen what has been previously marked as Steven Exhibit 20, which is a Residential Lease for the property located at 75485 Overseas Highway.**
**Do you see that?**
A Yes, I do.
**Q And this -- the tenant here under this lease was -- it states under the contract here, IMC Marine, LLC, but it's undisputed that this was a typographical error and that the actual tenant was IMG Marine, LLC. But do you see that language here?**
A Yes. Yes.
**Q Okay. You are familiar with the company called IMG Marine, LLC. Correct?**
A I have to look at the papers. I am not -- I have -- I need more time to look at that.
**Q Okay. So sitting here today, you don't know whether you do or do not have an ownership interest in IMG Marine, LLC. Correct?**
A I don't know. Yes.



**Q Okay. And have you seen this lease before?**
A I have not.
**Q Okay. And this lease went from June 1, 2024, through May 31, 2025.**
**Do you see that on the first page here?**
MR. HEFTMAN: Objection. Foundation.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q Do you see that term language here, Doctor?**
A Yeah, but what is address to that Islamorada?
MR. HEFTMAN: Well, wait. You don't get to ask questions. Just listen to his questions.
THE WITNESS: All right.
BY MR. JALALPOUR:
**Q So, Doctor, just to clarify, so this is a lease for the property located at 75485 Overseas Highway in Islamorada, Florida. Do you see that?**
A I do.
**Q Okay. And do you know -- are you familiar with that property?**
A I believe I am, but I -- yeah, I don't know exactly the address.
**Q Have you ever --**

A I don't remember this is address.
**Q -- have you ever been to that property, as far as you can recall?**
A I have been to a property, but I don't know if this is that property. I don't -- I don't remember exactly address. I have to look at the papers. Okay?
**Q Okay. Do you -- do you have an ownership or lease interest in any other properties in Islamorada, Florida?**
MR. TRUPPMAN: Objection. Time frame.
MR. HEFTMAN: Objection. Form.
THE WITNESS: I have gone through lots of personal problems in the last two years that I may or may not -- I now have to obtain with this title all of the paper to look and to have time to give you an answer.
BY MR. JALALPOUR:
**Q Okay. Do you recall, sitting here today, how many properties in Islamorada, Florida, you've leased or owned, whether directly or through any of your entities?**
MR. HEFTMAN: Objection to form. Foundation.
MR. TRUPPMAN: Join.



MR. HEFTMAN: This is beyond the scope.
If you know.
MR. TRUPPMAN: Yeah. Form. And unrelated to any of the issues in our litigation.
BY MR. JALALPOUR:
**Q Go ahead, Doctor. You can answer.**
A I have to talk to Steven to show me documents of ownership to give you that answer.
**Q Okay. But -- okay. Can you describe for us -- you know, strike that.**
**Earlier you testified you believed you -- you had gone to a property in Islamorada.**
**Do you recall that?**
A Yes.
**Q Can you describe for us what that property looked like?**
A It's a house.
**Q And can you provide --**
A On the --
**Q -- any details?**
A -- on the -- on the beach.
**Q Okay. All right. Well, you --**
A It's a two-story.
**Q Okay. Well, it sounds like you're**



**describing the property that's described here in this lease. But even if not, I'm gonna ask you my next question.**
**Do you know why this property in Islamorada was being leased?**
A It is leased for the family to go to Islamorada.
**Q Okay. So it's mostly for residential --**
A Yeah.
**Q -- purposes. Correct?**
A For residential purposes. Yes.
**Q Okay. And do you recall roughly how many times you had visited this property?**
A I haven't gone lately. But I have been there at least two, three times.
**Q Okay. And do you recall if you ever visited this property before Steven's arrest?**
A He showed me pictures.
**Q But had you visited the property before Steven's arrest?**
A I did not.
**Q Okay. So -- okay. When you did go to the property, were you aware that there were cameras at the -- on the facility?**



