**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

STEVEN IVANKOVICH,

Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP, and JOSEPH SEINITZ,

Defendants.
_______________________________________ /

Case No. 1:25-cv-25402-KMW

Hon. Judge Kathleen M. Williams

Magistrate Judge Enjolique A. Lett

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Dated: September 23, 2026.

Respectfully Submitted,

/s/ *Alexandra Tifford*
Alexandra L. Tifford, Esquire
Fla. Bar No. 0178624
atifford@fowler-white.com
FOWLER WHITE BURNETT, P.A.
Citigroup Center
201 S. Biscayne Blvd., 20th Floor Miami, Florida 33131
Telephone: (305) 789-9200
Telecopy: (305) 789-7549

/s/ *Ramses Jalalpour*
Ramses Jalalpour, Esquire
Illinois Bar No. 6313128
rj@konicekdillonlaw.com
*Admitted Pro hac vice*
KONICEK & DILLON, P.C.
70 W. Madison St., Ste. 2060
Chicago, IL 60602
Telephone: (630) 672-3728
Telecopy: (630) 262-9659
***Attorneys for Defendants***

Defendants, Schiller DuCanto & Fleck, LLP ("SDF") and Joseph Seinitz ("Seinitz") (collectively, "***Defendants***"), hereby reply in support of their summary judgment motion:

**ARGUMENT**

**I. Counts I through III against SDF are Barred by the Collateral Estoppel Doctrine**

Steven argues that collateral estoppel cannot apply to Counts I (false imprisonment), II (malicious prosecution), and III (abuse of process) since the District Court's July 2024 ruling in the First Florida Proceeding predated his April 2025 arrest. According to Steven, because his causes of action were not ripe at the time of the District Court's ruling, it cannot have collateral estoppel effect. Steven cites no legal support for this argument. That's because the legal authority holds the exact opposite, as Florida courts consistently apply collateral estoppel even though the cause of action in the second suit had not accrued at the time of the judgment in the first suit. *See, e.g., Kowallek v. Lee Rehm*, 183 So. 3d 1175, 1176 (Fla. DCA 2016) (finding second suit barred by collateral estoppel despite cause of action accruing after the judgment entered in the first suit); *Greenberg v. Country Isles*, 383 So. 3d 827, 832 (Fla. DCA 2024) ("Unlike res judicata, collateral estoppel can bar claims based on conduct subsequent to the first judgment, where the second case is an attempt to relitigate the same issue as the first."). Federal courts have taken the same approach. *See, e.g., Zip Dee, Inc. v. Dometic Corp.*, 905 F. Supp. 535, 536 (N.D. Ill. 1995).

Elsewhere Steven argues that the claims in this case are not identical to the claims in the First Florida Proceeding. Resp. at 5. Steven again confuses collateral estoppel, which focuses on identical ***issues***, with *res judicata*, which focuses on identical ***claims***. The claims in the two suits need not be the same for collateral estoppel to apply. *See, e.g., Topps v. State*, 865 So. 2d 1253, 1255 (Fla. 2004) ("In Florida, the doctrine of collateral estoppel bars relitigation of the same issues between the same parties in connection with a different cause of action."). Here, what is important is the symmetry of the issues between this matter and the First Florida Proceeding. In the first proceeding, the central issue litigated was the enforceability of the First BAO in the state of Florida. That issue is also central here, since Counts I through III are all premised on the First BAO (and Second BAO) being unenforceable in Florida. *See* ECF 31 at ¶ 65 (alleging that SDF "knew or should have known there was no lawful basis for the MCSO to execute these warrants or otherwise imprison Steven."). In other words, if the Court were to find that the First BAO was properly enforceable against Steven in Florida, these three claims all fail.

Although Steven raises a new argument in this suit against the enforceability of the First BAO (*i.e.*, the supposed lack of a legal basis to extradite Steven to Illinois), the collateral estoppel doctrine still applies since a "litigant cannot avoid preclusion simply by reframing the same issues or raising novel contentions." *Rajasekaran v. Crandall*, 460 F. Supp. 3d 1269, 1276 (M.D. Fla. 2020). Thus, collateral estoppel will apply to a "a new legal theory or factual assertion put forward in the second action" which could have been raised in the first action. *Id.* Otherwise, "[i]f a party could avoid issue preclusion by finding some argument it failed to raise in the previous litigation, the bar on successive litigation would be seriously undermined." *Id.*

Because Steven could have raised this argument the first time he sued SDF, he is barred from relitigating the issue.

