**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

STEVEN IVANKOVICH,

Plaintiff,

v.

SCHILLER, DUCANTO, & FLECK, LLP,
an Illinois limited
liability partnership, and
JOSEPH SEINITZ, an individual.

Defendants.
_______________________________________/

Case No.: 1:25-cv-25402-KMW

Hon. Judge Kathleen M. Williams

Magistrate Judge Enjolique A. Lett

# SECOND AMENDED COMPLAINT

Steven Ivankovich ("***Steven***") files this Second Amended Complaint against Schiller, DuCanto & Fleck, LLP ("***Schiller Firm***") and Joseph Seinitz ("***Seinitz***"), pursuant to the Court's Order dated October 7, 2026 (ECF No. 97), and states as follows:

## Jurisdiction, Venue, and the Parties

1. This is an action for damages in excess of $750,000, exclusive of interest, costs, and attorney's fees.

2. Steven is a resident of and domiciled in Miami-Dade County, Florida.

3. The Schiller Firm is a law firm specializing in family law and an Illinois limited liability partnership with its principal place of business located in Illinois. All of the Schiller Firm's partners are residents of and domiciled in the State of Illinois.

4. Seinitz has filed an affidavit with this Court stating that he is a resident of DeKalb, Illinois and has also maintained a residence in Florida. Seinitz was formerly employed by certain of Steven's family members, or their affiliated entities.

**The Marital Dissolution Proceeding**

5. Around October 29, 2021, Jeanette Ivankovich ("***Jeanette***") hired the Schiller Firm to represent her in an Illinois divorce action against Steven pending in the Circuit Court of Cook County, Domestic Relations Division ("***Cook County Court***"), Case No. 2021-D0009220 ("***Divorce Proceeding***").

6. Steven and Jeanette have two children who live with Jeanette in Chicago.

7. Steven's parents have provided and continue to provide extensive financial support for the children, including private school tuition, extracurricular activities, clothing, housing, food, and private club membership dues.

8. During the Divorce Proceeding, Steven's parents also provided hundreds of thousands of dollars in support to Jeanette and the grandchildren.

9. Notwithstanding the extensive financial support provided by Steven's parents, on May 4, 2024, pursuant to 750 ILCS 5/713(a), the Cook County Court issued a Body Attachment Order as to Steven for not appearing in court pursuant to a court order and for personally not paying child support in the amount of $672,559.41.[1]

10. On September 13, 2024, pursuant to 750 ILCS 5/713(a), the Cook County Court entered a second Body Attachment Order as to Steven holding him in "*indirect civil contempt*" for not paying an interim attorney's fee award entered against him in favor of the Schiller Firm for $425,000 ("***Schiller Fee Award***").

[1] This Body Attachment Order expired during the period of time Steven was incarcerated as alleged below.

**By 2025, the Schiller Firm Sought Over $2.2 Million in Fees From Steven**

11. Tanya Jo Stanish, Esq. ("***Stanish***"), is a Senior Partner at the Schiller Firm who leads Jeanette's representation and supervised all attorneys on the matter, including the former first-year associate Kevin Crémoux ("***Crémoux***").

12. The Schiller Firm has claimed to be owed attorney's fees and costs that far exceed the Schiller Fee Award.

13. According to Stanish's affidavit, as of October 6, 2026, the Schiller Firm was owed $2,882,072.38 in fees and costs related to Jeanette's representation, having been paid at that point $936,672.00 since the inception of the Divorce Proceeding.

14. Even though Jeanette is its client, the Schiller Firm has always looked to Steven or his parents to pay its outstanding fees.

15. At the time of Steven's arrest on April 28, 2025, the Schiller Firm was owed $2,204,738.78 by its client, Jeanette (the "***April 2025 Outstanding Fees***"**)**.

16. This was the first time that Stanish had an outstanding balance in excess of $1.5 million that she had attempted to collect in this manner.

17. The Schiller Firm had a financial motive to collect all its fees.

18. That was particularly true because there was a $1,779,738.78 difference between the Schiller Fee Award, which was the subject of the second Body Attachment Order, and the total balance allegedly owed to the Schiller Firm.

19. The amount of outstanding fees has attracted the attention and focus of the Schiller Firm's senior management, and, upon information and belief, has caused the Schiller Firm financial distress.

20. In addition, Stanish was the attorney responsible for collecting the seven-figure outstanding receivable in Jeanette's case.

21. Upon information and belief, and as evidenced by the conduct alleged herein, both Stanish and the Schiller Firm have grown increasingly desperate, despondent, and angry with Steven, and engaged in escalating extra-judicial conduct to extort Steven and his family.

**The Schiller Firm Obtains the NCIC Order**

22. During a hearing in the Divorce Proceeding on November 6, 2024, Stanish moved the court for an order to have the Body Attachment Orders entered into the National Crime Information Center ("***NCIC***"), a national criminal information database created to facilitate transmission of criminal warrant and criminal history information.

23. Steven's attorney at the hearing objected and argued that the NCIC system existed for transmitting criminal history record information and not a civil contempt citation that did not qualify as a criminal warrant. Steven's attorney cited legal authority for the proposition and asked for a briefing schedule to show that this was an improper request.

24. In response to Steven's attorney, Stanish argued that the court could enter an order to place the Body Attachment Orders in NCIC and that if this was not possible, NCIC would let them know.

25. The Court adopted Stanish's recommendation based upon her representations that NCIC administrators would independently make the ultimate call.

26. When Steven's lawyer noted the potential for Stanish to add additional information beyond the Body Attachment Orders to NCIC to get them included, Stanish promised the court that the Schiller Firm would provide Steven's lawyer with a copy of whatever it submitted to NCIC.

27. The court in the Divorce Proceeding proceeded to enter an Order on December 20, 2024 authorizing the Cook County Sheriff's Office ("***CCSO***") to enter the Body Attachment Orders into NCIC and the national criminal information system LEADS[2] ("***NCIC Order***").

28. Notably, though, the NCIC Order did not include any language stating that the Body Attachment Orders were capable of enforcement outside of Illinois or were extraditable. The Body Attachment Orders themselves were addressed solely to law enforcement within Illinois.

29. For that reason, as the Schiller Firm testified in this case, "the words fully extraditable anywhere in the United States of America" do not appear in the NCIC Order, and there is "nothing in our body attachment orders that say nationwide extraditable."

30. Similarly, the Superintendent of the Cook County Sheriff's Office's Civil Process Unit, Colin Luce, testified that the Court's Order did not indicate that the Body Attachment Orders referenced therein were extraditable in any way.

**The Islamorada House, Seinitz, and the Security Camera**

31. Seinitz's employment by Steven's family and their affiliates included providing security services.

32. While employed by Steven's family, Seinitz installed at least one Soliom brand security camera ("***Security Camera***") at the front entrance of a house located in Islamorada, Monroe County, Florida ("***Islamorada House***") that Steven on occasion occupied. The Security Camera had the capability to view multiple portions of the property, including the front driveway, the front door, and a portion of the backyard of the Islamorada House.

33. The Security Camera was programmed to transmit data, including video recordings, to Soliom's cloud storage, which could be accessed through an Access Key ID.

---

[2] https://leadsonline.com/.

34. The Security Camera could be moved remotely to surveil not only the front-facing portion of the property, but also the elevated deck and back yard on the Atlantic Ocean side of the property. The Security Camera transmitted audio.

35. Seinitz repeatedly accessed the Security Camera through an application on his phone. The Security Camera saved videos and photographs in electronic storage, or what Seinitz testified was the "cloud."

36. Through at least April 28, 2025, the account associated with the Security Camera, the unique device identifier, the SIM card integrated circuit card identifier, and the Access Key ID were registered to and controlled and monitored by Seinitz.

37. In late 2024, Steven and his mother, Dr. Olga Ivankovich, decided to transition Seinitz out of his security role.

38. In January 2025, Steven advised Seinitz that he would no longer be the full-time security director, and that the family was going to hire a new full-time security director while transitioning Seinitz to Marina Director at a Fort Pierce property known as the Taylor Creek Marina.

39. On February 18, 2025, Seinitz signed a management consulting agreement with the title "Marina Director" on a full-time basis. The agreement's "Essential Duties and Responsibilities" contained no reference to security, cameras, or surveillance.

40. On March 1, 2025, Seinitz received a formal disciplinary action letter from his supervisor, Olafur Hand, suspending him "based on several instances of conduct detrimental to the organization causing reputational and financial harm to the company."

41. On March 1, 2025, the Ivankovich family also announced that Jim Ayule was the new "global chief of security operations." On March 10, 2025, Ayule sent a group message—which Seinitz received—introducing himself as head of the security team.