A No.
**Q And were you involved in the decision to enter into this lease? As far as you can recall.**
A I'm sorry, can you repeat that? If I was aware of what?
**Q Were you involved at all in the decision to enter into this lease? As far as you can recall.**
A I don't remember that.
**Q Okay. All right. It's 3:52 now. Let's take another eight-minute break, and I should be done pretty soon. So I don't think we're gonna go past 4:30, so -- but let's take a quick break and go off the record.**
THE VIDEO TECHNICIAN: Going off the record -- going off the record at 3:53 p.m.
(Whereupon, a short recess was taken.)
THE VIDEO TECHNICIAN: This is the beginning of Media Unit 5. We're going back on the record at 4:06 p.m. Central Time.
BY MR. JALALPOUR:
**Q Okay. Dr. Ivankovich, I'm going to place onto your screen what has been previously marked Steven Exhibit 16, which is Steven's Answers to SDF's First Set of Interrogatories in this matter.**

Page 130

And I'm going to turn your attention to page 9 here, specifically, Interrogatory Number 12 that asks Steven to quote, "Separately list, itemize, and total the amount of damages, including interest and other monetary relief requested, that Plaintiff is seeking to recover from SDF in this case."

And then in response to that interrogatory on that next page Steven responded in part, quote, "Plaintiff is in the process of collecting supporting invoices, statements, and records regarding the above economic and non-economic damages. Multiple attorneys and law firms assisted in securing Plaintiff's release." Okay. Do you see that?

A Yes.

Q And then below, in the same interrogatory answer, he writes -- he disclosed the following. Quote, "The following legal counsel provided services to Plaintiff in connection with the claims at issue in this case that are properly considered damages --" herein. Do you see that?

A I do.

Q And then he lists seven -- or, sorry, excuse me, eight different lawyers and law firms.

Do you see that?

Page 131

A I do.

Q Okay. Do you know if you paid the legal fees associated with these attorneys and law firms in connection with the claims that Mr. Ivankovich has asserted in this case?

A I am aware.

Q Okay. So you paid those fees?

Is that correct?

A That's correct.

Q And do you know roughly how much in legal fees that is?

A I -- I know, but I -- you know, we have receipts to it. So I -- I don't collect that in my memory. But I have receipts.

Q Okay. But sitting here today, you can't tell us the amount of legal fees you paid to these attorneys in connection with the claims Mr. Ivankovich asserts in this case. Correct?

A Not exactly. But I -- globally I know.

Q Okay. And, again, you don't expect that your son has to pay you back for those fees.

Correct?

A He doesn't have money.

Q Okay. Another way of saying that is, yes,

Page 132

you don't expect that. Correct?

A Yeah, I don't.

Q Okay. Then the next paragraph here says, quote, "In addition, James Ayule was retained and compensated to assist Plaintiff during his incarceration and to assist in securing his release during the relevant time period. It is estimated that Plaintiff paid Ayule approximately $43,957.71 during this time." Okay. Do you see that?

A Yes.

Q You see that, right?

A Yes.

Q Okay. Did you pay that amount here listed as approximately $43,957.71?

A That had to come from our account, yes.

Q Okay. And, again, you don't expect that -- it's not your position that your son has to pay you back for that. Correct?

A I am not in position of what?

Q You're not taking the position that your son has to pay you back for that. Right?

A No, we -- we paid for that.

Q Okay. I think you answered the question.

But just so we have a clear record, you

Page 133

don't take the position that your son has to pay you back for that amount. Right?

A That's exactly right.

Q Okay. Now, we've discussed previously those Body Attachment Orders that required your son to pay certain sums of money.

Do you recall seeing those?

A Yes.

Q Now, ultimately, Steven did end up paying those amounts. Correct -- or, sorry, strike that.

Ultimately, those amounts were paid off.

Correct?

A Exactly. But I don't -- yes. I assume yes.

Q Okay. And they were paid pursuant to a loan from those bankruptcy debtors that we saw previously. Correct?

A I cannot answer that question. I have to look exactly the way how this was paid and a request of the payment.

Q Okay. Dr. Ivankovich, I have placed onto your screen Exhibit 5, which is a document titled Loan Agreement with an effective date of December 15, 2025. Do you see that?