## II. Counts I, III, IV, and V against SDF are Barred by the Litigation Privilege

### A. SDF Did Not Concede that Florida's Litigation Privilege Applies

Steven argues that the litigation privilege does not apply to protect SDF. To get there, Steven first asserts that Florida's version of the litigation privilege, not Illinois', applies. Steven claims that "SDF has already briefed this issue and concluded that Florida law controls these claims." Resp. at 5, n.2 (citing pages 7-8 of ECF 33). This is a complete mischaracterization. To start, ECF 33 is SDF's motion to dismiss, not SDF's motion for summary judgment. More importantly, Steven's quotation from SDF's motion to dismiss purposely omits the most pertinent language of SDF's statement, which states in full as follows: "**Strictly for purposes of this motion**, because Steven was arrested in Florida, SDF assumes that the laws of Florida apply to the common law state causes of action against SDF, as well as SDF's assertion of the litigation privilege." ECF 33 at p. 7 (emphasis added).

In SDF's summary judgment motion, SDF never conceded that Florida's law on the litigation privilege applied. Rather, SDF argued that the privilege under both Florida and Illinois protects SDF as a matter of law. As will be detailed below, SDF's position remains correct.

Steven has nevertheless correctly identified a difference between Florida and Illinois law regarding the litigation privilege. While Illinois' litigation privilege is always absolute (*O'Callaghan v. Satherlie*, 2015 IL App (1st) 142152, ¶ 30), Florida's litigation privilege is absolute only when the conduct at issue is taken during a judicial proceeding. *DelMonico v. Traynor*, 116 So. 3d 1205, 1217 (Fla. 2013). The privilege becomes qualified if the attorney's

conduct takes place outside of a judicial proceeding, even if the conduct relates to a judicial proceeding. *Id*. at 1218.

As a result of this distinction, SDF provides the following choice of law analysis. "In diversity cases, the choice-of-law rules of the forum state determine what law governs[.]" *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013). That means Florida's choice of law rules govern. "For tort claims, Florida follows the 'significant relationship test,' which is set out in the Restatement (Second) of Conflict of Laws §§ 145–46 (1971)." *Goodnight v. Bos. Sci. Corp*., 548 F. Supp. 3d 1325, 1333 (S.D. Fla. 2020). "Under that test, a court must: (1) identify the sovereigns with interests in applying their laws to the ... dispute; (2) determine whether there is a 'true conflict' between the laws of the interested jurisdictions; and, if there is a conflict, (3) determine which sovereign's interest is the most significant." *Id*.

"A true conflict exists where two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result." *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019). Thus, to determine whether a true conflict exists between Florida and Illinois law, the Court must decide whether application of each state's laws would produce different results.

**B. Litigation Privilege Protects SDF Whether under Florida or Illinois Law**

Steven does not even attempt to contest that Illinois' litigation privilege, if applicable, would bar Counts I, III, IV, and V of his Amended Complaint. Instead, Steven solely focuses his sights on Florida's litigation privilege, claiming that under Florida law, because SDF's conduct took place outside of court, the litigation privilege is merely qualified, not absolute. Yet even assuming that is true, it does not create a question of fact sufficient to overcome summary judgment since the record is devoid of any basis to conclude that SDF acted with express malice.

"To overcome a qualified privilege, the plaintiff must establish express malice." *Pomfret v. Atkinson*, 137 So. 3d 1161, 1164 (Fla. DCA 2014). "That is, the plaintiff must establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice—i.e., that the defendant's ***primary*** motive in making the statements was the intent to injure the reputation of the plaintiff." *Id*. (emphasis added).

"Where a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege, then it can be said that there was express malice and the privilege is

destroyed." *Nodar v. Galbreath*, 462 So.2d 803, 811 (Fla. 1984). "But if the occasion of the communication is privileged because of a proper interest to be protected, and the speaker is motivated by a desire to protect that interest, the speaker does not forfeit the privilege merely because he or she also in fact feels hostility or ill will toward the plaintiff." *Pomfret*, 137 So. 3d at 1164.

Here, Steven has not adduced any evidence that would establish express malice. That is because all of SDF's supposed misconduct concerned their efforts to enforce valid court orders, the enforcement of which would benefit their client, who was owed hundreds of thousands of dollars in court-ordered support and fees. That SDF would also benefit from the enforcement of the court orders does not establish that SDF was motivated by ill will against Steven.