42. Once Ayule took over as security director, Seinitz no longer had permission to access the Security Camera at the Islamorada House.

43. On April 4, 2025, Seinitz confirmed his understanding that he was no longer the security director, even messaging Steven: "Have your global security director handle [it] and stop threatening me."

44. On April 15, 2025, Seinitz messaged Mr. Hand: "You're not paying me. I'm not doing anything for you." The next day, Seinitz reminded Mr. Hand that "[w]e need to discuss my severance terms."

45. Accordingly, by Seinitz's own admission, he was terminated by Steven's family no later than April 15, 2025.

46. After his removal as security director and his termination, Seinitz was requested to (a) delete his remote access to the live feed of the Security Camera; (b) no longer use any access or control over, with, or connected to the Security Camera; and (c) turn over all relevant information, access, and control over, with, or connected to the Security Camera, such as the Access Key ID.

47. Following Seinitz's termination, Steven did not know that Seinitz was tracking or surveilling him using the Security Camera, or that Seinitz was disregarding the terms of his termination by surveilling him using the Security Camera.

**Seinitz and the Schiller Firm Begin Surreptitiously Surveilling Steven**
**(*March 31 through April 23, 2025*)**

48. Starting on or around March 31 and through at least April 28, 2025, Seinitz worked with the Schiller Firm to surreptitiously surveil Steven at both the Islamorada House and a house in Frisco, Colorado that Steven also occasionally occupied ("***Colorado House***"). Upon information and belief, Seinitz communicated to the Schiller Firm that he could covertly surveil Steven through cameras installed on certain properties. During this time, Seinitz acted to assist the Schiller Firm to carry out its scheme to arrest Steven outside the State of Illinois.

49. On March 31, 2025, Seinitz sent Stanish an email with the subject line "Information" and asked her to call him.

50. About two and a half hours later, Seinitz sent a new email to Stanish with the subject line "Ivankovich" and again asked her to call him.

51. Stanish then spoke with Seinitz by phone. Stanish was the Schiller Firm's primary contact with Seinitz, and Crémoux and other Schiller Firm attorneys were kept informed through "meetings and updates as to what type of information Tanya was receiving" from Seinitz "for strategy purposes."

52. On April 4, 2025, Seinitz sent Stanish an image of the Islamorada House from Google Earth with the message, "This is the 22 acres of land on the bay side of Islamorada."

53. Thereafter, the Schiller Firm enlisted Seinitz to locate Steven on their behalf, as well as to introduce the Schiller Firm to other current or former employees of the Ivankovich family, including Nathan Greenwood, Gus Pons, and Craig Butler.

54. Stanish relied on Seinitz's information and his judgment during these communications. For example, on April 3, 2025, Stanish asked Seinitz whether she could use his name as a reference in contacting them.

55. By April 18, 2025, the Schiller Firm had held "a handful" of calls with Seinitz and those individuals.

56. Seinitz made clear that Stanish could "[c]all me anytime" and on behalf of the Schiller Firm offered to "do the call with all of us again."

57. Later on April 18, 2025, Stanish circulated a Zoom link, and testified that the Zoom call "[m]ost likely" occurred.

58. Stanish participated in one or more Zoom calls with Seinitz, Gus Pons, Craig Butler, and Nathan Greenwood, during which they discussed, among other things, Steven's family's assets and his location.

59. Crémoux testified that he "was likely asked to attend as many [of these Zoom calls] as I could."

60. On April 22, 2025, Seinitz emailed Stanish a "Find-my-iPhone" screenshot showing the location of the Colorado House, stating that it was "Steve's current location. I can't tell you how long he will be there. This is home on copper mtn." Seinitz obtained this information by tracking Steven in real time, without Steven's knowledge or consent. Stanish forwarded that email to Crémoux and other lawyers at the Schiller Firm.

61. Stanish understood the image to be from "a Find My iPhone type screenshot."

62. Stanish did not believe Seinitz had Steven's permission to share this location information with the Schiller Firm.

63. Upon information and belief, Stanish intentionally did not try to find out if Seinitz had Steven's permission.

64. Stanish then used this information to attempt to have Steven arrested in Colorado.

65. The next day, on April 23, 2025, Stanish emailed Seinitz and several of his associates to introduce Crémoux and continue leveraging Seinitz's relationships to set up several additional Zoom meetings between the Schiller Firm and Seinitz and his associates.

66. On April 23, 2025, Stanish wrote to Seinitz and Gus Pons: "Gus and Joe, my associate, Kevin, and I would like to meet with you as we discussed via Zoom."

67. On April 24, 2025, Seinitz followed up with Stanish by email: "Did you see my email about Steve's location in Colorado?" Stanish replied: "Yes. Trying. He still there?" Minutes later Seinitz confirmed that Steven was still at the Colorado House.

68. Stanish has testified that by "[y]es, trying," she meant she was "[t]rying to get him picked up by Colorado"—that is, arrested in Colorado.

69. Seinitz has testified that he knew Stanish was trying to have law enforcement arrest Steven in Colorado, and that he was "working with her to accomplish that task."

70. Seinitz testified that the purpose of sending Steven's location to Stanish was to "[k]eep her informed . . . [w]ith his location, where he's at."

71. A few hours later, Stanish replied, "Trying to get it done but law enforcement moves slowly. We are in touch with them. Thanks for intel and keep me posted if anything changes." Seinitz replied within a minute: "Will do, let me know if he is picked up."

72. By asking Seinitz to "keep me posted," Stanish intended that Seinitz would act to aid and benefit the Schiller Firm to continue to use electronic means to covertly track and surveil Steven.

73. Throughout this time and through Steven's arrest on April 28, 2025, the Schiller Firm told Seinitz where to direct his surveillance ("Now shift to Florida"), what information to

report ("What's the address of his location"), and to continue reporting ("keep me posted if anything changes").

74. Seinitz accepted, responding "Will do," and continued surveilling Steven and reporting to the Schiller Firm until Steven was arrested.

75. Seinitz also testified that he was "assisting . . . [Stanish] to have him arrested."

76. Seinitz testified that he understood he had an agreement with the Schiller Firm to perform these services on the Schiller Firm's behalf.

77. In particular, when asked whether he had any agreement or understanding with the Schiller Firm as to compensation, Seinitz first testified: "None. None at all. We have no compensation."

78. Seinitz then testified: "I did have an agreement with them, and it says no compensation."

79. No such agreement has been produced in discovery, and the Schiller Firm's informal response in discovery is that no written agreement between Seinitz and the Schiller Firm exists.

80. However, Seinitz's testimony shows that he understood he was acting at the direction of, or under an agreement with, the Schiller Firm.

81. Moreover, the Schiller Firm repeatedly solicited, encouraged, and used the surveillance information that Seinitz provided, while specifically instructing him to continue providing that information so that the Schiller Firm could locate Steven and cause his arrest.

82. As alleged herein, the Schiller Firm also directed Seinitz to set up Zoom meetings between the Schiller Firm and other Ivankovich family affiliates.

**The Schiller Firm Did Not Review the NCIC Operating Manual or NCIC Guidelines Prior to Advocating for Its Entry**

83. In addition, between April 22, 2025 and April 28, 2025, Crémoux simultaneously contacted the following three law enforcement agencies repeatedly to procure a "Nationwide Extraditable" designation on Steven's entry in the NCIC system: (i) Summit County, Colorado Sheriff's Office; (ii) Monroe County, Florida Sheriff's Office; (iii) Cook County, Illinois Sheriff's Office.

84. Crémoux communicated with these law enforcement agencies under the direct supervision of Stanish, acting as Senior Partner of the Schiller Firm.

85. Prior to directing or engaging in these extra-judicial acts, Stanish had "no idea" that the NCIC database was limited to reporting information on crimes and criminals of nationwide interest.

86. In addition, prior to directing or engaging in these extra-judicial acts, Stanish, Crémoux, and the Schiller Firm did not review the NCIC Operating Manual.

87. Accordingly, the Schiller Firm did not know that the NCIC Operating Manual limits the database to "information of crimes and criminals of nationwide interest," does not permit entries for civil body attachment orders, and prohibits designating an entry as "extraditable" or "nationwide extraditable" when—as here—extradition is not legally possible.

88. During this litigation, Stanish admitted that the NCIC Operating Manual limits NCIC to listing "information of crimes and criminals of nationwide interest."

89. However, the Schiller Firm should have reviewed the NCIC Operating Manual and should have known that designating Steven's indirect civil contempt order as "Nationwide Extraditable" was not allowed under the terms of the NCIC Operating Manual.