Page 134

A Yes, yes, I do.
**Q And I'll read out loud the initial paragraph. It states, quote, "This Loan Agreement is made --" it should say between "-- the 'Reorganized Debtors'" Ivankovich Family, LLC; A&O Family, LLC, Florida; A&O Family, LLC, Illinois; and Atlas P2 Managing Member, LLC. "Collectively ('Lender')."**
**Did I roughly read that as it states?**
A Yes.
**Q Okay. And the next paragraph states, "The 'Loan' is made to Steven V. Ivankovich, ('Borrower')." Do you see that?**
A I do.
**Q Okay. And then if we go to the signature page at the end here, this document was signed on behalf of those four bankruptcy debtors by Nancy Webber. Do you see that?**
A I do.
**Q Okay. First of all, have you seen this Loan Agreement before?**
MR. HEFTMAN: I'm gonna object. I think this is well beyond the scope of the pending litigation in which this deposition is being taken. There's no relevance to this pending litigation. I'm gonna

Page 135

instruct the witness not to answer.
BY MR. JALALPOUR:
**Q And, again, it's an improper objection.**
**Dr. Ivankovich, are you following your attorney's instruction?**
A I am following instruction. But I agree with my advisor. I think I'm over --
MR. HEFTMAN: Okay. You don't need to explain anything.
THE WITNESS: Yeah.
MR. HEFTMAN: He's simply asking whether you're gonna adhere to the instruction. That's all.
THE WITNESS: Yeah. Yeah.
MR. JALALPOUR: And, Laura, please certify that question.
(Question certified.)
BY MR. JALALPOUR:
**Q And per this Loan Agreement, the bankruptcy debtors agreed to loan Steven $1,131,887.86 plus interest which would ultimately go to Jeanette.**
**Do you see that?**
A Yes, I do.
**Q And then also the bankruptcy debtors agreed to loan Steven $425,000 which would ultimately go to**

Page 136

**the Schiller DuCanto law firm. Do you see that?**
A I see.
**Q Okay. And so as far as you can tell here, these amounts were being paid to Jeanette and the Schiller law firm pursuant to those Body Attachment Orders we saw earlier today. Right?**
MR. HEFTMAN: Objection to form. Calls for a legal conclusion. Foundation. And misconstrues the bankruptcy documents.
MR. TRUPPMAN: Join.
BY MR. JALALPOUR:
**Q You can answer, Doctor.**
A Well, you have everything in bankruptcy documents. Decision made.
**Q Okay. And did you authorize this loan to be made to Steven so he could make those payments to Jeanette and the Schiller law firm?**
A I did.
**Q Okay. And when you authorized this Loan Agreement, did you have any guarantee that Steven would not be arrested again?**
A That question was never questioned at that time. But nothing has to do with arrest.
**Q Okay. As far as you know, sitting here**

Page 137

**today, has Steven made any payments back towards this loan?**
A This question, I have to look at the documents to let you know.
**Q Sitting here today, do you know if Steven is in default on this loan?**
A Excuse me?
**Q Sitting here today, do you have any knowledge as to whether Steven is in default on this loan?**
MR. HEFTMAN: Objection to form. Foundation. Calls for speculation.
MR. TRUPPMAN: Join.
THE WITNESS: I don't think I can give you answer to that until I look closely to the documents.
BY MR. JALALPOUR:
**Q Okay. And by the way, this amount here that was paid to Jeanette, over $1.1 million, that's substantially more than the amount of the Body Attachment Order entered with respect to the outstanding support. Correct?**
MR. TRUPPMAN: Form.
MR. HEFTMAN: Join.
THE WITNESS: That's correct.

BY MR. JALALPOUR:
**Q And so you were willing to pay that over 1.1 million amount in December of 2025, but you were not willing to pay the roughly $670,000 amount at the time that Steven was in jail. Correct?**
MR. HEFTMAN: Objection.
MR. TRUPPMAN: Objection.
MR. HEFTMAN: Form. Argumentative.
MR. TRUPPMAN: Join. Also irrelevant.
MR. HEFTMAN: I'm gonna instruct the witness not to answer. It has no bearing on this matter.
BY MR. JALALPOUR:
**Q Doctor, are you following your attorney's instruction?**
A I do.
**Q Okay. Laura, please certify that question.**
(Question certified.)
BY MR. JALALPOUR:
**Q And, in fact, you were willing in December of 2025 to pay $1.7 million, but you weren't willing in April of that same year to pay roughly $670,000.**
**Correct?**
MR. HEFTMAN: Objection. Argumentative. Misconstrues the exhibits and prior testimony. Calls