**C. If the Court Finds that Application of Florida's Litigation Privilege Would Create a Question of Fact, then a True Conflict Exists and the Court Should Next Determine that Illinois' Litigation Privilege Applies**

Assuming *arguendo* that the Court determines application of the Florida litigation privilege would create a question of fact, then the Court must next determine whether to apply Florida or Illinois law. This analysis requires a determination of "which state's interest is most significant[.]" *Beattey v. Coll. Ctr. of Finger Lakes Inc.*, 613 So. 2d 52, 53 (Fla. DCA 1992).

Pursuant to Second Restatement of Conflict of Laws, which Florida has adopted, a trial court considers four contacts when comparing one state's interest to another's: "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Goodnight v. Bos. Sci. Corp.*, 548 F. Supp. 3d 1325, 1333 (S.D. Fla. 2020). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Furthermore, the contacts are evaluated in light of the principles set forth in § 6 of the Restatement (Second) Conflict of Laws. *Beattey*, 613 So. 2d at 53.

In the context of determining the state law applicable to a privilege or immunity that would protect a defendant from liability, courts have uniformly applied the law of the state where the defendant committed the alleged misconduct. That is because a state has a significant interest in advancing the public policy underlying the state's decision to protect certain activity occurring within that state from liability. The district court's decision in *Arwa & Change Advocs. LLP v.*

*Smith LaCien LLP*, 2025 WL 1807939 (N.D. Ill. July 1, 2025) is particularly instructive. There, two law firms, one based out of Kenya and one based out of Chicago, represented the estate of an individual in a lawsuit against Boeing after the decedent died in an airplane crash. *Id*. at *1. During the litigation against Boeing, the Kenyan law firm's representation of the estate terminated. *Id*. at *2. The Kenyan firm filed suit against the Chicago firm, claiming *inter alia* that it tortiously interfered with the Kenyan firm's relationship with the mutual client. *Id*. at *3.

The Chicago firm moved to dismiss, arguing that the Illinois litigation privilege precluded liability. *Id*. Applying the choice of law rules of Illinois, which has also adopted the Second Restatement of Conflict of Laws, the district court ruled that Illinois' absolute litigation privilege, rather than Kenya's qualified litigation privilege, applied even though the alleged harm was suffered in Kenya. The court explained that Illinois "clearly" had the most significant contacts to the issue of the absolute attorney litigation privilege" since the defendant law firm was Illinois-based and Illinois "has a strong interest in protecting [the firm's] litigation-related conduct while practicing within the state." *Id*. at *4.

Courts have consistently come to the same conclusion in the context of other types of immunity-producing privileges. For example in *Wilkow v. Forbes, Inc*., an Illinois citizen filed a defamation suit against Forbes, a New York corporation with its principal place of business in New York. 2000 WL 631344, at *3 (N.D. Ill. May 15, 2000). Forbes moved to dismiss on the ground that its article was protected by New York's fair report privilege, which protects a defendant from suit "for the publication of a fair and true report of any judicial proceeding." *Id*. at *4. Forbes argued that New York's absolute fair report privilege applied rather than Illinois' qualified version.

In finding that the New York fair report privilege applied despite the plaintiff having been injured in Illinois, the district court provided the following analysis:

> Here, Illinois has a "[great] interest in seeing that the person injured by . . . remarks recover." *Vantassell-Matin v. Nelson*, 741 F. Supp. at 704. In other words, Illinois policy supports its libel and slander laws by ensuring that persons who claim they have been defamed have a remedy. *Id*…This policy, however, directly relates to the underlying defamation claim, as opposed to the privilege issue.
>
> **<u>In contrast, New York's policy is closely tied to the privilege issue</u>**. **<u>New York has a strong interest in encouraging unfettered expression by protecting certain types of speech within its borders</u>**. *See id*. **<u>Thus, it made its privilege absolute</u>**. Moreover, New York's interest in fixing the scope of a privilege applicable to conduct taking place within its borders is paramount. In addition, "the policy behind exempting those who

> speak in certain contexts is to encourage unfettered expression . . . by ensuring that such statements do not subject the speaker to liability." *Vantassell-Matin v. Nelson*, 741 F. Supp. at 704. **This policy would be wholly eviscerated if conduct occurring in New York was evaluated under another state's privilege laws**. **Finally, the fair reporting privilege is meant to protect speakers, not provide a remedy to plaintiffs**.