**The Schiller Firm Causes "Nationwide Extraditable" to Be Added to NCIC Without Any Court Order and in Direct Violation of the NCIC Operating Manual (*April 22 – 25, 2025*)**

90. On April 22, 2025, Crémoux called the Summit County Sheriff's Office seeking to have Steven arrested, but Summit County dispatch could not see any warrants for Steven in NCIC.

91. Crémoux learned that the NCIC entry needed to be marked as "nationwide extraditable" in order for sheriff's offices outside Illinois to see it, and that there was a "nationwide extradition box" that needed to be checked.

92. This is the same "Nationwide Extraditable" box that the NCIC Operating Manual ***expressly*** prohibits being checked whenever a warrant is not extraditable.

93. Despite being prohibited under the NCIC Operating Manual, on April 24, 2025, at approximately 2:04 p.m., Crémoux emailed Colin Luce, the Superintendent of the CCSO's civil process unit, and Christopher Kimble of the Summit County Sheriff's Office, attaching the two Body Attachment Orders and the NCIC Order.

94. At 2:56 p.m., Luce emailed Kimble: "Greetings, it shows in our LEADS system that he is wanted on civil body attachment out of Cook County as an add on." Luce added: "civil BAs are a difficult thing and sometimes aren't showing in NCIC the same way as a criminal warrant."

95. Kimble then contacted Crémoux and told him that Summit County still could not see the Body Attachment Orders in NCIC.

96. At 5:23 p.m., Crémoux emailed Luce and Kimble: "Colin, can you confirm that the body attachment orders have been entered into the NCIC system as 'Nationwide Extraditable'? I've been told that this designation needs to be added in order for the body attachment orders to appear outside of Illinois. Please advise and thank you for your help with this!"

97. About three minutes later, Luce responded: "If not I'll get it done. Might take a day or two." Crémoux responded: "Thanks so much, Colin."

98. Crémoux did not advise Luce that the NCIC Order did not authorize any extradition designation.

99. Luce did not look at the Body Attachment Orders or the NCIC Order before responding, and did not check whether either noted "nationwide extraditable."

100. At 7:37 p.m., Luce forwarded Crémoux's entire email to Cathy Ryan, the dispatch supervisor, and the CCSO's 911 clerks, asking: "can this be added to LEADS to show NCIC full extradition? If not, what do we need to have that added or who do we need to speak with?" Luce did not attach the Body Attachment Orders or the NCIC Order to that email.

101. Eight minutes later, 911 clerk Stephanie Adam replied: "The LEADS entry should now reflect full extradition." She did not ask for any further information or any court order before making the change.

102. On Friday, April 25, 2025, at 6:10 p.m., Crémoux emailed Luce again: "Any update on the extradition label being added in NCIC? My understanding was that it was done through LEADS but that Colorado only has access to NCIC orde7rs. LEADS is Illinois only. Sorry for continuing to reach out asking for updates. I'm receiving a lot of pressure from my firm about getting this fixed. Any help or assistance is much appreciated."

103. On Monday, April 28, 2025, at 11:26 a.m., Luce and Ryan continued to email concerning designating this entry as "Nationwide Extraditable."

104. In one of those emails, Luce advised: "I see an order dated 12-20-2024 saying that we are ordered to put it in NCIC. The civil body attachments list 'any sheriff of any county in

Illinois or any duly deputized law enforcement agent.' The attorney can get whatever language you need added to the order to have what y'all need to have to update NCIC."

105. No new order was ever obtained. Nonetheless, at Crémoux's request, the Cook County Sheriff's Office designated Steven's NCIC entry as "Nationwide Extraditable."

106. Luce testified that the Cook County Sheriff's Office only added "Nationwide Extraditable" to the NCIC system because Crémoux asked him to.

107. However, no court authorized the "Nationwide Extraditable" designation.

108. The designation was procured by the Schiller Firm through direct, *ex parte* requests to law enforcement personnel, outside of any courtroom, hearing, or court filing.

109. At no time did the Schiller Firm obtain a new or revised NCIC Order in the Divorce Proceeding to include new language reflecting nationwide extradition. Nor did Crémoux, Stanish, or anyone else from the Schiller Firm inform Steven's lawyers of the new information they were providing to CCSO to update NCIC as Stanish had promised and the divorce court had orally ordered.

110. As described below, Crémoux used the NCIC entry, now containing the language "nationwide extraditable" he procured, to cause the Monroe County Sheriff's Office to arrest and detain Steven.

**Seinitz Continues to Surveil Steven at the Schiller Firm's Request Through the Security Camera at the Islamorada House (*April 25 – 28, 2025*)**

111. On April 25, 2025, Seinitz emailed Stanish to see if she had "Any updates?" Stanish replied: "In the works. I will try to update you by end of day." Seinitz responded later that day, "He poked the wrong bears!"

112. On April 26, 2025, Seinitz emailed Stanish: "He is back in Islamorada Florida! He just popped up on the camera.. at his rental house."

113. Less than two hours later, Stanish replied to Seinitz, "Ok damn[.] Now shift to Florida[.] Very helpful and appreciated."

114. Stanish testified that she wrote "Okay damn" because the Schiller Firm "had made efforts to get in contact with Colorado to see if he could be picked up on the body attachments in Colorado," and agreed that by "Now shift to Florida," she meant the Schiller Firm would "have to do that same thing in Florida."

115. Seinitz soon replied to Stanish, "He has lost his mind, he is now seeing that I've turned on him in other business.. he is there in Islamorada.. Monroe county sheriff[.]"

116. Stanish emailed Seinitz that same evening, "What's the address of his location." Seinitz replied by sending an image of the Islamorada House address.

117. Unbeknownst to Steven, Seinitz was wrongfully and surreptitiously surveilling Steven through the Security Camera upon his arrival at the Islamorada House. By at least April 26, 2025, when Seinitz emailed Stanish that Steven was "back in Islamorada Florida[,]" as reflected through the Security Camera, the Schiller Firm knew Seinitz was actively surveilling Steven at the Islamorada House, approved his doing so for the firm's benefit, and directed him to continue.

118. Later in the evening on April 26, 2025, after Seinitz emailed the Schiller Firm that Steven was in Islamorada, Seinitz emailed Stanish, attaching a screenshot of the Security Camera footage showing the front stairs and driveway of the Islamorada House. The body of the email stated: "This is the house and he is driving the white rental SUV[.]" Stanish forwarded that email to Crémoux and five other lawyers at the Schiller Firm.

119. On the morning of April 28, 2025, Seinitz continued his covert surveillance of Steven. Seinitz emailed Stanish, "He is still currently in Islamorada as of this morning."

120. On April 28, 2025, Seinitz also called Crémoux twice. In the first call, Seinitz confirmed the address of the Islamorada House. In the second call, lasting approximately one minute, Seinitz told Crémoux that there were guns and arms in the house.

121. Crémoux then spoke to Stanish, who told him to call MCSO back. Crémoux did nothing to verify Seinitz's statement before relaying it to MCSO.

**Using the Altered NCIC Record, the Schiller Firm Causes Steven's Arrest**
**(*April 28, 2025*)**

122. After Seinitz notified the Schiller Firm that Steven was at the Islamorada House, the Schiller Firm directed Crémoux to contact the Monroe County Sheriff's Office ("***MCSO***") to request that MCSO execute on two outstanding "warrants" for Steven and to take Steven into custody.

123. On April 28, 2025, Crémoux made numerous telephone calls to MCSO to facilitate Steven's arrest by MCSO, including providing Steven's full name and date of birth, the address of the Islamorada House, and the assurance that there were valid "civil warrants" for Steven's arrest. Crémoux did not identify himself as calling from a law firm.

124. Crémoux spoke directly to Deputy Martin Digrius.

125. Deputy Martin Digrius was the acting Monroe County Sheriff's Office supervisor on the day of Steven's arrest.

126. Deputy Digrius has been in law enforcement for over 17 years, all with Monroe County. Deputy Digrius has served as a detention deputy, a road deputy, and a marine deputy.

127. When Deputy Digrius first ran the driver's license number Crémoux gave him, "it did not show up," and he told Crémoux "he'd have to contact the issuing agency and could readvise when it was in the system."

128. Crémoux "called back three hours later and said that it should be in the system," and when Deputy Digrius ran the search again "it came back with a hit for a warrant."

129. When asked whether the entry contained information about whether it was extraditable, Deputy Digrius testified: "It said it was extraditable."

130. If the NCIC entry had not listed the warrant as extraditable, then Deputy Digrius would not have arrested Steven, because it would not have met "the criteria to make a proper detainment."