for legal conclusions.
I'm gonna instruct the witness not to answer. It's beyond the scope and irrelevant to the litigation.
MR. TRUPPMAN: And I'll join the objection and again note that the question is the plaintiff's ability to purge. Not the third parties witnesses.
BY MR. JALALPOUR:
**Q Doctor, are you following your attorney's instruction not to answer?**
A I do.
**Q Laura, please certify that question.**
(Question certified.)
BY MR. JALALPOUR:
**Q Doctor, I have placed onto your screen Exhibit 6, which is a Verified Complaint for Injunctive Relief and Damages and Demand for Jury Trial filed by Tyler Atlas, LLC, against Gary Goldstein in the Circuit Court of Baltimore City, Maryland. Do you see that?**
A I do.
**Q And did you authorize the filing of this lawsuit?**
A Yes, I do. I did.



**Q Was Steven -- was Steven involved in the decision to file this lawsuit?**
MR. HEFTMAN: Objection --
THE WITNESS: He was.
MR. HEFTMAN: -- to the form.
BY MR. JALALPOUR:
**Q Okay. Just so the record was clear, doctor, you said he was. Right?**
**Doctor? Is that correct? Josh spoke over you for a second. So I just want to make sure we got a clear record there.**
A I would like you to repeat that question because I probably -- misunderstood probably. You know, I don't --
MR. HEFTMAN: You answered.
THE WITNESS: Yeah.
MR. JALALPOUR: Well, Laura, did we get an answer there? Can you read the question back with the answer?
(The record was read as follows:
"Q. Was Steven -- was Steven involved in the decision to file this lawsuit?
"MR. HEFTMAN: Objection --
"THE WITNESS: He was.
"MR. HEFTMAN: -- to the form.")



BY MR. JALALPOUR:
**Q Okay. Do you know what this lawsuit against Mr. Goldstein is about?**
MR. TRUPPMAN: Objection to the form.
MR. HEFTMAN: Join. And to the extent that your possible of the basis for this lawsuit is the result of discussions with counsel, then I'm gonna instruct you not to answer.
BY MR. JALALPOUR:
**Q Doctor, can you answer?**
A I agree with the instructions of the -- my counsel.
**Q Do you have any knowledge about -- regarding what this lawsuit is about from anybody besides your attorneys?**
MR. HEFTMAN: Counsel, this is far afield from the litigation in which this deposition is being taken.
MR. JALALPOUR: Jeff, Jeff, you have no idea what this litigation is about. And so we have -- we have an issue before the Court with respect to Gary Goldstein and whether certain correspondence is no longer privileged. And so this could be relevant to that.

Page 142

MR. HEFTMAN: And I'll --
MR. JALALPOUR: So you're just gonna delay everything and have to bring your witness -- your client back.
But continue on with your objection.
MR. TRUPPMAN: And I'll just note for the record that I have a standing objection to the extent you're gonna ask this witness about the issues that are currently teed up for ruling from the Court.
So I'll let you proceed, but I'm just putting a standing objection to questions that are directed to trying to get information that's currently under consideration by the Court as to whether or not it's relevant. Or privileged.
But carry on. I'm not stopping anything.
BY MR. JALALPOUR:
**Q I'll restate my question -- well, do I need to restate my question? Or are we going to go through all those objections again?**
**Doctor, do you have an answer to my pending question?**
A Could you repeat that question, please, again?
**Q Sure. Do you have any knowledge about what**

Page 143

**this case against Mr. Goldstein is about --**
MR. HEFTMAN: And I will reiterate --
BY MR. JALALPOUR:
**Q One second, one second, one second.**
**-- that you didn't obtain from your attorneys?**
A Did I give what? I didn't hear it.
**Q Do you have any knowledge about this lawsuit against Mr. Goldstein and -- strike that.**
**Do you have any knowledge regarding what the lawsuit against Mr. Goldstein is about from any sources aside from your attorneys?**
A I don't.
**Q Okay. And what's your relationship with the company Tyler Atlas, LLC?**
MR. HEFTMAN: Objection to form. Beyond the scope. Irrelevant.
You can answer if you know based on the present.
MR. TRUPPMAN: Join.
THE WITNESS: The answer is no.
MR. HEFTMAN: He's asking what your relationship to that entity is.
THE WITNESS: With Atlas?