*Id*. at **6-7 (emphasis added) (citations removed). Virtually every court to address this issue has come to the same conclusion. *See, e.g., Miller v. Gizmodo Media Grp*, 2019 WL 1790248, at *6 (S.D. Fla. Apr. 24, 2019) (applying New York's fair report privilege where supposed defamation occurred in New York but plaintiff was injured in Florida); *Goguen v. NYP Holdings, Inc.*, 544 P.3d 868, 881 (Mont. 2024) (applying New York's fair report privilege despite plaintiff being injured in Montana "because the privilege protects the speaker, New York's privilege provides more protection to the press than Montana's, and the conduct occurred in New York").

Here, application of Illinois' absolute litigation has an even stronger basis. Not only did the alleged misconduct of SDF (an Illinois firm) occur solely in Illinois, but the alleged misconduct all grows out of an ongoing divorce proceeding pending in Illinois, where Steven is a party and where the relationship between SDF and Steven is therefore centered. There is simply no basis on this record to apply Florida's litigation privilege. On the other hand, Illinois has a strong interest in seeing the application of its absolute litigation privilege, which advances Illinois' "public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Edelman v. Hinshaw & Culbertson*, 788 N.E.2d 740, 748 (Ill. App. Ct. 2003).

## III. Counts I, II, III, VIII, and IX against SDF Fail Due to Insufficient Evidence

### A. Steven Cannot Establish a Claim for False Imprisonment (Count I)

According to Steven, it "defies logic" to claim that SDF cannot be liable for false imprisonment where Steven's arrest was based on valid body attachment orders. Resp. at 12. Yet Steven is unable to circumvent the indisputable fact that the body attachment orders provided a basis for his "lawful detention," thereby eliminating at least one element of false imprisonment.

Tacitly conceding this point, Steven then focuses on his continued detention, rather than his initial arrest, as a ground to claim false imprisonment. But this theory of liability still suffers from the same flaw because the body attachment orders still provided a basis for Steven's continued "lawful detention." Furthermore, aside from pointing to a handful of emails from SDF to the Monroe County Sheriff's Office, Steven cannot show that SDF caused Steven's continued

incarceration. *See* Reply SOF, ECF 90 at ¶103. The facts show that the MCSO, not SDF, caused Steven's continued incarceration. *Id.*

**B. Steven Cannot Establish a Claim for Malicious Prosecution (Count II)**

Citing the Eleventh Circuit's opinion in *Uboh v. Reno*, Steven argues that the granting of a writ of habeas corpus can constitute a favorable termination of a proceeding for purposes of a malicious prosecution claim. Resp. at 13. But SDF did not argue that a successful writ of habeas corpus could never serve as a favorable termination. Rather, it's the basis for such grant that determines whether there's been a favorable termination. Even *Reno* supports this point: "The Supreme Court has observed that the requirement of favorable termination in the context of malicious prosecution suits ***prevents parallel litigation over the issues of probable cause and guilt*** and the possible creation of conflicting resolutions arising out of the same or identical transactions. ***Courts have further reasoned that only terminations that indicate that the accused is innocent ought to be considered favorable***." *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir. 1998) (emphasis added). Here, there was absolutely no determination by the Florida trial court of Steven's innocence. Rather, Steven was merely released upon Cook County's confirmation that it would not seek Steven's extradition. *See* Agreed Order for Emergency Release, ECF 82-50.

**C. Steven Cannot Establish a Claim for Abuse of Process (Count III)**

Steven argues that under Florida law, an abuse of process claim exists where a defendant instigates an arrest for the purpose of extorting the plaintiff. Resp. at 14-15. Steven's interpretation of the law is correct, but it provides him no help since he has adduced no evidence that SDF used Steven's arrest to extort him. Steven nevertheless argues (Resp. at 16) that there is evidence of extortion, first pointing to ¶42 of his Response to Defendants' SOF. That citation merely reveals testimony from Stanish that her firm's client, Jeanette, owed SDF a large outstanding balance and that SDF had a financial incentive to collect those fees. *See* Resp. to SOF, ECF 82 at ¶ 42. That testimony, apart from being utterly banal (which law firm does not want its fees paid?), offers no evidence of extortion. Steven next cites to ¶117 of his ASOF, which merely points out that SDF filed an *ex-parte* motion in the divorce case to appoint a receiver. *See* ASOF, ECF 82 at ¶117. How that equates to extortion Steven fails to explain.