131. When asked, "If the NCIC entry had not said full extradition, wouldn't you still have gone out to make the arrest?," Deputy Digrius answered: "No." When asked why not, he explained: "the warrant wouldn't have pertained to us if it wasn't extraditable from our jurisdiction."

132. Deputy Digrius further testified:

> Q. And if that criteria of extraditability was not there, you also would not have assisted Deputy Espinoza in taking Mr. Ivankovich to jail, correct?
>
> A. Correct.
>
> Q. And Mr. Ivankovich would not have been detained as well, correct?
>
> A. Correct.

(Deputy Digrius Dep. at 26:14-21.)

133. When examined by counsel for the Schiller Firm, Deputy Digrius again confirmed those two criteria, which required ***both*** entry into the NCIC system ***and*** listing the entry as "extraditable":

Q. You earlier testified there are basically two criteria in determining whether to serve warrants, and that's one, it's in the NCIC system, and two, the NCIC system shows extraditable, correct?

A. Yes.
(*Id.* at 35:3-8.)

134. Deputy Digrius had previously seen NCIC entries listing no extradition. In his 17 years as a law enforcement officer, he never made an arrest unless the NCIC entry listed the entry as extraditable.

135. During these calls, Crémoux did not disclose to Deputy Digrius or the MCSO dispatcher that he was an attorney in private practice with the Schiller Firm – a monetary creditor of Steven's – who was unaffiliated with any law enforcement, let alone the Chicago Police Department. Crémoux provided the dispatcher a personal cell number, which upon information and belief is unaffiliated with the Schiller Firm, even though the firm's webpage for Crémoux provides a (different) dedicated direct line as the method by which he may be contacted.

136. To encourage and entice MCSO to take Steven into custody, upon information and belief, upon Seinitz's recommendation, Crémoux again called dispatch, referred to Steven as the "subject in question," and stated that there were "guns and arms" at the property and that the subject might attempt to escape. Crémoux explained where Steven typically is located within the house and detailed a particular path by which Steven would supposedly escape if he became aware of the presence of law enforcement at the property.

137. Deputy Digrius reviewed these notes and believed there were guns and arms at the property. Based on this information, Deputy Digrius and Deputy Espinoza approached the property from the back to cut off the alleged escape route.

138. Crémoux's statements to law enforcement were false and baseless.

139. Upon information and belief, the Schiller Firm's goal was to manipulate and

mislead MCSO into believing Steven was armed and dangerous so that MCSO would act quickly and aggressively to apprehend and take Steven into custody, or worse.

140. The Schiller Firm knew or should have known that there was no lawful basis for MCSO to execute these warrants or imprison Steven, because Steven had not been charged with a crime or held in criminal contempt and therefore could not be extradited to Illinois, the only purpose for which MCSO could hold him.

141. Nevertheless, the Schiller Firm went to great lengths to cause Steven to be imprisoned in Monroe County.

142. Ostensibly, the purpose of taking Steven into custody and imprisoning him was to facilitate his extradition to Illinois. But this was a façade. In reality, the Schiller Firm sought to extort Steven and his family to recover the full balance of their attorneys' fees and to extort Steven through the unlawful seizure of third-party assets.

143. On April 28, 2025, at approximately 3:15 p.m., based on the Schiller Firm's wrongful and false representations, two MCSO officers entered the property at the Islamorada House and arrested Steven.

144. Seinitz monitored the Security Camera and recorded the MCSO officers as they entered and walked about the property.

145. The footage reflects that the Security Camera was remotely accessed and controlled to track the officers. This was performed by Seinitz who viewed the scene unfold through the Security Camera, manipulating the camera remotely to improve his view as the officers moved about the property.

146. In fact, Seinitz watched law enforcement officers arrest Steven while discussing his arrest with Crémoux, and sent live videos to Crémoux on WhatsApp, advising him: "First part, watch when he turns into the door and turn volume up. I'm not done with this POS [piece of shit]."

147. Crémoux responded: "He's unbelievable. Absolute POS [piece of shit]. First step was to arrest him. Now we need to get him to Illinois."

148. One officer went through a neighbor's property to enter the back of the Islamorada House. The officer demanded Steven come down a staircase from the back porch. Alarmed, Steven asked the officer to explain the reason for entering the property unannounced. Rather than do so, the officer came up the stairs and placed Steven in handcuffs as the second officer pointed a taser gun at Steven and shouted, "*Do not resist!*"

149. Steven did not resist. The officers detained Steven in handcuffs on the porch for approximately 25 minutes waiting for the MCSO dispatcher to "confirm the warrant."

150. While detained, the officers informed Steven that MCSO was called by "Cook County" and had an "extraditable warrant" for Steven's arrest. Throughout the encounter, the officers emphasized the importance of confirming an extraditable warrant.

151. Then, while barefoot in shorts and a t-shirt, Steven was placed cuffed in the backseat of a MCSO cruiser and taken into custody.

152. At no point during his detainment or arrest did Steven resist or attempt to flee the scene. At no time did Steven attempt to use a weapon.

153. Steven was confined and imprisoned at the Monroe County Detention Facility in Plantation Key and later moved to the detention facility in Key West.

**Absent the Altered NCIC Record,**
**No Law Enforcement Agency Would Have Arrested Steven**

154. The two Body Attachment Orders, standing alone, were not a basis for any law enforcement agency outside Illinois to arrest Steven. They were civil orders addressed only to Illinois law enforcement, and as entered in NCIC under the NCIC Order, they did not meet the criteria that the Monroe County Sheriff's Office requires to make an arrest. As alleged above, the Schiller Firm learned this before Steven's arrest and, rather than seek a court order authorizing extradition, had the NCIC record changed.

155. In short, Steven was not arrested because of the Body Attachment Orders. He was arrested because the Schiller Firm, outside of any court, caused the NCIC record to falsely describe the Body Attachment Orders as nationwide extraditable warrants.

**Steven Is Held on an Extradition Hold That Could Never Be Executed**
**(*April 28 – June 2, 2025*)**

156. Interstate extradition to Illinois is governed by the Uniform Criminal Extradition Act, 725 ILCS 225.

157. The Uniform Criminal Extradition Act is the exclusive mechanism for Illinois to obtain the return of a person from another state. The Uniform Criminal Extradition Act applies only to persons charged with or convicted of crimes, and it requires a demand by the Governor of Illinois and a Governor's warrant.

158. After his arrest, Steven did not waive extradition.

159. Mario Ponce, an Investigator with the CCSO, began the CCSO's internal process to seek extradition.

160. Investigator Mario Ponce is a seasoned law enforcement officer with approximately sixteen years of service with the Cook County Sheriff's Office. He rose from correctional officer to police officer to investigator, a position he has held for approximately six years.

161. For more than two years, Investigator Ponce has served as the Cook County Sheriff's Office's extradition investigator with responsibility for coordinating the extradition of individuals with Cook County warrants who are apprehended outside Illinois.

162. In that role, he reviews whether a warrant is designated for full extradition, submits extradition requests to the Cook County State's Attorney's Office, and coordinates with the out-of-state agency holding the individual.

163. Over the course of his career, Investigator Ponce has handled more than 150 extraditions.

164. Investigator Ponce testified that the only reason that he began any extradition process in this case, which necessarily included initiating an extradition hold, was because the data in NCIC and LEADS noted "full extradition."

165. If the NCIC entry had noted no extradition, or not listed "full extradition," then the CCSO would have advised MCSO that it would not extradite, and Steven would have been immediately released and never detained "because it says no extradition."

166. This was the first extradition arising from a civil body attachment order that Investigator Ponce had seen in his career, despite handling over 150 extraditions.

167. In addition, Investigator Ponce testified that for the 35-day period that Steven was detained, there was "no chance, zero possibility" of extradition.

168. This fact was corroborated by the testimony of Kevin DeBoni, who is an Assistant State's Attorney at the Cook County State's Attorney's Office and the Chief of its Criminal

Prosecutions Bureau. Chief DeBoni was responsible for handling Steven's extradition, and determined that Steven could not be extradited.

169. Chief DeBoni began working at the Cook County State's Attorney's Office in 2003, before being promoted to Deputy Chief and then Chief of the Criminal Prosecutions Bureau in about December 2024.

170. Chief DeBoni was the official responsible for deciding whether Illinois would seek Steven's extradition from Florida.

171. Based on his experience, on or about June 2, 2025, Chief DeBoni determined not to extradite Steven.

172. Critically, Chief DeBoni testified that he knows of no basis to extradite anyone to Illinois from another state on a civil body attachment order.