Page 144

BY MR. JALALPOUR:
**Q Yes. What is your relationship with the company Tyler Atlas, LLC?**
A We were the -- we are the owners.
**Q Okay. And so your testimony today, though, is you don't have any knowledge regarding why your company filed suit against Mr. Goldstein except the knowledge you obtained from your attorneys.**
**Is that correct?**
A Yes. That is correct.
**Q Are you aware of a company called Saucer Sled, LLC? That's spelled Saucer, S-a-u-c-e-r, Sled, S-l-e-d, LLC.**
**Are you familiar with that company?**
A I don't know.
**Q Are you aware that that company purchased the home in Colorado for roughly $6 million?**
A I am aware of purchase of the -- of the Colorado house.
**Q Okay. And who authorized that purchase?**
A I did.
**Q Are you aware of the purchase of Como Residence Dubai in September of 2023 for approximately $25 million?**

Page 145

MR. TRUPPMAN: I'll object to the form.
This is far afield from any of the discovery that the Court has allowed. You're now asking this witness about it.
And I think, although you can tell me if I'm wrong, that you're reading questions which were presumably provided to you by counsel in the divorce case.
MR. JALALPOUR: Well, let me stop you.
MR. HEFTMAN: I'm gonna instruct the witness not to answer. It has no relevance to anything before the Court in this litigation in which the discovery is being taken.
MR. JALALPOUR: Well, first of all, Josh, you're completely wrong. So thank you for making another inaccurate record there. And another improper objection.
MR. TRUPPMAN: If you can explain --
MR. JALALPOUR: I'm talking. I'm talking, Josh. I'm talking. Mr. Heftman --
MR. TRUPPMAN: If you can explain to me the relevance, I may reconsider my position.
MR. JALALPOUR: Well, a lot of this case is about who controls the finances and who this money

actually belongs to.
And so if a $25 million residence is purchased, and it's actually done by Steven, and nobody else, that's relevant. I think the judge and the jury would find that relevant.
Now, you guys are trying to hide it, but that's okay. We're gonna get to the bottom of it. So --
MR. TRUPPMAN: And I -- finish, and then I'll respond.
MR. JALALPOUR: Well, go -- go ahead and respond.
MR. TRUPPMAN: I was gonna say, this case we're on is not about who has money and who controls the finances. That's actually none of the claims or defenses raised in the case. That is the central issue in the divorce case, which is why --
MR. JALALPOUR: You're --
MR. TRUPPMAN: -- I've had to object.
MR. JALALPOUR: -- you're clearly wrong because Judge Lett has already -- has already denied your predecessor's motion.
MR. TRUPPMAN: That's not correct.
MR. JALALPOUR: Denied.



MR. TRUPPMAN: That's not correct.
MR. JALALPOUR: Denied.
MR. TRUPPMAN: No, she sustained objections to a number of the Requests for Production, which you still continue to ask about, PAMI Grand Lake and Edgefield, number one.
And number two, Judge Lett said that it's relevant and discoverable. Not admissible. And so those are two different --
MR. JALALPOUR: We're not talking admissible here, Josh. I don't think you understand. We're not in front of a jury right now. We're in a deposition. And so you're making admissibility objections here?
MR. TRUPPMAN: No.
MR. JALALPOUR: And that's what -- is that what the instruction is based on?
MR. TRUPPMAN: I'm asking you to explain to me why this line of questioning is relevant to Steven's ability to purge, which is your allegation as to why it's relevant.
MR. JALALPOUR: It is absolutely relevant to the issue of his ability to purge, which the judge has ruled is discoverable in this case.
And if he's the one that's purchasing a



$25 million Dubai residence in September of 2023, that is clearly relevant. Okay?
Now, having said all that, Mr. Heftman, is your instruction to the witness not to answer?
MR. HEFTMAN: It stands.
BY MR. JALALPOUR:
**Q Okay. Doctor, are you following your attorney's instruction?**
A I have to because you -- I don't think this question is proper.
**Q It's what -- are you -- are you following the instruction or not?**
A Yes. I am agreeing with my --
**Q Okay.**
A -- attorneys.
MR. JALALPOUR: Laura, please certify that question.
THE WITNESS: Thank you.
(Question certified.)
BY MR. JALALPOUR:
**Q Now, Dr. Ivankovich, I understand your husband recently passed away. Correct?**
A That's correct.
**Q He was suffering from certain illnesses**