These facts stand in stark contrast to the cases where evidence of extortion was sufficient to overcome a summary judgment motion. *See, e.g., Scozari v. Barone*, 546 So. 2d 750, 752 (Fla. DCA 1989) (finding that defendant's "own testimony indicates" he filed a lien against the

plaintiff's property "least in part as a bargaining chip"). Or cases where allegations of extortion were sufficient to overcome a motion to dismiss. *See, e.g., Svistina v. Elbadramany*, 2023 WL 34642, at *5 (S.D. Fla. Jan. 4, 2023) (finding that counter-plaintiff "sufficiently alleged" that counter-defendant "has attempted to use the criminal legal process as an extortionate vehicle"); *Dubai World Corp. v. Jaubert*, 2010 WL 11504310, *3 (S.D. Fla. July 9, 2010) (same).

Simply put, without evidence of extortion, all that Steven is left with is SDF's efforts to enforce validly entered body attachment orders. However, "[t]here can be no abuse of process when it is used 'to accomplish the result for which it was created, regardless of an incidental or concurrent motive of spite or ulterior purpose.'" *Bembry v. City of Tallahassee*, 2006 WL 1080676, at *8 (N.D. Fla. Apr. 24, 2006) (quoting *Bothmann v. Harrington*, 458 So. 2d 1163, 1169 (Fla. DCA 1984)).

## IV. Court Should Grant Summary Judgment in Favor of Defendants as to All Three Intrusion upon Seclusion Claims in Counts IV through VI

Given page limitation constraints, Defendants stand on the arguments raised in their MSJ as to Counts IV through VI. Defendants do, however, highlight one point. Steven argues that there is evidence Seinitz was no longer employed when he accessed the Security Camera in April 2025. Resp. at 16. The evidentiary citations provide no such support. Steven is unable to avoid the escapable conclusion that there is no evidence anyone, whether in writing or orally, communicated to Seinitz that he was terminated. The only document Steven has produced evidencing any termination was a fraudulent email doctored by Steven and then withdrawn by his attorneys. *See* SOF, ECF 70 at ¶¶ 30-32. And in terms of evidence that someone orally informed Seinitz of his termination, Steven testified that Olafur Hand communicated the termination, while Olafur Hand testified that Steven communicated the termination. *Id.* at ¶ 35.

Furthermore, as explained in Section V below, correctly assuming that Seinitz remained employed through April 2025, there is also no evidence that anyone revoked Seinitz's access to the Security Camera. Under these circumstances, there cannot be an intrusion upon seclusion where an authorized employee accessed a security camera belonging to a business.

## V. Summary Judgment as to Count VIII (Stored Communications Act) is Appropriate

In their MSJ, Defendants argued that summary judgment in their favor as to Count VIII (SCA) was appropriate for four reasons. First, there is no evidence that the Security Camera or its manufacturer is an "electronic communication service" within the meaning of the statute. *See* 18

U.S.C. §§ 2510(15), 2711(1). Defendants provided ample case law for support. In response, Steven cites to a single case, *Perez v. Hadley*, 2026 WL 500627 (S.D. Fla. Feb. 6, 2026), for the proposition that "unauthorized access to home security cameras is sufficient to support a claim for violating the SCA." Resp. at 19. What Steven neglects to mention is that *Perez* never addressed whether a home security camera is an "electronic communication service" since the defendant never raised that issue. This is unsurprising since the District Court was addressing a motion to dismiss, not a motion for summary judgment. *Perez* therefore has no relevance.

Second, there is no evidence that Seinitz obtained a communication from the Security Camera while it was "in electronic storage." *See* 18 U.S.C. § 2510(17). To get around this hurdle, Steven claims that Seinitz accessed videos and screenshots from the "cloud." Resp. at 18. But there is no evidentiary support for this assertion. *See* Reply SOF, ECF 90 at ¶66.