173. Steven could not be extradited to Illinois because Steven was never convicted of any crime, the body attachment orders contained no reference to a crime or criminal contempt, and extradition is not available for civil offenses.

174. Chief DeBoni testified, "you cannot extradite on that civil body attachment," explaining:

> Q: Okay. And sitting here today, you've testified you're not aware of any basis to extradite someone to Illinois from another state based on a civil body attachment order; fair?
>
> A: Yes. A reading of that statute [725 ILCS 225, the Uniform Criminal Extradition Act], yes, would tell me that you cannot extradite on that civil body attachment.

(Chief DeBoni Dep. at 22:8-11, 23:21-23.)

175. Moreover, the Body Attachment Orders directed an Illinois sheriff to take Steven into custody and bring him before the Cook County Court. The Body Attachment Orders did not control whether to hold or continue detaining Steven pending any potential extradition to Illinois.

176. Steven's thirty-five-day detention was therefore based solely on an extradition hold—a separate process whose only lawful purpose is to hold a person for delivery to a demanding state under the Uniform Criminal Extradition Act.

177. No Illinois court was asked to authorize Steven's extradition until after the May 30, 2025 hearing in Monroe County, more than a month into Steven's detention. No demand was ever made by the Governor of Illinois, and no Governor's warrant was ever issued.

178. That is because extradition was never permitted under Illinois law, which controlled extradition to Illinois.

179. Accordingly, Steven's prolonged 35-day detention did not arise from, and was not authorized by, any court order. It arose from the Schiller Firm's out-of-court advocacy to law enforcement, as alleged below.

**The Schiller Firm Advocates for Steven's**
**Continued Detention Despite No Basis to Extradite to Illinois**

180. The Schiller Firm knew or should have known that there was no legal way to extradite Steven to Illinois. It is an Illinois law firm, its attorneys include a former Cook County Assistant State's Attorney, and it had an independent obligation to ensure that there was some good faith basis to advocate for Steven's continued detention based on the possibility of ultimately extraditing him to Illinois.

181. With actual knowledge that Steven could not be extradited to Illinois or, in the alternative, in willful ignorance and failure to conduct basic diligence, the Schiller Firm nevertheless engaged in repeated extra-judicial acts to advocate for and procure Steven's continued detention for thirty-five days.

182. In particular, the Schiller Firm communicated with the Monroe County Sheriff's Office repeatedly -- outside of any court proceeding -- to advocate for Steven's ***continued*** detention.

183. As set forth by the Court in its Order (ECF No. 97), the Schiller Firm was not a party to, did not formally appear in, and filed nothing in the Monroe County habeas proceedings.

184. Accordingly, the Schiller Firm's communications with MCSO and MCSO's General Counsel were not made in the course of any judicial proceeding in which the Schiller Firm was a participant, but privately, outside the presence of any court or opposing counsel, and off the record.

185. On May 6, 2025, the Schiller Firm called and then emailed MCSO Assistant General Counsel Christina Cory to coordinate a defense to Steven's habeas petition. Crémoux wrote: "We would like to schedule a phone call with you to better understand the specific pleadings/filings you need from us to assist with your investigation." He added: "please let us know when Mr. Ivankovich's Petition is being heard in court. We would like to ensure appropriate representation is present at that time."

186. On May 7, 2025, the Schiller Firm began identifying local counsel to assist MCSO to oppose Steven's petition for writ of habeas corpus.

187. Later on May 7, 2025, Crémoux emailed Ms. Cory and Mr. McCullah that "Mr. Ivankovich's attorneys have repeatedly made false and misleading statements—both factual and legal—in courts across the country. The Emergency Petition for Writ of Habeas Corpus is no exception." He dismissed as recurring arguments the "assertions that Steven lacks the financial means to pay the purge amount," and represented that "[w]ith the Child Support order being

properly domesticated and registered in Florida, we hope your concerns regarding proving formal process are now alleviated."

188. In this email, Crémoux represented to MCSO that the support order was "properly domesticated and registered in Florida." That was not true.

189. Jeanette had filed her Petition to Register Foreign Support Order in Miami-Dade County in Case No. 2024-017347-FC-04, but Steven objected, and the Court never domesticated or registered the order over his objection.

190. In fact, it was not until May 8, 2025, alongside Crémoux's email to MCSO, that Steven's counsel was even served with notice of the Petition to Register Foreign Support Order.

191. Steven timely objected, and the action was dismissed by agreed order between Jeanette and Steven before the support order was domesticated or registered in Florida.

192. Crémoux has since testified that he did not know when the order was supposedly registered, and that this occurred "before I came into the case." Yet Crémoux made this representation to MCSO to support Steven's continued incarceration.

193. On May 8, 2025, the Schiller Firm's General Counsel, Ms. Maul, followed up: "Please let us know your thoughts on what Kevin sent last night and we are happy to have another call to discuss if necessary." Ms. Cory responded that the documents "were very helpful," and asked that the Schiller Firm's local counsel contact MCSO "so we can connect with them and make sure we are on the same page prior to a hearing."

194. On May 9, 2025, the Schiller Firm's General Counsel, Ms. Maul, circulated the "Ivankovich email string" to MCSO, adding Florida attorney Jordan M. Lewin to the Schiller Firm's communications with MCSO. Ms. Cory then sent the group the order denying Steven's petition.

195. On May 21, 2025, Ms. Cory forwarded Steven's motion for reconsideration, and Stanish replied: "There are many factual errors in the motion to say the least. We will address this and get back to you."

196. On May 24, 2025, Ms. Cory reported that Steven was "working to post the purge amount," and Stanish replied, "Wow would be amazing. Please keep us posted and thanks so much for your help."

197. Accordingly, Stanish herself ***admitted*** that MCSO was helping the Schiller Firm to continue detaining Steven.

198. Minutes later, Crémoux asked MCSO: "Is there anything to be done to ensure that both purges (~625k for May 2024 body attachment order and 425k for September 2024 body attachment order) are covered?"

199. On May 29, 2025, after Ms. Cory advised that a hearing was set before the extradition judge because "the 30 day was yesterday," Crémoux asked her for the telephone number of the prosecutor handling the hearing.

200. The Schiller Firm attorneys attended the May 30th hearing, though the Schiller Firm was not a party to that proceeding, did not enter an appearance, and filed nothing in it.

201. After the May 30th hearing, the Schiller Firm filed an emergency motion in Cook County Court seeking an order directing the Governor of Illinois to issue the interstate extradition warrant, thereby showing that the Schiller Firm knew no Governor's warrant was in process.

202. Circuit Judge Wilson continued the May 30th hearing to June 4th and ordered that at the continued hearing the Monroe County State Attorney's Office ("***MCSAO***") and MCSO must identify specific contacts they had with Illinois law enforcement and/or the Cook County State's Attorney to reflect that Illinois indeed was pursuing extradition.

203. Accordingly, between April 22, 2025 and June 2, 2025, the Schiller Firm made repeated *ex parte* contacts with law enforcement officers, their counsel, and prosecutors to procure and prolong Steven's detention, none of which occurred in any court proceeding, none of which was authorized by any court order, and which together prolonged Steven's illegal detention for thirty-five days.

**The Schiller Firm Made False Statements of Fact to Law Enforcement to Procure and Prolong Steven's Detention**

204. In seeking Steven's arrest and continued detention, the Schiller Firm did not merely advocate a legal position. It voluntarily made false statements of fact to law enforcement officers and their counsel.

205. First, on April 28, 2025, Crémoux told MCSO that there were "guns and arms" at the Islamorada House and that Steven might attempt to escape. Those statements were false, and Crémoux made no effort to verify them before making them.

206. Second, on May 7, 2025, while Steven's habeas petition was pending, Crémoux told MCSO's General Counsel's office that the support order was "properly domesticated and registered in Florida." That statement was false, and Crémoux had no legitimate basis for making it.

207. Both statements were made voluntarily, outside of any judicial proceeding, to law enforcement officers and their counsel, for the purpose of procuring and prolonging Steven's detention.

208. The Schiller Firm made these statements with express malice, that is, with the primary motive of harming Steven.

**The Schiller Firm Seeks an *Ex Parte* Order to Seize Ivankovich Family Assets and Seinitz Signs Agreement with Receiver for Compensation Between $8,000 and $9,000 per Month (*May 13, 2025 – May 22, 2025)***

209. The Schiller Firm's motive in prolonging Steven's illegal detention is shown through its parallel attempt to appoint a receiver to seize Steven's and his family's assets at the same time that Steven was unable to meaningfully respond because he was jailed.

210. The Schiller Firm first contacted Neal Levin, a receiver, in late 2024. Stanish asked Mr. Levin "what a retainer might look like if we were able to get a receiver appointed," and Levin told her he would require a $200,000 retainer.