**prior to his death. Is that fair?**
MR. HEFTMAN: I'm gonna instruct the witness not to answer. I object on the grounds of relevance. It is far afield from any matter before the Court in which this deposition is being taken and I'm gonna instruct her not to answer accordingly.
BY MR. JALALPOUR:
**Q Doctor, are you going to follow the --**
A I'm insulted with your question.
And the answer is, no, I am not answering that question.
MR. JALALPOUR: And, Laura, please certify that question.
(Question certified.)
BY MR. JALALPOUR:
**Q I've got a number of questions on this topic.**
**Mr. Heftman, are you gonna be instructing your witness not to answer any questions about representations made in court as to Mr. Ivankovich's dementia?**
MR. HEFTMAN: I'm gonna be instructing the witness not to answer any questions regarding Dr. Anthony Ivankovich's health conditions prior to

Page 150

his death earlier this year. I find it irrelevant, interposed for purposes of harassment, and the instruction will stand.

BY MR. JALALPOUR:

**Q Okay. So --**

A Agree.

**Q Let's take a five-minute break and come back and see if we've got some more questions here.**

THE VIDEO TECHNICIAN: Going off the record at 4:32 p.m. Central Time.

(Whereupon, a short recess was taken.)

THE VIDEO TECHNICIAN: This is the beginning of Media Unit 6. We're going back on the record at 4:40 p.m. Central Time.

MR. JALALPOUR: Okay. So I just want to make sure the record is clear. I'm not terminating this deposition, in light of the various instructions not to answer. I will be filing the appropriate motion or petition with the Court and we'll ideally be bringing back the witness and seeking legal fees in the process.

So with that said, I have no further questions today.

///

Page 151

EXAMINATION

BY MR. HEFTMAN:

**Q A few questions for the witness.**

**Dr. Ivankovich --**

MR. JALALPOUR: Wait a second. Wait. Mr. Heftman, are you authorized to ask questions during this deposition?

MR. TRUPPMAN: He represents --

MR. HEFTMAN: Of course I am.

MR. TRUPPMAN: -- the witness.

MR. JALALPOUR: Why would he -- he's not a party to this case. No, there -- no.

MR. TRUPPMAN: Okay, then let's take a -- let's take a five-minute break and -- and -- and then I'll see if I have any questions for the witness if that's how you want to handle it.

MR. JALALPOUR: Well, I mean, so you're saying you're gonna have the questions given to you by Jeff. Okay. Well, it's nice that you guys are playing those games.

But -- but, no, the witness is a witness. She's not a party. Why would her attorney be allowed to ask questions? That's -- I've never heard of it. If somebody can point me to some authority why that

Page 152

would be allowed, please advise. But otherwise, I've never seen anything like that.

MR. HEFTMAN: I'm not aware of any rule that would preclude it, Counsel.

But if that's the position, we'll take a five-minute break.

MR. JALALPOUR: Okay. Go ahead and give your questions to Josh.

THE VIDEO TECHNICIAN: All right. Going off the record at 4:41 p.m.

(Whereupon, a short recess was taken.)

THE VIDEO TECHNICIAN: This is the beginning of Media Unit 7. Going back on the record at 4:43 p.m. Central Time.

BY MR. HEFTMAN:

**Q Dr. Ivankovich --**

MR. JALALPOUR: Go for it.

BY MR. HEFTMAN:

**Q -- do you have any written communications between yourself and your son Steven regarding the litigation under which your deposition is being taken today?**

MR. JALALPOUR: Wait a second. I thought Josh was gonna be asking the questions.

Page 153

MR. HEFTMAN: Counsel, I'm asking a question. If you want to object, go ahead. And then I'll ask my question and I'll get an answer.

MR. JALALPOUR: Well, this is wholly improper. You are not a party -- you are not an attorney for a party in this case.

Do you intend to ask questions on the witness stand -- if somebody's on the witness stand when we're at trial?

MR. HEFTMAN: I'm gonna ask a question in a deposition which my client's been taken. If you want to make an objection, you can go ahead, Counsel.

MR. JALALPOUR: Well, I'm gonna object and I'm gonna instruct you not to ask any questions. This is absurd.

MR. HEFTMAN: I don't think you're in the position to give me instructions on whether to ask my client a question in a deposition in which she's been taken.