Third, there is no evidence that Seinitz accessed the Security Camera "without authorization or exceeding an authorization to access." On this point, Steven claims (Resp. at 19) that he personally revoked Seinitz's access to the Security Camera, citing to ¶29 of his Response to Defendants' SOF. That paragraph cites to Steven's own deposition testimony. But in the referenced testimony, Steven testified that ***Jim Ayule revoked Seinitz's access***. *See* Steven Dep., ECF 82-20 at 154:19-156:6. Ayule, however, denied ever revoking Seinitz's access. *See* Ayule Dep., ECF 70-32 at 30:15-32:9. This is critical since an employee "does not intentionally exceed authorized access when he deliberately accesses a protected system but lacks notice that his access is unauthorized." *Abu v. Dickson*, 107 F.4th 508, 516 (6th Cir. 2024). Elsewhere in ¶29 Steven asserts that Ayule "understood" that Seinitz did not have authorization to access the Security Camera. But Ayule's understanding is irrelevant to whether *Seinitz* had that understanding.

Fourth, as to SDF specifically, SDF argued that there is no secondary civil liability under the SCA. SDF cited at least five cases for support. In response, Steven cites three cases to support his assertion that the SCA does create secondary civil liability. Resp. at 19. Two of those cases (*Ryanair DAC* and *Brody*) did not involve the SCA whatsoever but instead concerned CFAA claims. The third case (*Abu v. Dickson*) involved both an SCA claim and a CFAA claim, but the vicarious liability language quoted in Steven's Response ***was directed at the CFAA claim***. *See* *Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024). Steven has thus failed to provide a single case that authorizes secondary liability under the SCA.

**VI. Summary Judgment as to Count IX (Computer Fraud and Abuse Act) is Appropriate**

In their MSJ, Defendants argued that summary judgment in their favor as to Count IX (CFAA) was appropriate for four reasons. First, because there was no evidence establishing what Seinitz accessed when he obtained imagery from the Security Camera, Steven could not prove that Seinitz accessed a "protected computer." In response, Steven again turns to his misguided assertion that Seinitz accessed a "cloud" in order to obtain the imagery. Resp. at 19. There is no evidentiary support for this claim. *See* Reply SOF, ECF 90 at ¶66.

Second, Steven cannot satisfy the threshold damage requirement showing that he suffered $5,000 in investigative or service interruption costs. In response, Steven asserts that Jim Ayule "was retained and compensated" to lead the investigation regarding the Security Camera. Resp. at 20. Steven's position is both misleading and incorrect. It is misleading because it implies that Steven paid the supposed investigative costs, which is not true. *See* Reply SOF, ECF 90 at ¶115. Even worse, Steven's position is incorrect since Mr. Ayule did not charge any fees for his supposed investigation; he merely charged his contractual monthly consulting fee, which he would have charged regardless of whether he conducted any investigation into the Security Camera. *Id*.

Third, as to SDF specifically, SDF argued the CFAA does not create secondary liability. SDF cited numerous district court opinions in this circuit for support but noted that courts outside this circuit have found secondary liability where a person "conspires" with another to commit an offense under the CFAA. In response, Steven points to a number of those contrary opinions. Resp. at 20. This is a matter of statutory interpretation that the Court must address as a matter of law.

Additionally, SDF asserted that even if there can be a "conspiracy" type claim under the CFAA, Steven has failed to produce any evidence that SDF was aware that Steven supposedly lacked authorization to access the Security Camera. Thus, Steven cannot establish "a knowing agreement with another to commit the unlawful act." *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1294 (M.D. Fla. 2012). Steven responded to this argument with silence.[1]

**CONCLUSION**

For the foregoing reasons, Defendants Schiller DuCanto & Fleck, LLP and Joseph Seinitz are entitled to summary judgment.

---

[1] In his Response, Steven also does not contest summary judgment as to Count VII (Federal Wiretap Act) and Count X (Florida Computer Crimes Act), thereby conceding those claims.

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2026, the foregoing document was electronically filed with the Clerk of Court using CM/ECF. I further certify that the foregoing document is being served this day on all counsel of record on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or by other authorized means for counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.

s/ Alexandra L. Tifford
Alexandra L. Tifford

| **SERVICE LIST**<br>*Ivankovich v. Schiller, DuCanto & Fleck, LLP and Joseph Seinitz* | |
|---|---|
| Joshua Truppman, Esq.<br>Benjamin Brodsky, Esq.<br>Brodsky Fotiu-Wojwoticz, PLLC<br>44 W Flagler St., Suite 2200<br>Miami, Florida 33130,<br>Telephone: (305) 503-5054<br>Email: bbrodsky@bfwlegal.com<br>Email: joshua@bfwlegal.com<br>*Counsel for Plaintiff* | |