211. The Schiller Firm drafted the motion to appoint a receiver in January 2025, and then waited to file the motion until after Steven's incarceration.

212. On May 13, 2025, two weeks after Steven's arrest, and while he remained incarcerated in Monroe County on the extradition hold, the Schiller Firm filed its motion to appoint a receiver.

213. The Schiller Firm sought *ex parte* relief while Steven remained incarcerated to extort Steven and his family.

214. The Schiller Firm drafted the proposed order, which the court entered ex parte and with no input from Steven's counsel.

215. The order that the Schiller Firm drafted and the court entered provided that "[t]he court approves an initial retainer for the receiver of $200,000 which shall be paid to the receiver by respondent"—Steven—"upon entry of this order."

216. Stanish included that payment obligation after discussing the clause with Levin.

217. Levin also knew that Steven was in jail in Monroe County, as the Schiller Firm informed Levin and communicated with him on May 16, 2025 concerning Steven's incarceration.

218. Within a week of his appointment, Levin contacted Seinitz to coordinate seizing the Ivankovich Family assets.

219. Seinitz testified that when Levin called, he immediately "called Schiller to say, 'Who is this guy?' And I said, 'Is it okay to talk to him?' And they said yes, and then I talked to him."

220. Then, Seinitz agreed to accept compensation from Levin. Seinitz signed a written engagement agreement with Levin under which Seinitz was to be paid $8,000 to $9,000 per month.

221. In addition, Seinitz understood the receivership was intended to "seize financial assets from Steven Ivankovich" while Steven remained incarcerated.

222. On May 22, 2025, just nine days after his *ex parte* appointment, the Cook County Court stayed the receivership in its entirety due to emergency motions by Steven and his parents.

223. During that nine-day period, Mr. Levin seized $250,000 belonging to a company controlled by Steven's late father, Dr. Anthony Ivankovich, and mother, Dr. Olga Ivankovich, and impeded access to and use of Steven's parents' condominium.

224. This constituted a coordinated effort to illegally arrest Steven in Monroe County, object to his release while he remained detained on an extradition hold, and then extort Steven and his family.

**<u>Steven Is Ordered to Be Released and the</u>**
**<u>Schiller Firm *Still* Advocates for His Detention</u>**
**(*June 2, 2025 – June 3, 2025*)**

225. On Monday, June 2, 2025, MCSO and MCSAO confirmed that Steven would not be extradited to Illinois.

226. That morning, at 8:29 a.m., Investigator Ponce forwarded the decision to release Steven from the LEADS/NCIC system to the Schiller Firm: "On today's date our states attorney's

office advised this unit that we would not extradite the above subject back to the State of Illinois. Please release our extradition hold on the above subject, local service only IL only."

227. The Schiller Firm refused to accept the Cook County State's Attorney's Office's decision.

228. Shortly after receiving Investigator Ponce's message, the Schiller Firm contacted Chief DeBoni through Adam Zebelian, a Schiller Firm attorney who lists on his firm profile that he joined the firm "after 7 years as an Assistant State Attorney" in the Cook County State's Attorney's Office.

229. Upon information and belief, this was the first time that Mr. Zebelian became involved, and the purpose was to use his professional relationships with the Cook County State's Attorney's Office to continue to incarcerate Steven.

230. On June 2, 2025, Chief DeBoni spoke to Mr. Zebelian and other Schiller Firm attorneys. Chief DeBoni explained that there was no legal basis to extradite Steven, and his decision was final.

231. Chief DeBoni testified that the Schiller Firm expressed "frustration."

232. After this phone call, the Schiller Firm had irrefutable actual knowledge that Steven could not be extradited and must be released.

233. Nonetheless, the Schiller Firm ***still*** opposed Steven's release.

234. On June 2, 2025 at 11:42 a.m., Crémoux emailed MCSO Assistant General Counsel Christina Cory with two proposed options "to support a hold/transfer on Mr. Ivankovich's incarceration," writing that "if your office is not willing to wait 20 hours for Judge Boyd to possibly enter an order seeking the extradition of Mr. Ivankovich, then Mr. Ivankovich must, at the very

least, be transferred to Miami-Dade county . . . where imprisonment for up to 179 days is permissible under your own state statute."

235. The first option would be to seek an unlawful extradition with Cook County Sheriff's officers traveling to Monroe County to arrest Steven and bring him to Illinois.

236. The second option would be to transfer Steven to Miami-Dade County jail by virtue of an emergency motion filed by Jonathan Schiller, counsel in Florida employed by another law firm separate from the Schiller Firm.

237. Crémoux also requested that Ms. Cory "call us to discuss before any decisions are made, if possible."

238. Shortly thereafter, on June 2, 2025 at 12:13 p.m., Stanish advised Ms. Cory that Jonathan Schiller had filed the emergency motion and to "[s]tay tuned."

239. On June 2, 2025 at 5:12 p.m., Judge Wilson ordered Steven's immediate release.

240. On June 2, 2025 at 6:05 p.m., Investigator Ponce emailed MCSO and Crémoux to again confirm that Steven would not be extradited and would be released.

241. On June 3, 2025, at 9:16 a.m., MCSO forwarded Judge Wilson's order to the Schiller Firm.

[*INTENTIONALLY LEFT BLANK*]

242. The text of Judge Wilson's Order states as follows:

> **AGREED ORDER FOR EMERGENCY RELEASE**
>
> **THIS CAUSE** having come before the Court on May 31, 2025 on Petitioner's "Petition for Writ of Habeas Corpus to Immediately Release the Defendant and Alternatively an Order to Show Cause on an Expedited Basis Against the Monroe County Sheriff's Office," with the Court having read the file and heard argument of counsel, it is hereby
>
> **ORDERED AND ADJUDGED** that:
>
> 1. Upon representation from the Monroe County State Attorney's Office on June 2, 2025, Cook County, Illinois has confirmed that they will not extradite Steven Ivankovich; and
>
> 2. The Court GRANTS Petitioner's motion for immediate release and directs the Monroe County Sheriff's Office to release Petitioner, Steven Ivankovich immediately.
>
> **DONE AND ORDERED** in Chambers at the Monroe County Courthouse, Key West, Florida, on Monday, June 2, 2025.

243. Steven was imprisoned for approximately 35 days before being liberated on June 2, 2025.

## The Corrected NCIC Entry Confirms the Schiller Firm's Extra-Judicial Conduct Caused Steven's Detention

244. After Steven's release, the NCIC entry was updated to reflect "no extradition — civil body attachment, Illinois extradition only."

245. On July 23, 2025, Steven was briefly detained at Newark Airport. Based on the corrected "Illinois extradition only" language, Steven was released the same day.

246. This contrasts with April 28, 2025 through June 2, 2025, when Steven was detained for thirty-five days based on the "Nationwide Extradition" language recorded in the NCIC database.

247. The fact that Steven was briefly detained when the NCIC entry reflected "no extradition -- civil body attachment, Illinois Extradition only," and was detained for thirty-five

days when the NCIC entry reflected "Nationwide Extradition," shows that the Schiller Firm's procurement of the "Nationwide Extradition" designation in the NCIC database directly caused Steven's illegal incarceration.

248. It was the Schiller Firm's procurement of the "Nationwide Extradition" designation in the NCIC database -- and not the NCIC Order or Body Attachment Orders -- that caused Steven to be incarcerated for thirty-five days.

249. Moreover, the Schiller Firm's efforts to cause Steven's illegal incarceration were intentional, willful, malicious, oppressive, and in furtherance of its own financial interests with a specific intent to harm Steven.

250. After Seinitz told Stanish that Steven had "poked the wrong bears," the Schiller Firm caused Steven's arrest. As Steven was being arrested, Crémoux called him an "Absolute POS" and wrote, "First step was to arrest him. Now we need to get him to Illinois." And when Chief DeBoni advised that his decision not to extradite was final, the Schiller Firm expressed "frustration" and continued to press MCSO to hold or transfer Steven.

251. The efforts by the Schiller Firm and Seinitz to covertly surveil Steven were intentional, willful, malicious, oppressive, and with specific intent to harm Steven, and as to the Schiller Firm in furtherance of its own financial interests.

**COUNT I – FALSE IMPRISONMENT**
**(The Schiller Firm)**

252. Steven realleges paragraphs 1-30, 83-111, 120-143, 146-250, as if fully set forth herein.

253. Steven acknowledges the Court's ruling in its Order dated October 7, 2026 (ECF No. 97) that the Body Attachment Orders were facially valid process. Steven respectfully preserves his position that the Body Attachment Orders were not facially valid process for an arrest in

Florida, particularly in light of the additional facts alleged herein that MCSO would not have arrested Steven absent the incorrect "Nationwide Extraditable" designation added to the NCIC database as a result of the Schiller Firm's conduct.