If you want to make a deposition (sic) for the record, you are welcome to do so.

MS. OPAL: It's an evidence dep.

MR. TRUPPMAN: And I'll just note one more thing on the record, which is that obviously I do not

represent Olga Ivankovich. And so if Mr. Heftman wants to ask for clarifications based on whatever he knows from talking to his client, he's welcome to do that.

I don't have an attorney-client relationship with Dr. Olga and I don't have that information and I'm not gonna ask the questions.

Nor do I accept your invitation to take a break, ask for the questions, and get the information and come back on. That's just silly.

So we can -- you can object. But that's my position.

MR. JALALPOUR: Well, that wasn't my invitation. That was what you had implied.

So my objection is these questions are highly improper. You have no right to be asking these questions.

But go ahead and make your record.

BY MR. HEFTMAN:

**Q Did you text your son Steven regarding his incarceration? Did you exchange text messages with your son Steven regarding his incarceration?**

A I already stated no. Never.

**Q Did you exchange emails with your son**



**Steven regarding the litigation under which your deposition was sought today?**

A Never. No.

**Q Have you exchanged text communications with Nancy Webber regarding Steven's incarceration?**

A No.

**Q Have you exchanged emails with Nancy Webber regarding this litigation under which your deposition is being taken?**

A Never.

**Q You were asked a question about advances that you and your husband and/or entities, in which you have an ownership or control of, advanced legal fees in excess of $2.4 million to lawyers who represent Steven in the divorce pending in Cook County, Illinois.**

MR. JALALPOUR: Just so we're clear, I have a standing objection to all of this.

MR. HEFTMAN: I understand you, do, Counsel.

MR. JALALPOUR: Okay. All right. Just so we're clear. So I don't need to object every single time.

MR. HEFTMAN: No, you --

MR. JALALPOUR: Go ahead.

///



BY MR. HEFTMAN:

**Q You were asked a question about -- I know it's been a long day, and I don't want to keep you much longer. I want to clarify the record from your questions.**

**You were asked about advances, monies paid, in excess of $2.4 million to Steven's lawyers by you; your husband, Anthony; and entities that you have interests in.**

A Yes.

**Q Do you recall that?**

A Yes.

MR. JALALPOUR: Objection in addition to my same objection. But objection to form.

Go ahead.

BY MR. HEFTMAN:

**Q Were the monies that you and your husband and entities, in which you have interests, paid to Steven's lawyers, compensation to him?**

A I don't know what you mean compensation. Steven --

MR. JALALPOUR: Objection. Asked and answered.

THE WITNESS: -- worked for it?

MR. JALALPOUR: As well as my standing



objection.

THE WITNESS: No.

MR. JALALPOUR: Go ahead.

THE WITNESS: The answer is no.

BY MR. HEFTMAN:

**Q Not compensation. So the money --**

A Not compensation.

**Q All right.**

A Of any kind.

**Q Thank you. Nothing further.**

A No compensation. No.

FURTHER EXAMINATION

BY MR. JALALPOUR:

**Q Doctor, did you review your text messages to confirm whether or not you had any text messages with Steven about his incarceration?**

A Now or before? At the time when --

**Q Dr. Ivankovich, earlier you testified that you had done nothing to determine whether there were documents responsive to the subpoena that was issued to you. Do you recall your testimony there?**

MR. HEFTMAN: Objection to form.

BY MR. JALALPOUR:

**Q It's whether you recall that testimony.**

A Again I'm confused with this question. What is --

**Q Earlier you testified that you had not done anything to confirm whether you had documents responsive to the subpoena that was issued to you.**

**Do you recall providing that testimony?**

A I don't understand this question. I don't -- I don't hear well.

**Q Okay. Well, you agree that you did not look through your text messages to determine whether you had text messages with Steven about his incarceration. Correct?**

A Are you asking me do I -- do I check my text messages? So did I -- I never had any text messages with Steven -- exchanged text messages while he was incarcerated.

**Q Okay. But my question is a little different.**

**You never looked through your phone to determine whether you had any text messages with Steven about his incarceration. Correct?**

A This -- no. I never --

**Q Okay.**

A -- no, I did not -- I text my -- checked my



messages, but I don't know why you are asking me this question. I don't know how to answer it. The answer is, no, I did not find -- have any exchange of text messages with Steven or check if he did send me any message.