254. However, even if the Body Attachment Orders authorized MCSO to arrest Steven on April 28, 2025, the Schiller Firm falsely imprisoned Steven by causing his ***continued*** unlawful detention for thirty-five days based on an extradition hold, when the Schiller Firm knew or should have known that extradition was not legally possible.

255. After his arrest, Steven was incarcerated in Florida based only on an extradition hold. The only lawful purpose of the extradition hold was to deliver Steven to Illinois. That purpose could never be accomplished because extradition was not legally available, as Steven had not been charged with or convicted of any crime or held in criminal contempt.

256. As set forth in the incorporated Paragraphs, during the entire 35-day period, there was "no chance, zero possibility" of extradition.

257. For these reasons, the Schiller Firm caused Steven's continued detention without legal authority and without color of authority.

258. The Schiller Firm's actions were unreasonable and unwarranted under the circumstances because the Schiller Firm knew or should have known that Steven could not be incarcerated for thirty-five days based solely on an extradition hold, when extradition was not legally possible.

259. The Schiller Firm's actual or constructive knowledge is shown by the Paragraphs incorporated herein, as well as the following:

a. The Schiller Firm is an Illinois law firm whose attorneys include a former Assistant State's Attorney in the Cook County State's Attorney's Office, who knew or should have known that extradition is only permitted to Illinois for crimes and not based on civil body attachment orders.

b. MCSO's communications with the Schiller Firm on May 6, 7, 8, 9, 21, 24, and 29 and June 2, 2025, which each separately provided a basis for the Schiller Firm to discover that Steven could not be extradited or, alternatively, imposed an obligation to determine whether Steven could be extradited under the Illinois Uniform Criminal Extradition Act.

c. Chief DeBoni's conversation with the Schiller Firm on June 2, 2025, in which Chief DeBoni advised the Schiller Firm that there was no legal avenue to extradite Steven to Illinois because extradition is available only for crimes, and Steven was never convicted of a crime or even found in criminal contempt.

260. Despite its actual or constructive knowledge that Steven could not be extradited and therefore should not be incarcerated based solely on an extradition hold, the Schiller Firm kept advocating for Steven's continued incarceration in Florida.

261. This included continuing to advocate for Steven's incarceration after the Cook County State's Attorney's Office advised of its final decision that Steven must be released because he could not be extradited to Illinois.

262. The Schiller Firm's actions were knowing, intentional, unreasonable and unwarranted.

263. The manner, length, and conditions of Steven's confinement were also unreasonable and unwarranted under the circumstances.

264. The Schiller Firm's efforts to keep Steven jailed—along with its repeated communications with MCSO, MCSO's General Counsel, the CCSO, and Chief DeBoni—were directed to law enforcement and prosecutors outside of any court proceeding and were not authorized or required by any court order.

265. The Schiller Firm thereby stepped outside of both the courtroom and the formal litigation process.

266. Indeed, the Schiller Firm was not a party to, did not appear in, and filed nothing in the Monroe County habeas proceedings. Its efforts to keep Steven detained were therefore not acts occurring in the course of any judicial proceeding in which it participated.

267. In addition, the object of Steven's detention was to extract payment of $2,204,738.78 from Steven and his family, which was beyond enforcement of the $425,000 Schiller Fee Award, to seize Ivankovich Family assets during the period of incarceration, and to extort a settlement from Steven in the parallel Divorce Proceeding.

268. There was also no reasonable assurance that Steven could have ended his detention by paying the purge amounts under the Body Attachment Orders, even assuming he had the financial means to do so.

269. Even if the purge amounts were paid, there was the possibility that Steven would not be released. Stanish testified that there was "confusion from the get go" in Monroe County as to what amount was required to purge the contempt because there were two Body Attachment Orders, which caused confusion between the various sheriff's departments and Judges in Florida.

270. Steven's mother, Dr. Olga Ivankovich, was also advised that there was no guarantee that, after a bond was paid, Steven would not remain incarcerated or be immediately re-arrested and reincarcerated due to disputes over the payment amounts.

271. The Body Attachment Orders also provided only that the sheriff "may release" Steven after the bond was posted, not that he must be released.

272. Accordingly, Steven's continued detention was not the sole result of failing to pay the purge amounts under the Body Attachment Orders.

273. As a result of the Schiller Firm's actions, Steven has suffered damages.

274. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that the Schiller Firm's conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory and punitive damages and costs of this action, and such further relief as the Court deems just and proper.

**COUNT II – MALICIOUS PROSECUTION**
**(The Schiller Firm)**

*Dismissed with prejudice by the Court's Order dated October 7, 2026 (ECF No. 97). Count II is omitted from this Second Amended Complaint to comply with that Order, and Plaintiff expressly preserves all rights to appeal its dismissal.*

**COUNT III – ABUSE OF PROCESS**
**(The Schiller Firm)**

275. Steven realleges paragraphs 1-30, 83-111, 120-143, 146-250, as if fully set forth herein.

276. For purposes of this claim, Plaintiff assumes that the Body Attachment Orders were facially valid and that there was a reasonable basis to initiate Steven's arrest on April 28, 2025.

277. The Schiller Firm made an illegal, improper, or perverted use of the process of an extradition hold.

278. The proper purpose of an extradition hold is to hold a person for delivery to the demanding state.

279. At all material times, the Schiller Firm knew or should have known that Illinois could not extradite Steven from the State of Florida, and that for the entire 35-day period there was "no chance, zero possibility" of extradition.

280. Nevertheless, through repeated communications with MCSO, MCSO's General Counsel, and CCSO outside of any court proceeding, the Schiller Firm used the extradition hold to persuade MCSO to keep Steven incarcerated for an extradition that could never occur.

281. Even after Cook County confirmed on June 2, 2025 that it would not extradite Steven, and after Chief DeBoni advised the Schiller Firm that this was a final decision, the Schiller Firm ***continued*** to illegally use the extradition hold to extend Steven's incarceration.

282. For example, at 11:42 a.m. on June 2, 2025, Crémoux emailed MCSO's Assistant General Counsel proposing "two bases to support a hold/transfer on Mr. Ivankovich's incarceration," including a transfer to Miami-Dade County where, he wrote, "imprisonment for up to 179 days is permissible," and asked MCSO to "call us to discuss before any decisions are made."

283. The Schiller Firm improperly used the extradition hold for an ulterior purpose for which that process was not designed, namely, to extract payment of $2,204,738.78 from Steven and his family, when that debt was owed to the Schiller Firm by its own client, Jeanette, and not by Steven. That debt exceeded the $425,000 Schiller Fee Award, the only amount payable to the Schiller Firm under either Body Attachment Order, by $1,779,738.78.[3]

284. The Schiller Firm further improperly used the extradition hold to unlawfully seize Ivankovich Family assets during the period of incarceration, and to extort a settlement from Steven in the parallel Divorce Proceeding.

285. The Schiller Firm's ulterior motive is underscored by the fact that the Schiller Firm waited until Steven was incarcerated to file a receivership motion it had drafted months earlier. Then, while Steven remained jailed, the Schiller Firm procured an *ex parte* nine-day receivership

---

[3] The support purge was payable to Jeanette and not to the Schiller Firm.

and order requiring that Steven pay a $200,000 retainer to this receiver, followed by the receiver seizing $250,000 belonging to a company controlled by Steven's parents.

286. Taken together, these facts show that the Schiller Firm improperly used the extradition hold.

287. The Schiller Firm's conduct constituted a willful and intentional misuse of legal process to achieve ends for which that process was not designed, rather than to accomplish the result for which it was created.

288. As a result of the Schiller Firm's conduct, Steven suffered damages.

289. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that the Schiller Firm's conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory and punitive damages and costs of suit, and all further relief deemed proper by the Court.

**COUNT IV – INTRUSION UPON SECLUSION**
**(Seinitz)**

290. Steven realleges paragraphs 1-21, 31-82, 111-121, 144-147, 151-153, and 251, as if fully set forth herein.

291. At all relevant times, including on April 28, 2025, Seinitz had access and control of the Security Camera without Steven's consent.

292. Steven maintained a reasonable expectation of privacy in the curtilage of the Islamorada House.

293. Seinitz intentionally intruded, through electronic means, into Steven's private quarters by accessing, controlling, viewing, and monitoring the Islamorada House and Steven at the Islamorada House without Steven's consent.