**Q Okay.**

A I checked everything, every day messages, and there was no messages.

**Q Okay. But when you received the subpoena, you didn't look through your messages to determine whether there were text messages with Steven about his incarceration. Correct?**

A I -- I cannot answer this question because --

**Q Okay. And similarly --**

A -- I answered.

**Q -- you did not look through your phone to determine if there were text messages between you and Steven about this lawsuit. Correct?**

A No, I didn't. Again, I -- particularly, how -- I was not looking for the messages. What I'm telling you, I did not find any messages when I was looking that would be correlated to his incarceration or any other legal.



**Q Okay. But you didn't -- you didn't look through those messages when -- after you received my subpoena. Correct?**

A I do not recall, okay?

**Q Okay. And then same with emails. You didn't search your emails -- or strike that.**

**Same with Nancy Webber. You didn't check your text messages, after you received my subpoena, to determine whether there were text messages with Nancy Webber about either the incarceration or this lawsuit. Correct?**

MR. HEFTMAN: Objection to form. Mischaracterizes the witness' prior testimony.

BY MR. JALALPOUR:

**Q Doctor, did you understand my question?**

A I have to ask Nancy and talk to Nancy about it.

**Q But my question is whether you -- I'm just asking, did you look through your phone for those messages? When you got my subpoena, did you or somebody on your behalf look through your phone to see if there were responsive messages? Yes or no?**

A I'm -- I'm not certain. I have to go back and see if I actually read your messages that you --



I cannot answer that question right now.

**Q Okay. And is that gonna be the same answer with respect to emails?**

A Yes.

**Q Okay.**

A I have to talk to Nancy.

**Q Okay. Again, just so the record is clear, I'm not terminating today's deposition. But that's all the questions I have for now.**

MR. TRUPPMAN: I don't have anything.

THE VIDEO TECHNICIAN: All right. I'll take us off. This concludes today's video deposition -- or do you want signature? Are we doing that?

MR. HEFTMAN: We'll reserve.

THE VIDEO TECHNICIAN: All right. This concludes today's video deposition of Olga Ivankovich. We're going off the record at 4:52 p.m.

(End of video record.)

MR. JALALPOUR: I'll take a copy and -- or I'll order the transcript and, Laura, can I get it rush by chance?

THE REPORTER: When would you like it?

MR. JALALPOUR: Sometime mid-next week.

THE REPORTER: That's fine. Thank you.

MR. TRUPPMAN: And I'll take a copy. But I don't need it rush. So whatever the regular fee is.

THE REPORTER: All right. Thank you.

THE VIDEO TECHNICIAN: Any video at this time? No video?

MR. JALALPOUR: No video.

THE VIDEO TECHNICIAN: All right, thank you.

(Proceedings adjourned at 4:52 p.m.)

* * * * *



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

STEVEN IVANKOVICH, )
)
Plaintiff, )
)
-vs- )1:25-CV-25402-KMW
)
SCHILLER, DuCANTO & FLECK, LLP, )Judge Williams
and JOSEPH SEINITZ, )Magistrate Lett
)
Defendants. )

This is to certify that I have read my deposition taken on Wednesday, August 12, 2026, in the foregoing cause, and that the foregoing transcript accurately states the questions asked and the answers given by me, with the changes or corrections, if any, made on the Errata Sheet attached hereto.

__________________________________
OLGA IVANKOVICH, MD

No errata sheets submitted _____ (Please initial)
Number of errata sheets submitted _____ pages
SUBSCRIBED AND SWORN TO
before me this _____ day
of __________, A.D. _______.

_________________________
Notary Public
///



I, LAURA L. KOOY, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition was reported stenographically by me, was thereafter reduced to a printed transcript by me, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 18th day of August, 2026.

LAURA L. KOOY, CSR, RDR, CRR, CRC
Notary Public
CSR No. 084-002467

Errata Sheet

NAME OF CASE: STEVEN IVANKOVICH vs SCHILLER DUCANTO & FLECK, LLP, et al.

DATE OF DEPOSITION: 08/12/2026

NAME OF WITNESS: Olga Ivankovich, MD

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

Page ____ Line _____ Reason _____
From _________________ to _________________

___________________