294. Seinitz's intrusion is highly offensive to a reasonable person, as it invaded areas and activities that Steven reasonably expected to remain private.

295. As a direct and proximate result of Seinitz's intrusion, Steven has suffered damages.

296. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that Seinitz's conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against Seinitz for compensatory and punitive damages and costs of suit, and all further relief deemed proper by the Court.

**COUNT V – INTRUSION UPON SECLUSION**
**(The Schiller Firm)**

297. Steven realleges paragraphs 1-21, 31-82, 111-121, 144-147, 151-153, and 251, as if fully set forth herein.

298. At all relevant times, including on April 28, 2025, Seinitz had access and control of the Security Camera without Steven's consent.

299. From at least April 26, 2025 through April 28, 2025, the Schiller Firm knew that Seinitz had access and control of the Security Camera without Steven's consent. The Schiller Firm approved and directed Seinitz to surveil Steven at the Islamorada House without Steven's consent, and Seinitz continued to do so at the request of, and to aid and benefit, the Schiller Firm.

300. Steven maintained a reasonable expectation of privacy in the curtilage of the Islamorada House.

301. Steven maintained a reasonable expectation that he would not be surveilled remotely while in the curtilage of the Islamorada House.

302. The Schiller Firm, by approving, directing, and conspiring with Seinitz, intentionally intruded, through electronic means, into Steven's private quarters by accessing,

controlling, viewing, and monitoring the Islamorada House and Steven at the Islamorada House without Steven's consent.

303. The Schiller Firm's intrusion is highly offensive to a reasonable person, as it invaded areas and activities that Steven reasonably expected to remain private.

304. The Schiller Firm had actual knowledge of both the wrongfulness of its conduct and a high probability that injury or damage to Steven would result.

305. As a direct and proximate result of the Schiller Firm's intrusion, Steven has suffered damages.

306. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that the Schiller Firm's conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against the Schiller Firm for compensatory and punitive damages and costs of suit, and all further relief deemed proper by the Court.

**COUNT VI – Civil Conspiracy to Commit Intrusion Upon Seclusion**
**(Both Defendants)**

307. Steven realleges paragraphs 1-21, 31-82, 111-121, 144-147, 151-153, and 251, as if fully set forth herein.

308. The Schiller Firm and Seinitz agreed, and conspired with each other, to access the Security Camera and surveil Steven without his knowledge or consent.

309. Steven maintained a reasonable expectation of privacy in the curtilage of the Islamorada House.

310. Steven maintained a reasonable expectation that he would not be surveilled remotely while in the curtilage of the Islamorada House.

311. The Schiller Firm, by approving, directing, and conspiring with Seinitz, intentionally intruded, through electronic means, into Steven's private quarters by accessing, controlling, viewing, and monitoring the Islamorada House and Steven at the Islamorada House without Steven's consent.

312. Defendants' intrusion is highly offensive to a reasonable person, as it invaded areas and activities that Steven reasonably expected to remain private.

313. In furtherance of this scheme, the Schiller Firm directed Seinitz to unlawfully surveil Steven using the Security Camera, held meetings about unlawfully surveilling Steven, and coordinated regarding Steven's location based on this unlawful intrusion into Steven's private residence.

314. In furtherance of this scheme, Seinitz unlawfully surveilled Steven using the Security Camera and communicated Steven's location and pictures to the Schiller Firm.

315. Defendants had actual knowledge of both the wrongfulness of their conduct and a high probability that injury or damage to Steven would result.

316. As a direct and proximate result of the Schiller Firm's and Seinitz's agreement and actions in furtherance thereof, Steven has suffered damages.

317. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that Defendants' conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against the Defendants for compensatory and punitive damages and costs of suit, and all further relief deemed proper by the Court.

**COUNT VII – Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2511 & 2520**
**(Both Defendants)**

*Withdrawn.*

**COUNT VIII – Violation of the Stored Communications Act 18 U.S.C. §§ 2701(a)(1) & 2707**
**(Both Defendants)**

318. Steven realleges paragraphs 1-21, 31-82, 111-121, 144-147, 151-153, 218-221, and 251, as if fully set forth herein.

319. Seinitz intentionally accessed the Security Camera without authorization in order to surveil Steven at the Islamorada House.

320. The Schiller Firm intentionally directed Seinitz to access the Security Camera, knowing he did not have authorization to do so, in order to covertly surveil Steven at the Islamorada House and obtain his location.

321. In accessing the Security Camera, Seinitz acted as the agent of the Schiller Firm.

322. As alleged in Paragraphs 48-82 and 111-121, the Schiller Firm requested that Seinitz obtain and provide to the Schiller Firm surveillance information pertaining to Steven, and Seinitz agreed to do so on behalf of the Schiller Firm.

323. Seinitz thereby agreed to accept the undertaking to provide the Schiller Firm with surveillance information pertaining to Steven.

324. In fact, Seinitz himself understood that he was acting at the Schiller Firm's direction or under an agreement with the Schiller Firm. He testified that he "did have an agreement with them," although no such agreement has been produced and Defendants' position is that none exists.

325. Seinitz further testified that he was "assisting with her [Stanish] to have him [Steven] arrested."

326. And when the receiver the Schiller Firm had selected contacted Seinitz, he first called the Schiller Firm to ask, "Is it okay to talk to him?" and spoke to the receiver only after "they said yes."

327. The Schiller Firm also directed Seinitz's surveillance by directing where he should look ("Now shift to Florida"), what he should report ("What's the address of his location"), and when he should report it ("keep me posted").

328. The Schiller Firm further directed Seinitz's surveillance by coordinating Zoom meetings with Seinitz.

329. The Schiller Firm knew or should have known that Seinitz lacked authorization to surveil Steven. Stanish did not believe Steven had authorized Seinitz to share his location information and video footage with the Schiller Firm, did not try to find out whether there was any basis to conclude that Seinitz had permission, and never asked what device or technology Seinitz used to continually track Steven.

330. The Schiller Firm nonetheless used the information Seinitz obtained to cause Steven's arrest.

331. The Security Camera uploaded the electronic communications and video footage to Soliom's cloud storage so that it could be accessed by a user with an Access Key. Seinitz accessed those stored videos and photographs through an application on his phone.

332. Seinitz thereby obtained, and the Schiller Firm obtained and caused Seinitz to obtain, wire and electronic communications stored by the Security Camera and its cloud storage facility without permission or authorization.

333. Defendants had actual knowledge of both the wrongfulness of their conduct and a high probability that injury or damage to Steven would result.

334. As a result, Steven suffered damages.

335. Moreover, for purposes of Steven's demand for punitive damages only, Steven realleges paragraphs 1–251 as if fully set forth herein, which show that the Defendants' conduct was intentional and malicious.

WHEREFORE, Steven demands judgment against the Defendants for compensatory and punitive damages, attorneys' fees, and costs of suit, and all further relief deemed proper by the Court.

**COUNT IX – Violation of the Computer Fraud and Abuse Act 18 U.S.C. § 1030 (Both Defendants)**

*Dismissed with prejudice as to the Schiller Firm by the Court's Order dated October 7, 2026 (ECF No. 97). Count IX is omitted from this Second Amended Complaint to comply with that Order, and Plaintiff expressly preserves all rights to appeal its dismissal.*

**COUNT X – Violation of the Florida Computer Crimes Act Fla. Stat. § 815.06 (Both Defendants)**

*Withdrawn.*

**DEMAND FOR JURY TRIAL**

Steven demands a trial by jury on all issues so triable.

Dated: October 22, 2026.

Respectfully submitted,

By: */s/ Joshua E. Truppman*
Joshua E. Truppman, Esq.
Florida Bar No. 111795
joshua@bfwlegal.com
docketing@bfwlegal.com
Benjamin H. Brodsky, Esq.
Florida Bar No. 73748
bbrodsky@bfwlegal.com
BRODSKY FOTIU-WOJTOWICZ, PLLC
44 W. Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 503-5054
Telecopy: (786) 749-7644
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 22, 2026, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF, which will serve a true and correct copy on all counsel of record registered to receive electronic notice in this case.

By: */s/ Joshua E. Truppman*
Joshua E. Truppman, Esq.

**SERVICE LIST**

Ramses Jalalpour, Esq.
Konicek & Dillon, P.C.
70 W. Madison St., Ste. 2060
Chicago, IL 60602
Telephone: 630-262-9655
Email: rj@konicekdillonlaw.com

Alexandra Lyn Tifford, Esq.
Fowler White Burnett, P.A.
201 S. Biscayne Blvd., 20th Floor
Miami, FL 33131
Telephone: 305-789-9200
Email: atifford@fowler-white.com